UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Jane Doe 1, individually and on behalf of all others similarly situated, | ) ) ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) |
| v. | ) |
| | ) |
| Deutsche Bank Aktiengesellschaft, Deutsche Bank AG New York Branch, Deutsche Bank Trust Company Americas, | ) ) ) ) ) |
| | ) |
| Defendants. | ) |
| _____/ | |

**CLASS ACTION COMPLAINT**

JURY TRIAL DEMANDED

Case Number:

## INDIVIDUAL AND CLASS ACTION COMPLAINT

Plaintiff Jane Doe 1 files this individual and civil class action complaint for damages and other relief under (among other provisions of law) the United States federal anti-sex trafficking statute, 18 U.S.C. §§ 1591-95, et seq.—the Trafficking Victim Protection Act ("TVPA")—and 18 U.S.C. §§ 1961-68, et seq.—the Racketeer Influenced and Corrupt Organizations Act ("RICO"), as well as for intentional and negligent acts and omissions under the New York Adult Survivors Act. The suit arises from Defendants Deutsche Bank Aktiengesellschaft's, Deutsche Bank AG New York Branch's, and Deutsche Bank Trust Company Americas' (hereinafter referred to collected as "Deutsche Bank"), participating in and

1

financially benefitting from participating in Jeffrey Epstein's sex trafficking by providing the requisite financial support for the continued operation of Epstein's international sex trafficking organization.

Deutsche Bank knowingly benefited and received things of value for assisting, supporting, facilitating, and otherwise providing the most critical service for the Jeffrey Epstein sex trafficking organization to successfully rape, sexually assault, and coercively sex traffic Plaintiff Jane Doe 1 and the numerous other members of the Class proposed below (the "Class"). Deutsche Bank knew that Epstein was regularly committing violations of New York Penal Law Art. 130, including and especially New York Penal Law §§ 130.20, 130.35, 130.50, 130.52, and 130.66, and acted in a negligent manner so as to enable Epstein to commit such offenses against countless young women.

Deutsche Bank also knew that Epstein would use means of force, threats of force, fraud, abuse of legal process, exploitation of power disparity, and a variety of other forms of coercion to cause young women and girls to engage in commercial sex acts. Deutsche Bank also engaged in repeated acts of racketeering activity to support the Epstein organization. Knowing that they would earn millions of dollars from facilitating Epstein's sex trafficking, and from its relationship with Epstein, Deutsche Bank chose profit over following the law. Specifically, Deutsche Bank chose facilitating a sex trafficking operation in order to churn profits.

Plaintiff makes the following allegations on information and belief and believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery:

## I. JURISDICTION, VENUE, AND TIMELINESS

1. This action is brought pursuant to various federal and state statutes, including the federal TVPA, 18 U.S.C. § 1589 through § 1595. This Court has federal question subject-matter jurisdiction pursuant to 28 U.S.C. §1331, because Jane Doe 1—individually and on behalf of the other Class members—proceeds under the federal TVPA statute.

2. This Court also has supplemental jurisdiction of the state law claims recounted below pursuant to 28 U.S.C. § 1367(a), because all claims alleged herein are part of a uniform pattern and practice and form part of the same case or controversy.

3. This Court is "an appropriate district court of the United States" in accordance with 18 U.S.C. § 1595, in which to bring this action. Venue is proper in this District under 28 U.S.C. § 1391(b)(2), because Epstein, his co-conspirators, and Deutsche Bank all conducted substantial activities in this District and knowingly aided and abetted, facilitated, and directly participated in Epstein's illegal venture through actions that originated in this District. In addition, Epstein sexually abused and trafficked Jane Doe 1, and members of the Class is this District.

4.      Often these acts of sexual abuse and commercial sex acts, committed by Jeffrey Epstein and certain select friends of his, took place in Jeffrey Epstein's New York mansion, located within this District at 9 East 71st Street, New York City.  Epstein also used his New York mansion to harbor his victims and as a base from which to transport them to other locations outside of New York.

5.      A substantial part of the acts, events, and omissions giving rise to this cause of action occurred in this District.

6.      This action has been timely filed pursuant to 18 U.S.C. § 1595(c)(1), which provides that a plaintiff shall have ten years after the cause of action arose to file suit against any person who knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known violated the laws against sex trafficking. This action is also timely under New York's Adult Survivor's Act.

## II. PARTIES

7.      Jane Doe 1 is a U.S. citizen and was at all relevant times a resident of and domiciled in the State of New York.

8.      Plaintiff Jane Doe 1 is using a pseudonym to protect her identity because of the sensitive and highly personal nature of this matter, which involves sexual assault.

9.      Jane Doe 1 is also at serious risk of retaliatory harm because the co-

conspirators who participated in the Epstein sex-trafficking venture had—and continue to possess—tremendous wealth and power and have demonstrated a clear ability to cause her serious harm.

10.    Jane Doe 1's safety, right to privacy, and security outweigh the public interest in her identification.

11.    Jane Doe 1's legitimate concerns outweigh any prejudice to Defendants by allowing her to proceed anonymously. Accordingly, Jane Doe will be filing a Motion to Proceed Anonymously.

12.    As discussed below, many other women, who are victims and survivors of sexual abuse and trafficking are similarly situated to Jane Doe 1 and also need to proceed anonymously for the same reasons. The identities of most of these other women are known to Defendants.

13.    Defendant Deutsche Bank AG is a global financial institution headquartered in Frankfurt, Germany.

14.    Defendant Deutsche Bank AG is licensed by the New York State Department of Financial Services to operate a foreign bank branch in the State of New York, the Deutsche Bank AG New York Branch (the "New York Branch"), and also operates a trust company, Deutsche Bank Trust Company Americas ("DBTCA"), which is likewise licensed and supervised by the Department.

15.    Unless otherwise indicated, the three defendants—Deutsche Bank

AG, the New York Branch, and DBTCA—are referred to collectively as "Deutsche Bank" in this complaint.

16.     Defendants Deutsche Bank AG, the New York Branch, and DBTCA all currently conduct substantial business in this District and conducted substantial business at the time of events covered in this complaint.

17.     As one example of business conducted in this District, Deutsche Bank ordinarily trades shares on the New York Stock Exchange, located in this District. As another example, Deutsche Bank maintains branch banks within this District.

18.     Deutsche Bank's financial activities, including the events alleged herein, were in and affecting interstate and foreign commerce. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of national securities markets.

19.     Deutsche Bank is responsible, under United States law and otherwise, for the acts of its officers, directors, employees, and agents, including the acts described in this complaint.

20.     Paul Morris joined Deutsche Bank as a relationship manager in November 2012. During his tenure, he was involved in bringing Jeffrey Epstein over to Deutsche Bank from JP Morgan Chase as a client and maintaining Epstein as a

client.

21.     Charles Packard was co-head of Deutsche Bank's Wealth Management Americas Group when Epstein became a client. Packard was involved in approving Epstein as a Deutsche Bank client and maintaining Epstein as a client.

22.     Patrick Harris was the Chief Operating Officer of Wealth Management Americas for Deutsche Bank. Harris was involved in approving Epstein as a Deutsche Bank client and maintaining Epstein as a client.

### III. INTRODUCTION

#### A. An Overview of the Jeffrey Epstein Sex-Trafficking Venture.

23.     Jeffrey Epstein's sex-trafficking venture operated in many respects as a sex-themed cult designed to ensnare vulnerable young women and indoctrinate them into Epstein's carefully constructed world in which Epstein was their messiah and sex abuser.

24.     Each victim understood that Epstein was the most powerful man in the world, with the most powerful connections. Epstein and his co-conspirators preached the Gospel of Epstein. Epstein's victims were taught to do what he said and he could protect them; but disobey him, and he would punish them and would cause them serious harm from which they could never recover.

25.     Once in Epstein's clutches, each victim was taught and understood that she must be completely compliant with every wish or demand Epstein had for

her; otherwise, she would certainly suffer serious reputational, financial, and psychological harm. By using these and other means of force, threats of force, fraud, threats of abuse of the legal process and coercion, Epstein and his co-conspirators sexually trafficked and sexually abused Plaintiff Jane Doe 1 and the other members of the Class.

26.     As is evident from this Complaint and public reporting on Epstein, he was indeed an enormously powerful man, known to have close personal relationships with former US Presidents, politicians, billionaires, other world leaders, British Royalty, and had the backing and support of powerful banking institutions.

27.     The Epstein sex-trafficking venture originated in the 1990s. From its inception until Jeffrey Epstein's arrest by the FBI for sex trafficking in 2019 (and his subsequent death on August 10, 2019, by apparent suicide), the venture operated primarily for the purpose of luring young women and girls into a position where Jeffrey Epstein and his co-conspirators could coerce them to engage in commercial sex acts and commit sexual offenses against them. His venture also operated to conceal its sex trafficking from law enforcement organizations.

28.     The Epstein sex-trafficking venture was well-structured from the beginning and grew increasingly more complex and powerful as it victimized more young women.

29.     Epstein did not, and could not, act alone.  He created and maintained his sex-trafficking venture with the assistance of other influential individuals and entities who knew he was sexually trafficking young women and girls and provided support to facilitate his sex trafficking operation.

30.     Epstein's sex-trafficking venture was not possible without the assistance and complicity of a financial institution—specifically, a banking institution—which provided his operation with an appearance of legitimacy and special treatment to the sex-trafficking venture, thereby ensuring its continued operation and sexual abuse and sex-trafficking of young women and girls.  Without the financial institution's participation, Epstein's sex-trafficking scheme could not have existed or flourished.

31.     Epstein's victims were young women and girls, who suffered severe abuse as Epstein's sex-trafficking victims and who believed they had to remain loyal to the venture at all costs in order to survive. At all times relevant to this action, Epstein victimized hundreds of young women and girls.

32.     Epstein's sex trafficking scheme was supported by virtually unlimited wealth, derived from carefully selected wealthy individuals who acted as the financial engine behind the sex-trafficking operation. During all times relevant to this Complaint, one wealthy individual provided almost all the financial fuel for Epstein's sex-trafficking operation.

33.     Epstein masterfully assessed the specific needs and vulnerability of each of his targeted victims.  He then closed the trap on his victims with offers of money, food, shelter, medical care for them or family members, travel, schooling, and career opportunities. Epstein groomed the young women and girls, indoctrinating them to believe that the sexual abuse was normal.

34.     Epstein fraudulently represented to the victims that he would take care of them in various ways, which ultimately allowed Epstein to cause them to engage in commercial sex acts with himself and, on occasion, others, as well as to create the opportunity for Epstein to sexually abuse them.

35.     The Epstein sex-trafficking venture's purpose included enticing, obtaining, harboring, and transporting the young victims without drawing unwanted attention from law enforcement. The venture had everything a sex-trafficking organization needed—funding, infrastructure, the appearance of legitimacy, and perhaps most importantly a complicit banking institution.  It was by many accounts the most powerful and wealthiest sex-trafficking venture ever created.

36.     The Epstein sex-trafficking venture knowingly used means of force, threats of force, fraud, coercion (including threats of serious harm or physical restraint), and abuse of law and the legal process, to cause Jane Doe 1 and many dozens of others similarly situated to engage in commercial sex acts.

37.     The Epstein sex-trafficking venture operated in and affecting

interstate and foreign commerce. Epstein recruited, solicited, coerced, harbored, transported, and enticed some of his victims, including Jane Doe 1 and others similarly situated, to engage in commercial sex acts in, among other places, New York (including the Southern District of New York), Florida, the U.S. Virgin Islands, England, and France.

38.     The Epstein sex-trafficking venture operated throughout the world from in and around the 1990's through in and around August 10, 2019, when Epstein died by apparent suicide.

39.     Thereafter, to and including the date of this complaint, members of the sex-trafficking venture continued to further the venture by concealing the activities and extent of the venture.

40.     In 2006, Jeffrey Epstein was arrested in Florida after state and federal law enforcement discovered that he had sexually abused more than 30 children in his Palm Beach, FL mansion.  During that investigation, it was concluded that Epstein and his co-conspirators had committed federal criminal acts constituting violations of 18 U.S.C §§ 2422 (b), 2422 (2), 2423 (f), 2423 (b), 2424 (e), 18 U.S.C § 371, 18 U.S.C § 1591 (c) (1) and 1591 (a) (1) and (2), as well as state crimes in violation of Florida Statute §§ 796.07 and 796.03, against dozens of young women, some as young as 14 years old.  With respect to the specific discoveries, the United States Attorney's Office for the Southern District of Florida found that some of the

victims "went to Mr. Epstein's house only once, some went there as much as 100 times or more."

41.     As a consequence of the Florida investigation, Epstein pled guilty to two felonies, was permanently labeled a "Registered Sex Offender," and was jailed in 2008.

42.     The 2006 criminal investigation uncovered a mountain of evidentiary information that became public, including documents obtained through trash pulls outside Epstein's home, documents discovered in a search warrant, and extensive travel records, revealing details about Epstein's life-style, daily activities, and pertinently the unique manner of operation for his sex-trafficking venture.

43.     Epstein's criminal case in Florida and the many related news reports left no doubt about Jeffrey Epstein and his extraordinary penchant for sexually abusing and trafficking young females.  For instance, it was revealed that until the time of his Florida arrest, Jeffrey Epstein was sexually abusing three to four young females per day, in every location he was in at the time; sexually abusing young girls and women was a full-time job for him, from which he never took a vacation or hiatus.

44.     Beginning with his Florida arrest and for years moving forward, Epstein was embroiled in dozens of public lawsuits pertaining to his sexual abuse of females and hundreds if not thousands of news stories circulated worldwide about

his illegal sexual proclivities.

45.     The manner of operation for Epstein's particular sex trafficking operation was widely publicized after his 2006 arrest.  He would lure young girls or women to one of his luxurious mansions, under the guise of being a wealthy philanthropist, able to provide them something they needed or wanted, including cash money, advancement of careers, education, or other life necessities, and once inside he would force his would-be victim into providing a massage that would turn sexual, and from there he would sexually abuse them and cause each of his unsuspecting victims to engage in a variety of forced commercial sex acts.

46.     Once in his presence, each victim knew it was no option to disobey Epstein. It was well known and understood that he was one of the most powerful and connected people in the United States, able to help any of these young victims and also capable of and willing to significantly harm any of his victims.

47.     Through the 2006 criminal investigation and the ensuing hundreds of news articles and dozens of lawsuits, the details of Epstein's sexual abuse and sex trafficking operation was widely publicized and known.

48.     While the first sexual abuse was discovered to have likely occurred in the early 1990s with the use of his then paramour, Ghislaine Maxwell, his appetite for sexual abusing young women and girls grew over the years.

49.     By the late 1990s each victim was being requested to bring other

victims and being paid handsomely in cash for recruiting other victims.

50.     The Florida criminal investigation uncovered that Epstein's sex-trafficking operation grew its number of victims exponentially in the late 1990s and early 2000s.

51.     One major reason why Epstein's sex-trafficking venture accumulated new victims at an alarming rate beginning in 2000 was his access to unlimited amounts of cash.

52.     Without exorbitantly large amounts of cash, his operation could not run, as newly recruited victims were each paid hundreds of dollars in cash immediately after Epstein sexually abused them, as hush money.

53.     Each victim was also informed that she would be paid hundreds of dollars in cash for each additional victim she recruited, and Epstein made good on that promise of large cash payments.

54.     The public documents and articles stemming from the 2006 arrest made abundantly clear that Epstein was doling out thousands of dollars in cash every day as hush money to victims he was sexually abusing and to victims he was using to recruit additional victims.

55.     If Epstein paid every victim with wire transfers and left a money trail, his illegal sex trafficking operation would have been easily uncovered; however, with access to unlimited amounts of cash, Epstein was able to commit the most

egregious sexual crimes many times a day without leaving a paper trail.

56.     This constant expansion of sex trafficking victims required cash on hand for Epstein to pay each victim as hush money for the abuse she was suffering as well as each victim's finder's fee for bringing another victim.

57.     Because Epstein's vast wealth, said to have been more than a billion dollars, was maintained in seemingly legitimate financial institutions, not in the form of cash in a warehouse.

58.     In order to access the large amount of cash needed to maintain his active sexual abuse of young women, it was essential that the financial institution where he banked be complicit in his operation, and more specifically that the bank at a financial institution that would allow him to constantly withdraw cash from his accounts without following anti-money laundering and reporting laws.

59.     This scheme of paying victims to bring other victims worked effectively because it not only allowed expansion through the recruitment of other victims in a pyramid-scheme fashion, but it also allowed each victim a possibility to avoid future sexual abuse – she could bring someone else who would get abused in her place.

60.     This constant expansion of sex trafficking victims required cash on hand for Epstein to pay each victim as hush money for the sexual abuse she was suffering as well as each victim's finder's fee for bringing another victim.

61.     In addition to the inner workings of Epstein's sex trafficking scheme being public when he served his jail time in Florida, other relevant information became public about Jeffrey Epstein and was widely published: he had no college degree, had never obtained any specialized license, none of the companies with whom he was associated had any legitimate business structure or purpose, and he had no documented expertise that would provide the requisite skill or knowledge to amass his vast wealth.

62.     Despite the false rumors Jeffrey Epstein had created to conceal his true "business," he was exposed as literally nothing other than an expert sex trafficker and abuser of young females—a fact easily discernible by any responsible financial institution with whom he was banking.

63.     Epstein's aptitude as a sex-trafficker and appetite as a sexual abuser did not suffer because of his Florida incarceration in 2008.

64.     Even while he was in jail in Florida, he continued to sexually abuse young girls and women from his work release office.

65.     Once out of jail and off work release, Epstein continued to collect young women and lure them through force, fraud, or coercion into one of his mansions, primarily his townhouse located at 9 East 71 Street, NYC, where he would sexually abuse each one.

66.     His sex trafficking operation continued as it had in the past, although

it became more elaborate, creating more phony companies, opening more bank accounts, withdrawing excessive amounts of cash, and delivering money to victims through wires, payroll, direct deposits, and other means known to his financial institution as evidence of the continuation of his criminal sex trafficking scheme.

67.     As time went by, the news articles and lawsuits continued to mount and more information became publicly available that Epstein was continuing to sexually abuse young women, and was using professionals on his payroll to help him conceal his illegal activity, and give him ostensible cover as a well-connected money manager.

68.     As a registered sex offender discovered to be sexually abusing multiple young women each day through a pyramid-type recruiting scheme that required the transfer of millions of dollars to continue the operation, a complicit bank became more important than ever.

69.     From approximately 2000 through 2013, JP Morgan was the bank complicit in seeing to it that Epstein could abuse countless young females and could grow his sex-trafficking operation.

70.     Epstein's relationship with James "Jes" Staley was key to Epstein running his illegal operation through JP Morgan.

71.     Staley and JP Morgan built the financial infrastructure that allowed for Epstein's sex trafficking operation to become what it was. They had a business

relationship with Epstein when he was arrested, when he was required to register as a sex offender, and even continued to enable and support his sex trafficking operation after he was released from jail. As an agent of JP Morgan, Staley knew exactly what he was doing, and so did JP Morgan.

72.     Staley left JP Morgan in 2013, and JP Morgan, knowing that Epstein was a sex trafficker running a publicly known sex trafficking operation, with no other legitimate business, began separating itself from Epstein.

73.     In 2013, when the world knew Epstein was now perhaps the most famous sex offender, publicly known for abusing females on a daily basis, and as he was on the precipice of being dropped by JP Morgan, the bank that had protected him and his operation for nearly 15 years, he needed a financial institution that would allow him to run his illegal operation indifferent to the victims that he was continuing to abuse. He found that partner in Deutsche Bank.

74.     Deutsche Bank picked up exactly where JP Morgan left off and became the bank that Epstein needed to fund his sexual abuse and sex-trafficking operation.

**B. An Overview of Deutsche Bank's Role in the Epstein Sex-Trafficking Venture.**

75.     Various banks and bankers were a critical part of Epstein's particular sex-trafficking venture. Due to the extensive publicity about Epstein's illegal sexual activities, in 2013 his longtime financial banking institution was severing ties with

him.

76.     By 2013, Jeffrey Epstein needed a new, reliable banking institution that would provide the necessary legitimate appearance for his operation, allow him to open many accounts for illegitimate companies, ignore blatant red flags, allow him to transfer money without questioning, allow him access to abundant cash in direct violation of federal law, and to otherwise facilitate the commercial aspect of his commercial sex trafficking enterprise.

77.     From on or about August 19, 2013, through about 2018, Deutsche Bank was the key bank participating, and playing an essential role in, the Epstein sex-trafficking venture.

78.      Deutsche Bank knowingly participated in the Epstein sex-trafficking venture by (among other things) providing the financial underpinnings for Epstein to have ready and reliable access to resources—including cash—to recruit, lure, coerce, and entice young women and girls to be sexually abused and to cause them to engage in commercial sex acts and other degradations.

79.     Deutsche Bank assisted and participated in Epstein's sex-trafficking venture by knowingly enabling him to make payments to victims, including directly or indirectly Jane Doe 1, and others similarly situated, and obtain large sums of cash from his various accounts in violation of structuring laws in order to finance his well-known cash-driven sex trafficking venture.

80.     Deutsche Bank participated in Epstein's violations of the Trafficking Victims Protection Act (TVPA) by knowingly facilitating, assisting, and enabling Epstein's illegal conduct. Deutsche Bank's conduct violated the TVPA, which forbids benefiting financially by participating in a sex trafficking venture knowing, or in reckless disregard of the fact, that means of force, threats of force, fraud, coercion, abuse of process, and combination of those means have been used to cause young women and girls to engage in commercial sex acts.

81.     When considering whether to participate in the sex-trafficking venture, and before on-boarding Epstein, Deutsche Bank estimated that it would earn between $2,000,000 to $4,000,000 annually by funding the sex-trafficking venture and handling the accounts of Epstein-related entities.

82.     Ultimately, Deutsche Bank did financially benefit by earning millions of dollars for its participation in the Epstein sex-trafficking venture.

83.     Throughout its relationship with Epstein, Deutsche Bank violated numerous regulations in order to continue its lucrative venture facilitating the Epstein sex trafficking scheme.

84.     Through information and belief, Paul Morris, a former JP Morgan banker brought Epstein over from JP Morgan to Deutsche Bank, and all knowledge acquired by JP Morgan about Epstein while Morris was at JP Morgan is rightfully imputed to Deutsche Bank at the time of on-boarding the Epstein accounts.

85.     Considering the known reputation of Epstein, Deutsche Bank had a responsibility to make all available inquiries to any other entity who had been associated with Epstein to learn if in fact Epstein had retired from his illegal sex-trafficking operation and had transformed somehow into a legitimate businessman no longer abusing women, which he had not.

86.     Financial institutions must conduct Know Your Customer ("KYC") reviews for each client relationship at intervals commensurate to the Anti-Money Laundering ("AML") risks posed by the client, including reviewing account activity to determine whether such activity fits with what would have been expected given the nature of the account. Each client's AML risk should also be re-assessed if material new information or unexpected account activity is identified.

87.     Financial institutions must also establish criteria for determining when a client relationship poses too high of a risk and therefore must be terminated. A financial institution may be liable under applicable laws if it maintains such a relationship despite repeated indications of facilitation of improper transactions.

88.     Without Deutsche Bank's assistance, Epstein could not have abused or trafficked the dozens of young women he did between 2013 and 2018.

89.     On July 6, 2020, Deutsche Bank agreed to pay a fine of $150 million dollars to the New York State Department of Financial Services for (among other things) its failures to meet banking regulations in connection with its relationship to

Jeffrey Epstein.

## IV. THE TRAFFICKING VICTIMS' PROTECTION ACT

90.     The Trafficking Victims Protection Act (TVPA) outlaws sex trafficking activities that affect interstate or foreign commerce or take place within the territorial jurisdiction of the United States. It is to be construed broadly because it serves a remedial purpose and uses intentionally broad language.

91.     The TVPA forbids the following sex-trafficking conduct:

(a) Whoever knowingly—

> (1)     in or affecting interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, orsolicits by any means a person; or
>
> (2)     benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1),
>
> knowing, or, except where the act constituting the violation of paragraph is advertising, in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in acommercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act, shall be punished as provided in subsection (b). 18 U.S.C. § 1591(a).

92.     The TVPA also contains an explicit "civil remedy" provision which allows an individual who is a victim of a violation of Chapter 77 of Title 18 (e.g., 18 U.S.C. §§ 1591-95) to bring a civil action against the perpetrator and any person or entity who knowingly benefits, financially or by receiving anything of value from

participation in an illegal sex-trafficking venture. 18 U.S.C. § 1595(a).

93.    Unlike the criminal penalties provisions in the TVPA, the civil remedies provision contains a "constructive knowledge" provision. This provision allows a civil action to be brought not only against a person or entity who participated in a venture known to have engaged in illegal sex trafficking but also against a person or entity who participated in a venture that the person or entity should have known had engaged in illegal sex trafficking. 18 U.S.C. § 1595(a). This expansive provision is known as the "constructive knowledge" provision, which provides an alternative to proving actual knowledge as part of civil damages claim.

94.    In this complaint, Jane Doe 1 and other members of the class allege that Deutsche Bank acted outrageously and intentionally. But, in addition, in the paragraphs that follow, wherever Jane Doe 1 and the other members of the class allege that the Defendants acted with actual knowledge, or in reckless disregard of the fact, that the Epstein sex-trafficking venture used means of force, threats of force, fraud, coercion, abuse of process, or some combination thereof to cause a person to engage in commercial sex acts, Jane Doe 1 and other members of the class also allege that, at a bare minimum, the Defendants should have known that the Epstein sex-trafficking venture had used such means to engage in illegal sex trafficking in violation of 18 U.S.C. §§ 1591-94—i.e., that they had constructive knowledge of Epstein's sex trafficking.

## V. THE RACKETEER INFLUENCED AND
## CORRUPT ORGANIZATIONS ACT

95.     The Racketeer Influenced and Corrupt Organizations Act (RICO) forbids racketeering activities that affect interstate or foreign commerce or take place within the territorial jurisdiction of the United States.

96.     RICO is to be construed broadly because it serves a remedial purpose and uses intentionally broad language.  The Act provides that, "[t]he provisions of this title shall be liberally construed to effectuate its remedial purposes." Pub.L. No. 91–452, § 904(a), 84 Stat. 922, 947 (1970).

97.     RICO forbids the following racketeering activities:

(a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce. A purchase of securities on the open market for purposes of investment, and without the intention of controlling or participating in the control of the issuer, or of assisting another to do so, shall not be unlawful under this subsection if the securities of the issuer held by the purchaser, the members of his immediate family, and his or their accomplices in any pattern or racketeering activity or the collection of an unlawful debt after such purchase do not amount in the aggregate to one percent of the outstanding securities of any one class, and do not confer, either in law or in fact, the power to elect one or more directors of the issuer.

98.     RICO also contains an explicit "civil remedy" provision which allows

an individual who is injured in his business or property by virtue of a violation of 18 U.S.C. § 1962 to sue to recover threefold the damages sustained. 18 U.S.C. § 1964(c).

99.    In the paragraphs that follow, Plaintiff allege that the Defendants violated 18 U.S.C. § 1962 and injured them in various ways, including injury to their businesses and property.

## VI. FACTUAL ALLEGATIONS

### A. The Epstein Sex-Trafficking Venture.

100.    During all times relevant to this complaint, Jeffrey Epstein was an extraordinarily wealthy man with multiple residences in the United States, including a New York City mansion, a Palm Beach mansion, and an island in the U.S. Virgin Island.

101.    Beginning in the early 1990's and continuing through the summer of 2019, Jeffrey Epstein knowingly established and ran a sex-trafficking venture in violation of 18 U.S.C. §§ 1591-95. As part of the venture, Epstein used means of force, threats of force, fraud, coercion, abuse of legal process, and a combination of these means to cause young women and girls from all over the world to engage in commercial sex acts and to sexually abuse them.

102.    In creating and maintaining this network of victims in multiple states and in other countries to sexually abuse and exploit, Epstein worked and conspired

with others, including employees and associates who facilitated his conduct by, among other things, recruiting victims, coercing victims, and scheduling their sexual abuse by Epstein at his New York mansion, his Palm Beach mansion, and his island in the U.S. Virgin Islands.

103.    In this District and elsewhere, Epstein perpetuated this abuse in similar ways. Epstein and his co-conspirators lured new victims into his home for seemingly innocuous activity. Victims were initially recruited to speak with an alleged philanthropic Epstein and provide "massages" to him. Once at the home and trapped in Epstein's bedroom the victims would be instructed to remove their clothing. Epstein would then force the massages to become increasingly sexual in nature, typically including one or more sex acts. Epstein would use means of force, threats of force, or fraud to coerce the victims to participate in these sex acts and to cause them to return and continue to engage in commercial sex acts with him. Epstein and his associates then paid his victims hundreds of dollars in cash for each sexual encounter.

104.    Moreover, Epstein actively encouraged his victims to recruit additional girls to be similarly sexually abused. Epstein incentivized his victims to become recruiters by paying these victim-recruiters hundreds of dollars for each girl that they brought to Epstein. In so doing, Epstein, through this system of paying victims to recruit others whom he would also pay for being sexually abused as well

as for recruiting, created a sex trafficking spider web and maintained a steady supply of new victims to exploit.

105.    Epstein was skilled at ascertaining his victim's greatest fears and aspirations and targeted those fears and aspirations to coerce and trap his victims into performing commercial sex acts and to be subject to sexual abuse.

106.    Among other things, Epstein caused his victims to engage in commercial sex acts, specifically sex acts for which his victims received things of value, including cash, promises of educational and career advancement, and promises that Epstein would provide various forms of assistance.

107.    Among other things, Epstein provided things of value to his victims in order to cause them to engage sex acts with him and on occasion his friends, co-conspirators, or other victims.

108.    As one means of causing victims to engage in commercial sex acts, Epstein and his co-conspirators threatened that harm would come to victims if they did not comply with his demands that they perform commercial sex acts.

109.    As another means of causing victims to engage in commercial sex acts, Epstein and his co-conspirators fraudulently promised to further victims' educational or career aspirations if they would comply with his sexual demands. These promises were a quid pro quo for the sex acts that occurred.

110.    As one means of causing victims to engage in commercial sex acts,

Epstein and his co-conspirators would "gift" his victims money and provide them with living accommodations, clothing, education, or other necessities. Epstein and his co-conspirators would then force them to pay off the "debt" by complying with Epstein's sexual demands.

111.    Throughout most of the 1990s through about July 2019, the Epstein's sex-trafficking venture recruited, solicited, enticed, harbored, obtained, provided, and transported hundreds of victims to cause them to engage in commercial sex acts with Epstein and Epstein's friends. Epstein was reliant on banking institutions to help make the racketeering activity successful.

112.    Epstein recruited, solicited, enticed, harbored, obtained, provided, and transported his victims to cause them to engage in commercial sex acts in ways that were in and affecting interstate and foreign commerce, including using means of interstate communications (such as cellular telephones) and means of interstate and foreign travel (such as aircraft that he owned and controlled).

113.    Epstein transported his victims in interstate and foreign commerce, including transportation to and from his mansion in this District.

114.    The Epstein sex-trafficking venture transported victims across state boundaries between New York, Florida, New Mexico, New Jersey, Massachusetts, and the U.S. Virgin Islands and elsewhere, and in foreign commerce to places, especially Eastern Europe.

115.    At all times relevant to this complaint, the Epstein sex-trafficking venture was a group of two or more individuals associated in fact, even if they were not a formal legal entity. Indeed, members of the Epstein sex-trafficking venture referred to it as "The Organization."

116.    On July 2, 2019, the United States Attorney's Office for the Southern District of New York filed a sealed, two-count Indictment against Epstein, including one count of Sex Trafficking Conspiracy and one count of Sex Trafficking for violations of 18 U.S.C. §1591, in part due to Epstein's criminal activities in his New York Mansion located at 9 East 71st Street.  See United States v. Jeffrey Epstein, Case No. 1:19-cr-480 (S.D.N.Y.).

117.    On July 8, 2019, Jeffrey Epstein was arrested pursuant to the New York Indictment.

118.    On August 10, 2019, prison guards found Epstein unresponsive in his Metropolitan Correctional Center jail cell, where was awaiting trial on the federal sex trafficking charges. He was later pronounced dead from apparent suicide.

119.    In July 2020, Epstein's co-conspirator in the origin of the sex-trafficking venture, Ghislaine Maxwell, was arrested on federal sex trafficking charges filed in this Court. The charges alleged that she had assisted, facilitated, and contributed to Epstein's abuse of sex trafficking victims, helping Epstein to recruit, groom, and ultimately abuse his victims. See United States v. Maxwell, Case No.

1:20-cr-00330 (S.D.N.Y.).

120.    On December 29, 2021, Maxwell was found guilty in this Court on five federal sex-trafficking counts in this Court.

**B. Consistent with His Uniform Pattern and Practice, Jane Doe 1 Was Assaulted within the Definition of New York Penal Law Section 130 and Forced to Engage in Commercial Sex Acts with Epstein by Means of Force, Fraud, and Coercion.**

121.    In about 2003, Jane Doe 1 moved to New York City where she was introduced to and sexually abused by Jeffrey Epstein.

122.    From 2003 until the time that Jane Doe 1 escaped, Jeffrey Epstein committed numerous intentional acts against Jane Doe 1 which constitute sexual offenses as defined in New York Penal Law § 130, including but not limited to the following:

   a. Sexual misconduct as defined in §130.20 inasmuch as Jeffrey Epstein engaged in sexual intercourse with Jane Doe without her consent;
   b. Rape in the first degree as defined in §130.35 inasmuch as Jeffrey Epstein engaged in sexual intercourse with Jane Doe by forcible compulsion;
   c. Criminal sexual act in the first degree as defined in §130.50 inasmuch as Jeffrey Epstein engaged in oral sexual conduct with Jane Doe by forcible compulsion;
   d. Forcible touching as defined in §130.52 inasmuch as Jeffrey Epstein, intentionally and for no legitimate purpose, engaged the forcible sexual touching of Jane Doe for the purpose of degrading or abusing her or for the purpose of gratifying his own sexual desire; and
   e. Sexual abuse in the third degree as defined in §130.66 inasmuch as Jeffrey Epstein inserted a foreign object in the vagina of Jane Doe by forcible compulsion.

123.    Epstein and his co-conspirators had a long history of grooming,

indoctrinating, controlling, and ultimately committing sexual offenses against young, vulnerable women like Jane Doe 1. Epstein and his co-conspirators constantly reminded Doe 1 how powerful and important Epstein was.

124.    The well-oiled Epstein sex abuse and trafficking venture included frequent statements to Jane Doe 1, and other victims, by Jeffrey Epstein and his co-conspirators that: (1) Jeffery Epstein possessed extraordinary wealth, power and influence; (2) Jeffrey Epstein's business and political friends, including world leaders, included some of the most powerful people in the world; (3) Jeffrey Epstein had the ability to advance or destroy nearly anyone financially, reputationally, and otherwise; (4) medical and normal life necessities would be denied victims if they, including Jane Doe 1, did not allow Epstein to sexually abuse them and failed to perform commercial sex acts for Epstein; and (5) Epstein could take away Jane Doe 1's and other victims' life needs such as shelter or housing if she or they failed to allow sexual abuse or to perform those acts or did not follow his instructions no matter how harmful.

125.    As with his other chosen victims, Jane Doe 1 was vulnerable to being victimized by Epstein and was sexually abused by Epstein at his sole direction almost every single day she was in his presence, as was customary practice for Jeffrey Epstein. His sex-trafficking venture targeted vulnerable young women and Jane Doe 1 was soon forced to remain in contact with Epstein, was unable to

extricate herself, and had no real choice but to comply with his every command or risk suffering serious harm.

126.     Jane Doe 1 was sexually abused and trafficked by Epstein for numerous years and was not able to escape from Epstein until 2018.  Having been conditioned that the sexual abuse was "normal" and knowing that everyone surrounding Epstein, including accountants, lawyers, bankers, and other important people, were aware of the sex abuse, Jane Doe 1 was coerced into a cult-like life controlled and manipulated by Epstein and others to be sexually abused and to otherwise do Epstein's bidding.

127.     Over the ensuing years, from about 2003 through about 2018, Epstein sexually abused Jane Doe 1 and trafficked her to friends for commercial sex acts in this District.

128.     Epstein used means of force, threats of force, fraud, coercion, abuse of process, and a combination of such means to sexually abuse Jane Doe 1 and to cause her to engage in commercial sex acts.

129.     Epstein recruited Jane Doe 1 to, among other things, cause her to engage in commercial sex acts in ways that were in and affecting interstate and foreign commerce, including use of cellular telephones and means of interstate transportation (such as aircraft that he owned or controlled).

130.     Epstein transported Jane Doe 1 from New York to other states to

sexually abuse her and to cause her to engage in commercial sex acts.

131.    Over the ensuing years, Jane Doe 1 wanted to escape from the Epstein Organization, yet Epstein and his supporting team of co-conspirators increased the tactics of fraud, force, and coercion to cause her to remain compliant in allowing Epstein to sexually abuse her and to sexually traffic her.

132.    Epstein threatened Jane Doe 1 that she would lose contact with people in her social circle who were connected with Epstein if she failed to comply with his demands.

133.    Epstein would alternate between *usually false* promises and threats to secure Jane Doe 1's compliance with his demands, including demands that she engage in commercial sex acts with him and others. In some instances, Epstein would pay Jane Doe 1 directly in cash for sex acts.

134.    Epstein and his co-conspirators continued to coerce Jane Doe 1 in various ways until her ultimate escape in 2017.

**C. Deutsch Bank's Participation in Epstein's Sex-Trafficking Venture**

**1.  Overview of Deutsche Bank's participation in the venture.**

135.    From on or about August 19, 2013, through about 2018, Deutsche Bank knowingly and intentionally participated in the Epstein sex-trafficking venture and racketeering activity by (among other things) providing the financial underpinnings for the venture.  Deutsche Bank's conduct, as described below, was

outrageous and intentional.

136.    Deutsche Bank enabled Epstein to have ready and reliable access to resources—including cash—to recruit, solicit, entice, harbor, obtain, provide, and transport young women and girls (including the Plaintiff bringing this action) to cause them to engage in commercial sex acts.

137.    Deutsche Bank participated in Epstein's violations of the TVPA by knowingly assisting, supporting, facilitating, and enabling Epstein's illegal sexual abuse and sex-trafficking venture, including in particular his coercive sex trafficking in violation of 18 U.S.C. § 1591(a)(1).

138.    Deutsche Bank's conduct knowingly and intentionally violated the TVPA, which forbids benefitting financially from participating in a venture that, in or affecting interstate or foreign commerce, has recruited, solicited, enticed, transported, harbored, provided, or obtained a person knowing, or in reckless disregard of the fact, that the person has been caused to engage in a commercial sex act by means of force, threats of force, fraud, coercion, abuse of process, or a combination of such means.

139.    Deutsche Bank's actions knowingly and intentionally furthered the Epstein sex-trafficking venture, including specifically Epstein's sex trafficking. For example, Deutsche Bank provided cash to Epstein knowing that he would use the cash to pay for commercial sex acts—including sexualized massages during which

Epstein penetrated Jane Doe 1—forcing all Jane Does to engage in sexual activity. Deutsche Bank also provided funds through wire transfers and by mail.

140.   Deutsche Bank also aided and abetted Epstein's sex-trafficking venture by (among other things) providing the financial underpinnings for the venture.

141.   Deutsche Bank enabled Epstein to have ready and reliable access to resources—including cash and a variety of bank accounts and other financial tools—to recruit, entice, solicit, harbor, provide, obtain, and transport young women and girls to sexually abuse them and to cause them to engage in commercial sex acts.

142.   Deutsche Bank knowingly and intentionally benefitted financially and in other ways from its participation in Epstein's sex-trafficking venture with knowledge, or with reckless disregard to the fact, that Epstein used means of force, threats of force, fraud, and coercion (and combinations thereof) to force young women and girls to be sexually abused and to engage in commercial sex acts.

143.   When considering whether to participate in the sex-trafficking venture, Deutsche Bank estimated that it would earn between $2,000,000 to $4,000,000 annually by funding the sex-trafficking venture and handling the accounts of Epstein-related entities.

144.   As recounted more fully in the paragraphs that follow, Deutsche Bank did financially benefit by earning millions of dollars from its participation in the

Epstein-sex-trafficking venture. The benefits that Deutsche Bank received came directly from its participation in the sex-trafficking venture and because of its participation in that venture. In other words, there was a causal relationship between Deutsche Bank's conduct furthering Epstein's sex-trafficking venture and its receipt of the financial benefits with actual (and constructive) knowledge of that causal relationship.

145.    Deutsche Bank knowingly and intentionally financed Epstein's illegal sex-trafficking venture. Deutsche Bank knew that if it did not finance Epstein's illegal sex-trafficking venture, then it would lose valuable Epstein-related accounts. Faced with the choice between profiting from Epstein's sex-trafficking venture or following the law, Deutsche Bank intentionally chose to profit.

146.    In violation of various banking laws and regulations, including various "Know Your Customer" laws, Deutsche Bank regularly authorized cash withdrawals and deposits for the Epstein sex-trafficking venture, as well as wire transfers, which allowed Epstein, his co-conspirators, and those they directed to conduct the business of the sex-trafficking venture, including sexually abusing victims.

147.    Deutsche Bank's knowing and intentional banking law violations allowed Epstein and his various corporations to stay "under the radar" and continue the sex trafficking operation without close scrutiny or interference.

148.    Deutsche Bank knowingly and intentionally benefited financially from Epstein's sex-trafficking venture. By facilitating and financing Epstein's sexual abuse and commercial sex acts in interstate and foreign commerce, Deutsche Bank earned interest, commissions, service fees, and other financial benefits directly from its connection with Epstein, Epstein-related entities, and others acting in concert with Epstein. Epstein provided those financial benefits to Deutsche Bank precisely because it was facilitating his sex-trafficking venture—and Deutsche Bank knew that was the reason that Epstein was providing them with those financial benefits.

149.    Deutsche Bank knowingly and intentionally benefitted financially from Epstein's sexual abuse and sex-trafficking venture by obtaining customer accounts. For example, Epstein and his co-conspirators forced Jane Doe 1 to open an account at Deutsche Bank, which financially benefitted Deutsche Bank and simultaneously created greater connection between Jane Doe 1 and the Epstein organization, making escape more difficult.

150.    Deutsche Bank knowingly and intentionally benefitted financially from Epstein's sexual abuse and sex-trafficking venture by profiting from the funds that Epstein, his co-conspirators, and his wealthy associates deposited with Deutsche Bank.

151.    For example, Deutsche Bank profited financially from funds

deposited by or controlled by (among other Epstein-related entities): (1) Southern Trust Company, Inc., (2) Southern Financial LLC, (3) The Butterfly Trust, (4) Global Markets Account, and (5) Gratitude America.

152.    Deutsche Bank benefitted by receiving things of value from its participation in Epstein's sexual abuse and the Epstein sex-trafficking venture. Among the various things of value it received were (1) connections with Jeffrey Epstein, his co-conspirators, and his wealthy friends and associates; (2) additional deposits from Epstein, his co-conspirators, and his wealthy friends and associates; (3) the ability to charge above-normal fees to Epstein because he was a "high risk, high reward" customer; and (4) the opportunity to earn financial benefits from the funds that had been deposited with it. Deutsche Bank knowingly received these things of value as a direct result of its participation in the Epstein sex-trafficking venture and because it was furthering Epstein's sex-trafficking venture.

153.    Among the women and girls whose sex trafficking and sex abuse Deutsche Bank furthered was Jane Doe 1.

154.    On July 20, 2020, the New York State Department of Financial Service (hereinafter "New York Banking Regulators") and Deutsche Bank agreed to a Consent Order, which resolved the Department's investigation into Deutsche Bank's relationship with Epstein and Epstein-related entities. Deutsche Bank agreed to pay a penalty of $150 million to resolve the investigation regarding Epstein and

two other customers.

155.     The New York Banking Regulators found, accurately, that Deutsche Bank conducted business regarding Epstein in an unsafe and unsound manner, in violation of New York Banking Law § 44.

156.      The New York Banking Regulators found, accurately, that Deutsche Bank failed to maintain an effective and compliant anti-money laundering program, in violation of 3 NYCRR § 116.2.

## 2. Banking Regulations Exist to Help Prevent Funding of Criminal Ventures.

157.     The Federal Bank Secrecy Act ("BSA") requires financial institutions to have adequate anti-money laundering ("AML") policies and systems in place. New York state law requires financial institutions to devise and implement systems reasonably designed to identify and report suspicious activity and block transactions prohibited by law.

158.     All regulated institutions are expected to configure systems based on their unique risk factors, incorporating parameters such as institution size, presence in high-risk jurisdictions, and the specific lines of business involved, and the institutions have an affirmative duty to ensure that their systems run effectively.

159.     In addition to having effective AML controls in place, it is also necessary for financial institutions to monitor their customers for the purpose of preventing their customers from facilitating criminal activity using the institutions'

facilities.

160.     As part of preventing criminal activity, Know Your Customer ("KYC") and customer due diligence are critically important, and financial institutions must collect customer information at the time of establishing new relationships with clients, including as necessary to assess the risks associated with the client. To properly consider these risks, financial institutions must consider relevant factors such as the nature of the client's business, the purpose of the client's accounts, and the nature and duration of the relationship.

161.     Financial institutions must also conduct KYC reviews for each client relationship at intervals commensurate to the AML risks posed by the client, including reviewing account activity to determine whether such activity fits with what would have been expected given the nature of the account. Each client's AML risk should also be re-assessed if material new information or unexpected account activity is identified.

162.     Financial institutions must also establish criteria for determining when a client relationship poses too high of a risk and therefore must be terminated. A financial institution may be liable under applicable laws if it maintains such a relationship despite repeated indications of facilitation of improper transactions.

**3. Deutsche Bank's Knowledge about the Epstein Venture.**

163.     The New York Banking Regulators determined, accurately, that

Deutsche Bank failed in various respects to meet its Know Your Customer and other obligations fully with respect to its relationship with Jeffrey Epstein and entities related to Epstein.

164.    In around 2013, Deutsche Bank was aware that Epstein was a wealthy man with hundreds of millions of dollars in assets and an extensive network of friends and connections that included prominent financial institutions, politicians, royalty, and billionaires.

165.    In around 2013, Deutsche Bank was aware that Epstein also had a well-publicized reputation related to the sexual trafficking and sexual abuse of young women. Allegations against him began appearing in the press as early as March 2005, with the accusation that he paid a 14-year-old girl for a "massage."

166.    That year, the Palm Beach (Florida) Police Department began an investigation into allegations against Epstein related to his sexual abuse in Palm Beach. The investigation quickly uncovered dozens of other Epstein sex abuse victims. The investigation also identified the Epstein sex-trafficking venture, which included a number of individuals who were responsible for recruiting young women to come to Epstein's Palm Beach mansion to give "massages" or otherwise furthering his abuse.

167.    In 2006, the State Attorney handling the case, after meeting privately with an attorney representing Epstein, referred the case to a state grand jury instead

of charging Epstein and his co-conspirators for crimes for which local police believed there was abundant evidence. As a result, the Palm Beach Police Chief publicly denounced the State Attorney and referred the case to the Federal Bureau of Investigation, which subsequently opened its own investigation and interviewed potential witnesses and victims.

168.     In September 2007, Epstein agreed to plead guilty to two "prostitution" charges in state court, including the solicitation of a minor to engage in prostitution, in exchange for a federal non-prosecution agreement (NPA) providing him and his co-conspirators (including Lesley Groff, Sarah Kellen, Adriana Ross, and Nadia Marcinkova) with immunity from federal prosecution for extensive federal sex-trafficking charges in Florida. The deal included an 18-month sentence and Epstein was also required to register as a sex offender upon his release. Epstein ultimately served only 13 months of his 18-month sentence in the Palm Beach County jail and was allowed work release privileges that enabled him to leave jail six days a week for twelve hours a day.

169.     In the summer of 2008, Epstein's non-prosecution agreement (NPA) with the U.S. Department of Justice was made public when it was unsealed in connection with a challenge brought to the NPA by two of his victims. The agreement, among other things, outlined possible charges that could have resulted from the investigation, including charges that Epstein conspired to use a facility or

means of interstate commerce to induce minors to engage in prostitution, to engage in illicit sexual conduct with minors, conspiring with others to do the same, and trafficking minors. That agreement also notes that the United States had compiled "a list of individuals whom it [had] identified as victims," and that Epstein would pay for legal representation for these alleged victims.

170.   Court proceedings involving the challenge to Epstein's NPA continued between 2008 and 2013 (and beyond) and attracted significant media attention.

171.   Indeed, between 2005 and 2013, press reports outlined the allegations underlying the NPA and to varying degrees detailed the involvement of Epstein's alleged co-conspirators, including Lesley Groff, Sarah Kellen, and Nadia Marcinkova.

172.   Some articles reported that Lesley Groff and Sarah Kellen had invoked their Fifth Amendment right against self-incrimination, and others reported that Nadia Marcinkova had allegedly recruited underage girls to give Epstein "massages."

173.   The names of these women and other alleged co-conspirators were publicly known by 2013.

174.   Additionally, press reports during this time noted allegations that Epstein was involved with Eastern European women in particular and that a

modeling agency he helped fund brought "young girls . . . often from Eastern Europe" to the U.S. on Epstein's private jets.

175.     Deutsche Bank was aware of the foregoing information and more about Epstein's sex abuse and sex trafficking activities by around 2013, when it considered whether to begin a banking relationship with Epstein.

### 4.   Deutsche Bank Agrees to Become Epstein's Banker in 2013.

176.     In early 2013, Epstein, who had been banking with one of Deutsche Bank's competitors, J.P. Morgan, began the process of moving his assets to Deutsche Bank.

177.     The relationship between Deutsche Bank and Epstein came about through a Deutsche Bank relationship manager, Paul Morris, who had left J.P. Morgan bank ("JP Morgan") to join the Bank's private wealth department. At JP Morgan, Morris had been a member of the team servicing Epstein's accounts.

178.     Paul Morris joined Deutsche Bank in November 2012. Soon after joining Deutsche Bank, Morris suggested to senior management that Epstein was a potential client who could generate millions of dollars of revenue as well as leads for other lucrative clients to Deutsche Bank. Morris and Epstein began discussions in the spring of 2013 about a potential relationship between Deutsche Bank and Epstein.

179.     In April of 2013, in preparation for establishing Deutsche Bank's

relationship with Epstein, a junior relationship coordinator on the Epstein account (herein, "Relationship Coordinator-1") prepared a memorandum for Paul Morris to send to Deutsche Bank's then co-head of the Wealth Management Americas Group, Charles Packard, and Patrick Harris, the Chief Operating Officer of Wealth Management Americas.

180.    Among other things, the memorandum contained information concerning Epstein's previous plea deal and prison sentence for sex-trafficking related crimes. In particular, the memorandum stated that "Epstein was charged with soliciting an underage prostitution [sic] in 2007," that "[h]e served 13 months out of his 18-month sentence," and that "[h]e was accused of paying young woman [sic] for massages in his Florida home." It also highlighted that Epstein was involved in 17 out-of-court civil sex abuse settlements related to his 2007 conviction.

181.    In the email to Charles Packard and Patrick Harris attaching the memorandum, Paul Morris noted how lucrative becoming Epstein's banker could be, stating "[e]stimated flows of $100-300 [million] overtime [sic] (possibly more) w/ revenue of $2-4 million annually over time." In the same email, Morris proposed that all Epstein-related accounts be for "entities" affiliated with Epstein, "not personal accounts."

182.    On May 5, 2013, Charles Packard sent an email (hereinafter, the "Approval Email") to Morris, which read "spoke with [the Head of AML

Compliance for Deutsche Bank Americas and the then-General Counsel for Deutsche Bank Americas, who at that time served as chair of the Bank's Americas Reputational Risk Committee ("ARRC")]. Neither suggest [that the Epstein relationship] requires rep risk and we can move ahead so long as nothing further is identified through KYC and AML client adoptions." The ARRC did not meet in connection with the initial onboarding of Epstein.

183.    "Rep risk" as referenced in the Approval Email referred to a review by the relevant regional reputational risk committee. Deutsche Bank's policies and procedures provided that, should a Deutsche Bank business or compliance unit identify a client that they believe could pose a reputational risk to the Bank, it must escalate that client for review by the attendant reputational risk committee. In the case of the onboarding of the Epstein relationship, this was the ARRC.

184.    At the time, Deutsche Bank was aggressively expanding its U.S. wealth management business under its new co-chief executive, Anshu Jain, and was courting wealthy clients shunned by other banks. Indeed, attractive earnings multiples had driven strong investment from Deutsche Bank into asset and wealth management, as they consumed less capital than the investment banking business. Deutsche Bank officials have repeatedly called the Bank's private banking wealth management business in the Americas as a "key geographic region." Second Amended Complaint, Karimi et al. v. Deutsche Bank Aktiengesellschaft et al., Case

No. 2:20-cv-08978-ES-JRA (D.N.J. Mar. 1, 2021), Dkt. 37 at ¶ 84 (case later transferred to this Court, Case No. 1:22-cv-02854-JSR).

185.    According to confidential witnesses in another case before this Court, no formal KYC investigation was ever ultimately undertaken for Epstein. Karimi et al. v. Deutsche Bank Aktiengesellschaft et al., Case No. 1:22-cv-2854-JSR (S.D.N.Y. June 13, 2022), Dkt. 86 at 9.

186.    The relationship between Deutsche Bank and Epstein officially began on August 19, 2013, when the Bank opened brokerage accounts for Southern Trust Company Inc., a self-described "database company and services" founded in the U.S. Virgin Islands in 2011, and Southern Financial LLC, a wholly owned subsidiary of Southern Trust Company Inc. According to the KYC record, the purposes of the brokerage accounts were to "hold marketable securities and cash" and "to invest long term [sic] with the bank," respectively. Over the course of the relationship, Epstein, his related entities, and associates would eventually open and fund more than 40 accounts at Deutsche Bank, with more than $110 million in just one of the accounts. Second Amended Complaint at ¶ 96, Karimi et al. v. Deutsche Bank Aktiengesellschaft et al., Case No. 2:20-cv-08978-ES-JRA (D.N.J. Mar. 1, 2021), Dkt. 37 at ¶ 96 (case later transferred to this Court, Case No. 1:22-cv-02854-JSR).

**5. Epstein Uses Deutsche Bank Accounts for the Sex-Trafficking Venture.**

187.    From the time of Epstein's onboarding, the relationship was classified

by Deutsche Bank as "high-risk" and therefore subject to enhanced due diligence. Although the Bank did not initially classify Epstein as a politically exposed person ("PEP"), the Bank did designate him an "Honorary PEP" because of his connections to prominent political figures. The high-risk classification and informal designation as an Honorary PEP resulted in enhanced transaction monitoring of activity within Epstein's accounts. However, and as discussed below, this required monitoring scrutiny was not followed.

188.    As early as November 1, 2013, Epstein and other co-conspirators in his sex-trafficking venture began using Deutsche Bank accounts to make wire transfers of money to facilitate Epstein's sex abuse and his sex-trafficking venture. Over the course of the relationship, Epstein and his representatives used Deutsche Bank accounts to send dozens of wires, directly and indirectly, including at least 18 wires in the amount of $10,000 or more to then known co-conspirators in the sex-trafficking venture, including Lesley Groff, Sarah Kellen, and Nadia Marcinkova.

189.    Deutsche Bank was aware that the recipients of some of these wire transfers described in the previous paragraph were to Epstein's co-conspirators, as described further below. Deutsche Bank was aware that its wire transfers were in furtherance of Epstein's sexual abuse and the Epstein sex-trafficking venture.

190.    On January 24, 2014, Deutsche Bank opened checking and money market accounts for an Epstein-related trust named "The Butterfly Trust." The

Butterfly Trust included a number of beneficiaries, including, among others, Lesley Groff, Sarah Kellen, and Nadia Marcinkova, and a number of women with Eastern European surnames. When Deutsche Bank personnel asked Epstein and Epstein's representatives about his relationship with the beneficiaries, Epstein represented that they were employees or friends. Deutsche Bank's KYC records state that the purpose of the money market account was "to pay all expenses/disbursements related to the trust [such as] taxes, trust fee [SIC], etc."

191.   The Butterfly Trust accounts were, like the overall Epstein relationship itself, approved for onboarding based on the earlier Approval Email from Charles Packard, despite obvious reputational and possible financial crime risks. Specifically, the beneficiaries of the Butterfly Trust included, among others, Lesley Groff, Sarah Kellen, and Nadia Marcinkova. The existence of co-conspirators as beneficiaries of the trust established Deutsche Bank's actual and constructive knowledge that payments through the Trust would be used to further or coverup criminal activity and to endanger more young women and girls as victims of Epstein's sexual abuse and the Epstein sex-trafficking venture.

192.   At the time of onboarding of the Butterfly Trust accounts, Deutsche Bank was aware that one of the Trust's beneficiaries was an alleged co-conspirator of Epstein's prior sex trafficking-related offenses. In October 2013, a compliance officer performed background checks on the beneficiaries of the trust and flagged

for Paul Morris that one of the beneficiaries, Sarah Kellen had been alleged to be one of Epstein's co-conspirators. In reply, Paul Morris confirmed that Kellen "was accused as a co-conspirator in a case but was never brought to trial nor ever convicted. The account for which she will be associated is a trust account which names her as a beneficiary." The alert was cleared citing the Approval Email from Paul Morris.

193. While Epstein held accounts at Deutsche Bank, he used the Butterfly Trust account and various other accounts to send over 120 wires totaling $2.65 million to beneficiaries of the Butterfly Trust. These transfers furthered his sex abuse and the sex-trafficking venture, including funds paying directly for coercive and commercial sex acts, funds paid to professionals for carrying out illegal acts for the operation of the sex-trafficking venture, and paying funds to others for committing crimes necessary to continue the operation of the sex trafficking venture.

194. Epstein used Deutsche Bank accounts to pay for coerced commercial sex acts by Jane Doe 1.

195. Given Deutsche Bank's knowledge about Epstein's past sex trafficking, its continuation of its financial relationship with Epstein after January 24, 2014 (and earlier) was, at a minimum, in reckless disregard of the fact that Epstein was using means of force, threats of force, fraud, coercion (and a combination of such means) to cause and coerce Epstein's victims to engage in

commercial sex acts.

196.    By way of another example of the flagrant nature of Epstein's coercive sex-trafficking operation, in around 2013 certain of Epstein's foreign victims (who essentially lived with Epstein as commercial sex slaves) began having immigration problems and risked the possibility of deportation. Epstein's solution was to force certain of his American victims to enter into same-sex marriages with his foreign victims in order to prevent deportation and to exercise even greater control over all of the victims he caused to marry one another.

197.    It was during this late part of 2013, that Epstein needed a banking institution that would be complicit and provide all the necessary services for his sex trafficking operation to run, without banking regulations getting in the way.

198.    One way in which Epstein obtained victims to sexually abuse was by using sham marriages to bring the victims into this country illegally. Because Epstein was paying fees to a particular immigration attorney to coach the women who did not want to participate on what to say from his Deutsche Bank account, had his personal attorney also advising the women and signing related checks, and even opened bank accounts in the names of the victims, Epstein needed to know with absolute certainty that the bank would not report this highly suspicious activity. Even though his relationship with Deutsche Bank was brand new, he knew the bank would play along in even this multi-layered criminal aspect of his sexually abusive

international operation.

199.    The abuse victims were given no choice about whether to marry one another.

200.    Epstein demanded that they comply, and the professionals closest to Epstein choreographed the entire arrangement, from hiring and paying the crooked immigration attorney to falsifying records, to facilitating wire transfers to establishing a bank account at Deutsche Bank.

201.    The sham marriage scheme, which was designed solely to perpetrate continued sexual abuse and trafficking through immigration and marriage fraud, was just another example of Epstein's brazen criminality that he could never have pulled off without a complicit bank protecting him.

202.    Epstein used Deutsche Bank for all matters relating to his criminal sex trafficking enterprise because he knew that Deutsche Bank would disregard the fact that Epstein was using the account as part of his sex-trafficking venture.

203.    Deutsche Bank financially benefitted from the accounts that Epstein used for his sex-trafficking operation, including the accounts for his many related entities, the personal accounts for his longtime attorney, and the accounts for some of his victims.

204.    In addition to actual knowledge that it was facilitating the Epstein sex-trafficking venture, Deutsche Bank benefitted financially by participating in a

venture that it should have known had engaged in coercive sex trafficking in violation of 18 U.S.C. § 1591(a).

### 6. ARRC's Consideration of the Epstein Relationship

205.     Deutsche Bank's awareness it was facilitating Epstein's sex-trafficking venture continued to grow after January 24, 2014.

206.     In 2014 and into 2015, the Bank's Anti-Financial Crime department alerted Deutsche Bank's senior management to issues concerning Epstein's sex trafficking. Deutsche Bank's senior management chose to ignore Epstein's coercion of his victims because Deutsche Bank was profiting handsomely from facilitating Epstein's sex abuse and sex trafficking.

207.     One issue regarding Epstein's sex trafficking arose in connection with the Bank's opening of a Global Markets account for Epstein. In January 2015, during the onboarding process for that account, a Deutsche Bank AML Compliance Officer ("AML Officer-1") identified recent developments in the press concerning Epstein, including (a) a June 2014 federal appeals court ruling that some of Epstein's alleged victims would receive information supporting their challenge to Epstein's 2008 non-prosecution agreement, potentially reopening criminal cases for federal sex offenses against Epstein, and (b) additional allegations in the press regarding Epstein's relationships with a prominent former U.S. politician and a member of a European royal family.

208.    AML Officer-1 escalated these issues to a more senior AML officer ("AML Officer-2"). In response, AML Officer-2 initially noted that the same negative allegations against Epstein had been approved by Charles Packard, the former Head of AML and the former General Counsel for the Americas and attached a copy of the Approval Email. AML Officer-1 responded that they should still run the issue by the then-Head of AFC Americas because: (1) the Approval Email was "not a direct approval by [the Head of AML Compliance for Deutsche Bank Americas and the [then] General Counsel for Deutsche Bank Americas]; it's a statement by a front office MD about his conversation with them and their alleged opinion not to escalate to Rep Risk;" (2) the Head of AML Compliance was no longer at the Bank; and (3) there were new developments in Epstein's case that could lead to the reopening of his 2008 plea deal.

209.    As a result of these discussions and additional media reports regarding Epstein's association with prominent political figures, AML Officer-2 put the question of whether to escalate before Patrick Harris, who agreed to escalate to the ARRC. In the email to Patrick Harris, AML Officer-2 noted that the communication underpinning the Approval Letter occurred before these new developments and for further background also noted, among other things, that "[b]y 2011, 40 underage girls had come forward with testimony of Epstein sexually assaulting them" and that "Epstein [had] managed to settle at least 17 lawsuits out

of court."

210.     Later that month, on January 22, 2015, in preparation for the ARRC meeting, Charles Packard and Paul Morris met in person with Epstein at his New York home. The meeting was held in a bar adjacent to Epstein's indoor swimming pool, located in the basement of his Manhattan mansion. During the meeting, Packard asked Epstein about his involvement in sex trafficking. During the meeting, Epstein allegedly explained away suspicious transactions, including large cash withdrawals and payments to Russian accounts that appeared suspicious in that they may have been indicators of sex trafficking and coercive commercial sex acts. Epstein's denials were not credible.

211.     Suspiciously, or tellingly, Packard and Morris did not make any contemporaneous record of their meeting with Epstein. Other than this perfunctory meeting with Epstein to get their stories straight, Deutsche Bank did not take any other steps at the time to investigate the veracity of the allegations about Epstein being involved in sex abuse and sex trafficking. The reason Deutsche Bank did not take further steps to investigate the veracity of the allegations is because it knew that such investigation would only further confirm the allegations.

212.     On January 30, 2015, members of the ARRC, including Stuart Clarke, Chief Operating Officer for the Americas and General Manager of Deutsche Bank's New York branch, and Jan Ford, a Managing Director and Deutsche Bank Americas

Head of Compliance and a member of the North America Executive Committee and the Global Compliance Executive Committee, met to discuss the Epstein relationship. Despite the fact that Deutsche Bank's policies and procedures mandate that detailed minutes of such meetings be kept, Deutsche Bank did not make any record of this important meeting. Deutsche Bank decided not to make a record of this meeting because a record would have demonstrated that it knew, and was acting in reckless disregard of the fact, that Epstein was using his Deutsche Bank accounts to cause his victims, thorough means of force, fraud and coercion, to be sexually abuse and to engage in commercial sex acts.

213.    In a recent case before this Court, it was alleged that a confidential witness (identified only as "CW1") reported that the way this meeting was conducted flouted all of Deutsche Bank's rules about how such meetings should be handled. Specifically, the meeting at Epstein's bar has been described as a "due diligence meeting" by Deutsche Bank. However, Deutsche Bank's own rules lay out how such diligence meetings are to be conducted when dealing with his risk clients. CW1 explained: "There are meant to be minutes taken, there is meant to be a thorough record of the meeting, allegations are meant to be put to the client in writing and the client is generally expected to have his lawyer or advisor, and often also his accountant, with him." Both sides are meant to sign off on the minutes of such meetings. Failing to abide by these regulations is a disciplinary offense at Deutsche

Bank. According to CW1, however, neither Packard nor Morris were ever disciplined. Second Amended Complaint at ¶ 87, Karimi v. Deutsche Bank Aktiengesellschaft, Case No. 2:20-cv-08978-ES-JRA (D.N.J. Mar. 1, 2021), Dkt. 37 at ¶ 87 (case later transferred to this Court, Case No. 1:22-cv-02854-JSR).

214.    Later that day, a member of the ARRC emailed Charles Packard to say, without explanation, that the committee was "comfortable with things continuing" with Epstein, and that another member of the committee had "noted a number of sizable deals recently." The reason that Deutsche Bank was "comfortable" with continuing its relationship with Epstein is because of the "sizeable deals" it was obtaining.   The sizeable deals with Epstein were very valuable to Deutsche Bank and benefitted Deutsche Bank financially.

### 7. Conditions on the Epstein Relationship Not Communicated to the Relationship Managers or the Relevant Transaction Monitoring Team.

215.    The following week, another member of the ARRC, Jan Ford, the Bank's Head of Compliance, Americas, reiterated the ARRC's decision in an email to other executives, stating that ARRC had agreed to "continue business as usual with Jeff Epstein" based upon Packard's "due diligence [bar] visit with him." Deutsche Bank knew, and was acting in reckless disregard of the fact, that Epstein's usual business was the sexual abuse and coercive sex trafficking of young women and girls.

216.    That same email outlined three conditions that the ARRC placed on the relationship (1) Epstein would be allowed to continue to "conduct trades and transactions in existing accounts without Compliance pre-approval, provided that the business had determined these transactions do not involve any unusual and/or suspicious activity or are in a size that is unusually significant or novel in structure."; (2) The Bank's Corporate Banking and Securities unit would be allowed to "also 'open' accounts to facilitate activity as a booking matter where the activity has already been approved by [the Bank's America's Wealth Management division]."; and (3) The business would "need to monitor for any further developments in connection with the reputational risk of the client relationship and to review transactions/activity conducted in the accounts for any activity, size or structure as described in [the first condition]." Deutsche Bank was aware that conditions such as these were necessary (although not sufficient) to prevent Epstein from using Deutsche Bank accounts in furtherance of sex abuse and coercive sex trafficking.

217.    Deutsche Bank had no intention of actually enforcing the conditions described in the previous paragraph on Epstein. Instead, the conditions were designed to create the illusion—i.e., a paper trail—that would make it appear that Deutsche Bank was closely monitoring Epstein when, in fact, it was allowing him to use his multiple Deutsche Bank accounts for sex abuse and sex trafficking purposes.

218. The three conditions were communicated to several senior Bank personnel who did not have day-to-day operational authority over the Epstein account. Deutsche Bank never communicated the conditions to those who could have enforced them—i.e., members of the Epstein relationship team. As a result, Epstein's relationship managers continued conducting business with Epstein in the same manner as they had before the ARRC meeting. The conditions thus became a dead letter—as Deutsche Bank had intended.

219. This failure was then substantially compounded when AML Officer-2 purportedly misinterpreted the conditions; as a result, they were also not communicated to the transaction monitoring team responsible for monitoring the Epstein relationship. Specifically, AML Officer-2 interpreted the clause "transactions [with] unusual and/or suspicious activity or are in a size that is unusually significant or novel in structure" to mean transactions that were unusual, suspicious, or novel as compared to the prior history of transactions related to the Epstein relationship. He communicated this interpretation to the rest of the transaction monitoring team responsible for the Epstein relationship. The interpretation was exemplified by a later email exchange in March of 2017, when a member of the transaction monitoring team responded to an alert about payments to a Russian model and Russian publicity agent, stating, "[s]ince this type of activity is normal for this client it is not deemed suspicious."

220.    Instead of monitoring the accounts for all potential crimes and suspicious activity that could be implicated by Epstein's past conduct, including payments to co-conspirators and those that could be related to sex trafficking involving adults, AML Officer- 2 only instructed the relevant transaction monitoring team to verify, using internet searches, that any woman involved with transactions related to the Epstein relationship was at least 18 years old and to only flag transactions if they could not discern a rational reason for the transaction, a standard which had little if any effect on the Bank's furthering Epstein's sex abuse and his sex trafficking venture.

### 8. The Bank Continued to Facilitate the Epstein Sex Trafficking Venture for Years Despite Additional Red Flags.

221.    On July 21, 2015, Epstein requested that Deutsche Bank increase his trading limits. Several days later, a member of Epstein's coverage team ("Coverage Team Member-1"), who was aware of the ARRC's conditions on the relationship, escalated this request to AML Officer-2, who in turn escalated the issue to the Chairman of the ARRC. On July 29, 2015, after conferring with other members of the ARRC but without formally meeting, the Chairman replied to AML Officer-2 stating they had no objections. The Chairman added, "I also checked in with [Packard] last night to make sure he supports this and has heard nothing negative on the client. [Packard] confirmed both."

222.    Again, without any due diligence and in complete disregard for the

crimes Epstein was perpetrating and the reputational risks he posed, Deutsche Bank knowingly and intentionally allowed him to continue to employ the Bank's services to further his criminal activities. Second Amended Complaint at ¶ 92, Karimi v. Deutsche Bank Aktiengesellschaft, Case No. 2:20-cv-08978-ES-JRA (D.N.J. Mar. 1, 2021), Dkt. 37 at ¶ 92 (case later transferred to this Court, Case No. 1:22-cv-02854-JSR).

223.     On January 4, 2016, an accountant representing Epstein (herein, "Accountant-1") requested that the Bank open a brokerage account for Gratitude America, Epstein's private charity. Coverage Team Member-1 escalated the request to AML Officer-2, who directed the inquiry to the Secretary for the ARRC. The Secretary of the ARRC conferred with a member of the ARRC and ordered that an external due diligence report be prepared on Epstein. In response to the request for additional information, Account-1 informed the Bank of Epstein's resignation from Gratitude America and withdrew the request to open the account. As a result, Deutsche Bank did not run a due diligence report on Epstein.

224.     Deutsche Bank was aware that the reason that Epstein was withdrawing his request to open the new account was to avoid a due diligence report. Deutsche Bank was aware that a due diligence report on Epstein would have documented that Epstein was using Deutsche Bank accounts to facilitate his sex abuse and sex-trafficking venture.

225.    By April 2016, Paul Morris was replaced by another relationship manager (herein, "Relationship Manager-2") to handle accounts associated with Epstein. Although Relationship Manager-2 had Epstein's KYC file and had been made aware of the prior escalation of the relationship to the ARRC, he was not made aware by anyone at the Bank of the three conditions the ARRC placed on the relationship after its February 2015 review.

226.    In a May 2018 email, a compliance officer submitted an inquiry to Relationship Manager-2 about payments to the accounts of women with Eastern European surnames at a Russian bank, and asking for an explanation of the purpose of the wire transactions and Epstein's relationship with the counterparties. After submitting the questions to Accountant-1, Relationship Manager-2 forwarded Accountant-1's response to the compliance officer, which read "SENT TO A FRIEND FOR TUITION FOR SCHOOL." When the compliance officer followed up, asking "[w]hy is this client using this account to . . . pay school tuition?," Relationship Manager-2 replied "[g]enerally, Jeffrey has separate accounts to manage each of his properties. This is one of them. However, when making one-off transfers to people, he and his finance staff have the flexibility to use any account they like that is funded."

227.    The compliance officer did not ask any further follow-up questions, and the transaction was cleared. This transaction was one of many in which Epstein

used his Deutsche Bank accounts to further his sex abuse and sex-trafficking venture.

228.    In addition, payments from the Butterfly Trust accounts and other Epstein accounts were used for lawsuit settlement payments to alleged victims, and rent, legal, and immigration expenses made to or on behalf of young women whom Epstein was sexually abusing and trafficking, including additional women with Eastern European surnames.

### 9. Deutsche Bank Knew About Epstein's Suspicious Cash Activity Throughout the Relationship

229.    Several of Epstein's employees or agents had authority to conduct transactions in the accounts on Epstein's behalf. One of them, Epstein's personal attorney (herein, "Attorney-1"), was active in withdrawing cash for Epstein. Attorney-1, on behalf of Epstein, made a total of 97 withdrawals from the Bank's Park Avenue (New York City) Branch from 2013 to 2017 from personal accounts belonging to Epstein. The transactions in question occurred roughly two to three times per month, all in the amount of $7,500 per withdrawal, the Bank's limit for third-party withdrawals (i.e., withdrawals made by an authorized user who was not a primary account holder). When Deutsche Bank personnel asked Attorney-1 why Epstein needed cash, Attorney-1 replied Epstein used it for travel, tipping and expenses.

230.    Under federal regulations, banks and other financial institutions must

file Currency Transaction Reports ("CTRs") with the U.S. Treasury Department when there are cash transactions with an individual in excess of $10,000 in one day. Breaking up transactions to avoid the CTR reporting is a criminal offense commonly referred to as "structuring."

231.     In May 2014, Attorney-1 inquired into how often he could withdraw cash on behalf of Epstein without triggering an alert. Around the same time, Relationship Coordinator-1 sent an email to the branch manager stating that Attorney-1 "asked how often they could come in to withdraw cash without creating some sort of alert," and asking "Is it once a week? Twice a week? Once every other week?"

232.     In 2017, Attorney-1 again inquired about triggering an alert. Specifically, in July 2017, Attorney-1 had, among other things, asked a teller whether a withdrawal transaction in excess of $10,000 would require reporting and, upon being advised that it would, broke up the withdrawal transaction over two days. In July of that year, members of the Bank's Wealth Management AML transaction monitoring team, including AML Officer-2, met to discuss suspicions of cash structuring to avoid currency transaction reports ("CTRs") by Attorney-1. Nonetheless, Deutsche Bank permitted Attorney-1 to continue to withdraw cash from his own and Epstein's accounts. In 2018, just prior to the Bank's closing of the Park Avenue Branch, which was located nearby Epstein's house, Attorney-1

withdrew $100,000.00 in cash on behalf of Epstein. When later questioned why Attorney-1 withdrew these sums from the Bank, Attorney-1 reported that Epstein needed the funds for tipping and household expenses—and explanation that was not credible on its face.

233.    In total, in a roughly four-year period, Attorney-1 withdrew on Epstein's behalf more than $800,000 in cash from Epstein's personal accounts. Throughout the Epstein relationship, Deutsche Bank never sought or received any explanation for Epstein's cash activity beyond the general travel, tipping, and expenses explanation provided by Attorney-1.

234.    Through information and belief, Attorney-1 also had accounts at Deutsche Bank. Attorney 1 withdrew substantial amounts of cash from his accounts and transferred money from Epstein controlled accounts to his accounts as payment or his participation in activities to further his sex abuse and his sex-trafficking scheme, including engaging in the crime of structuring outlined above.

235.    In light of all of these red flags, in addition to its actual knowledge that they were facilitating the Epstein sex-trafficking venture, Deutsche Bank should have known that it was facilitating sex abuse and a sex-trafficking venture that was engaging in coercive sex trafficking in violation of 18 U.S.C. § 1591(a).

236.    In a recent case before this Court, it was alleged that a confidential witness (identified only as "CW1") reported that Epstein was retained as a client

only after discussion at Deutsche Bank's Board level. Karimi v. Deutsche Bank
Aktiengesellschaft, Case No. 22-cv-2854-JSR, Dkt. 86 at 6 (S.D.N.Y. June 13,
2022).

237.    In the same recent case before this Court, it was alleged that a
confidential witness (identified only as "CW8") reported that "Deutsche Bank had a
KYC [Know Your Customer] 'special deal' for Epstein and other high-net-worth
individuals. CW8 explained that such individuals were not required to submit to the
normally required KYC documentation. Deutsche Bank gave them special
exceptions because of the amount of business they generated." Karimi v. Deutsche
Bank Aktiengesellschaft, Case No. 22-cv-2854-JSR (S.D.N.Y. June 13, 2022), Dkt.
86 at 7.

238.    In the same recent case before this Court, a confidential witness
("CW8") explained that "after Epstein was onboarded, decisions about whether to
continue keeping him as a client were repeatedly escalated, including to Deutsche
Bank's Reputational Risk Committee. 'He would go up, get approved, go up, get
approved,' CW8 said. CW8 noted that the people who sat on Deutsche Bank's
Reputational Risk Committee were 'primarily business-side people,' meaning they
were interested solely in making money for the Bank." Karimi v. Deutsche Bank
Aktiengesellschaft, Case No. 22-cv-2854-JSR (S.D.N.Y. June 13, 2022), Dkt. 86 at
7.

239. In the same case, another confidential witness ("CW1") explained that from the time of Epstein's onboarding, the relationship was classified by Deutsche Bank as "high-risk" and therefore should have been subject to enhanced due diligence. Instead, in an ironic twist, the Bank designated as an "Honorary PEP" (that is, an Honorary Politically Exposed Person). According to CW1, "there is no such thing as an honorary PEP. You are either a PEP or you aren't. I suspect they use this term to fudge things. Epstein was certainly very high risk …. But Deutsche Bank did not treat him as a high-risk client. I think the phrase 'honorary PEP has been dreamt up to explain away why he wasn't treated as a high-risk client—whose accounts should have been constantly reviewed." Second Amended Complaint at 100, Karimi et al. v. Deutsche Bank Aktiengesellschaft et al., Case No. 2:20-cv-08978-ES-JRA (D.N.J. Mar. 1, 2021), Dkt. 37 at ¶ 100 (case later transferred to this Court, Case No. 1:22-cv-02854-JSR).

**10.    Termination of the Epstein Relationship**

240. In November, 2018, the Miami Herald published a three part journalistic report entitled: Perversion of Justice, which rehashed old news stories about Jeffrey Epstein and his publicly known history of sexual abuse.  While the series did not contain any new information, it resurfaced previously publicized information about Jeffrey Epstein's sexual abuse of 'women, now in a post #metoo world.

241.    With the world once again talking about Jeffrey Epstein's long known history for committing sex crimes, Deutsche Bank got nervous it would be exposed as the complicit banking partner of Jeffrey Epstein's operation.

242.    On December 21, 2018, after making millions on the banking relationship with Epstein, the Bank informed Epstein by letter that they would no longer be servicing his accounts.

243.    Despite the Bank's decision to offboard all Epstein accounts due to reputational risks, Relationship Manager-2 drafted reference letters to two other financial institutions, on Deutsche Bank letterhead, indicating in one such letter that he was "unaware of any problems relating to the operation or use of [the] accounts."

244.    Deutsche Bank fraudulently concealed its role in facilitating Epstein's sexual abuse and the sex-trafficking venture from the public until around July 2020.

**11.    Conclusions Regarding the Epstein Accounts**

245.    If a financial institution decides to do business with a high-risk client, that institution is required to conduct due diligence commensurate with that risk and to tailor its transaction monitoring to detect suspicious or unlawful activity based on what the risk is. Deutsche Bank knowingly, intentionally, deliberately, and maliciously failed to do so with regard to its relationship with Epstein.

246.    After reviewing Deutsche Bank's relationship with Epstein, the New

York Banking Regulators concluded that "although the Bank properly classified Epstein as high-risk, the Bank failed to scrutinize the activity in the accounts for the kinds of activity that were obviously implicated by Epstein's past."

247.  The Bank was well aware not only that Epstein had pled guilty and served prison time for engaging in sex with a minor but also that there were public allegations that his conduct was facilitated by several named co- conspirators.

248.  Despite this knowledge, the Bank did little or nothing to inquire into or block numerous payments to named co-conspirators, and to or on behalf of numerous young women, or to inquire how Epstein was using, on average, more than $200,000 per year in cash.

249.  Epstein used the $200,000 per year in cash to facilitate his sex abuse and his sex-trafficking venture. As the New York Banking Regulators concluded, the fact that the cash withdrawals "were suspicious should have been obvious to Bank personnel at various levels." In fact, Bank personnel at various level did recognize that the transactions were being used by Epstein to facilitate his sex abuse and his sex-trafficking venture.

250.  Deutsche Bank's desire to maintain its profitable relationship with Epstein led it to deliberately avoid taking steps that would have documented its involvement in Epstein's sex-trafficking venture. Despite Epstein's prior criminal history, the initial onboarding of the first Epstein account was not reviewed by the

Bank's regional reputational risk committee but was instead approved in what appears to have been an off-hand conversation reflected only in the Approval Email. That Approval Email was then relied upon, substantially without additional scrutiny, to open numerous other Epstein-related accounts.

251.   When the relationship was finally elevated to the full ARRC in early 2015, no minutes were taken of that meeting, contrary to Deutsche Bank policy. Thereafter, the Committee continued the relationship based primarily on a brief, purported due diligence meeting between two front-office personnel and Epstein himself, the substance of which was also not reflected in writing.

252.   Moreover, the conditions imposed by the ARRC—conditions that, if followed, would have prevented many subsequent suspicious transactions—(a) were not transmitted to the majority of the relationship team; and (b) were misinterpreted by a compliance officer in a way that resulted in very little change in how the monitoring of the accounts occurred going forward. As the New York Banking Regulators concluded, "Throughout the relationship, very few problematic transactions were ever questioned, and when they were, they were usually cleared without satisfactory explanation."

253.   To profiteer from the fees and referrals generated by Epstein, Deutsche Bank intentionally, continuously, and outrageously allowed Epstein to use the Bank's services to cover up old crimes and to facilitate new ones—a major

compliance failure and reputational stain on the bank. *See* Second Amended Complaint at ¶ 42, Karimi et al. v. Deutsche Bank Aktiengesellschaft et al., Case No. 2:20-cv-08978-ES-JRA (D.N.J. Mar. 1, 2021), Dkt. 37 at ¶ 42 (case later transferred to this Court, Case No. 1:22-cv-02854-JSR).

### D. Deutsche Bank's Participation in the Epstein Sex-trafficking Venture Was Part of a Broader Pattern of Participating in Other Illegal and "High Risk, High Reward" Ventures.

254.    Deutsche Bank's intentional and outrageous participation in the Epstein sex abuse and sex-trafficking venture was not a "one off." To the contrary, its deliberate participation fits within a pattern and practice of Deutsche Bank profiting by undertaking illegal "high risk, high reward" clients. *See generally* Opinion and Order, Karimi v. Deutsche Bank Aktiengesellschaft et al., Case No. 22-cv-2854-JSR (S.D.N.Y. June 13, 2022), Dkt. 86 at 2 (recounting allegations that Deutsche Bank executives "routinely overruled compliance staff so that the Bank's wealth management business could commence or continue relationships with high-risk, ultra-rich clients, such as Russian oligarchs, the convicted sex trafficker Jeffrey Epstein, founders of terrorist organizations, persons associated with Mexican drug cartels, and people suspected of financing terrorist organizations).

255.    As discussed above, the "special deal" that Epstein received from Deutsche Bank in not being required to provide the normally required Know Your Customer document was extended to other high net worth individuals. Deutsche

Bank gave this "special deal" because of the amount of business these individuals generated. Second Amended Complaint, Karimi et al. v. Deutsche Bank Aktiengesellschaft et al., Case No. 2:20-cv-08978-ES-JRA (D.N.J. Mar. 1, 2021), Dkt. 37 at ¶ 101 (case later transferred to this Court, Case No. 1:22-cv-02854-JSR).

256.    As part of a similar pattern and practice to has it did for Jeffrey Epstein, Deutsche Bank routinely onboarded without due diligence and serviced individuals reported engaged in criminal activities, in reckless disregard of the financial and other crimes they helped to perpetrate. Second Amended Complaint, Karimi et al. v. Deutsche Bank Aktiengesellschaft et al., Case No. 2:20-cv-08978-ES-JRA (D.N.J. Mar. 1, 2021), Dkt. 37 at ¶ 103 (case later transferred to this Court, Case No. 1:22-cv-02854-JSR).

257.    In a similar pattern to what it did for Jeffrey Epstein, Deutsche Bank onboarded and serviced Eastern European oligarchs reportedly involved in criminality, including Igor Putin and Roman Abramovich.

258.    In a similar pattern to what it did for Jeffrey Epstein, Deutsche Bank onboarded and serviced the founders of the Hezbollah terrorist organization.

259.    In a similar pattern to what it did for Jeffrey Epstein, Deutsche Bank onboarded and serviced a billionaire who was a relative of one of the founders of Al Rajhi Bank in Saudi Arabia, an entity long suspected of financing terrorists.

260.    In a similar pattern to what it did for Jeffrey Epstein, Deutsche Bank

onboarded and serviced Germán and José Efromovich despite their links to a Mexican drug cartel.

261.    Deutsche Bank's pattern and practice has been exposed in multiple ways. For example, in 2015, Deutsche Bank agreed to pay a combined $2.5 billion in fines—a $2.175 billion fine by American regulators and a €227 million penalty by British authorities—for its involvement in the Libor scandal uncovered in June 2012. The company also pleaded guilty to wire fraud, acknowledging that at least 29 employees had engaged in illegal activity.

262.    For another example, in November 2015, Deutsche Bank was ordered to pay $258 million in penalties imposed by the New York State Department of Financial Services and the U.S. Federal Reserve Bank after the bank was caught doing business with Burma, Libya, Sudan, Iran and Syria, which were under U.S. sanctions at the time.

263.    For another example, in January 2017, Deutsche Bank agreed to a $7.2 billion settlement with the U.S. Department of Justice over its sale and pooling of toxic mortgage securities in the years leading up to the 2008 financial crisis. As part of the agreement, Deutsche Bank was required to pay a civil monetary penalty of $3.1 billion and provide $4.1 billion in consumer relief, such as loan forgiveness.

264.    For another example, in January 2017, the bank was fined $425 million by the New York State Department of Financial Services and £163 million

by the U.K. Financial Conduct Authority regarding accusations of money laundering $10 billion out of Russia.

265.     The common thread running through Deutsche Bank's participation in the Epstein sex-trafficking venture and its other illegal behavior is that Deutsche Bank intentionally planned to profit from being the banker for individuals and organizations that other banks knew they could not lawfully handle. For Deutsche Bank, this "high risk, high reward" approach ensured—and continues to ensure—that it will earn greater profits than would come from complying with the law.

### E. The Statute of Limitations

266.     The statute of limitations under the TVPA is ten years after the cause of action arose, or ten years after the victim reaches eighteen years of age, if the victim was a minor at the time of the alleged offense. 18 U.S.C. § 1595(c)(1), (2). The TVPA causes of actions for Jane Doe 1, and the other Class Members, all arose within ten years of the filing of this complaint.

267.     The New York Adult Survivor's Act has opened up a one-year revival window for the statute of limitations.

268.     RICO does not establish a precise statute of limitations. In this case, the RICO enterprise continued and caused injury through December 2018, as explained in further detail below, within any possible statute of limitations.

269.     Deutsche Bank fraudulently concealed its role in facilitating the

Epstein sex trafficking venture through around July 20, 2020, when Deutsche Bank and the New York banking regulators publicly announced a civil settlement for Deutsche Bank's violation of its obligations in connection with Jeffrey Epstein's sex trafficking. As a result, any applicable statute of limitations was equitable tolled until July 20, 2020.

270.     Plaintiff did not have the means and resources to uncover Deutsche Bank's role in facilitating their sexual abuse and sex trafficking until New York banking regulators announced their findings on July 20, 2020.

## VII. CLASS ACTION ALLEGATIONS

271.     Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23(b)(3) and 23(c)(4) on behalf of herself and the following Class:

> All women who were sexually trafficked by Jeffrey Epstein during the time when Deutsche Bank maintained bank accounts for Epstein and/or Epstein related-entities, which was in or about August 19, 2013, through in or about December 31, 2018, both dates inclusive (the "Class Period").

272.     Plaintiff reserves the right to seek leave to modify this definition, including the addition of one or more subclasses, after having the opportunity to conduct discovery

273.     <u>Numerosity</u>: The Class consists of dozens of women, making joinder impracticable, in satisfaction of Fed. R. Civ. P. 23(a)(1). The exact size of the Class and the identities of the individual Class members are ascertainable through records

maintained by the Epstein estate executors and the Defendants, including but not limited to Deutsche Bank's records for Epstein-related accounts (e.g., account ledgers reflecting payments from Epstein to Class members).

274.   <u>Typicality</u>: Plaintiff's claims are typical of the claims of the other Class members she seeks to represent. The claims of Plaintiff and the other Class members are based on the same legal theories and arise from the same unlawful pattern and practice of Defendants' participation in and funding of Epstein's sex abuse and Epstein's sex-trafficking venture.

275.   <u>Commonality</u>: There are many questions of law and fact common to the claims of Plaintiff and the other Class members, and those questions predominate over any questions that may affect only individual Class members, within the meaning of Fed. R. Civ. P. 23(a)(2) and (b)(3). Class treatment of common issues under Fed. R. Civ. P. 23(c)(4) will materially advance the litigation.

276.   Common questions of fact and law affecting Class members include, but are not limited to, the following:

a.   Whether the Epstein sex-trafficking venture caused its victims to engage in commercial sex acts in violation of Trafficking Victims Protection Act, 18 U.S.C. § 1591(a)(1);

b.   Whether the Epstein sex-trafficking venture recruited, enticed, solicited, harbored, provided, obtained, and transported victims in ways that were in or affecting interstate or foreign commerce;

c.   Whether Epstein and his co-conspirators used means of force, fraud, coercion, and abuse of legal process, or a combination of such means,

to sexually abuse the victims and to cause victims to engage in commercial sex acts;

d.     Whether Deutsche Bank knowingly assisted, facilitated, and supported the Epstein sex-trafficking venture's pattern and practice of coercively forcing victims to engage in commercial sex acts;

e.     Whether Deutsche Bank benefitted financially or by receiving things of value from its participation in a venture which has engaged in sex trafficking in violation of TVPA, 18 U.S.C. § 1591(a)(1);

f.     Whether Deutsche Bank knew or should have known that the Epstein sex-trafficking venture had engaged in violations of the TVPA, 18 U.S.C. § 1591(a); and

g.     Whether Deutsche Bank committed negligent acts or omissions that facilitated sexual abuse which would constitute a sexual offense as defined in article one hundred thirty of the penal law committed against such persons who were eighteen years of age or older.

277.     Absent a class action, most of the Class members would find the cost of litigating their claims to be cost-prohibitive and will have no effective remedy. The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation, in that it conserves the resources of the courts and the litigants and promotes consistency and efficiency of adjudication.

278.     Adequacy: Jane Doe 1 will fairly and adequately represent and protect the interests of the other Class members she seeks to represent. Jane Doe 1 has retained counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the other Class members and have the financial resources to do

so. Neither Plaintiff nor her counsel have any interests adverse to those of the other Class members.

279.     This action has been brought and may properly be maintained as a class action against Defendant pursuant to Rule 23 of the Federal Rules of Civil Procedure because there is a well-defined community of interest in the litigation and the proposed Class is easily ascertainable from Defendants' records.

280.     <u>Superiority</u>: A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because:

a.     Joinder of all Class Members is impracticable;

b.     The prosecution of individual remedies by members of the Class will tend to establish inconsistent standards of conduct for Defendants and result in the impairment of Class Member's rights and the disposition of their interests through actions to which they were not parties;

c.     Class action treatment will permit a large number of similarly-situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender;

d.     Absent a class action, Class Members will continue to suffer losses and be aggrieved and Defendants will continue to violate New York and federal law without remedy;

e.      Class treatment of this action will cause an orderly and expeditious administration of class claims, economies of time, effort and expense will be fostered, and uniformity of decisions will be ensured;

f.      Plaintiff and her counsel are unaware of any class action brought against any Defendant for the violations alleged in this action;

g.      The forum is desirable because the Defendant conducted the subject business with Jeffrey Epstein in this District and Class Members were consequently trafficked in this District; and,

h.      This action presents no difficulty that would impede its management by the Court as a class action.

## VIII. CAUSES OF ACTION

### COUNT I
**PARTICIPATING IN A SEX-TRAFFICKING VENTURE IN VIOLATION OF THE TRAFFICKING VICTIMS PROTECTION ACT, 18 U.S.C. §§ 1591(a)(2), 1595**

281.    Plaintiff Jane Doe 1 realleges and incorporates by reference paragraphs 1-280, as if fully set forth in this Count.

282.    Plaintiff Jane Doe 1 brings this Count individually and on behalf of the other Class members she respectively seeks to represent.

283.    Deutsche Bank knowingly and intentionally participated in, assisted, supported, and facilitated a sex-trafficking venture that was in and affecting interstate and foreign commerce, together and with others, in violation of 18 U.S.C.

§ 1591(a)(2).

284. Deutsche Bank knowingly and intentionally benefited financially from, and received value for, its participation in the sex-trafficking venture, in which Epstein, with Defendant's knowledge, or its reckless disregard of the fact, that Epstein would use means of force, threats of force, fraud, coercion, and a combination of such means to cause Jane Doe 1, as well as other Class members, some of whom were under the age of eighteen, to engage in commercial sex acts.

285. Among the financial benefits that the Deutsche Bank received for participating in and facilitating Epstein's sex-trafficking venture were the deposit of funds that Epstein and Epstein-controlled entities made to Deutsche Bank. Deutsche Bank profited from the use of these deposits. Epstein and Epstein-controlled entities deposited these funds in exchange for Deutsche Bank's facilitation and participation in the sex trafficking venture.

286. Among the financial benefits that the Defendants received for participating in Epstein's sex-trafficking venture was referral of business opportunities from Epstein and his co-conspirators. Deutsche Bank profited from these referred business opportunities. Epstein referred business entities and business opportunities to Deutsche Bank in exchange for its facilitation and participation in the sex trafficking venture.

287. Deutsche Bank financially profited from the deposits made by Epstein

and Epstein-controlled entities and from the business opportunities referred to Deutsche Bank by Epstein in exchange for its facilitation and participation in Epstein's sex trafficking venture.

288.   Deutsche Bank knew, and was in reckless disregard of the fact, that it was Epstein's pattern and practice to use the channels and instrumentalities of interstate and foreign commerce, to entice, recruit, solicit, harbor, provide, obtain, and transport young women and underage girls for purposes of causing commercial sex acts, in violation of 18 U.S.C. § 1591(a)(1).

289.   Deutsche Bank and its employees had actual knowledge that they were facilitating Epstein's sexual abuse and sex trafficking conspiracy to recruit, solicit, entice, coerce, harbor, transport, obtain and provide Jane Doe 1 as well as other members of the Class, into commercial sex acts, through the means of force, threats of force, fraud, abuse of process, and coercion.

290.   Despite such knowledge, Defendants intentionally paid for, facilitated, and participated in Epstein's violations of 18 U.S.C. § 1591(a)(1), which Defendants knew, and were in reckless disregard of the fact that, Epstein would coerce, defraud, and force Jane Doe 1, as well as other members of the Class, to engage in commercial sex acts.

291.   Deutsche Bank, through its employees and agents, actively participated in the sex trafficking conspiracy and led Jane Doe 1, as well as other

members of the Class, to believe that they would be rewarded if they cooperated and acquiesced to Epstein's demands.

292.    Defendants' affirmative conduct was committed knowing, and in reckless disregard of the facts, that Epstein would use cash and financial supported provided by Deutsche Bank as a means of defrauding, forcing, and coercing sex acts from Jane Doe 1 as well as other members of the Class. Defendants' conduct was outrageous and intentional.

293.    In addition to actual knowledge that they were participating in and facilitating the Epstein sex-trafficking venture, the Defendants also should have known that it was participating in and facilitating a venture that had engaged in coercive sex trafficking in violation of 18 U.S.C. § 1591(a)(1).

294.    In exchange for facilitating and covering up Epstein's commercial sex trafficking, the Deutsche Bank's employees advanced in their careers at Deutsche Bank and received financial benefits therefrom.

295.    Facilitating and covering up Epstein's sexual misconduct was a means of obtaining economic success and promotion within the Deutsche Bank hierarchy.

296.    Defendants' knowing and intentional conduct has caused Jane Doe 1 and the other members of the Class serious harm including, without limitation, physical, psychological, emotional, financial, and reputational harm.

297.     Defendants' knowing and intentional conduct has caused Jane Doe 1 and the other members of the Class harm that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity, in order to avoid incurring that harm.

298.     This case does not involve mere fraud. Instead, Defendants' tortious conduct in violating the TVPA was outrageous and intentional, because it was in deliberate furtherance of a widespread and dangerous criminal sex trafficking organization. Defendants' tortious conduct also evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations. Defendants' tortious conduct was directed specifically at Jane Doe 1 and other members of the class, who were the victims of Epstein's sexual abuse and sex trafficking organization.

299.     Defendants' outrageous and intentional conduct in this case is part of a pattern and practice of Deutsche Bank profiting by undertaking illegal "high risk, high reward" clients.

300.     By virtue of these knowing and intentional violations of 18 U.S.C. §§ 1591(a)(2), 1595, Defendants are liable to Jane Doe 1 and the other members of the Class for the damages they sustained and reasonable attorneys' fees.

301.     By virtue of these intentional and outrageous violations of 18 U.S.C.

§§ 1591(a)(2), 1595, Defendants are liable to Jane Doe 1 and other members of the class for punitive damages.

## COUNT II
## CONSPIRACY TO COMMIT VIOLATIONS OF THE TRAFFICKING VICTIM PROTECTION ACT, 18 U.S.C. §§ 1594(c),1595

302.    Plaintiff Jane Doe 1 realleges and incorporates by reference paragraphs 1-280, as if fully set forth in this Count.

303.    Plaintiff Jane Doe 1 brings this Count individually and on behalf of the other Class members she respectively seeks to represent.

304.    Deutsche Bank intentionally conspired with others, by agreement and understanding, to violate 18 U.S.C. § 1591(a), and to further Epstein's sex-trafficking venture to coerce commercial sex acts from Jane Doe 1 and other Class members, all in violation of 18 U.S.C. § 1594(c). Deutsche Bank employees conspired with Epstein himself to further the sex trafficking venture.

305.    Deutsche Bank conspired with Epstein and his co-conspirators to further the Epstein sex-trafficking venture and with the purpose of facilitating Epstein's illegal sex trafficking.

306.    Deutsche Bank intentionally committed overt acts in furtherance of the conspiracy, agreement, and understanding to violate 18 U.S.C. § 1591(a) by knowingly playing an active role in assisting, supporting, and facilitating the recruiting, enticing, coercing, harboring, transporting, and inducing Jane Doe 1 and

other Class members to engage in commercial sex acts, through providing financial support for the Epstein sex-trafficking venture.

307.    Among the many overt acts intentionally committed by Deutsche Bank in furtherance of the sex-trafficking venture were creating and maintaining a financial relationship between Deutsche Bank and Epstein within this District.

308.    Acting within this District and in furtherance of the Epstein sex-trafficking venture, on or about August 19, 2013, Deutsche Bank opened brokerage accounts for Southern Trust Company Inc., an Epstein-related company.

309.    In furtherance of the Epstein sex-trafficking venture, between on or about August 19, 2013, and through about 2018, Deutsche Bank opened about 40 accounts for Epstein, his related entities, and associates. The accounts were in and affecting interstate and foreign commerce.  The accounts were opened within this District.

310.    It was part of the conspiracy that Deutsche Bank would financially benefit from providing financial support for the Epstein sex-trafficking venture. Deutsche Bank did financially benefit from its participation in the venture, including receiving valuable deposits from Epstein and Epstein-related entities into Deutsche Bank.

311.    Deutsche Bank's participation in furthering Epstein's sex-trafficking venture was intentional and willful and, therefore, Deutsche Bank intentionally and

willfully caused Epstein's commission of the commercial sex acts with Jane Doe 1 and other Class members through its affirmative and overt acts supporting Epstein.

312.   Deutsche Bank knew, or acted in reckless disregard of the fact, that its acts and conduct supporting and facilitating Epstein would lead to unlawful coercive commercial sex acts by Epstein with young women and girls, including Jane Doe 1 and other Class members.

313.   Deutsche Bank conspired with Epstein through their affirmative acts and provided substantial support to Epstein committing commercial sex acts upon Jane Doe 1 and other Class members.

314.   In addition to acting with knowledge that they were supporting the Epstein sex-trafficking venture, Deutsche Bank benefitted financially from participating in the Epstein sex-trafficking venture which Deutsche Bank also should have known that had engaged in coercive sex trafficking in violation of 18 U.S.C. § 1591(a)(1).

315.   Defendants' conduct has caused Jane Doe 1 and other Class members serious harm, including, without limitation, physical, psychological, financial, and reputational harm.

316.   Defendants' conduct has caused Jane Doe 1 harm that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue

performing commercial sexual activity in order to avoid incurring that harm.

317.    This case does not involve mere fraud. Instead, Defendants' tortious conduct in conspiring to violate the TVPA was outrageous and intentional, because it was in deliberate furtherance of a widespread and dangerous criminal sex trafficking organization. Defendants' tortious conspiracy also evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations. Defendants' tortious conspiracy was directed specifically at Jane Doe 1 and other members of the class, who were the victims of Epstein's sex trafficking organization.

318.    By virtue of these violations of 18 U.S.C. §§ 1594(c), 1595, Defendants are liable to Jane Doe 1 and the other members of the Class for the damages they sustained and reasonable attorneys' fees.

319.    By virtue of its intentional and outrageous conspiracy to violate 18 U.S.C. §§ 1594(c), 1595, Defendants are liable to Jane Doe 1 and other members of the class for punitive damages.

<u>**COUNT III**</u>
**ATTEMPT TO COMMIT VIOLATIONS OF THE TRAFFICKING VICTIM PROTECTION ACT, 18 U.S.C. §§ 1594(a), 1595**

320.    Plaintiff Jane Doe 1 realleges and incorporates by reference paragraphs 1-280, as if fully set forth in this Count.

321.    Plaintiff Jane Doe 1 brings this Count individually and on behalf of

the other Class members she respectively seeks to represent.

322.    Deutsche Bank intentionally attempted to violate 18 U.S.C. § 1591(a), and to further Epstein's sex-trafficking venture to coerce commercial sex acts from Jane Doe 1 and other Class members, all in violation of 18 U.S.C. § 1594(a).

323.    Deutsche Bank employees deliberately took substantial steps to attempt to violate 18 U.S.C. § 1591(a) within this District.

324.    Deutsche Bank deliberately took substantial steps toward attempting to violate 18 U.S.C. § 1591(a) providing financial support for the Epstein sex-trafficking venture.

325.    Among the many substantial steps taken by Deutsche Bank to deliberately attempt to violate 18 U.S.C. § 1591(a) were creating a financial relationship between Deutsche Bank and Epstein within this District.

326.    Acting within this District and in attempting to further the Epstein sex-trafficking venture, on or about August 19, 2013, Deutsche Bank opened brokerage accounts for Southern Trust Company Inc., an Epstein-related company.

327.    In attempting to further the Epstein sex-trafficking venture, between on or about August 19, 2013, and through about 2018, Deutsche Bank opened about 40 accounts for Epstein, his related entities, and associates. The accounts were in and affecting interstate and foreign commerce.  The accounts were opened within this District.

328.     It was part of the attempt to violate 18 U.S.C. 1591(a) that Deutsche Bank would financially benefit from providing financial support for the Epstein sex-trafficking venture. Deutsche Bank did financially benefit from its participation in the venture, including receiving valuable deposits from Epstein and Epstein-related entities into Deutsche Bank.

329.     Defendants' attempt to violate the TVPA by furthering Epstein's sex-trafficking venture was intentional and willful and, therefore, Defendants' intentionally and willfully caused Epstein's commission of sexual abuse and commercial sex acts with Jane Doe 1 and other Class members through its affirmative and overt acts supporting Epstein.

330.     Defendants knew and acted in reckless disregard of the fact, that its acts and conduct supporting and facilitating Epstein would lead to sexual abuse and unlawful coercive commercial sex acts by Epstein with young women and girls, including Jane Doe 1 and other Class members.

331.     In addition to acting intentionally and with knowledge that they were supporting the Epstein sex-trafficking venture, Defendants benefitted financially from participating in the Epstein sex-trafficking venture which Defendants should have known that had engaged in coercive sex trafficking in violation of 18 U.S.C. § 1591(a)(1).

332.     This case does not involve mere fraud. Instead, Defendants' tortious

conduct in attempting to violate the TVPA was outrageous and intentional, because it was a deliberate attempt to further the crimes of a widespread and dangerous criminal sex trafficking organization. Defendants' tortious attempts also evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations. Defendants' tortious attempt was directed specifically at Jane Doe 1 and other members of the class, who were the victims of Epstein's sex trafficking organization.

333.     Defendants conduct has caused Jane Doe 1 and other Class members serious harm, including, without limitation, physical, psychological, financial, and reputational harm.

334.     By virtue of these violations of 18 U.S.C. §§ 1594(a), 1595(a), Defendants are liable to Jane Doe 1 and the other members of the Class for the damages they sustained and reasonable attorneys' fees.

335.     By virtue of its intentional and outrageous attempt to violate 18 U.S.C. §§ 1594(a), 1595, Defendants are liable to Jane Doe 1 and other members of the class for punitive damages.

## COUNT IV
## CIVIL RICO, 18 U.S.C. §§ 1962, 1964(c)

336.     Plaintiff Jane Doe 1 realleges and incorporates by reference paragraphs 1-280, as if fully set forth in this Count.

337.     Plaintiff Jane Doe 1 brings this Count individually and on behalf of

the other Class members she respectively seeks to represent.

338.    Deutsche Bank employees deliberately took substantial steps to attempt to violate 18 U.S.C. § 1962 within this District.

339.    An "enterprise" as defined in RICO "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(3). Deutsche Bank and others employed by or associated with it or others acting in concert with Deutsche Bank, promoted, facilitated, financed, and otherwise effectuated the Epstein sex trafficking enterprise and/or Epstein's coercive commercial sex acts, as alleged in this Complaint, and constituted an "enterprise" under this definition.

340.    The Epstein sex trafficking enterprise engaged in, and had activities which affect, interstate and foreign commerce.

341.    The Epstein sex trafficking enterprise consisted of more than Epstein and Epstein's own employees and agents. It also included other persons, including Deutsche Bank's employees and agents. The enterprise operated together as an association in fact.

342.    The persons who operated together as an association in fact included, but were not limited to, Defendant Deutsche Bank, Jeffrey Epstein, Attorney-1, Sarah Kellen, Leslie Groff, Adriana Ross, Nadia Marcinkova, defendants Charles

Packard, defendant Patrick Harris, defendant Paul Morris, and Jan Ford. These individuals knew of, and agreed to, the general criminal objective of the Epstein sex trafficking enterprise. These individuals also agreed that Deutsche Bank would provide the funding for the enterprise.

343.   The Epstein sex trafficking enterprise had a shared and common purpose—securing young women and girls for Epstein to sexually abuse and to commercially sex traffic.

344.   The Epstein sex trafficking enterprise had a relationship among the associates, including a relationship among Epstein's employees and agents and Deutsche Bank's employees and agents. The associates coordinated their actions to facilitate the actions of the sex trafficking enterprise, including ensuring that the enterprise had sufficient financing to pursue its purpose.

345.   The Epstein sex trafficking enterprise lasted from (at least) around 2013 through around December 2018, permitting the associates in the enterprise to successfully pursue the enterprise's purpose. As a result of the longevity of the enterprise, many young women and girls were sexually abused and sexually trafficked by Epstein. In this way, those involved in the enterprise helped it achieve the common purpose.

346.   Deutsche Bank and others acting in concert with them as part of the aforementioned enterprise engaged in racketeering activity within the meaning of

RICO, 18 U.S.C. §1961(1)(B), when they engaged in acts "indictable under" 18 U.S.C. §§ 1581-1592 (the statutes relating to peonage, slavery, and trafficking in persons), to wit, the acts in violation of 18 U.S.C. § 1591 alleged in Count I and otherwise specified throughout this Complaint.

347.    Deutsche Bank received income derived directly and indirectly from participating in a pattern of racketeering activity, specifically by obtaining interest and other things of value from financially supporting and participating in the Epstein sex trafficking enterprise.

348.    Deutsche Bank and its employees participated directly and indirectly in the conduct of the Epstein sex trafficking enterprise, through a pattern of racketeering activity, including knowingly funding the enterprise's commercial sex trafficking.

349.    Deutsche Bank and others acting in concert with them as part of the aforementioned enterprise engaged in a pattern of racketeering activity within the meaning of RICO, 18 U.S.C. §1961(5), when they committed two or more separate acts constituting a pattern of racketeering activity, the last of which occurred within ten years after the commission of a prior act of racketeering activity. Specifically, Deutsche Bank and others in the enterprise committed multiple acts in violation of 18 U.S.C. § 1962(a)-(d) over the course of several years from about 2013 to about December 2018, during which time Plaintiff were sexually assaulted and sexually

trafficked.

350.    Among the acts constituting a pattern of racketeering activity, on or about August 19, 2013, Deutsche Bank opened brokerage accounts for Southern Trust Company Inc., a self-described "database company and services" founded in the U.S. Virgin Islands in 2011, and Southern Financial LLC, a wholly owned subsidiary of Southern Trust Company Inc. Opening these accounts for the Epstein sex trafficking enterprise constituted acts which were indictable under 18 U.S.C. § 1581-92, for the reasons described above.

351.    Among the acts constituting a pattern of racketeering activity, over the course of its relationship with the Epstein sex trafficking enterprise from about 2013 to December 2018, Deutsche Bank would open and allow Epstein to fund more than 40 accounts at Deutsche Bank.  Opening these accounts for the Epstein sex trafficking enterprise constituted acts which were indictable under 18 U.S.C. § 1581-92, for the reasons described above.

352.    Among the acts constituting a pattern of racketeering activity, over the course of its relationship with the Epstein sex trafficking enterprise, Deutsche Bank sent over 120 wires totaling $2.65 million to beneficiaries of the Butterfly Trust. These transfers furthered the sex-trafficking enterprise, including funds paying directly for commercial sex acts, funds paid to professionals for carrying out illegal acts for the operation of the sex-trafficking venture, and paying funds to

others for committing crimes necessary to continue the operation of the sex trafficking venture. Sending the wires for the Epstein sex trafficking enterprise constituted acts which were indictable under 18 U.S.C. § 1581-92, for the reasons described above.

353.    Deutsche Bank knowingly facilitated Epstein using Deutsche Bank accounts to pay for coerced commercial sex acts by Jane Doe 1. Helping Epstein provide the funding for commercial sex acts constituted acts of racketeering activity because they were indictable under 18 U.S.C. § 1581-92, for the reasons described above.

354.    Defendants' pattern of racketeering activity extended over a substantial period of time—i.e., during the multiple years that Deutsche Bank financially furthered and supported the Epstein sex trafficking enterprise.

355.    Deutsche Bank violated RICO, 18 U.S.C. § 1962(c), which makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity ...." Deutsche Bank were associated with the enterprise and they conducted or participated (directly and indirectly) in the conduct of the enterprise's affairs by financially supporting the Epstein sex trafficking enterprise and also engaging in a pattern of racketeering activity as alleged above.

356.    Jane Doe 1 and other members of the class were directly and proximately injured and continue to be directly and proximately injured in their business and/or property by the knowing and intentionally conduct constituting Defendants' violation of 18 U.S.C. § 1962.

357.    Among the injuries that Plaintiff directly and proximately suffered from Defendants' knowing and intentional violation of 18 U.S.C. § 1962 were economic consequences and damage from the sexual abuse and sex trafficking by Epstein.

358.    The injuries that Plaintiff directly and proximately suffered from Defendants' violation of 18 U.S.C. § 1962 extended beyond personal injuries and included, in addition, economic injuries and injuries to the Plaintiff' business and property.

359.    Defendants' violations have directly and proximately caused Plaintiff serious and permanent economic harm, including, without limitation, financial harm, including harm to their careers and business and professional prospects. Defendants' violations continue to cause economic harm and injury to Jane Doe 1 and other members of the class.

360.    Under 18 U.S.C. § 1964(c), Jane Doe 1 and the other members of the class are entitled to recover from Defendants the "threefold the damages" they have sustained, and the cost of the suit, including reasonable attorneys' fees.

## COUNT V
## INTENTIONAL AND NEGLIGENT ACTS AND OMISSIONS UNDER THE NEW YORK ADULT SURVIVORS ACT, NEW YORK CPLR § 214-j.

361.     Plaintiff Jane Doe 1 realleges and incorporates by reference paragraphs 1-280, as if fully set forth in this Count.

362.     Plaintiff Jane Doe 1 brings this Count individually and on behalf of the other Class members she respectively seeks to represent.

363.     Pursuant to New York Civil Practice Law and Rules § 214-j, this Count for intentional and negligent acts and omissions has been timely filed, as every civil claim or cause of action brought against any party alleging intentional and negligent acts or omissions by a person for physical, psychological, or other injury or condition suffered as a result of conduct which would constitute a sexual offense as defined in article one hundred thirty of the penal law committed against such person who was eighteen years of age or older was revived effective November 24, 2022.

364.     Intentional and negligent acts and omissions committed by Deutsche Bank within this District and elsewhere directly and proximately resulted in the commission of sexual offenses by Epstein and his co-conspirators under the laws of the State of New York (e.g., New York Penal Law Art. 130, including New York Penal Law §§ 130.20, 130.35, 130.50, 130.52, and 130.66), which injured Plaintiff Jane Doe 1 and the other Class Members.

365.     As a financial institution operating within this District and within the State of New York, Deutsche Bank owed legal duties to Plaintiff Jane Doe 1 and the Class Members to exercised reasonable care to monitor Deutsche Bank's customers (including Jeffrey Epstein) for the purpose of preventing them from facilitating and engaging in foreseeable criminal activity using the Bank's facilities that could harm the Plaintiff and the Class Members.

366.     All employees of Deutsche Bank also owed these same legal duties to Plaintiff and the Class Members.

367.     The legal duties of Deutsche Bank described in the two preceding paragraphs also extended to the other Class members whom Plaintiff Jane Doe 1 seeks to represent.

368.     The legal duties of Deutsche Bank include, but are not limited to, the Know Your Customer ("KYC") laws and related regulations described above.

369.     Under KYC laws, banks have special duties to inquire about possible crimes being committed by their customers—duties above and beyond any duties that the general public may have. The inquiries that banks must make include duties to inquire about specific individuals who are being harmed. The regulations establish a duty of care that must be followed by banks, including Deutsche Bank.

370.     Deutsche Bank breached their legal duties to Plaintiff Jane Doe 1 and the Class Members by failing to discharge their legal duties to prevent Jeffrey

Epstein and others from using the Bank's facilities to facilitate and commit criminal activity harming the Plaintiff. The criminal activity that harmed the Plaintiff and Class Members included foreseeable federal crimes committed by the Epstein sex trafficking enterprise described above as well as state sex offense crimes.

371.    As a direct and proximate result of the breach of legal duties by Deutsche Bank, Plaintiff Jane Doe and the Class Members repeatedly suffered foreseeable injuries from Epstein and his co-conspirators, including federal and state sexual offenses (including sexual assaults) and resulting emotional distress, mental pain and suffering, and other physical, psychological, and other injuries.

372.    The breaches of legal duties were the direct—i.e., the but-for—cause of these injuries. Without Defendants' breaches of legal duties, those injuries would not have occurred. The injuries that occurred were readily foreseeable to Deutsche Bank.

373.    The injuries that Plaintiff Jane Doe 1 and the Class Members suffered included injuries directly and proximately suffered while they were adults who were present in this District. These injuries are permanent in nature and Jane Doe 1 and the other class members will continue to suffer these losses in the future.

374.    The injuries that Plaintiff Jane Doe 1 and the Class Members suffered include injuries directly and proximately suffered as a result of sex offenses committed by Epstein and other co-conspirators and criminalized under article 130

of the New York Penal Laws. The offenses included sexual intercourse without consent and oral sexual conduct without consent, forbidden by New York Penal Law § 130.20. The offenses included forcible touching of sexual or other intimate parts without consent, forbidden by New York Penal Law §§130.20, 130.35, 130.50, 130.52, and 130.66.

375.    The breaches of legal duties by Deutsche Bank proximately caused Plaintiff Jane Doe 1 and the Class Members to repeatedly suffer injuries from Epstein and his co-conspirators, including sexual assaults and resulting emotional distress, mental pain and suffering, and other physical and psychological trauma. These injuries were easily foreseeable, because Deutsche Bank knew, and acted in reckless disregard of the fact, that their actions and omissions supporting and facilitating Epstein would lead to (among other crimes) sex offenses by Epstein and his co-conspirators forbidden by article 130 of New York Penal Law against his victims, including Jane Doe 1 and the Class Members.

376.    In the exercise of reasonable care, Deutsche Bank and its employees knew or should have known of the dangerous propensities of Jeffrey Epstein and the proximately harm that would be caused by his likely sexual crimes and various violations of article 130 of New York Penal Law.

377.    Deutsche Bank could reasonably foresee that their actions and omissions in facilitating Epstein's sex trafficking enterprise would lead to sex

offenses against Plaintiff and the Class Members. Among other things, the Defendants were specifically aware that Epstein had previously been prosecuted for similar sex crimes and previously paid numerous civil settlements associated with similar sex crimes. Indeed, the Defendants were aware, and should have been aware, that Epstein was a "high risk" to commit sex offenses against young women and girls. As the New York banking regulators concluded, the fact that Epstein was engaging in suspicious transactions "should have been obvious to [Deutsche] Bank personnel at various levels."

378.   Plaintiff Jane Doe 1 and the Class Members were easily within the zone of foreseeable harm from the Defendants' reckless and negligent acts and omissions. The Defendants' acts and omissions foreseeably created substantial risk of Jeffrey Epstein and his co-conspirators committing sex crimes against young women with whom he was in contact. Tragically, Plaintiff Jane Doe 1 and the Class Members fell within that zone.

379.   The sex offenses Jeffrey Epstein committed against Plaintiff Jane Doe 1 and the Class Members were easily within the zone of foreseeable risks that the Defendants created with their reckless and negligent actions and omissions. Those actions and omissions foreseeably risked further sex crimes by Jeffrey Epstein and his co-conspirators—which is exactly and tragically the harm that he inflicted on Plaintiff Jane Doe 1 and the Class Members.

380.     While the foregoing allegations easily make out a clear case of negligence, this case does not involve mere negligence. Instead, Defendants' tortious conduct in this case evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations. It also involved outrageous and intentional acts and omissions, because it was a deliberate attempt to further the crimes of a widespread and dangerous criminal sex trafficking organization. Defendants' tortious conduct was directed specifically at Jane Doe 1 and other members of the class, who were the victims of Epstein's sexual abuse and sex trafficking organization.

381.     As a result of the intentional and negligent actions and omissions described in this Count, Plaintiff Jane Doe 1 and the Class Members have sustained both general and specifical damages in substantial amounts.

382.     By virtue of acting intentionally, outrageously, and with a high degree of moral turpitude and demonstrating such wanton dishonesty as to imply a criminal indifference to civil obligations, Defendants are liable to Jane Doe 1 and other members of the class for punitive damages.

## IX. REQUEST FOR RELIEF

Jane Doe 1 respectfully requests that the Court enter judgment in her favor, and against Deutsche Bank, as follows:

a.  That the Court certify the Class, name Jane Doe 1 as Class

Representative, and appoint her lawyers as Class Counsel;

b.  That the Court award Plaintiff and the other members of the Class compensatory, consequential, general, and nominal damages against Defendants in an amount to be determined at trial;

c.  That the Court award punitive and exemplary damages and treble damages against Defendants in an amount to be determined at trial;

d.  That the Court award to Plaintiff the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses;

e.  That the Court award pre- and post-judgment interest at the maximum legal rate; and

f.  That the Court grant all such other and further relief as it deems just and proper.

## **JURY DEMAND**

Plaintiff demand a trial by jury on all claims so triable.

Dated:  November 24, 2022

Respectfully Submitted,
EDWARDS POTTINGER, LLC

By:  */s/ Bradley Edwards*
    Bradley J. Edwards
    425 N. Andrews Ave., Suite 2
    Fort Lauderdale, FL 33301
    (954)-524-2820
    Fax: (954)-524-2822
    Email: brad@epllc.com

EDWARDS POTTINGER
Brittany N. Henderson
1501 Broadway
Floor 12
New York, New York
(954)-524-2820
Fax: (954)-524-2822
Email: brittany@epllc.com

Paul G. Cassell
*Pro Hac Vice*
S.J. Quinney College of Law at the
University of Utah
383 S. University St.
Salt Lake City, UT 84112
Telephone: 801-585-5202
Facsimile: 801-585-6833
E-Mail: pgcassell.law@gmail.com

(institutional address for identification
purposes, not to imply institutional
endorsement)

David Boies
Boies Schiller Flexner LLP
55 Hudson Yards
New York, New York
Telephone: (212) 446-2300
Facsimile: (212) 446-2350
E-mail: dboies@bsfllp.com

Sigrid McCawley
Boies Schiller Flexner LLP
401 E. Las Olas Blvd. Suite 1200
Fort Lauderdale, FL 33316
Telephone: (954) 356-0011
Facsimile: (954) 356-0022
E-mail: smccawley@bsfllp.com
*Pro Hac Vice Pending*