UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| Jane Doe 1, individually and on behalf of all others similarly situated, | ) ) ) | **FIRST AMENDED CLASS ACTION COMPLAINT** |
| Plaintiff, | ) ) ) | JURY TRIAL DEMANDED |
| v. | ) ) | Case No.: 22-cv-10018-JSR |
| Deutsche Bank Aktiengesellschaft, Deutsche Bank AG New York Branch, Deutsche Bank Trust Company Americas, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## FIRST AMENDED INDIVIDUAL AND CLASS ACTION COMPLAINT

Plaintiff Jane Doe 1 files this first amended individual and civil class action complaint for damages and other relief under (among other provisions of law) the United States federal anti-sex-trafficking statute, 18 U.S.C. §§ 1591–95, *et seq.*— the Trafficking Victim Protection Act ("TVPA")—and 18 U.S.C. §§ 1961–68, *et seq.*—the Racketeer Influenced and Corrupt Organizations Act ("RICO"), as well as for aiding and abetting, intentional infliction of emotional distress and negligence related to the commission of chapter one hundred thirty New York sex offenses, timely under the New York Adult Survivors Act. This suit arises from Defendants Deutsche Bank Aktiengesellschaft's, Deutsche Bank AG New York Branch's, and

1

Deutsche Bank Trust Company America's (hereinafter referred to collected as "Deutsche Bank"), participating in and financially benefitting from their direct and intentional involvement in Jeffrey Epstein's sex-trafficking venture by providing the financial lifeblood and infrastructure for the venture's continued operation.

Deutsche Bank knowingly benefited and received things of value for assisting, supporting, facilitating, and otherwise providing the most critical tool for the Jeffrey Epstein sex-trafficking organization to successfully rape, sexually assault, and coercively sex traffic Plaintiff and the numerous other members of the class proposed below (the "Class"). Deutsche Bank knew that Epstein was regularly committing violations of New York Penal Law Art. 130, including and especially New York Penal Law §§ 130.20 (sexual misconduct), 130.35 (rape in the first degree), 130.50 (criminal sexual acts in the first degree), 130.52 (forcible touching), 130.66 (aggravated sexual abuse in the third degree) and 130.70 (aggravated sexual abuse in the first degree). Deutsche Bank aided and abetted those crimes, as well as acted in a negligent manner to directly and proximately cause those crimes, enabling Epstein to commit such offenses against countless young women.

Deutsche Bank also knew that Epstein would use means of force, threats of force, fraud, abuse of legal process, and a variety of other forms of coercion to cause young women and girls to engage in commercial sex acts. Deutsche Bank also engaged in repeated acts of racketeering activity to support the Epstein organization.

Knowing that they would earn millions of dollars from facilitating Epstein's sex trafficking, and from its relationship with Epstein, Deutsche Bank chose financial gain over following the law. Specifically, Deutsche Bank chose to facilitate a sex trafficking operation in order to churn profits.

Jane Doe makes the following allegations on information and belief and believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery:

## I. JURISDICTION, VENUE, AND TIMELINESS

1. This action is brought pursuant to various federal and state statutes, including the TVPA, 18 U.S.C. § 1589 through § 1595. This Court has federal-question subject-matter jurisdiction pursuant to 28 U.S.C. §1331, because Jane Doe 1—individually and on behalf of the other Class Members—proceeds under the TVPA.

2. This Court also has supplemental jurisdiction of the state law claims recounted below pursuant to 28 U.S.C. § 1367(a), because all claims alleged herein are part of a uniform pattern and practice and form part of the same case or controversy.

3. This Court is "an appropriate district court of the United States" in accordance with 18 U.S.C. § 1595, in which to bring this action. Venue is proper in this District under 28 U.S.C. § 1391(b)(2), because Jeffrey Epstein, his co-

conspirators, and Deutsche Bank all conducted substantial activities in this District. Deutsche Bank knowingly aided and abetted, facilitated, and directly participated in Epstein's illegal venture through actions that originated in this District. In addition, Epstein sexually abused and trafficked Jane Doe 1, and Members of the Class is this District.

4.     These acts of sexual abuse and commercial sex committed by Jeffrey Epstein and certain select friends of his often took place in Epstein's New York mansion, located within this District at 9 East 71st Street, New York City. Epstein also used his New York mansion to harbor his victims and as a base from which to transport them to other locations outside of New York.

5.     A substantial part of the acts, events, and omissions giving rise to this cause of action occurred in this District.

6.     This action has been timely filed pursuant to 18 U.S.C. § 1595(c)(1), which provides that a plaintiff shall have ten years after the cause of action arose to file suit against any person who knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known violated the laws against sex trafficking. This action involves a long-running conspiracy, which Deutsche Bank joined while it was on-going. Deutsche Bank ratified the earlier-committed acts of the conspiracy. This action is also timely under RICO and New York's Adult Survivors Act.

## II. PARTIES

7.      Jane Doe 1 is a United States citizen and was at all relevant times a resident of and domiciled in the State of New York.

8.      Jane Doe 1 is using a pseudonym to protect her identity because of the sensitive and highly personal nature of this matter, which involves sexual assault and abuse.  *See* Order Granting Motion for Leave to Proceed Anonymously, Dkt. 28.

9.      Jane Doe 1 is also at serious risk of retaliatory harm because the co-conspirators who participated in the Epstein sex-trafficking venture had—and continue to possess—tremendous wealth and power and have demonstrated a clear ability to cause her serious harm.

10.     Jane Doe 1's safety, right to privacy, and security outweigh the public interest in her identification.

11.     Jane Doe 1's legitimate concerns outweigh any prejudice to Defendants by allowing her to proceed anonymously.

12.     As discussed below, many other women, who are victims and survivors of sexual abuse and trafficking are similarly situated to Jane Doe 1 and also need to proceed anonymously for the same reasons.  The identities of many of these other women are known to Defendants and in other proceedings the identities of the other Epstein victims have been protected.

13.     Defendant Deutsche Bank AG is a global financial institution

headquartered in Frankfurt, Germany.

14.     Defendant Deutsche Bank AG is licensed by the New York State Department of Financial Services to operate a foreign bank branch in the State of New York, the Deutsche Bank AG New York Branch (the "New York Branch"), and also operates a trust company, Deutsche Bank Trust Company Americas ("DBTCA"), which is likewise licensed and supervised by the Department.

15.     Unless otherwise indicated, the three Defendants—Deutsche Bank AG, the New York Branch, and DBTCA—are referred to collectively as "Deutsche Bank" in this complaint.

16.     Defendants Deutsche Bank AG, the New York Branch, and DBTCA all currently conduct substantial business in this District and conducted substantial business at the time of events covered in this complaint.

17.     As one example of business conducted in this District, Deutsche Bank ordinarily trades shares on the New York Stock Exchange, located in this District. As another example, Deutsche Bank maintains branch banks within this District.

18.     Deutsche Bank's financial activities, including the events alleged herein, were in and affecting interstate and foreign commerce.  In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of national securities

markets.

19.     Deutsche Bank is responsible, under United States law and otherwise, for the acts of its officers, directors, employees, and agents, including for the acts described in this complaint.  The acts alleged were committed by Deutsche Bank's officers, directors, employees, and agents within the scope of their employment and with the intention, at least in part, to benefit Deutsche Bank.

20.     Numerous Deutsche Bank employees, including Paul Morris, Charles Packard and Patrick Harris, were integral in onboarding Epstein and the many Epstein-related entities to Deutsche Bank.

21.     Paul Morris joined Deutsche Bank as a relationship manager in November 2012.  During his tenure, he was involved in bringing Jeffrey Epstein over to Deutsche Bank from JP Morgan Chase as a client and maintaining Epstein as a client.

22.     Charles Packard was co-head of Deutsche Bank's Wealth Management Americas Group when Epstein became a client.  Packard was involved in approving Epstein as a Deutsche Bank client and maintaining Epstein as a client.

23.     Patrick Harris was the Chief Operating Officer of Wealth Management Americas for Deutsche Bank.  Harris was involved in approving and maintaining Epstein as a Deutsche Bank client.

### III. INTRODUCTION

## A. Overview of the Jeffrey Epstein Sex-Trafficking Venture and Conspiracy.

24.     Before Jeffrey Epstein was ever brought over to Deutsche Bank, he was well known as a registered sex offender and sex trafficker who spent his day-to-day life sexually abusing young females and constantly recruiting others. He had previously established a sex-trafficking venture and conspiracy, which was on-going at the time Deutsche Bank became his banker. That conspiracy began in 1998, if not earlier.

25.     Epstein's sex-trafficking venture operated in many respects as a sex-themed cult designed to ensnare vulnerable young women and indoctrinate them into Epstein's carefully constructed world in which Epstein was their messiah and sex abuser.

26.     Each victim was led to believe that Epstein was the most powerful man in the world, with the most powerful connections.  Epstein and his co-conspirators preached the Gospel of Epstein.  Epstein's victims were taught to do what he said and he would protect them; but disobey him, and he would punish them and cause them serious harm from which they could never recover.

27.     Once in Epstein's clutches, each victim was taught and led to believe that she must be completely compliant with every wish or demand Epstein had for her; otherwise, she would certainly suffer serious reputational, financial, property, and psychological harm.  By using these and other means of force, threats of force,

fraud, threats of abuse of the legal process, and coercion, Epstein and his co-conspirators sexually trafficked and sexually abused Plaintiff Jane Doe 1 and the other Members of the Class.

28.     As is evident from this complaint and public reporting on Epstein, he was indeed an enormously powerful man, known to have close personal relationships with former U.S. Presidents, politicians, billionaires, other world leaders, and British Royalty, and to have the backing and support of powerful banking institutions which was essential to maintaining Epstein's persona as a respectable and powerful person despite the fact that he was a sex-trafficking serial abuser.

29.     Epstein began his sex-trafficking venture and conspiracy in 1998 and perhaps earlier.  From its inception until Jeffrey Epstein's arrest by the FBI for sex trafficking in 2019 (and his subsequent death on August 10, 2019, by apparent suicide), the venture operated with a purpose of luring young women and girls into a position where Jeffrey Epstein and his co-conspirators could coerce them to engage in commercial sex acts and commit sexual offenses against them.  His venture also operated to conceal its sex trafficking from law enforcement organizations.  And his venture operated with a purpose to provide financial and other benefits to those who assisted and enabled the venture.

30.     The Epstein sex-trafficking venture and conspiracy was well-structured

from at least 1998 and grew increasingly more powerful as it victimized more young women.

31.     Epstein did not, and could not, act alone.  He created and maintained his sex-trafficking venture and conspiracy with the assistance of other influential individuals and entities who knew he was sexually trafficking young women and girls yet supported his sex-trafficking operation in order to obtain financial and other favors from Epstein.

32.     Epstein's sex-trafficking venture and conspiracy was not possible without the assistance and knowing complicity of a financial institution—specifically, a banking institution—which provided his operation not only with the means to conduct sex trafficking but also with an appearance of legitimacy, thereby ensuring its continued operation without fear of being reported to law enforcement or being arrested. Without the financial institution's knowing participation, Epstein's sex-trafficking scheme could not have logistically operated and Epstein's appearance to the outside world, including his victims, as a powerful and protected person could not have been maintained.

33.     Epstein's victims were young women and girls, who suffered severe abuse as Epstein's sex-trafficking victims and who believed they had to remain loyal to the venture at all costs in order to survive.  During the times relevant to this action, Epstein victimized hundreds of young women and girls.

34.     Epstein's sex-trafficking scheme was supported by virtually unlimited wealth, although Deutsche Bank knew that Epstein's self-professed job of "money manager to billionaires" was false.

35.     Epstein masterfully assessed the specific needs and vulnerability of each of his targeted victims.  He then closed the trap on his victims with offers of money, food, shelter, medical care travel, schooling, and career opportunities for them or family members.   Epstein groomed the young women and girls, indoctrinating them to believe that the sexual abuse was normal.

36.     Epstein fraudulently represented to the victims that he would take care of them in various ways, which ultimately allowed Epstein to cause them to engage in commercial sex acts with himself (and, on occasion, others), as well as to create the opportunity for Epstein to sexually abuse them.

37.     The Epstein sex-trafficking venture's and conspiracy's purpose included enticing, obtaining, harboring, and transporting the young victims for Epstein to sexually abuse without drawing unwanted attention from law enforcement.  The venture had everything a sex-trafficking organization needed— funding, infrastructure, the appearance of legitimacy, and, most importantly, a complicit banking institution to ensure the illegal operation could continue to grow undetected by law enforcement.  By many accounts, it was the most powerful and wealthiest sex-trafficking venture ever created.

38.    The Epstein sex-trafficking venture knowingly used means of force, threats of force, fraud, coercion (including threats of serious harm or physical restraint), and abuse of law and the legal process, to cause Jane Doe 1 and many dozens of others similarly situated to engage in commercial sex acts.

39.    The Epstein sex-trafficking venture operated in and affecting interstate and foreign commerce. Epstein recruited, solicited, coerced, harbored, transported, and enticed some of his victims, including Jane Doe 1 and others similarly situated, to engage in commercial sex acts in, among other places, New York (including the Southern District of New York), Florida, the U.S. Virgin Islands, England, and France.

40.    The Epstein sex-trafficking venture operated throughout the world from (at least) in and around 1998 through in and around August 10, 2019, when Epstein died by apparent suicide.

41.    After Epstein's death, to and including the date of this complaint, members of the sex-trafficking venture continued to further the venture by concealing the activities and extent of the venture.

42.    In 2006, Jeffrey Epstein was arrested in Florida after state and federal law enforcement discovered that he had sexually abused more than 30 children in his Palm Beach, Florida mansion.  During that investigation, it was concluded that Epstein and his co-conspirators had committed federal criminal acts constituting

violations of 18 U.S.C §§ 2422(b), 2422(2), 2423(f), 2423(b), 2424(e), 18 U.S.C § 371, 18 U.S.C § 1591(c)(1) and 1591(a)(1) & (2), as well as state crimes in violation of Florida Statutes §§ 796.07 and 796.03. Epstein committed these crimes against dozens of young women and girls, some as young as 14 years old. With respect to the specific discoveries, the United States Attorney's Office for the Southern District of Florida found that some of the victims "went to Mr. Epstein's house only once, some went there as much as 100 times or more."

43. As a consequence of the Florida investigation, Epstein pled guilty to two felony sex offenses, and was permanently labeled as a "Registered Sex Offender." He was jailed for these felonies in 2008.

44. The 2006 criminal investigation uncovered a mountain of evidence that became public, including documents obtained through trash pulls outside Epstein's home, documents discovered in a search warrant, and extensive travel records. This evidence revealed details about Epstein's life-style, daily activities, and the unique manner of operation for his sex-trafficking venture.

45. Epstein's criminal case in Florida and the many related police reports and news reports left no doubt about Epstein's extraordinary penchant for sexually abusing and trafficking young women and girls from (at least) about 2005 onwards. For instance, it was revealed that until the time of his Florida arrest, Epstein was sexually abusing three to four young females per day, in every location he was in at

13

the time.  Sexually abusing young girls and women was a full-time job for him, from which he never took a vacation or hiatus.

46.     Beginning with his Florida arrest and for years after, Epstein was embroiled in dozens of highly public lawsuits documenting his sexual abuse of his victims.  Thousands of news stories circulated worldwide about his sexual crimes.

47.     The manner and means of Epstein's sex trafficking operation was widely publicized after his 2006 arrest.  It was well-known that he would lure young women or girls to one of his luxurious mansions, under the guise of being a wealthy philanthropist.  Epstein would claim to be able to provide them something they needed or wanted, such as cash money, advancement of careers, education, or other life necessities.  Once his victim was under Epstein's control, he would force his victim into providing a massage that would turn sexual, and from there he would sexually abuse them and cause them to engage in a variety of forced commercial sex acts.

48.     Once in Epstein's presence, each victim knew there was no realistic option to disobey him.  It was well known and understood that he was one of the most powerful and connected people in the United States, able to help any of these young victims if they complied, and through his coercive techniques Epstein made clear that he was also able to significantly harm any of his victims of they refused his wishes.

49. While Epstein's first sexual abuse occurred in the early 1990s with the complicity of his then-paramour, Ghislaine Maxwell, Epstein's appetite for sexual abusing young women and girls grew over the years. His sex-trafficking and abuse had crystalized in a well- organized and well-defined conspiracy by as early as 1998.

50. The Florida criminal investigation uncovered that Epstein's sex-trafficking operation grew its number of victims exponentially in the early 2000s.

51. One major reason why Epstein's sex-trafficking venture accumulated new victims at an alarming rate beginning in 2000 was his access to unlimited amounts of cash and a bank that would knowingly support and protect his sex-trafficking operation.

52. Without exorbitantly large amounts of cash, his operation could not run, as newly recruited victims were each paid hundreds of dollars in cash immediately after Epstein sexually abused them, as hush money.

53. Each victim was also informed that she would be paid hundreds of dollars in cash for each additional victim she recruited, and Epstein made good on that promise of large cash payments.

54. The public police reports, documents, and articles stemming from the 2006 arrest made abundantly clear that Epstein was doling out thousands of dollars in cash every day as hush money to victims he was sexually abusing and to victims he was using to recruit additional victims.

55.     If Epstein paid every victim, including the young children, with wire transfers, his illegal sex trafficking operation would have been easily uncovered; however, with access to unlimited amounts of cash, Epstein was able to commit the most egregious sexual crimes many times a day without leaving a trail for each sex crime he committed.

56.     Because Epstein's vast wealth—said to have been more than a billion dollars—was maintained in seemingly legitimate financial institutions, he had greater power to wield in order to coerce his victims.

57.     In order to access the large amount of cash needed to maintain his active sexual abuse of young women, Epstein needed the financial institution where he banked to be complicit in his operation. More specifically, Epstein needed a bank that would allow him to constantly withdraw cash from his accounts, without regard to anti-money laundering prohibitions and currency transaction reporting requirements.

58.     This scheme of paying victims to bring other victims worked effectively because it not only allowed expansion through the recruitment of other victims in a pyramid-scheme fashion, but it also allowed each victim a possibility to avoid future sexual abuse—she could bring someone else who would be abused in her place.

59.     This constant expansion of sex-trafficking victims required cash on

hand for Epstein to pay many of his victims on the spot at the time of the abuse as hush money for the sexual abuse she was suffering as well as each victim's finder's fee for bringing another victim.

60.    In addition to the inner workings of Epstein's sex-trafficking scheme being public when he served his jail time in Florida, other relevant information about Epstein was widely published: he had no college degree, had never obtained any specialized license, none of the companies with whom he was associated had any legitimate business structure or purpose, and he had no documented expertise that would provide the requisite skill or knowledge to amass his vast wealth.

61.    Despite the rumors that Epstein had created to conceal his true "business," he was exposed as literally nothing other than an expert sex trafficker and abuser of young females—a fact easily discernible by any responsible financial institution with whom he was banking.

62.    Epstein's aptitude as a sex trafficker and appetite as a sexual abuser did not suffer because of his Florida incarceration in 2008.

63.    Even while he was in jail in Florida, he continued to sexually abuse young girls and women while he was on "work release" to his office that he opened under the name "Florida Science Center."

64.    Once out of jail and off work release, Epstein continued to collect young women and lure them through force, fraud, or coercion into one of his

mansions, primarily his townhouse located at 9 East 71st Street, New York, where he would sexually abuse each one.

65.     His sex-trafficking venture and conspiracy continued in the same manner and mode as it had in the past, although it involved more phony companies, more bank accounts, more withdrawals of large amounts of cash, and more delivery of funds to victims and co-conspirators through wires, payroll, direct deposits, and other means—means known to his financial institution as evidence of Epstein continuing his criminal sex trafficking scheme.

66.     As time went by, while Epstein sought to create cover as a well-connected "money manager to billionaires," the news articles and lawsuits continued to mount expressing skepticism of the source(s) of his money and more confirming information became publicly available that Epstein was abusing young women.

67.     As a registered sex offender known to be sexually abusing multiple young women each day through a pyramid-type recruiting scheme that required the transfer of millions of dollars to continue the operation, a complicit bank was essential, without which he could not sexually abuse in the way he did and his organization could not operate.

68.     From approximately 1998 through around August 2013, JP Morgan was the bank complicit in seeing to it that Epstein could sexually abuse countless young females and could operate his sex-trafficking venture and conspiracy.

69.     Epstein's relationship with James "Jes" Staley was a key alliance that enabled Epstein to run his illegal operation through JP Morgan.

70.     Staley and JP Morgan built the financial infrastructure that allowed for Epstein's sex trafficking operation to become what it was. They had a business relationship with Epstein when he was arrested, when he was required to register as a sex offender, and even continued to enable and support his sex trafficking operation after he was released from jail. As an employee and agent of JP Morgan, Staley knew exactly what he was doing, and so did JP Morgan.

71.     Staley left JP Morgan in 2013, and JP Morgan, knowing that Epstein was a sex trafficker running a publicly known sex trafficking operation, with no other legitimate business, began to create the perception of distancing itself from Epstein.

72.     In 2013, when Epstein was perhaps the most infamous sex offender in the world, he was on the precipice of losing his accounts at JP Morgan—the bank that had protected him and participated in his operation for nearly 15 years. He immediately needed a financial institution that would partner with him to continue the operation of his sex-trafficking venture. He found that partner in Deutsche Bank.

73.     Deutsche Bank picked up exactly where JP Morgan left off and worked quickly and diligently to figure out exactly what they needed to do (and not do) in order to conceal Epstein's illegal venture and conspiracy and ensure that it could

continue to run without a hitch.

**B. An Overview of Deutsche Bank's Role in the Epstein Sex-Trafficking Venture.**

74.     Various banks and bankers were a critical part of Jeffrey Epstein's particular sex-trafficking venture.  Due to the extensive publicity about Epstein's illegal sexual activities, in 2013 his longtime financial banking institution, JP Morgan, had decided it would no longer serve as his banker.

75.     By 2013, Epstein needed a new banking institution that would provide the necessary appearance of legitimacy for his operation.  This institution would need to allow him to open many accounts for illegitimate companies, ignore blatant red flags, permit him to transfer money without questioning, give him access to abundant cash in direct violation of federal law, coach Epstein and his organization leaders on how to avoid reporting or scrutiny, and to otherwise intentionally participate in and facilitate the commercial aspect of his commercial sex-trafficking enterprise.

76.     From on or about August 19, 2013, through about 2018, Deutsche Bank was the key bank participating, and playing an essential role in, the Epstein sex-trafficking venture.  Deutsche Bank continued to conceal what it had done through about July 2020. Deutsche Bank developed a special—and illegal—banking relationship with Epstein.

77.     Deutsche Bank knowingly and intentionally participated in the Epstein

sex-trafficking venture by, among other things, providing the financial underpinnings for Epstein to have ready and reliable access to resources—including cash—to recruit, lure, coerce, and entice young women and girls to be sexually abused and to cause them to engage in commercial sex acts and other degradations.

78.     Deutsche Bank assisted and participated in Epstein's sex-trafficking venture by knowingly enabling him to make payments to victims, including directly or indirectly Jane Doe 1, and others similarly situated, and obtain large sums of cash from his various accounts in violation of structuring laws in order to finance his well-known, cash-driven, sex-trafficking venture.

79.     Deutsche Bank participated in Epstein's violations of the Trafficking Victims Protection Act by knowingly facilitating, assisting, and enabling Epstein's illegal conduct.   Deutsche Bank's conduct violated the TVPA, which forbids benefiting financially by participating in a sex trafficking venture knowing, or in reckless disregard of the fact, that means of force, threats of force, fraud, coercion, abuse of process, and combination of those means have been used to cause young women and girls to engage in commercial sex acts.

80.     Deutsche Bank also conspired with Epstein (and others) to violate 18 U.S.C. § 1591. It knew that it was joining a sex-trafficking venture and conspiracy that had been on-going for many years (at least since 2005). It adopted the goals of the venture and conspiracy and took specific actions in this District and elsewhere

in furtherance of it.

81.     When considering whether to participate in the sex-trafficking venture, and before on-boarding Epstein, Deutsche Bank estimated that it would earn between $2,000,000 to $4,000,000 annually by funding the sex-trafficking venture and handling the accounts of Epstein-related entities.

82.     Ultimately, Deutsche Bank did financially benefit by earning millions of dollars for its participation in the Epstein sex-trafficking venture.

83.     Throughout its relationship with Epstein, Deutsche Bank violated numerous regulations in order to continue its lucrative venture of facilitating the Epstein sex trafficking scheme.  These violations were intentional and for the sole purpose of aiding and assisting Epstein in his sex trafficking venture and conspiracy.

84.     Paul Morris, a former JP Morgan banker, brought Epstein over from JP Morgan to Deutsche Bank in around August 2013.  All knowledge acquired by JP Morgan about Epstein's sex-trafficking venture while Morris was at JP Morgan, became known to Deutsche Bank.  Morris knew that Epstein was continuing his on-going sex-trafficking venture and conspiracy. Morris had a special relationship with Epstein.

85.     In addition to Morris's knowledge and considering the known reputation of Epstein as a sex-trafficker, when Deutsche Bank was on-boarding Epstein, it had a responsibility to make all available inquiries to any other entity who

had been associated with Epstein to learn if Epstein had retired from his illegal sex-trafficking operation. Reasonable inquiries would have quickly revealed that he had not. And, through Morris and other information, Deutsche Bank quickly learned that he had not.

86.     Financial institutions must conduct Know Your Customer ("KYC") reviews for each client relationship at intervals commensurate to the Anti-Money Laundering ("AML") risks posed by the client. These reviews included reviewing account activity to determine whether such activity fits with what would have been expected given the nature of the account. Each client's AML risk should also be re-assessed if new information or unexpected account activity is identified.

87.     Financial institutions must also establish criteria for determining when a client relationship poses too high of a risk and therefore must be terminated. A financial institution may facilitate illegal activity—and be liable under applicable laws—if it maintains such a relationship despite repeated indications of facilitation of improper transactions.

88.     Without Deutsche Bank's participation and assistance, Epstein could not have sexually abused or trafficked the hundreds of young women he did between 2013 and 2018.

89.     Deutsche Bank knew that in order to onboard Epstein and his related entities and maintain that relationship, it would have to intentionally circumvent

banking rules and regulations and work with Epstein to aid in the operation of the sex trafficking venture—and Deutsche Bank did exactly that.

90.     On July 6, 2020, Deutsche Bank agreed to pay a fine of $150 million to the New York State Department of Financial Services for, among other things, its failures to meet banking regulations in connection with its relationship to Epstein. Until that date, Deutsche Bank concealed who it had adopted the goals of the Epstein sex trafficking venture and conspiracy and worked to further those goals.

## IV. THE TRAFFICKING VICTIMS PROTECTION ACT

91.     The Trafficking Victims Protection Act (TVPA) forbids sex trafficking activities that affect interstate or foreign commerce or take place within the territorial jurisdiction of the United States.  Courts must broadly construe the TVPA because it serves a remedial purpose and uses intentionally broad language.

92.     The TVPA forbids the following sex-trafficking conduct:

(a) Whoever knowingly—

> (1) in or affecting interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or

> (2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1),

knowing, or, except where the act constituting the violation of paragraph is advertising, in reckless disregard of the fact, that means of

force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act, shall be punished as provided in subsection (b).

18 U.S.C. § 1591(a).

93.     The TVPA also contains a conspiracy provision, which forbids conspiring with a person to violate 18 U.S.C. § 1591.

94.     The TVPA also contains an explicit "civil remedy" provision which allows an individual who is a victim of a violation of Chapter 77 of Title 18 (*e.g.*, 18 U.S.C. §§ 1591–95) to bring a civil action against the perpetrator and any person or entity who knowingly benefits financially or by receiving anything of value from participation in an illegal sex-trafficking venture.  18 U.S.C. § 1595(a).

95.     Unlike the criminal penalties provisions in the TVPA, the civil remedies provision contains a "constructive knowledge" provision.  This provision allows a civil action to be brought not only against a person or entity who participated in a venture known to have engaged in illegal sex trafficking but also against a person or entity who participated in a venture that the person or entity should have known had engaged in illegal sex trafficking.  18 U.S.C. § 1595(a).  This expansive provision is known as the "constructive knowledge" provision, which provides an alternative to proving actual knowledge as part of civil damages claim.

96.     In this complaint, Jane Doe 1 and other members of the Class allege

that Deutsche Bank acted outrageously and intentionally. But additionally, in the paragraphs that follow, wherever Jane Doe 1 and the other members of the Class allege that Defendants acted with actual knowledge, or in reckless disregard of the fact, that the Epstein sex-trafficking venture used means of force, threats of force, fraud, coercion, abuse of process, or some combination thereof to cause a person to engage in commercial sex acts, Jane Doe 1 and other members of the Class also allege that, at a bare minimum, Defendants should have known that the Epstein sex-trafficking venture had used such means to engage in illegal sex trafficking in violation of 18 U.S.C. §§ 1591-94—*i.e.*, that they had constructive knowledge of Epstein's sex trafficking.

97. In this complaint, Jane Doe 1 and other members of the Class also allege that Deutsche Bank was willfully blind to the fact that was facilitating and participating in Epstein's sex-trafficking venture.

## V. THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

98. The Racketeer Influenced and Corrupt Organizations Act (RICO) forbids racketeering activities that affect interstate or foreign commerce or take place within the territorial jurisdiction of the United States.

99. As with the TVPA, courts must broadly construe RICO because it serves a remedial purpose and uses intentionally broad language. The Act provides that "[t]he provisions of this title shall be liberally construed to effectuate its

remedial purposes." Pub.L. No. 91–452, § 904(a), 84 Stat. 922, 947 (1970).

100.   RICO forbids the following racketeering activities:

It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce. A purchase of securities on the open market for purposes of investment, and without the intention of controlling or participating in the control of the issuer, or of assisting another to do so, shall not be unlawful under this subsection if the securities of the issuer held by the purchaser, the members of his immediate family, and his or their accomplices in any pattern or racketeering activity or the collection of an unlawful debt after such purchase do not amount in the aggregate to one percent of the outstanding securities of any one class, and do not confer, either in law or in fact, the power to elect one or more directors of the issuer.

18 U.S.C. § 1962(a).

101.   RICO also contains provision making it illegal for any person to conspire with others to violate any of RICO's prohibitions. 18 U.S.C. § 1962(d).

102.   RICO also contains an explicit "civil remedy" provision which allows an individual who is injured in his business or property by virtue of a violation of 18 U.S.C. § 1962 to sue to recover threefold the damages sustained.  18 U.S.C. § 1964(c).

103.   In the paragraphs that follow, Jane Doe 1 and other members of the Class allege that Deutsche Bank violated 18 U.S.C. § 1962 and injured them in

various ways, including injury to their businesses and property.

## VI. FACTUAL ALLEGATIONS

### A. The Epstein Sex-Trafficking Venture and Conspiracy.

104. During all times relevant to this complaint, Jeffrey Epstein was an extraordinarily wealthy man with multiple residences in the United States, including a New York City mansion, a New Mexico Ranch, an apartment in Paris, France, a Palm Beach mansion, and an island in the U.S. Virgin Islands.

105. Beginning in about 1998 (and perhaps earlier) and continuing through the summer of 2019, Epstein knowingly established and ran a sex-trafficking venture and conspiracy in violation of 18 U.S.C. §§ 1591–95. As part of the venture and conspiracy, Epstein used means of force, threats of force, fraud, coercion, abuse of legal process, and a combination of these means to cause young women and girls from all over the world to engage in commercial sex acts and to sexually abuse them.

106. In creating and maintaining this network of victims in multiple states and in other countries to sexually abuse and exploit, Epstein worked and conspired with others, including employees and associates who facilitated his conduct by, among other things, recruiting victims, coercing victims, paying victims, and scheduling their sexual abuse by Epstein at each of his residences, most predominantly in New York.

107. In this District and elsewhere, Epstein perpetuated this abuse in similar

ways. Epstein and his co-conspirators lured new victims into his home for seemingly innocuous activity. Victims were initially recruited to speak with an alleged philanthropic Epstein and provide "massages" to him. Once at Epstein's home and trapped in his bedroom, the victims were instructed to remove their clothing. Epstein would then force the massages to become increasingly sexual in nature, typically including one or more sex acts. Epstein would use means of force, threats of force, or fraud to coerce the victims to participate in these sex acts and to cause them to return and continue to engage in commercial sex acts with him. Epstein and his associates then paid his victims hundreds of dollars in cash for each sexual encounter and for maintaining silence about the encounter.

108. Moreover, Epstein actively encouraged and coerced his victims to recruit additional girls to be similarly sexually abused. Epstein incentivized his victims to become recruiters by paying these victim-recruiters hundreds of dollars for each girl that they brought to Epstein. In so doing, Epstein, through this system of paying victims to recruit others whom he would also pay for being sexually abused as well as for recruiting, created a sex-trafficking spider web and maintained a steady supply of new victims to exploit.

109. Epstein was skilled at ascertaining his victim's greatest fears and aspirations and targeted those fears and aspirations to coerce and trap his victims into performing commercial sex acts and to be subject to sexual abuse.

110. Among other things, Epstein caused and coerced his victims to engage in commercial sex acts, specifically sex acts for which his victims received things of value, such as cash, promises of educational and career advancement, and promises that Epstein would provide various forms of assistance.

111. Among other things, Epstein provided things of value to his victims in order to cause and coerce them to engage sex acts with him and on occasion his friends, co-conspirators, or other victims.

112. As one means of causing and coercing victims to engage in commercial sex acts, Epstein and his co-conspirators threatened that harm would come to victims if they did not comply with his demands that they perform commercial sex acts.

113. As another means of causing and coercing victims to engage in commercial sex acts, Epstein and his co-conspirators fraudulently promised to further victims' educational or career aspirations if they would comply with his sexual demands. These promises were a quid pro quo for the sex acts that occurred.

114. Epstein and his co-conspirators falsely promised Jane Doe 1 and other Class Members various employment and professional opportunities, which prevented them from pursuing other employment opportunities. These false promises were part of the Enterprise's operation, because they forced and caused Epstein's victims to participate in commercial sex acts. Forcing sex-trafficking victims into a position of economic dependency on their traffickers is a well-known

means of coercion, which Epstein used against Jane Doe 1 and the Class Members.

115.    As one means of causing and coercing victims to engage in commercial sex acts, Epstein and his co-conspirators would "gift" his victims money and provide them with living accommodations, clothing, education, or other necessities.  Epstein and his co-conspirators would then force them to pay off the "debt" by complying with Epstein's sexual demands.

116.    In addition to coercing commercial sex acts from his victims, Epstein also committed intentional torts and sexual offenses against them as defined in New York Penal Law § 130, as described in greater detail below.

117.    From around 1998 through about July 2019, Epstein's sex-trafficking venture recruited, solicited, enticed, harbored, obtained, provided, and transported hundreds of victims to cause them to engage in commercial sex acts with Epstein and Epstein's friends.  Epstein was reliant on banking institutions to help make the racketeering activity successful.

118.    Epstein recruited, solicited, enticed, harbored, obtained, provided, and transported his victims to cause them to engage in commercial sex acts in ways that were in and affecting interstate and foreign commerce, including using means of interstate communications (such as cell phones) and means of interstate and foreign travel (such as aircraft that he owned and controlled).

119.    Epstein transported his victims in interstate and foreign commerce,

including transportation to and from his New York mansion in this District.

120.  The Epstein sex-trafficking venture transported victims across state boundaries between New York, Florida, New Mexico, New Jersey, Massachusetts, the U.S. Virgin Islands, and elsewhere, and in foreign commerce to places abroad, especially Eastern Europe.

121.  At all times relevant to this complaint, the Epstein sex-trafficking venture was a group of two or more individuals associated in fact, even if they were not a formal legal entity.  Indeed, members of the Epstein sex-trafficking venture referred to it as "The Organization."  Epstein was continuously at the hub of The Organization, which operated continuous throughout the times indicated in this complaint.

122.  On July 2, 2019, the United States Attorney's Office for the Southern District of New York filed a sealed, two-count Indictment against Epstein, including one count of sex-trafficking conspiracy and one count of sex trafficking for violations of 18 U.S.C. § 1591, in part due to Epstein's criminal activities in his New York Mansion located at 9 East 71st Street.  *See United States v. Jeffrey Epstein*, Case No. 1:19-cr-00490 (S.D.N.Y.).

123.  On July 8, 2019, Epstein was arrested pursuant to the Southern District of New York Indictment.

124.  On August 10, 2019, prison guards found Epstein unresponsive in his

Metropolitan Correctional Center jail cell, where he was awaiting trial on the federal sex trafficking charges. He was later pronounced dead from apparent suicide.

125. In July 2020, Epstein's co-conspirator in the origin of the sex-trafficking venture, Ghislaine Maxwell, was arrested on federal sex trafficking charges filed in this Court. The charges alleged that she had assisted, facilitated, and contributed to Epstein's abuse of sex trafficking victims, helping Epstein to recruit, groom, and ultimately abuse his victims. *See United States v. Maxwell*, Case No. 1:20-cr-00330 (S.D.N.Y.).

126. On December 29, 2021, Maxwell was found guilty in this Court on five federal sex-trafficking counts in this Court.

**B. Consistent With Jeffrey Epstein's Uniform Pattern and Practice, Jane Doe 1 Was Assaulted Within the Definition of New York Penal Law Section 130 and Forced to Engage in Commercial Sex Acts With Epstein by Means of Force, Fraud, and Coercion.**

127. In about 2003, Jane Doe 1 moved to New York City where she was introduced to and sexually abused by Jeffrey Epstein.

128. From about 2003 until the time that Jane Doe 1 escaped, Epstein committed numerous intentional torts and acts against Jane Doe 1 on a regular and frequent basis, which constitute sexual offenses as defined in New York Penal Law § 130, including but not limited to the following:

   a. Sexual misconduct as defined in §130.20, as Epstein engaged in sexual intercourse with Jane Doe without her consent;

33

b. Rape in the first degree as defined in §130.35, as Epstein engaged in sexual intercourse with Jane Doe by forcible compulsion;

c. Criminal sexual act in the first degree as defined in §130.50, as Epstein engaged in oral sexual conduct with Jane Doe by forcible compulsion;

d. Forcible touching as defined in §130.52, as Epstein, intentionally and for no legitimate purpose, forcibly sexual touched Jane Doe for the purpose of degrading or abusing her or for the purpose of gratifying his own sexual desire;

e. Sexual abuse in the third degree as defined in §130.66, as Epstein inserted a foreign object in the vagina of Jane Doe by forcible compulsion;

f. Aggravated sexual abuse in the first degree as defined in §130.70, as Epstein inserted a foreign object in Jane Doe's vagina causing physical injury, by forcible compulsion.

129. Epstein and his co-conspirators had a long history of grooming, indoctrinating, controlling, and ultimately committing sexual offenses against young, vulnerable women like Jane Doe 1. Epstein and his co-conspirators constantly reminded Jane Doe 1 how powerful and important Epstein was.

130. The well-oiled Epstein sex-abuse and sex-trafficking venture and conspiracy included frequent statements to Jane Doe 1, and other victims, by Epstein

and his co-conspirators that: (1) Epstein possessed extraordinary wealth, power and influence; (2) Epstein's business and political friends, including world leaders, included some of the most powerful people in the world; (3) Epstein had the ability to advance or destroy nearly anyone financially, reputationally, and otherwise; (4) medical and normal life necessities would be denied victims if they, including Jane Doe 1, did not allow Epstein to sexually abuse them and failed to perform commercial sex acts for Epstein; and (5) Epstein could take away Jane Doe 1's and other victims' life needs such as shelter or housing if they failed to allow sexual abuse or to perform those acts.

131.   As with his other chosen victims, Jane Doe 1 was vulnerable to being victimized by Epstein and was sexually abused by Epstein at his sole direction almost every day she was in his presence, as was customary practice for Epstein.  Jane Doe 1 was soon forced to remain in contact with Epstein, was unable to extricate herself, and had no real choice but to comply with Epstein's every command or risk suffering serious harm.

132.   Jane Doe 1 was sexually abused and trafficked by Epstein for numerous years and was not able to escape from Epstein until about 2018.  Having been conditioned that the sexual abuse was "normal" and knowing that everyone surrounding Epstein, including accountants, lawyers, bankers, and other important people, were aware of the sex abuse, Jane Doe 1 was coerced into a cult-like life

controlled by Epstein and others to be sexually abused and sexually trafficked.

133.    From about 2003 through about 2018, Epstein sexually abused Jane Doe 1 in this District.

134.    Epstein used means of force, threats of force, fraud, coercion, abuse of process, and a combination of such means to sexually abuse Jane Doe 1 and to cause her to engage in commercial sex acts.

135.    Epstein recruited Jane Doe 1 to, among other things, cause her to engage in commercial sex acts in ways that were in and affecting interstate and foreign commerce, including through use of cell phones and means of interstate transportation such as aircraft that he owned or controlled.

136.    Epstein transported Jane Doe 1 from New York to other states to sexually abuse her and to cause her to engage in commercial sex acts.

137.    As the years of abuse continued, Jane Doe 1 wanted to escape from the Epstein organization, yet Epstein and his supporting team of co-conspirators increased the tactics of fraud, force, and coercion to cause her to remain compliant in allowing Epstein to sexually abuse and traffic her, making it clear she would suffer serious harm if she were to try to leave the organization.

138.    Epstein threatened Jane Doe 1 that she would lose contact with people in her social circle who were connected with Epstein if she failed to comply with his demands.

139.   Epstein would alternate between usually false promises and threats to secure Jane Doe 1's compliance with his demands, including demands that she engage in commercial sex acts with him and others.  In some instances, Epstein would pay Jane Doe 1 directly in cash for sex acts and in other instances she was provided other things of value such as medical care, housing, transportation, schooling, and job opportunity.

140.   From 2003, when Doe was first introduced to Epstein, and through her eventual separation from Epstein and his organization 15 years later, Epstein and his co-conspirators used extreme measures of force, fraud and coercion to cause Jane Doe 1 to engage in commercial sex and to remain obedient to the organization.

141.   Epstein introduced Jane Doe 1 to powerful individuals, made clear he could destroy anyone who disobeyed him, including Jane Doe 1.

142.   Even when Epstein was in Florida jail, Doe 1 was required to be in Florida for the hours during the day when Epstein was on work release.

143.   Doe 1 never had a say in anything, including sex, and had to be compliant to Epstein's every wish and was trained that she had to express gratitude and appear appreciative for Epstein and all he could do for her, knowing that he would cause her serious harm if she did not comply.

144.   Epstein controlled where Doe 1 lived, and he housed her at his victim stash houses that he owned at 310 East 66 Street, NY, NY.

145. When Epstein demanded Doe 1 be on flights to anywhere in the world at a moments notice, she had to be there, and co-conspirators for Epstein passed out schedules for Doe 1 so she knew where she had to be and when.

146. When Epstein was in civil or criminal trouble, Epstein provided gifts or promises of gifts or promises of employment or schooling to prevent Doe 1 from turning on Epstein.

147. Epstein forced Doe 1 into relationships that would be advantageous to Epstein, and Doe 1 was given no choice but to comply.

148. Epstein forced Doe 1 to be at his beckon call to participate in whatever sexual encounter he commanded at the time, wherever he commanded, with whoever he commanded.

149. Epstein's sexual abuse of exploitation of Plaintiff grew more painful as Jane Doe 1 aged, yet Doe 1 was explicitly told she could not leave the Epstein organization's grasp without the risk of suffering serious harm.

150. As late as 2017 and 2018, Epstein continued to demand sexual compliance from Doe 1 and Doe 1 continued to ask out of the organization peacefully. However, as was Epstein's known coercive style, Epstein and co-conspirators of his made it clear she would suffer serious harm if she would try to separate from the Epstein organization, and that if she did separate it would need to be on terms outlines by the organization.

151. Certain coercive tactics employed by Epstein and his co-conspirators included forced relationships directed by Epstein, legal entanglements with Epstein related entities, the threat that Doe 1 would go bankrupt in legal processes if she left, threats that the organization would protect her if she remained compliant, yet she would suffer if she did not.

152. Once Doe 1 was lured in, Epstein's coercive tactics increased over time to ensure that Jane Doe 1 could never escape.

153. Epstein and his co-conspirators continued to coerce Jane Doe 1 into commercial sex in various ways until her ultimate escape from Epstein and his organization in about 2018.

## C. Deutsche Bank's Participation in Epstein's Sex-Trafficking Venture

### 1. Overview of Deutsche Bank's participation in the venture.

154. From on or about August 19, 2013, through about July 2020, Deutsche Bank knowingly and intentionally participated in the Epstein sex-trafficking venture, conspiracy, and racketeering activity by (among other things) providing the financial underpinnings for the venture. Deutsche Bank's conduct, as described below, was outrageous and intentional. After Deutsche Bank joined the venture and conspiracy, it became aware that Epstein venture and conspiracy had been on-going for many years and it adopted the goals and ratified the venture's and conspiracy's earlier actions, racketeering conduct, and crimes.

155. Deutsche Bank enabled Epstein to have ready and reliable access to resources—including cash—to recruit, solicit, entice, harbor, obtain, provide, and transport young women and girls (including Jane Doe 1) to cause them to engage in commercial sex acts.

156. Deutsche Bank participated in Epstein's violations of the TVPA by knowingly assisting, supporting, facilitating, and enabling Epstein's illegal sexual abuse and sex-trafficking venture, including in particular his coercive sex trafficking in violation of 18 U.S.C. § 1591(a)(1).

157. Deutsche Bank's conduct knowingly and intentionally violated the TVPA, which forbids benefitting financially from participating in a venture that, in or affecting interstate or foreign commerce, has recruited, solicited, enticed, transported, harbored, provided, or obtained a person knowing, or in reckless disregard of the fact, that the person has been caused to engage in a commercial sex act by means of force, threats of force, fraud, coercion, abuse of process, or a combination of such means.

158. Deutsche Bank's actions knowingly and intentionally furthered the Epstein sex-trafficking venture, including specifically Epstein's sex trafficking. For example, Deutsche Bank provided cash to Epstein knowing that he would use the cash to pay for commercial sex acts—including sexualized massages during which Epstein penetrated Jane Doe 1—forcing all Jane Does to engage in sexual activity.

Deutsche Bank also provided funds through wire transfers and by mail.

159. Deutsche Bank also aided and abetted Epstein's sex-trafficking venture by, among other things, providing the financial underpinnings for the venture.

160. Deutsche Bank also conspired with Epstein and others to violate 18 U.S.C. § 1591, by, among other things, adopting the purpose of providing victims for Epstein to sexually abuse.

161. Deutsche Bank enabled Epstein to have ready and reliable access to resources—including cash and a variety of bank accounts and other financial tools—to recruit, entice, solicit, harbor, provide, obtain, and transport young women and girls to sexually abuse them and to cause them to engage in commercial sex acts.

162. Deutsche Bank knowingly and intentionally benefited financially and in other ways from its participation in Epstein's sex-trafficking venture with knowledge, or with reckless disregard to the fact, that Epstein used means of force, threats of force, fraud, and coercion (and combinations thereof) to force young women and girls to be sexually abused and to engage in commercial sex acts.

163. When considering whether to participate in the sex-trafficking venture, Deutsche Bank estimated that it would earn between $2,000,000 to $4,000,000 annually from serving as Epstein's banker. Deutsche Bank knew that being Epstein's banker required joining in the purposes of the sex-trafficking venture and funding the venture.

164.    As recounted more fully in the paragraphs that follow, Deutsche Bank did financially benefit by earning millions of dollars from its participation in the Epstein-sex-trafficking venture.  The benefits that Deutsche Bank received came directly from its participation in the sex-trafficking venture and because of its participation in that venture.  In other words, there was a causal relationship between Deutsche Bank's conduct furthering Epstein's sex-trafficking venture and its receipt of the financial benefits with actual (and constructive) knowledge of that causal relationship.

165.    Deutsche Bank knowingly and intentionally financed Epstein's illegal sex-trafficking venture. Deutsche Bank knew that if it did not finance Epstein's illegal sex-trafficking venture, then it would lose valuable Epstein-related accounts. Faced with the choice between profiting from Epstein's sex-trafficking venture or following the law, Deutsche Bank intentionally chose to profit.

166.    In violation of various banking laws and regulations, including various "Know Your Customer" and anti-money laundering laws, Deutsche Bank regularly authorized cash withdrawals and deposits for the Epstein sex-trafficking venture, as well as wire transfers, which allowed Epstein, his co-conspirators, and those they directed to conduct the business of the sex-trafficking venture.

167.    Deutsche Bank's knowing and intentional banking law violations allowed Epstein and his various corporations to stay "under the radar" and continue

the sex trafficking operation without close scrutiny or interference.

168.    By facilitating and financing Epstein's sexual abuse and commercial sex acts in interstate and foreign commerce, Deutsche Bank earned interest, commissions, fees, and other financial benefits directly from its connection with Epstein, Epstein-related entities, and others acting in concert with Epstein. Epstein provided those financial benefits to Deutsche Bank precisely because it was facilitating his sex-trafficking venture—and Deutsche Bank knew that was the reason that Epstein was providing them with those financial benefits.

169.    Deutsche Bank knowingly and intentionally benefited financially from Epstein's sexual abuse and sex-trafficking venture by obtaining customer accounts. Epstein and his co-conspirators even forced Jane Doe 1 to open an account at Deutsche Bank, which financially benefited Deutsche Bank and simultaneously created greater connection between Jane Doe 1 and the Epstein organization, making escape more difficult.

170.    Deutsche Bank knowingly and intentionally benefited financially from Epstein's sexual abuse and sex-trafficking venture by profiting from the funds that Epstein, his co-conspirators, and his wealthy associates deposited with Deutsche Bank.

171.    For example, Deutsche Bank profited financially from funds deposited by or controlled by (among other Epstein-related entities): (1) Southern Trust

43

Company, Inc., (2) Southern Financial LLC, (3) The Butterfly Trust, (4) Global Markets Account, and (5) Gratitude America.

172.    Deutsche Bank benefited by receiving things of value from its participation in Epstein's sexual abuse and the Epstein sex-trafficking venture. Among the various things of value it received were:  (1) connections with Epstein, his co-conspirators, and his wealthy friends and associates; (2) additional deposits from Epstein, his co-conspirators, and his wealthy friends and associates; (3) the ability to charge above-normal fees to Epstein because he was a "high risk, high reward" customer; and (4) the opportunity to earn financial benefits from the funds that had been deposited with it.   Deutsche Bank knowingly received these things of value as a direct result of its participation in the Epstein sex-trafficking venture, which included actively concealing the illegality of it in order to keep the trafficking organization in business.

173.    Among the women and girls whose sex trafficking and sex abuse Deutsche Bank furthered were Jane Doe 1 and the Class Members, as each would not have been abused by this scheme but for Deutsche Bank's knowing venture with Epstein to provide the financial infrastructure to the sex-trafficking criminal enterprise.

174.    On July 20, 2020, the New York State Department of Financial Service (hereinafter "New York Banking Regulators") and Deutsche Bank agreed to a

Consent Order, which resolved the Department's investigation into Deutsche Bank's relationship with Epstein and Epstein-related entities. Deutsche Bank agreed to pay a penalty of $150 million to resolve the investigation regarding Epstein and two other customers.

175. The New York Banking Regulators found, accurately, that Deutsche Bank conducted business regarding Epstein in an unsafe and unsound manner, in violation of New York Banking Law § 44.

176. The New York Banking Regulators found, accurately, that Deutsche Bank failed to maintain an effective and compliant anti-money laundering program, in violation of 3 NYCRR § 116.2.

177. While this complaint refers to facts found by the New York Banking Regulators, the allegations made in this complaint extend beyond those facts. In particular, the regulators did not address issues surrounding Deutsche Bank's criminal liability for participating in Epstein's sex trafficking venture. This complaint sweeps more broadly and accurately alleges that Deutsche Bank engaged in intentional criminal behavior in participating in Epstein's sex-trafficking venture.

**2. Banking Regulations Exist to Help Prevent Funding of Criminal Ventures.**

178. The Federal Bank Secrecy Act ("BSA") requires financial institutions to have adequate anti-money laundering ("AML") policies and systems in place. New York state law requires financial institutions to devise and implement systems

45

reasonably designed to identify and report suspicious activity and block transactions prohibited by law.

179. All regulated institutions are expected to configure systems based on their unique risk factors, incorporating parameters such as institution size, presence in high-risk jurisdictions, and the specific lines of business involved, and the institutions have an affirmative duty to ensure that their systems run effectively.

180. In addition to having effective AML controls in place, it is also necessary for financial institutions to monitor their customers for the purpose of preventing their customers from facilitating criminal activity using the institutions' facilities.

181. As part of preventing criminal activity, Know Your Customer ("KYC") and customer due diligence are critically important, and financial institutions must collect customer information at the time of establishing new relationships with clients, including as necessary to assess the risks associated with the client. To properly consider these risks, financial institutions must consider relevant factors such as the nature of the client's business, the purpose of the client's accounts, and the nature and duration of the relationship.

182. Financial institutions must also conduct KYC reviews for each client relationship at intervals commensurate to the AML risks posed by the client, including reviewing account activity to determine whether such activity fits with

what would have been expected given the nature of the account. Each client's AML risk should also be re-assessed if material new information or unexpected account activity is identified.

183. Financial institutions must also file reports with federal authorities of suspicious activities by their customers, including suspicious cash activities, known as Suspicious Activity Reports ("SARs").

184. Financial institutions must also establish criteria for determining when a client relationship poses too high of a risk and therefore must be terminated. A financial institution may facilitate illegal activity—and be liable under applicable laws—if it maintains such a relationship despite repeated indications of facilitation of improper transactions.

### 3. Deutsche Bank's Knowledge about the Epstein Venture.

185. The New York Banking Regulators determined, accurately, that Deutsche Bank failed in various respects to meet its Know Your Customer and other obligations fully with respect to its relationship with Jeffrey Epstein and entities related to Epstein. The motive for those failures was simple: the bank was making millions of dollars for its knowing participation in and concealment of Epstein's criminal organization.

186. In around 2013, Deutsche Bank was aware that Epstein was a wealthy man with hundreds of millions of dollars in assets and an extensive network of

friends and connections that included prominent financial institutions, politicians, royalty, and billionaires.

187.   In around 2013, Deutsche Bank was aware that Epstein also had a well-publicized reputation related to the sexual trafficking and sexual abuse of young women.

188.   Allegations against Epstein began appearing in the press as early as 2005, with the accusation that he paid a 14-year-old girl for a "massage."

189.   That year, the Palm Beach Police Department in Florida began an investigation into allegations against Epstein related to his sexual abuse in Palm Beach.   The investigation quickly uncovered dozens of other Epstein sex-abuse victims.   The investigation also identified the Epstein sex-trafficking venture, which included a number of individuals who were responsible for recruiting young women to come to Epstein's Palm Beach mansion to give "massages" or otherwise furthering his abuse.

190.   In 2006, the Palm Beach State Attorney handling the case referred the matter to the Federal Bureau of Investigation, which subsequently opened its own investigation and interviewed potential witnesses and victims.

191.   In September 2007, Epstein agreed to plead guilty to two felony sex offenses in Florida state court, in exchange for a federal Non-Prosecution Agreement ("NPA") providing him and his co-conspirators (including Lesley Groff, Sarah

Kellen, Adriana Ross, and Nadia Marcinkova) with immunity from federal prosecution for extensive federal sex-trafficking charges in Florida. The deal included incarceration and for Epstein to register as a "Sex Offender."

192. In the summer of 2008, Epstein's NPA with the U.S. Department of Justice was made public when it was unsealed in connection with a challenge brought to the NPA by two of his victims. The agreement, among other things, outlined charges that could have resulted from the investigation, including that Epstein conspired to use a facility or means of interstate commerce to induce minors to engage in prostitution, to engage in illicit sexual conduct with minors, conspiring with others to do the same, and trafficking minors. That agreement also noted that the United States had compiled "a list of individuals whom it [had] identified as victims," and that Epstein would pay for legal representation for these alleged victims.

193. Court proceedings involving the challenge to Epstein's NPA continued between 2008 and 2013 (and beyond) and attracted extensive media attention.

194. Indeed, between around 2006 and 2013, press reports outlined the allegations underlying the NPA and to varying degrees detailed the involvement of Epstein's alleged co-conspirators, including Lesley Groff, Sarah Kellen, and Nadia Marcinkova.

195. The names of these women and other alleged co-conspirators were

publicly known by 2013.

196. Additionally, press reports during this time noted allegations that Epstein was involved with Eastern European women in particular and that a modeling agency he helped fund along with a known sexual abuser Jean Luc Brunel brought "young girls . . . often from Eastern Europe" to the U.S. on Epstein's private jets.

197. By the time Deutsche Bank onboarded Epstein and during the relationship between the bank and Epstein and his many related entities, hundreds of pages of police reports, countless news articles, dozens of public civil lawsuits and corresponding settlements, Epstein's sexual offender registration, numerous depositions, and other overwhelming evidence of Epstein's sexual abuse was public and known to Deutsche Bank.

198. Deutsche Bank was aware of the foregoing information and more about Epstein's sex abuse and sex trafficking activities by around 2013, and also of the fact that JP Morgan was terminating its relationship with Epstein when it considered whether to begin a banking relationship with Epstein.

199. Deutsche Bank took in Epstein as a client because it knew this was an opportunity to take in a wealthy criminal that no other bank would take and make significant profits providing the infrastructure Epstein's sex trafficking operation desperately needed to continue.

### 4. Deutsche Bank Agrees to Become Epstein's Banker in 2013.

200.   In 2013, Epstein, who had been banking with one of Deutsche Bank's competitors, JP Morgan, began the process of moving his assets to Deutsche Bank.

201.   The relationship between Deutsche Bank and Epstein came about through a Deutsche Bank relationship manager, Paul Morris, who had left JP Morgan bank ("JP Morgan") to join the Bank's private wealth department.  At JP Morgan, Morris had been a member of the team servicing Epstein's accounts and he was aware of JP Morgan's role of facilitating Epstein's sex-trafficking venture and conspiracy.

202.   Paul Morris joined Deutsche Bank in November 2012, bringing with him the knowledge he had acquired at JP Morgan about Epstein's sex-trafficking venture and conspiracy.  Soon after joining Deutsche Bank, Morris suggested to senior management that Epstein was a potential client who could generate millions of dollars of revenue as well as leads for other lucrative clients to Deutsche Bank. Morris and Epstein began discussions in the spring of 2013 about a potential relationship between Deutsche Bank and Epstein.

203.   In April of 2013, in preparation for establishing Deutsche Bank's relationship with Epstein, a junior relationship coordinator on the Epstein account (herein, "Relationship Coordinator-1") prepared a memorandum for Paul Morris to send to Deutsche Bank's then co-head of the Wealth Management Americas Group,

Charles Packard, and Patrick Harris, the Chief Operating Officer of Wealth Management Americas.

204. Among other things, the memorandum contained information concerning Epstein's previous plea deal and prison sentence for sex-trafficking related crimes. In particular, the memorandum stated that "Epstein was charged with soliciting an underage prostitution [*sic*] in 2007," that "[h]e served 13 months out of his 18-month sentence," and that "[h]e was accused of paying young woman [sic] for massages in his Florida home." It also highlighted that Epstein was involved in 17 out-of-court civil sex abuse settlements related to his 2007 conviction.

205. In the email to Charles Packard and Patrick Harris attaching the memorandum, Paul Morris noted how lucrative becoming Epstein's banker could be, stating "[e]stimated flows of $100-300 [million] overtime [*sic*] (possibly more) w/ revenue of $2-4 million annually over time." In the same email, Morris proposed that all Epstein-related accounts be for "entities" affiliated with Epstein, "not personal accounts."

206. On May 5, 2013, Charles Packard sent an email (hereinafter, the "Approval Email") to Morris, which read "spoke with [the Head of AML Compliance for Deutsche Bank Americas and the then-General Counsel for Deutsche Bank Americas, who at that time served as chair of the Bank's Americas Reputational Risk Committee ("ARRC")]. Neither suggest [that the Epstein

relationship] requires rep risk and we can move ahead so long as nothing further is identified through KYC and AML client adoptions." The ARRC did not meet in connection with the initial onboarding of Epstein.

207. "Rep risk" as referenced in the Approval Email referred to a review by the relevant regional reputational risk committee. Deutsche Bank's policies and procedures provided that, should a Deutsche Bank business or compliance unit identify a client that they believe could pose a reputational risk to the Bank, it must escalate that client for review by the attendant reputational risk committee. In the case of the onboarding of the Epstein relationship, this was the ARRC.

208. At the time, Deutsche Bank was aggressively expanding its U.S. wealth management business under its new co-chief executive, Anshu Jain, and was courting wealthy clients shunned by other banks. Indeed, attractive earnings multiples had driven strong investment from Deutsche Bank into asset and wealth management, as they consumed less capital than the investment banking business. Deutsche Bank officials have repeatedly called the Bank's private banking wealth management business in the Americas as a "key geographic region." *Karimi et al. v. Deutsche Bank Aktiengesellschaft et al.*, Case No. 2:20-cv-08978-ES-JRA (case later transferred to this Court, Case No. 1:22-cv-02854-JSR) ("*Karimi*"), Second Amended Complaint (Dkt. 37) at ¶ 84 (D.N.J. Mar. 1, 2021).

209. According to confidential witnesses in another case before this Court,

no formal KYC investigation was ever ultimately undertaken for Epstein. *See Karimi*, Opinion and Order (Dkt. 86) at 9 (S.D.N.Y. June 13, 2022). Deutsche Bank intentionally avoided conducting such an investigation because it knew what the investigation would reveal, and that it would not be able to serve Epstein after such an investigation based on his well-documented and publicized history of sex trafficking.

210. The relationship between Deutsche Bank and Epstein officially began on August 19, 2013, when the Bank opened brokerage accounts for Southern Trust Company Inc., a self-described "database company and services" founded in the U.S. Virgin Islands in 2011, and Southern Financial LLC, a wholly owned subsidiary of Southern Trust Company Inc. According to the KYC record, the purposes of the brokerage accounts were to "hold marketable securities and cash" and "to invest long term [*sic*] with the bank," respectively. Over the course of the relationship, Epstein, his related entities, and associates would eventually open and fund more than 40 accounts at Deutsche Bank, with more than $110 million in just one of the accounts. *See Karimi*, Dkt. 37 at ¶ 96.

## 5. Epstein Uses Deutsche Bank Accounts for the Sex-Trafficking Venture.

211. From the time of Epstein's onboarding, the relationship was classified by Deutsche Bank as "high-risk" and therefore subject to enhanced due diligence requirements. Although the Bank did not initially classify Epstein as a politically

exposed person ("PEP"), the Bank did designate him an "Honorary PEP" because of his connections to prominent political figures. The high-risk classification and informal designation as an Honorary PEP should have resulted in enhanced transaction monitoring of activity within Epstein's accounts. However, and as discussed below, this required monitoring scrutiny was not followed. The reason that Deutsche Bank did not give this scrutiny to Epstein is that it knew that doing so would more fully reveal Deutsche Bank's participation in and responsibility for Epstein's sex-trafficking venture.

212. As early as November 1, 2013, Epstein and other co-conspirators in his sex-trafficking venture began using Deutsche Bank accounts to make wire transfers of money to facilitate Epstein's sex abuse and his sex-trafficking venture. Over the course of the relationship, Epstein and his representatives used Deutsche Bank accounts to send dozens of wires, directly and indirectly, including at least 18 wires in the amount of $10,000 or more to then known co-conspirators in the sex-trafficking venture, including Lesley Groff, Sarah Kellen, and Nadia Marcinkova—individuals who were listed as Epstein's co-conspirators in his Non-Prosecution Agreement with the U.S. Attorney's Office in Florida.

213. Deutsche Bank was aware that the recipients of some of these wire transfers described in the previous paragraph were to Epstein's co-conspirators, as described further below. Deutsche Bank was aware that its wire transfers were in

furtherance of Epstein's sexual abuse and the Epstein sex-trafficking venture.

214.   On January 24, 2014, Deutsche Bank opened checking and money market accounts for an Epstein-related trust named "The Butterfly Trust."   The Butterfly Trust included a number of beneficiaries, including, among others, Lesley Groff, Sarah Kellen, and Nadia Marcinkova, and a number of women with Eastern European surnames.   When Deutsche Bank personnel asked Epstein and Epstein's representatives about his relationship with the beneficiaries, Epstein represented that they were employees or friends.   Deutsche Bank's KYC records state that the purpose of the money market account was "to pay all expenses/disbursements related to the trust [such as] taxes, trust fee [*sic*], etc."

215.   The Butterfly Trust accounts were, like the overall Epstein relationship itself, approved for onboarding based on the earlier Approval Email from Charles Packard, despite obvious reputational and possible financial crime risks. Specifically, the beneficiaries of the Butterfly Trust included, among others, known criminal co-conspirators Lesley Groff, Sarah Kellen, and Nadia Marcinkova.   The existence of co-conspirators as beneficiaries of the trust further established Deutsche Bank's actual and constructive knowledge that payments through the Trust would be used to further or coverup criminal activity and to endanger more young women and girls as victims of Epstein's sexual abuse and the Epstein sex-trafficking venture.   In addition, Paul Morris had actual and constructive knowledge of

Epstein's sex-trafficking venture because of his previous time at JP Morgan.

216. At the time of onboarding of the Butterfly Trust accounts, Deutsche Bank was aware that the Trust's beneficiaries were co-conspirators of Epstein's prior sex trafficking-related offenses. In October 2013, a compliance officer performed background checks on the beneficiaries of the trust and flagged for Paul Morris that one of the beneficiaries, Sarah Kellen, had been alleged to be one of Epstein's co-conspirators. In reply, Morris confirmed that Kellen "was accused as a co-conspirator in a case but was never brought to trial nor ever convicted. The account for which she will be associated is a trust account which names her as a beneficiary." The alert was cleared citing the Approval Email from Paul Morris. Morris had knowledge that Kellen was part of the Epstein sex-trafficking venture.

217. While Epstein held accounts at Deutsche Bank, he used the Butterfly Trust account and various other accounts to send over 120 wires totaling $2.65 million to beneficiaries of the Butterfly Trust. These transfers furthered his sex abuse and the sex-trafficking venture, including funds paying directly for coercive and commercial sex acts, funds paid to professionals for carrying out illegal acts for the operation of the sex-trafficking venture, and paying funds to others for committing crimes necessary to continue the operation of the sex trafficking venture.

218. Epstein used Deutsche Bank accounts to pay for coerced commercial sex acts by Jane Doe 1, an individual Morris and others at Deutsche Bank knew was

a victim of Epstein's illegal operation.

219.    Given Deutsche Bank's knowledge about Epstein's past sex trafficking, its continuation of its financial relationship with Epstein after January 24, 2014 (and earlier) was, at a minimum, in reckless disregard of the fact that Epstein was using means of force, threats of force, fraud, coercion (and a combination of such means) to cause and coerce Epstein's victims to engage in commercial sex acts.

220.    By way of another example of the flagrant nature of Epstein's coercive sex-trafficking operation, in around 2013 certain of Epstein's foreign victims (who essentially lived with Epstein as commercial sex slaves) began having immigration problems and risked the possibility of deportation.  Epstein's solution was to force certain of his American victims to enter into same-sex marriages with his foreign victims in order to prevent deportation and to exercise even greater control over all of the victims he caused to marry one another.

221.    One way in which Epstein obtained victims to sexually abuse was by using sham marriages to keep control over select victims and keep them in the country.  Epstein was paying fees from his Deutsche Bank account to a particular immigration attorney to coach the women who did not want to participate on what to say. Epstein also had his personal attorney – the same one that was corresponding with Deutsche Bank to coach him on circumventing reporting requirements in violation of federal structuring laws – meeting with the immigration attorney and

advising the women and signing related checks.

222. Epstein even arranged for Deutsche Bank to open accounts in the names of certain of his victims. In doing all this, Epstein needed to know, with absolute certainty, that his bank would not report this highly suspicious and obviously illegal activity. Even though his relationship with Deutsche Bank was brand new, he knew the bank would assist him in this multi-layered criminal aspect of his sexually abusive international operation. And the reason Epstein knew this is that Deutsche Bank had, at a minimum, tacitly agreed to participate in his sex-trafficking venture and was well aware that Epstein was a sex trafficker in need of a bank to aid in his illegal and abusive venture.

223. With the marriages, like any other aspect of their lives under the rule of Epstein, the abuse victims were given no choice about whether to marry one another.

224. Epstein demanded that they comply, and the "professionals" closest to Epstein choreographed the entire arrangement, from hiring and paying the crooked immigration attorney to falsifying records, to facilitating wire transfers, to establishing a bank account at Deutsche Bank.

225. The sham marriage scheme, which was designed solely to perpetrate continued sexual abuse and trafficking through immigration and marriage fraud, was just another example of Epstein's brazen criminality that he could never have pulled off without a complicit bank protecting him.

226.   Epstein used Deutsche Bank for all matters relating to his criminal sex-trafficking enterprise because he knew that Deutsche Bank had agreed to disregard the fact that Epstein was using the account as part of his sex-trafficking venture.

227.   Deutsche Bank financially benefited from the accounts that Epstein used for his sex-trafficking operation, including the accounts for his many related entities, the personal accounts for his longtime attorney, and the accounts for some of his victims.

228.   Deutsche Bank, by providing the financial infrastructure to Epstein's illegal operation, was also able to justify charging Epstein higher.

229.   In addition to actual knowledge that it was facilitating the Epstein sex-trafficking venture, Deutsche Bank benefited financially by participating in a venture that it should have known had engaged in coercive sex trafficking in violation of 18 U.S.C. § 1591(a).

**6.  ARRC's Consideration of the Epstein Relationship**

230.   Deutsche Bank's awareness that it was facilitating Epstein's sex-trafficking venture continued to grow after January 24, 2014.

231.   In 2014 and into 2015, Deutsche Bank's Anti-Financial Crime department alerted Deutsche Bank's senior management to issues concerning Epstein's sex trafficking.  Deutsche Bank's senior management chose to ignore Epstein's coercion of his victims because Deutsche Bank was profiting handsomely

from facilitating Epstein's sex abuse and sex trafficking.

232.    One issue regarding Epstein's sex trafficking arose in connection with the Bank's opening of a Global Markets account for Epstein.  In January 2015, during the onboarding process for that account, a Deutsche Bank AML Compliance Officer ("AML Officer-1") identified recent developments in the press concerning Epstein, including:  (1) a June 2014 federal appeals court ruling that some of Epstein's alleged victims would receive information supporting their challenge to Epstein's 2008 non-prosecution agreement, potentially reopening criminal cases for federal sex offenses against Epstein, and (2) additional allegations in the press regarding Epstein's relationships with a prominent former U.S. politician and a member of a European royal family.

233.    AML Officer-1 escalated these issues to a more senior AML officer ("AML Officer-2").  In response, AML Officer-2 initially noted that the same negative allegations against Epstein had been approved by Charles Packard, the former Head of AML and the former General Counsel for the Americas and attached a copy of the Approval Email.  AML Officer-1 responded that they should still run the issue by the then-Head of AFC Americas because:  (1) the Approval Email was "not a direct approval by [the Head of AML Compliance for Deutsche Bank Americas and the [then] General Counsel for Deutsche Bank Americas]; it's a statement by a front office MD about his conversation with them and their alleged

opinion not to escalate to Rep Risk;" (2) the Head of AML Compliance was no longer at the Bank; and (3) there were new developments in Epstein's case that could lead to the reopening of his 2008 plea deal.

234. As a result of these discussions and additional media reports regarding Epstein's association with prominent political figures, AML Officer-2 put the question of whether to escalate before Patrick Harris, who agreed to escalate to the ARRC. In the email to Patrick Harris, AML Officer-2 noted that the communication underpinning the Approval Letter occurred before these new developments and for further background also noted, among other things, that "[b]y 2011, 40 underage girls had come forward with testimony of Epstein sexually assaulting them" and that "Epstein [had] managed to settle at least 17 lawsuits out of court."

235. Later that month, on January 22, 2015, in preparation for the ARRC meeting, Charles Packard and Paul Morris met privately and in person with Epstein at his New York home. The private meeting was held in Epstein's Manhattan mansion. During the meeting, Packard asked Epstein about his involvement in sex trafficking. In response, Epstein allegedly "explained away" suspicious transactions, including large cash withdrawals and payments to Russian accounts that appeared suspicious in that they may have been indicators of sex trafficking and coercive commercial sex acts. Epstein's denials were not credible.

236. During the meeting at Epstein's home, trafficking victims were in the

house, as they always were, and openly observable by Packard and Morris.

237. Tellingly, and perhaps because of what Packard and Morris saw, Packard and Morris did not make any contemporaneous record of their meeting with Epstein. The reason they did not make a record of Epstein's denials was that any such record would have been utterly implausible.

238. Through information and belief, other Deutsche Bank employees also met with Epstein personally outside the bank and made observations consistent with Epstein's daily sex trafficking activities, which included being surrounded by certain of his victims.

239. Other than perfunctory, private meetings with Epstein to get their stories straight, Deutsche Bank did not take any other steps at the time to investigate the veracity of the allegations about Epstein being involved in sex abuse and sex trafficking. The reason Deutsche Bank did not take further steps to investigate the veracity of the allegations is because it knew that such investigation would only further confirm the allegations.

240. On January 30, 2015, members of the ARRC, including Stuart Clarke, Chief Operating Officer for the Americas and General Manager of Deutsche Bank's New York branch, and Jan Ford, a Managing Director and Deutsche Bank Americas Head of Compliance and a member of the North America Executive Committee and the Global Compliance Executive Committee, met to discuss the Epstein

relationship. Despite the fact that Deutsche Bank's policies and procedures mandate that detailed minutes of such meetings be kept, Deutsche Bank did not make any record of this important meeting. Deutsche Bank decided not to make a record of this meeting because a record would have demonstrated that it knew, and was acting in reckless disregard of the fact, that Epstein was using his Deutsche Bank accounts to cause his victims, thorough means of force, fraud, and coercion, to be sexually abused and to engage in commercial sex acts.

241. In a recent case before this Court, it was alleged that a confidential witness (identified only as "CW1") reported that the way this meeting was conducted flouted all of Deutsche Bank's rules about how such meetings should be handled. Specifically, the private meeting at Epstein's bar has been described as a "due diligence meeting" by Deutsche Bank. However, Deutsche Bank's own rules lay out how such diligence meetings are to be conducted when dealing with high risk clients. CW1 explained: "There are meant to be minutes taken, there is meant to be a thorough record of the meeting, allegations are meant to be put to the client in writing and the client is generally expected to have his lawyer or advisor, and often also his accountant, with him." Both sides are meant to sign off on the minutes of such meetings. Failing to abide by these regulations is a disciplinary offense at Deutsche Bank. According to CW1, however, neither Packard nor Morris were ever disciplined. *See Karimi*, Dkt. 37 at ¶ 87.

242. The reason that Deutsche Bank did not comply with its own rules described in the preceding paragraph is that it knew that compliance with the rules would create a paper trail about its awareness of its complicitly in Epstein's sex-trafficking.

243. Later that day, a member of the ARRC emailed Charles Packard to say, without explanation, that the committee was "comfortable with things continuing" with Epstein, and that another member of the committee had "noted a number of sizable deals recently." The reason that Deutsche Bank was "comfortable" with continuing its relationship with Epstein is because of the "sizeable deals" it was obtaining. The sizeable deals with Epstein were very valuable to Deutsche Bank and benefited Deutsche Bank financially. At that time (and earlier), Deutsche Bank knew that it was obtaining these "sizeable deals" only because it was willing to fund Epstein's sex-trafficking venture.

**7. Conditions on the Epstein Relationship Not Communicated to the Relationship Managers or the Relevant Transaction Monitoring Team.**

244. The following week, another member of the ARRC, Jan Ford, the Bank's Head of Compliance, Americas, reiterated the ARRC's decision in an email to other executives, stating that ARRC had agreed to "continue business as usual with Jeff Epstein" based upon Packard's "due diligence [bar] visit with him." Deutsche Bank knew, and was acting in reckless disregard of the fact, that Epstein's

usual business was the sexual abuse and coercive sex trafficking of young women and girls.

245.   That same email outlined three conditions that the ARRC placed on the relationship:  (1) Epstein would be allowed to continue to "conduct trades and transactions in existing accounts without Compliance pre-approval, provided that the business had determined these transactions do not involve any unusual and/or suspicious activity or are in a size that is unusually significant or novel in structure"; (2) the Bank's Corporate Banking and Securities unit would be allowed to "also 'open' accounts to facilitate activity as a booking matter where the activity has already been approved by [the Bank's America's Wealth Management division]"; and (3) the business would "need to monitor for any further developments in connection with the reputational risk of the client relationship and to review transactions/activity conducted in the accounts for any activity, size or structure as described in [the first condition]."  Deutsche Bank was aware that conditions such as these were necessary (although not sufficient) to prevent Epstein from using Deutsche Bank accounts in furtherance of sex abuse and coercive sex trafficking.

246.   Deutsche Bank had no intention of actually enforcing the conditions described in the previous paragraph on Epstein. Instead, the conditions were designed to create the illusion—*i.e.*, a paper trail—that would make it appear that Deutsche Bank was closely monitoring Epstein when, in fact, it was allowing him

to use his multiple Deutsche Bank accounts for sex abuse and sex trafficking purposes.

247. The three conditions were communicated to several senior Bank personnel who did not have day-to-day operational authority over the Epstein account. Deutsche Bank never communicated the conditions to those who could have enforced them—*i.e.*, members of the Epstein relationship team. As a result, Epstein's relationship managers continued conducting business with Epstein in the same manner as they had before the ARRC meeting. The conditions thus became a dead letter—as Deutsche Bank had intended.

248. This failure was then substantially compounded when AML Officer-2 purportedly misinterpreted the conditions; as a result, they were also not communicated to the transaction monitoring team responsible for monitoring the Epstein relationship. Specifically, AML Officer-2 interpreted the clause "transactions [with] unusual and/or suspicious activity or are in a size that is unusually significant or novel in structure" to mean transactions that were unusual, suspicious, or novel as compared to the prior history of transactions related to the Epstein relationship. He communicated this interpretation to the rest of the transaction monitoring team responsible for the Epstein relationship. The interpretation was exemplified by a later email exchange in March of 2017, when a member of the transaction monitoring team responded to an alert about payments to

a Russian model and Russian publicity agent, stating, "[s]ince this type of activity is normal for this client it is not deemed suspicious."

249.    Instead of monitoring the accounts for all potential crimes and suspicious activity that could be implicated by Epstein's past conduct, including payments to co-conspirators and those that could be related to sex trafficking involving adults, AML Officer-2 only instructed the relevant transaction monitoring team to verify, using internet searches, that any woman involved with transactions related to the Epstein relationship was at least 18 years old and to only flag transactions if they could not discern a rational reason for the transaction, a standard which had little if any effect on Deutsche Bank's furthering Epstein's sex abuse and his sex trafficking venture.

**8.    Deutsche Bank Continued to Facilitate the Epstein Sex-Trafficking Venture for Years Despite Additional Red Flags.**

250.    On July 21, 2015, Epstein requested that Deutsche Bank increase his trading limits.  Several days later, a member of Epstein's coverage team ("Coverage Team Member-1"), who was aware of the ARRC's conditions on the relationship, escalated this request to AML Officer-2, who in turn escalated the issue to the Chairman of the ARRC.  On July 29, 2015, after conferring with other members of the ARRC but without formally meeting, the Chairman replied to AML Officer-2 stating they had no objections.  The Chairman added, "I also checked in with [Packard] last night to make sure he supports this and has heard nothing negative on

the client. [Packard] confirmed both."

251. Again, without any due diligence and in complete disregard for the crimes Epstein was perpetrating and the reputational risks he posed, Deutsche Bank knowingly and intentionally allowed him to continue to employ Deutsche Bank's accounts to further his criminal activities. *See Karimi*, Dkt. 37 at ¶ 92.

252. On January 4, 2016, an accountant representing Epstein (herein, "Accountant-1") requested that Deutsche Bank open a brokerage account for Gratitude America, Epstein's private charity. Coverage Team Member-1 escalated the request to AML Officer-2, who directed the inquiry to the Secretary for the ARRC. The Secretary of the ARRC conferred with a member of the ARRC and ordered that an external due diligence report be prepared on Epstein. In response to the request for additional information, Accountant-1 informed Deutsche Bank of Epstein's resignation from Gratitude America and withdrew the request to open the account. Thereafter, Deutsche Bank did not run a due diligence report on Epstein.

253. Deutsche Bank was aware that the reason that Epstein was withdrawing his request to open the new account was to avoid a due diligence report. Deutsche Bank was aware that a due diligence report on Epstein would have documented that Epstein was using Deutsche Bank accounts to facilitate his sex abuse and sex-trafficking venture.

254. By April 2016, Paul Morris was replaced by another relationship

manager (herein, "Relationship Manager-2") to handle accounts associated with Epstein. Although Relationship Manager-2 had Epstein's KYC file and had been made aware of the prior escalation of the relationship to the ARRC, he was not made aware by anyone at Deutsche Bank of the three conditions the ARRC placed on the relationship after its February 2015 review.

255. In a May 2018 email, a compliance officer submitted an inquiry to Relationship Manager-2 about payments to the accounts of women with Eastern European surnames at a Russian bank, and asking for an explanation of the purpose of the wire transactions and Epstein's relationship with the counterparties. After submitting the questions to Accountant-1, Relationship Manager-2 forwarded Accountant-1's response to the compliance officer, which read "SENT TO A FRIEND FOR TUITION FOR SCHOOL." When the compliance officer followed up, asking "[w]hy is this client using this account to . . . pay school tuition?" Relationship Manager-2 replied "[g]enerally, Jeffrey has separate accounts to manage each of his properties. This is one of them. However, when making one-off transfers to people, he and his finance staff have the flexibility to use any account they like that is funded."

256. The compliance officer did not ask any further follow-up questions, and the transaction was cleared. This transaction was one of many in which Epstein used his Deutsche Bank accounts to further his sex abuse and sex-trafficking venture.

Deutsche Bank did not inquire further about the transaction because it knew that doing so would only further expose its participation in and facilitation of Epstein's sex-trafficking venture.

257. In addition, payments from the Butterfly Trust accounts and other Epstein accounts were used for lawsuit settlement payments to alleged victims, and rent, legal, and immigration expenses made to or on behalf of young women whom Epstein was sexually abusing and trafficking, including additional women with Eastern European surnames.

### 9. Deutsche Bank Knew About Epstein's Suspicious Cash Activity Throughout the Relationship

258. Several of Epstein's employees or agents had authority to conduct transactions in the accounts on Epstein's behalf. One of them, Epstein's personal attorney (herein, "Attorney-1"), was active in withdrawing cash for Epstein. Attorney-1, on behalf of Epstein, made a total of 97 withdrawals from Deutsche Bank's Park Avenue (New York City) Branch from 2013 to 2017 from personal accounts belonging to Epstein. The transactions in question occurred roughly two to three times per month, all in the amount of $7,500 per withdrawal, Deutsche Bank's limit for third-party withdrawals (*i.e.*, withdrawals made by an authorized user who was not a primary account holder). When Deutsche Bank personnel asked Attorney-1 why Epstein needed cash, Attorney-1 replied Epstein used it for travel, tipping, and expenses.

259. Under federal regulations, banks and other financial institutions must file Currency Transaction Reports ("CTRs") with the U.S. Treasury Department when there are cash transactions with an individual in excess of $10,000 in one day. Breaking up transactions to avoid the CTR reporting is a criminal offense commonly referred to as "structuring."

260. In May 2014, Attorney-1 inquired into how often he could withdraw cash on behalf of Epstein without triggering an alert. Around the same time, Relationship Coordinator-1 sent an email to the branch manager stating that Attorney-1 "asked how often they could come in to withdraw cash without creating some sort of alert," and asking "Is it once a week? Twice a week? Once every other week?"

261. In 2017, Attorney-1 again inquired about triggering an alert. Specifically, in July 2017, Attorney-1 had, among other things, asked a teller whether a withdrawal transaction in excess of $10,000 would require reporting and, upon being advised that it would, broke up the withdrawal transaction over two days. In July of that year, members of Deutsche Bank's Wealth Management AML transaction monitoring team, including AML Officer-2, met to discuss suspicions of cash structuring to avoid currency transaction reports ("CTRs") by Attorney-1. Nonetheless, Deutsche Bank permitted Attorney-1 to continue to withdraw cash from his own and Epstein's accounts. In 2018, just prior to Deutsche Bank's closing

of the Park Avenue Branch, which was located nearby Epstein's house, Attorney-1 withdrew $100,000 in cash on behalf of Epstein. When later questioned why Attorney-1 withdrew these sums from Deutsche Bank, Attorney-1 reported that Epstein needed the funds for tipping and household expenses—an explanation that was not credible on its face.

262. In total, in a roughly four-year period, Attorney-1 withdrew on Epstein's behalf more than $800,000 in cash from Epstein's personal accounts. Throughout the Epstein relationship, Deutsche Bank never sought or received any explanation for Epstein's substantial cash activity beyond the general travel, tipping, and expenses explanation provided by Attorney-1. The reason that Deutsche Bank never sought or received further information about Epstein's case activity is that it knew that truthful information would more directly expose Epstein's sex-trafficking venture.

263. Attorney-1 also had accounts at Deutsche Bank. Attorney-1 withdrew substantial amounts of cash from his accounts and transferred money from Epstein controlled accounts to his accounts as payment or his participation in activities to further his sex abuse and his sex-trafficking scheme, including engaging in the crime of structuring outlined above.

264. In light of all of these red flags, in addition to its actual knowledge that they were facilitating the Epstein sex-trafficking venture, Deutsche Bank was (at a

minimum) willfully blind and should have known that it was facilitating sex abuse and a sex-trafficking venture that was engaging in coercive sex trafficking in violation of 18 U.S.C. § 1591(a).

265. In a recent case before this Court, it was alleged that a confidential witness (identified only as "CW1") reported that Epstein was retained as a client only after discussion at Deutsche Bank's Board level. *See Karimi*, Dkt. 86 at 6.

266. In the same recent case before this Court, it was alleged that a confidential witness (identified only as "CW8") reported that "Deutsche Bank had a KYC [Know Your Customer] 'special deal' for Epstein and other high-net-worth individuals. CW8 explained that such individuals were not required to submit to the normally required KYC documentation. Deutsche Bank gave them special exceptions because of the amount of business they generated." *Id.* at 7. With respect to Epstein, the reason for the special KYC deal was that applying standard KYC regulations would have more fully exposed Epstein's sex-trafficking venture.

267. In the same recent case before this Court, a confidential witness ("CW8") explained that "after Epstein was onboarded, decisions about whether to continue keeping him as a client were repeatedly escalated, including to Deutsche Bank's Reputational Risk Committee. 'He would go up, get approved, go up, get approved,' CW8 said. CW8 noted that the people who sat on Deutsche Bank's Reputational Risk Committee were 'primarily business-side people,' meaning they

were interested solely in making money for the Bank." *Id.*

268.   In the same case, another confidential witness ("CW1") explained that from the time of Epstein's onboarding, the relationship was classified by Deutsche Bank as "high-risk" and therefore should have been subject to enhanced due diligence. Instead, in an ironic twist, the Bank designated as an "Honorary PEP" (that is, an Honorary Politically Exposed Person).  According to CW1, "there is no such thing as an honorary PEP.  You are either a PEP or you aren't.  I suspect they use this term to fudge things.  Epstein was certainly very high risk . . . .  But Deutsche Bank did not treat him as a high-risk client.  I think the phrase 'honorary PEP has been dreamt up to explain away why he wasn't treated as a high-risk client—whose accounts should have been constantly reviewed." *Id.*, Dkt. 37 at ¶ 100.  The reason Deutsche Bank did not constantly review Epstein's accounts is that it knew those accounts were being used as part of a sex-trafficking venture.

### 10.      Termination of the Epstein Banking Relationship

269.  In November 2018, the Miami Herald published a three-part journalistic report entitled *Perversion of Justice*, which rehashed old news stories about Jeffrey Epstein and his publicly known history of sexual abuse.  While the series did not contain any new information, it resurfaced previously publicized information about Jeffrey Epstein's sexual abuse of women, now in a post-#MeToo world.

270. With the world now even more expansively talking about Epstein's long-known history for committing sex crimes, Deutsche Bank got nervous it would be exposed as the complicit banking partner of Epstein's operation.

271. On December 21, 2018, after making millions on the banking relationship with Epstein, Deutsche Bank informed Epstein by letter that they would no longer be servicing his accounts. While Deutsche Bank stopped being Epstein's banker, it did not make a clean breast of things by disclosing its actions in support of the conspiracy to the authorities. Nor did it communicate its abandonment of its conspiring with Epstein and others in a manner reasonably calculated to reach Epstein's co-conspirators.

272. While Deutsche Bank stopped being Epstein's banker, it continued to take subsequent actions to promote the venture and conspiracy. Despite the Bank's decision to offboard all Epstein accounts due to reputational risks, Relationship Manager-2 drafted reference letters to two other financial institutions, on Deutsche Bank letterhead, indicating in one such letter that he was "unaware of any problems relating to the operation or use of [the] accounts."

273. Deutsche Bank fraudulently concealed its role in facilitating Epstein's sexual abuse and the sex-trafficking venture from the public until around July 2020.

**11. Deutsche Bank's Failure to File Suspicious Activity Reports**

274. Deutsche Bank also failed to timely file with the federal government

the required Suspicious Activity Reports (SARs) that financial institutions must file with the Financial Crimes Enforcement Network (FinCEN) whenever there is a suspected case of money laundering or fraud. Filing of these reports is required by the Bank Secrecy Act and related laws and regulations. These reports are tools that the federal government uses to detect and prosecute, among other illegal activities, sex trafficking in violation of the TVPA.

275. While Deutsche Bank was providing Epstein more than $200,000 in cash per year, it was required to file SARs about Epstein's suspicious and unusual cash transactions.

276. Deutsche Bank's failure to filed SARs about Epstein's sex-trafficking venture, in spite of numerous red flags, was wrongful and purposeful.

## 12.        Conclusions Regarding the Epstein Accounts

277. If a financial institution decides to do business with a high-risk client, that institution is required to conduct due diligence commensurate with that risk and to tailor its transaction monitoring to detect suspicious or unlawful activity based on what the risk is. Deutsche Bank knowingly, intentionally, deliberately, and maliciously failed to do so with regard to its relationship with Epstein.

278. After reviewing Deutsche Bank's relationship with Epstein, the New York Banking Regulators concluded that "although the Bank properly classified Epstein as high-risk, the Bank failed to scrutinize the activity in the accounts for the

kinds of activity that were obviously implicated by Epstein's past."

279.   Deutsche Bank was well aware not only that Epstein had pled guilty and served prison time for engaging in sex with a minor but also that there were public allegations that his conduct was facilitated by several named co-conspirators.

280.   Despite this knowledge, Deutsche Bank did little or nothing to inquire into or block numerous payments to named co-conspirators, and to or on behalf of numerous young women, or to inquire how Epstein was using, on average, more than $200,000 per year in cash.

281.   Epstein used the $200,000 per year in cash to facilitate his sex abuse and his sex-trafficking venture.  As the New York Banking Regulators concluded, the fact that the cash withdrawals "were suspicious should have been obvious to Bank personnel at various levels."  In fact, Deutsche Bank personnel at various level did recognize that the transactions were being used by Epstein to facilitate his sex abuse and his sex-trafficking venture.

282.   Deutsche Bank's desire to maintain its profitable relationship with Epstein led it to deliberately avoid taking steps that would have documented its involvement in Epstein's sex-trafficking venture.  Despite Epstein's prior criminal history, the initial onboarding of the first Epstein account was not reviewed by Deutsche Bank's regional reputational risk committee but was instead approved in what appears to have been an off-hand conversation reflected only in the Approval

Email.  That Approval Email was then relied upon, substantially without additional scrutiny, to open numerous other Epstein-related accounts.

283.   When the relationship was finally elevated to the full ARRC in early 2015, no minutes were taken of that meeting, contrary to Deutsche Bank policy. Thereafter, the Committee continued the relationship based primarily on a brief, purported due diligence meeting between two front-office personnel and Epstein himself, the substance of which was also not reflected in writing.

284.   Moreover, the conditions imposed by the ARRC—conditions that, if followed, would have prevented many subsequent suspicious transactions—(1) were not transmitted to the majority of the relationship team; and (2) were misinterpreted by a compliance officer in a way that resulted in very little change in how the monitoring of the accounts occurred going forward.  As the New York Banking Regulators concluded, "Throughout the relationship, very few problematic transactions were ever questioned, and when they were, they were usually cleared without satisfactory explanation."

285.   To profiteer from the fees and referrals generated by Epstein, Deutsche Bank intentionally, continuously, and outrageously allowed Epstein to use its accounts to cover up old crimes and to facilitate new ones—a major compliance failure and reputational stain on the bank.  *See Karimi*, Dkt. 37 at ¶ 42.

286.   Deutsche Bank should have filed SARs about Epstein's receipt of

hundreds of thousands of dollars in cash in suspicious circumstances. But it willfully failed to do so, because it knew that doing so would reveal the Epstein sex-trafficking venture and conspiracy.

287.  In and around the time that Deutsche Bank on-boarded Epstein, it became aware that it was joining in an on-going sex-trafficking venture and conspiracy.  It was aware that the on-going venture and conspiracy had been operating in a similar manner back to (at least) 2005.  Deutsche Bank choose to ratify the earlier acts of the venture and conspiracy and to act in furtherance of the venture and conspiracy.

### D. Deutsche Bank's Participation in the Epstein Sex-trafficking Venture Was Part of a Broader Pattern of Participating in Other Illegal and "High Risk, High Reward" Ventures.

288.  Deutsche Bank's intentional and outrageous participation in the Epstein sex abuse and sex-trafficking venture was not a "one off."  To the contrary, its deliberate participation fits within a pattern and practice of Deutsche Bank profiting by undertaking illegal "high risk, high reward" clients. *See generally*, *Karimi*, Dkt. 86 at 2 (recounting allegations that Deutsche Bank executives "routinely overruled compliance staff so that the Bank's wealth management business could commence or continue relationships with high-risk, ultra-rich clients, such as Russian oligarchs, the convicted sex trafficker Jeffrey Epstein, founders of terrorist organizations, persons associated with Mexican drug cartels, and people suspected of financing

terrorist organizations").

289. As discussed above, the "special deal" that Epstein received from Deutsche Bank in not being required to provide the normally-required Know Your Customer document was extended to other high-net-worth individuals. Deutsche Bank gave this "special deal" because of the amount of business these individuals generated. *See Karimi*, Dkt. 37 at ¶ 101.

290. As part of a pattern and practice similar to what it did for Epstein, Deutsche Bank routinely onboarded without due diligence individuals reportedly engaged in criminal activities, in reckless disregard of the financial and other crimes they helped to perpetrate. *See id.* at ¶ 103.

291. In a similar pattern to what it did for Epstein, Deutsche Bank onboarded and provided accounts to Eastern European oligarchs reportedly involved in criminality, including Igor Putin and Roman Abramovich.

292. In a similar pattern to what it did for Epstein, Deutsche Bank onboarded and provided accounts to the founders of the Hezbollah terrorist organization.

293. In a similar pattern to what it did for Epstein, Deutsche Bank onboarded and provided accounts to a billionaire who was a relative of one of the founders of Al Rajhi Bank in Saudi Arabia, an entity long suspected of financing terrorists.

294. In a similar pattern to what it did for Epstein, Deutsche Bank onboarded and provided accounts to Germán and José Efromovich despite their links to a

Mexican drug cartel.

295. Deutsche Bank's pattern and practice has been exposed in multiple ways. For example, in 2015, Deutsche Bank agreed to pay a combined $2.5 billion in fines—a $2.175 billion fine by American regulators and a €227 million penalty by British authorities—for its involvement in the Libor scandal uncovered in June 2012. The company also pleaded guilty to wire fraud, acknowledging that at least 29 employees had engaged in illegal activity.

296. For another example, in November 2015, Deutsche Bank was ordered to pay $258 million in penalties imposed by the New York State Department of Financial Services and the U.S. Federal Reserve Bank after the bank was caught doing business with Burma, Libya, Sudan, Iran, and Syria, which were under U.S. sanctions at the time.

297. For another example, in January 2017, Deutsche Bank agreed to a $7.2 billion settlement with the U.S. Department of Justice over its sale and pooling of toxic mortgage securities in the years leading up to the 2008 financial crisis. As part of the agreement, Deutsche Bank was required to pay a civil monetary penalty of $3.1 billion and provide $4.1 billion in consumer relief, such as loan forgiveness.

298. For another example, in January 2017, the bank was fined $425 million by the New York State Department of Financial Services and £163 million by the U.K. Financial Conduct Authority regarding accusations of money laundering $10

billion out of Russia.

299.   The common thread running through Deutsche Bank's participation in the Epstein sex-trafficking venture and its other illegal behavior is that Deutsche Bank intentionally planned to profit from being the banker for individuals and organizations that other banks knew they could not lawfully handle.  For Deutsche Bank, this "high risk, high reward" approach ensured—and continues to ensure—that it will earn greater profits than would come from complying with the law.

**E. The Statute of Limitations**

300.   The statute of limitations under the TVPA is ten years after the cause of action arose, or ten years after the victim reaches eighteen years of age, if the victim was a minor at the time of the alleged offense.  18 U.S.C. § 1595(c)(1), (2). The TVPA causes of actions for Jane Doe 1, and the other Class Members, all arose within ten years of the filing of this complaint.

301.   The New York Adult Survivors Act has opened up a one-year revival window for the statute of limitations.  *See* New York State, Governor Hochul Signs Adult Survivors Act, Governor Kathy Hochul (May 24, 2022), https://www.governor.ny.gov/news/governor-hochul-signs-adult-survivors-act ("For many survivors, it may take years to come to terms with the trauma of sexual assault and feel ready to seek just.").

302.   RICO does not establish a precise statute of limitations.  In this case,

the RICO enterprise, as well as the conspiracy to violate RICO, continued and caused injury through around July 2020, as explained in further detail below, within any possible statute of limitations.

303. Deutsche Bank fraudulently concealed its role in facilitating the Epstein sex trafficking venture through around July 20, 2020, when Deutsche Bank and the New York banking regulators publicly announced a civil settlement for Deutsche Bank's violation of its obligations in connection with Jeffrey Epstein's sex trafficking. As a result, the conspiracy continued until that time and also any applicable statute of limitations was equitably tolled until July 20, 2020.

304. Deutsche Bank joined a conspiracy to violate the TVPA and a conspiracy to violate RICO in and around 2013. Thereafter, it ratified the acts and crimes already committed by the Epstein sex-trafficking venture and conspiracy in furtherance of the venture and conspiracy.

305. Jane Doe 1, and other members of the Class, did not have the means and resources to uncover Deutsche Bank's role in facilitating their sexual abuse and sex trafficking until New York banking regulators announced their findings on July 20, 2020.

## VII. CLASS ACTION ALLEGATIONS

306. Jane Doe 1 brings this action pursuant to Federal Rule of Civil Procedure 23(b)(3) and 23(c)(4) on behalf of herself and the following Class:

All women who were sexually abused or trafficked by Jeffrey Epstein during the time when Deutsche Bank began maintaining bank accounts for Epstein and/or Epstein related-entities, which was in or about August 19, 2013, through Epstein's death on about August 10, 2019, both dates inclusive, as well as all women who were sexually abused or trafficked by Jeffrey Epstein during earlier times, between January 1, 2005 and August 19, 2013, when the sex-trafficking venture and conspiracy was operating—*i.e.*, from January 1, 2005 through August 10, 2019 (the "Class Period").

Jane Doe 1 reserves the right to seek leave to modify this definition, including the addition of one or more subclasses, after having the opportunity to conduct discovery.

307. <u>Numerosity</u>:  The Class consists of dozens of women, making joinder impracticable, in satisfaction of Fed. R. Civ. P. 23(a)(1).  The exact size of the Class and the identities of the individual Class Members are ascertainable through records maintained by the Epstein estate executors and the Defendants, including but not limited to Deutsche Bank's records for Epstein-related accounts (*e.g.*, account ledgers reflecting payments from Epstein to Class Members).

308. <u>Typicality</u>:  Jane Doe 1's claims are typical of the claims of the other Class Members she seeks to represent.  The claims of Jane Doe 1and the other Class Members are based on the same legal theories and arise from the same unlawful pattern and practice of Deutsche Banks' participation in and funding of Epstein's sex abuse and Epstein's sex-trafficking venture.

309. <u>Commonality</u>:  There are many questions of law and fact common to

the claims of Jane Doe 1 and the other Class Members, and those questions predominate over any questions that may affect only individual Class Members, within the meaning of Fed. R. Civ. P. 23(a)(2) and (b)(3). Class treatment of common issues under Fed. R. Civ. P. 23(c)(4) will materially advance the litigation.

310. Common questions of fact and law affecting Class Members include, but are not limited to, the following:

a. Whether the Epstein sex-trafficking venture caused its victims to engage in commercial sex acts in violation of Trafficking Victims Protection Act, 18 U.S.C. § 1591(a)(1);

b. Whether the Epstein sex-trafficking venture recruited, enticed, solicited, harbored, provided, obtained, and transported victims in ways that were in or affecting interstate or foreign commerce;

c. Whether Epstein and his co-conspirators used means of force, fraud, coercion, and abuse of legal process, or a combination of such means, to sexually abuse the victims and to cause victims to engage in commercial sex acts;

d. Whether Deutsche Bank knowingly assisted, facilitated, and supported the Epstein sex-trafficking venture's pattern and practice of coercively forcing victims to engage in commercial sex acts;

e. Whether Deutsche Bank benefited financially or by receiving things of

value from its participation in a venture which has engaged in sex trafficking in violation of TVPA, 18 U.S.C. § 1591(a)(1);

f. Whether Deutsche Bank knew or should have known that the Epstein sex-trafficking venture had engaged in violations of the TVPA, 18 U.S.C. § 1591(a);

g. Whether Deutsche Bank was part of a conspiracy violate the TVPA and RICO, in violation of 18 U.S.C. § 1594(c) & 18 U.S.C. § 1961(d); and

h. Whether Deutsche Bank committed aided and abetted, or was negligent in facilitating, Epstein's sexual abuse which would constitute and include sexual offenses as defined in Article 130 of New York penal law committed against persons who were eighteen years of age or older.

311. Absent a class action, most of the Class Members would find the cost of litigating their claims to be cost-prohibitive and will have no effective remedy. The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation, in that it conserves the resources of the courts and the litigants and promotes consistency and efficiency of adjudication.

312. Adequacy: Jane Doe 1 will fairly and adequately represent and protect the interests of the other Class Members she seeks to represent. Jane Doe 1 has retained counsel with substantial experience in prosecuting complex litigation and class actions. Jane Doe 1 and her counsel are committed to vigorously prosecuting

this action on behalf of the other Class Members and have the financial resources to do so. Neither Jane Doe 1 nor her counsel have any interests adverse to those of the other Class Members.

313. This action has been brought and may properly be maintained as a class action against Deutsche Bank pursuant to Rule 23 of the Federal Rules of Civil Procedure because there is a well-defined community of interest in the litigation and the proposed Class is readily and easily ascertainable from Defendants' records.

314. <u>Superiority</u>: A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because:

    a. Joinder of all Class Members is impracticable;

    b. The prosecution of individual remedies by Members of the Class will tend to establish inconsistent standards of conduct for Defendants and result in the impairment of Class Members' rights and the disposition of their interests through actions to which they were not parties;

    c. Class action treatment will permit a large number of similarly-situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender;

    d. Absent a class action, Class Members will continue to suffer losses and be aggrieved and Defendants will continue to violate New York and

federal law without remedy;

e.  Class treatment of this action will cause an orderly and expeditious administration of class claims, economies of time, effort and expense will be fostered, and uniformity of decisions will be ensured;

f.  Jane Doe 1 and her counsel are unaware of any class action brought against any Defendant for the violations alleged in this action;

g.  The forum is desirable because Defendants conducted the subject business with Jeffrey Epstein in this District and Class Members were consequently trafficked in this District; and,

h.  This action presents no difficulty that would impede its management by the Court as a class action.

## VIII. CAUSES OF ACTION

### COUNT I
**KNOWING BENEFICIARY IN A SEX-TRAFFICKING VENTURE IN VIOLATION OF THE TRAFFICKING VICTIMS PROTECTION ACT, 18 U.S.C. §§ 1591(a)(2), 1595**

315.  Plaintiff Jane Doe 1 realleges and incorporates by reference paragraphs 1 – 314, as if fully set forth in this Count.

316.  Jane Doe 1 brings this Count individually and on behalf of the other Class Members she respectively seeks to represent.

317.  Deutsche Bank knowingly and intentionally participated in, assisted, supported, and facilitated a sex-trafficking venture that was in and affecting

89

interstate and foreign commerce, together and with others, in violation of 18 U.S.C. § 1591(a)(2).

318. Deutsche Bank took many concrete steps to aid Epstein's sex-trafficking venture, as outlined above. Among the concrete steps that Deutsche Bank took to aid Epstein was providing hundreds of thousands of dollars in cash, which made the sex-trafficking venture possible. Providing Epstein hundreds of thousands of dollars in cash caused Deutsche Bank to receive financial benefits. Deutsche Bank's willingness to provide large amounts of cash to Epstein was the quid pro quo for it receiving financial benefits from Epstein.

319. The cash that Deutsche Bank provided was necessary for Epstein to coerce Jane Doe 1 as well as other Class Members to engage in commercial sex acts. The cash directly formed part of the commercial nature of the sex acts. The cash was also a necessary and required part of Epstein's recruitment of Jane Doe 1 and other victims of his sex-trafficking venture. By providing cash that Deutsche Bank knew would be used to fund the sex trafficking venture, Deutsche Bank actively participated in the recruitment of victims of the venture.

320. The cash that Deutsche Bank provided went far beyond providing routine banking facilities to a client. It was far from routine for Deutsche Bank to provide $200,000 per year in cash to someone like Epstein, who did not have an apparent need for such extravagant sums. Moreover, the circumstances in which

Epstein was requesting such large amounts were far from routine and raised numerous "red flags"—taking it well outside routine circumstances.

321. Deutsche Bank providing $200,000 per year in cash to Epstein, under the circumstances of this case, was entirely inconsistent with the ordinary duties of a bank or its employees.

322. The reason that Deutsche Bank ignored the numerous red flags about Epstein was to receive financial benefits from Epstein, estimated to be in the range of (at least) "$2-4 million annually." Deutsche Bank knew that it would gain far-from-routine financial benefits by ignoring the red flags associated with Epstein and by participating in his sex-trafficking venture.

323. Among the concrete steps that Deutsche Bank took to aid and participate in the Epstein sex-trafficking venture were opening up more than 40 accounts at Deutsche Bank for Epstein, his related entities, and associates. By opening these accounts, Deutsche Bank receive many benefits from participating in Epstein's venture. The opening of these accounts was affirmative conduct that caused Deutsche Bank to receive those benefits.

324. Among the concrete steps that Deutsche Bank took to aid the Epstein sex-trafficking venture, between on or about August 19, 2013, and through about July 2020, Deutsche Bank concealed its delivery of hundreds of thousands of dollars in cash to Epstein and his associates. In order to benefit from the Epstein sex-

trafficking venture, Deutsche Bank willfully failed to file required Suspicious Activity Reports (SARs) with the federal government, because doing so would imperil its ability to profit from the sex-trafficking venture. Deutsche Bank's concealment of the cash transactions caused it to receive financial benefits through continuation of the Epstein sex-trafficking venture.

325.　Among the concrete steps that Deutsche Bank took to aid the Epstein sex-trafficking venture were its failure to implement oversight requirements imposed by the ARRC.  This failure was not just passive facilitation, but a deliberate omission by Deutsche Bank.  This omission was specific act of concealment, which allowed Epstein to continue funding his sex-trafficking venture through suspicious transactions that would have otherwise been prevented.

326.　Deutsche Bank knowingly and intentionally benefited financially from, and received value for, its participation in the sex-trafficking venture, in which Epstein, with Deutsche Bank's knowledge, or its reckless disregard of the fact, that Epstein would use means of force, threats of force, fraud, coercion, and a combination of such means to cause Jane Doe 1, as well as other Class Members, some of whom were under the age of eighteen, to engage in commercial sex acts.

327.　Deutsche Bank actually knew that it was participating in a particular sex-trafficking venture—*i.e.*, the Epstein sex-trafficking venture outlined above. Deutsche Bank's knowledge went far beyond having an abstract awareness of sex

trafficking in general. Indeed, Deutsche Bank discussed internally Epstein's sex trafficking and the large amounts of cash that Deutsche Bank was giving him. Thus, Deutsche Bank did not simply fail to adequately detect signs of Epstein's sex trafficking; it *did* detect multiple signs of Epstein's sex-trafficking venture and continued to participate in the venture. Deutsche Bank knew that the venture was on-going, which was why Epstein required vast sums of cash.

328. Deutsche Bank's actions extend well beyond a situation of failing to train its staff about recognizing the warning signs of sex trafficking. Deutsche Bank's employees did recognize the signs of Epstein's sex trafficking. Indeed, Deutsche Bank's employees knew about Epstein's sex-trafficking venture. But Deutsche Bank decided to continue facilitating the Epstein sex-trafficking venture rather than ending its participation in the venture.

329. Among the signs that Deutsche Bank was facilitating Epstein's sex trafficking venture were those facts that came to the attention of Deutsche Bank's Anti-Financial Crime Department at the end of 2014 and into 2015, which caused the Department to escalate issues regarding Epstein's sex-trafficking venture to more senior levels.

330. Among the signs that Deutsche Bank was facilitating Epstein's sex trafficking venture were those facts that came to the attention of Deutsche Bank were those facts that came to its attention that led to an in-person meeting by Deutsche

Bank officials with Epstein in the bar in the basement of his New York home. While Epstein appears to have denied sex trafficking at that meeting, in light of all the circumstances, his denial was not credible—and Deutsche Bank knew that they were not credible.

331. Deutsche Bank's actual knowledge extended to the fact that specific individual women and girls were being coercively sex trafficked by Epstein between the time of his on-boarding and the termination of its relationship with Epstein. Even if Deutsche Bank did not know all the names of Epstein's victims, it knew that specific victims (*e.g.*, Jane Doe 1) of a specific trafficker (Epstein) at a specific time period (various dates between 2013–19) existed and were being forced to engage in commercial sex acts. It also knew that some of the victims had eastern European surnames. Deutsche Bank was on notice, and knew, that such victims were being coercively trafficked by Epstein's sex-trafficking venture.

332. Deutsche Bank helped to conceal the names of Epstein's victims from the public and from law enforcement and prosecuting agencies by helping to conceal the existence of the sex-trafficking venture. Among the ways in which Deutsche Bank helped to conceal the venture's existence was by providing the cash necessary for the venture to avoid leaving a visible "paper trail."

333. Deutsche Bank's concealment included failing to follow through on enhanced monitoring of Epstein's accounts recommended by the ARRC. Deutsche

Bank failed to implement that enhanced monitoring specifically to help conceal Epstein's ongoing sex-trafficking. Deutsche Bank knew that if it implemented that enhanced monitoring, it would have to stop providing Epstein with the cash needed to run his sex-trafficking venture.

334. Deutsche Bank's concealment included failing to file required SARs for Epstein's suspicious cash transactions.

335. In addition to having actual knowledge that it was participating in Epstein's sex trafficking venture, Deutsche Bank had constructive knowledge that it was participating in Epstein's sex trafficking venture. Deutsche Bank also had constructive knowledge that Jane Doe 1, as well as other Members of the Class, were being coercively sex trafficked by Epstein. Its constructive knowledge extended to the names of Epstein's victims, because Epstein and his associates knew the names of the victims.

336. Deutsche Bank had constructive knowledge of Epstein's sex-trafficking venture because of specific acts by Epstein that put it on notice of a particular and ongoing sex trafficking venture. Among the specific acts were Epstein's use of $200,000 per year in cash in circumstances that prompted Deutsche Bank to specifically ask Epstein about sex-trafficking.

337. Also among the specific acts giving rise to constructive knowledge were the facts that an associate of Epstein (his attorney) made a total of 97

withdrawals from the Bank's Park Avenue branch, all in the amount of $7,500, Deutsche Bank's limit for third-party withdrawals. The circumstances of these withdrawals gave the bank notice that "structuring" was occurring to avoid alerting federal authorities.

338. Also among the specific acts giving rise to constructive knowledge were the facts that came to the attention of Deutsche Bank's Anti-Financial Crime Department at the end of 2014 and into 2015, which caused the Department to escalate issues concerning Epstein's sex-trafficking venture to more senior management.

339. Among the financial benefits that the Deutsche Bank received for participating in and facilitating Epstein's sex-trafficking venture were the deposit of funds that Epstein and Epstein-controlled entities made to Deutsche Bank. Deutsche Bank profited from the use of these deposits. Epstein and Epstein-controlled entities deposited these funds in exchange for Deutsche Bank's facilitation and participation in the sex trafficking venture, including its willingness to provide large amounts of cash in suspicious circumstances and to allow "structuring" of withdrawals to avoid triggering reporting requirements.

340. Among the financial benefits that Deutsche Bank received for participating in Epstein's sex-trafficking venture was referral of business opportunities from Epstein and his co-conspirators. Deutsche Bank profited from

these referred business opportunities. Epstein referred business entities and business opportunities to Deutsche Bank in exchange for its facilitation and participation in the sex trafficking venture. These referrals were a quid pro quo for Deutsche Bank's participation in the sex-trafficking venture.

341. Deutsche Bank financially profited from the deposits made by Epstein and Epstein-controlled entities and from the business opportunities referred to Deutsche Bank by Epstein in exchange for its facilitation and participation in Epstein's sex trafficking venture.

342. Deutsche Bank knowingly received financial benefits in return for its assistance, support, and facilitation of Epstein's sex-trafficking venture. Deutsche Bank knew that if it stopped providing assistance, support, and facilitation of Epstein's sex-trafficking venture, it would no longer receive those benefits.

343. Deutsche Bank knew, and was in reckless disregard of the fact, that it was Epstein's pattern and practice to use the channels and instrumentalities of interstate and foreign commerce, to entice, recruit, solicit, harbor, provide, obtain, and transport young women and underage girls for purposes of causing commercial sex acts, in violation of 18 U.S.C. § 1591(a).

344. Deutsche Bank and its employees had actual knowledge that they were facilitating Epstein's sexual abuse and sex trafficking conspiracy to recruit, solicit, entice, coerce, harbor, transport, obtain and provide Jane Doe 1 as well as other

Members of the Class, into commercial sex acts, through the means of force, threats of force, fraud, abuse of process, and coercion.

345. Deutsche Bank's affirmative conduct was committed knowing, and in reckless disregard of the fact, that Epstein would use cash and financial supported provided by Deutsche Bank as a means of defrauding, forcing, and coercing sex acts from Jane Doe 1 as well as other Members of the Class. Deutsche Bank's conduct was outrageous and intentional.

346. In addition to actual knowledge that it was participating in and facilitating the Epstein sex-trafficking venture, Deutsche Bank also should have known that (and was willfully blind to the fact that) it was participating in and facilitating a venture that had engaged in coercive sex trafficking, as covered by 18 U.S.C. § 1595(a).

347. In exchange for facilitating and covering up Epstein's commercial sex trafficking, Deutsche Bank's officers and employees advanced in their careers at Deutsche Bank and received financial benefits therefrom by securing the Deutsche Bank-Epstein relationship.

348. Facilitating and covering up Epstein's sexual trafficking and misconduct was a means of obtaining economic success and promotion within the Deutsche Bank hierarchy.

349. Deutsche Bank's actions were in and affecting interstate and  foreign

commerce, including its banking activities which were in and affecting interstate and foreign commerce.

350. Deutsche Bank's knowing and intentional conduct has caused Jane Doe 1 and the other Members of the Class serious harm including, without limitation, physical, psychological, emotional, financial, and reputational harm.

351. Deutsche Bank's knowing and intentional conduct has caused Jane Doe 1 and the other Members of the Class harm that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity, in order to avoid incurring that harm.

352. This case does not involve mere fraud. Instead, Deutsche Bank's criminal conduct in violating the TVPA was outrageous and intentional, because it was in deliberate furtherance of a widespread and dangerous criminal sex trafficking organization. Deutsche Bank's criminal conduct also evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations. Deutsche Bank's criminal conduct was directed specifically at Jane Doe 1 and other members of the Class, who were the victims of Epstein's sexual abuse and sex trafficking organization.

353. Deutsche Bank's outrageous and intentional conduct in this case is part of a pattern and practice of Deutsche Bank profiting by undertaking illegal "high

risk, high reward" clients.

354. By virtue of these knowing and intentional violations of 18 U.S.C. §§ 1591(a)(2), 1595, Deutsche Bank is liable to Jane Doe 1 and the other Members of the Class for the damages they sustained and reasonable attorneys' fees.

355. By virtue of these intentional and outrageous violations of 18 U.S.C. §§ 1591(a)(2), 1595, Deutsche Bank is liable to Jane Doe 1 and other members of the Class for punitive damages.

**COUNT II**
**PARTICIPATING IN A SEX-TRAFFICKING VENTURE IN VIOLATION OF THE TRAFFICKING VICTIMS PROTECTION ACT, 18 U.S.C. §§ 1591(a)(1), 1595**

356. Plaintiff Jane Doe 1 realleges and incorporates by reference paragraphs 1 – 314, as if fully set forth in this Count.

357. Jane Doe 1 brings this Count individually and on behalf of the other Class Members she respectively seeks to represent.

358. Deutsche Bank knowingly and intentionally participated in, perpetrated, assisted, supported, facilitated a sex-trafficking venture that was in and affecting interstate and foreign commerce, together and with others, in violation of 18 U.S.C. § 1591(a)(1).

359. Among other things, Deutsche Bank knowingly and intentionally recruited, enticed, provided, obtained, advertised, and solicited by various means Jane Doe 1, as well as other Class Members, knowing that Epstein would use means

of force, threats of force, fraud, coercion, and a combination of such means to cause Jane Doe 1, as well as other Class Members, some of whom were under the age of eighteen, to engage in commercial sex acts.

360. Deutsche Bank and its employees had actual knowledge that they were perpetrating and facilitating Epstein's sexual abuse and sex trafficking conspiracy to recruit, solicit, entice, coerce, harbor, transport, obtain, and provide Jane Doe 1 as well as other Members of the Class, into commercial sex acts, through the means of force, threats of force, fraud, abuse of process, and coercion.

361. Despite such knowledge, Deutsche Bank intentionally paid for, facilitated, perpetrated, and participated in Epstein's violations of 18 U.S.C. § 1591(a)(1), which Deutsche Bank knew, and were in reckless disregard of the fact that, Epstein would coerce, defraud, and force Jane Doe 1, as well as other Members of the Class, to engage in commercial sex acts.

362. Deutsche Bank's actions were in and affecting interstate and foreign commerce, including its banking activities which were in and affecting interstate and foreign commerce.

363. By taking the concrete steps alleged in this complaint, Deutsche Bank knowingly participated in sex trafficking and furthered the Epstein sex-trafficking venture. The concrete steps constituted taking part in the sex-trafficking venture and were necessary for its success. The concrete steps constituted active engagement by

Deutsche Bank in Epstein's sex-trafficking venture. Deutsche Bank knew that its active engagement would lead to and cause coercive commercial sex-trafficking.

364. As part of perpetrating TVPA violations, between on or about August 19, 2013, and through about July 2020, Deutsche Bank concealed its delivery of hundreds of thousands of dollars in cash to Epstein and his associates.

365. As part of perpetrating TVPA violations, Deutsche Bank also willfully failed to file required SARs with the federal government.

366. Deutsche Bank's affirmative conduct was committed knowing, and in reckless disregard of the facts, that Epstein would use cash and the financial support provided by Deutsche Bank as a means of defrauding, forcing, and coercing sex acts from Jane Doe 1 as well as other Members of the Class. Deutsche Bank's conduct was outrageous and intentional.

367. Deutsche Bank's knowing and intentional conduct has caused Jane Doe 1 and the other Members of the Class serious harm including, without limitation, physical, psychological, emotional, financial, and reputational harm.

368. Deutsche Bank's knowing and intentional conduct has caused Jane Doe 1 and the other Members of the Class harm that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity, in order to avoid incurring that harm.

369. This case does not involve mere fraud. Instead, Deutsche Bank's criminal conduct in perpetrating TVPA violations was outrageous and intentional, because it was in deliberate furtherance of a widespread and dangerous criminal sex trafficking organization. Deutsche Bank's criminal conduct also evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations. Deutsche Bank's criminal conduct was directed specifically at Jane Doe 1 and other members of the Class, who were the victims of Epstein's sexual abuse and sex trafficking organization.

370. Deutsche Bank's outrageous and intentional conduct in this case is part of a pattern and practice of Deutsche Bank profiting by undertaking illegal "high risk, high reward" clients.

371. By virtue of these knowing and intentional violations of 18 U.S.C. §§ 1591(a)(1), 1595, Deutsche Bank is liable to Jane Doe 1 and the other Members of the Class for the damages they sustained and reasonable attorneys' fees.

372. By virtue of these intentional and outrageous violations of 18 U.S.C. §§ 1591(a)(1), 1595, Deutsche Bank is liable to Jane Doe 1 and other members of the Class for punitive damages.

## COUNT III
### AIDING, ABETTING, AND INDUCING A SEX-TRAFFICKING VENTURE IN VIOLATION OF THE TRAFFICKING VICTIMS PROTECTION ACT, 18 U.S.C. §§ 2, 1591(a)(1) & (2), 1595

373. Plaintiff Jane Doe 1 realleges and incorporates by reference paragraphs

1 – 314, as if fully set forth in this Count.

374.   Jane Doe 1 brings this Count individually and on behalf of the other Class Members she respectively seeks to represent.

375.   Deutsche Bank aided, abetted, and induced Epstein's sex-trafficking venture that was in and affecting interstate and foreign commerce, together and with others, in violation of 18 U.S.C. §§ 2, 1591(a)(1) & (a)(2).

376.   The crimes that Deutsche Bank aided and abetted are (1) Epstein's perpetrating of coercive sex trafficking, in violation of 18 U.S.C. § 1591(a)(1), and (2) Epstein's co-conspirators' knowingly benefitting from coercive sex trafficking, in violation of 18 U.S.C. § 1591(a)(2). These crimes were in and affecting interstate and foreign commerce.

377.   Epstein's co-conspirators benefitted financially and received things of value from their participation in the Epstein sex-trafficking venture, including payments and other compensation from Epstein. The co-conspirators who benefitted financially include Attorney-1, Accountant 1, Ghislaine Maxwell, Lesley Groff, Sarah Kellen, Adriana Ross, and Nadia Marcinkova.

378.   Under 18 U.S.C. § 2, Deutsche Bank is punishable as a principal under 18 U.S.C. §§ 1591(a)(1) & (a)(2) and thereby committed and perpetrated violations of Chapter 77, Title 18, U.S. Code, when it aided, abetted, counseled, commanded, induced, and procured Epstein's and his co-conspirators sex-trafficking venture and

sex trafficking of Jane Doe 1, as well as other Class Members.

379.   Under 18 U.S.C. § 2, Deutsche Bank committed and perpetrated crimes in violation of 18 U.S.C. §§ 1591(a)(1) & (a)(2) by aiding, abetting, inducing and procuring Epstein's and his co-conspirator's sex-trafficking venture and the sex trafficking of Jane Doe 1, as well as of other Class Members.  As a consequence, Jane Doe 1, as well as other members of the Class, are victims of Deutsche Bank's criminally aiding, abetting, and inducing Epstein's and his co-conspirators' violations of 18 U.S.C. §§ 1591(a)(1) & (a)(2).

380.   Deutsche Bank itself directly committed and perpetrated violations of Chapter 77, Title 18, U.S. Code, including 18 U.S.C. §§ 1591(a)(1) & (a)(2), by aiding, abetting, and inducing the sex-trafficking venture and the sex trafficking of Jane Doe 1, as well as other Class Members.  Deutsche Bank itself directly violated Chapter 77 by committing and perpetrating these violations.

381.   Among other things, Deutsche Bank aided, abetted, and induced Epstein's and his co-conspirators' sex-trafficking venture and sex trafficking of Jane Doe 1, as well as other Class Members, knowing that Epstein and his-conspirators would use means of force, threats of force, fraud, coercion, and a combination of such means to cause Jane Doe 1, as well as other Class Members, some of whom were under the age of eighteen, to engage in commercial sex acts.

382.   By aiding, abetting, and inducing Epstein's and his co-conspirators'

sex-trafficking venture and sex trafficking of Jane Doe 1, as well as other Class Members, Deutsche Bank knowingly benefited, both financially and by receiving things of value, from participating in Epstein's sex-trafficking venture.

383. Deutsche Bank and its employees had actual knowledge that they were aiding, abetting, and inducing Epstein's and his co-conspirators' sexual abuse and sex trafficking conspiracy to recruit, solicit, entice, coerce, harbor, transport, obtain, and provide Jane Doe 1 as well as other Members of the Class, into commercial sex acts, through the means of force, threats of force, fraud, abuse of process, and coercion. Deutsche Bank knew, and should have known, that Epstein had engaged in acts in violation of the TVPA.

384. Despite such knowledge, Deutsche Bank intentionally paid for and aided, abetted, and induced Epstein's violations of 18 U.S.C. §§ 1591(a)(1) & (a)(2), which constituted perpetrating violations of those laws under 18 U.S.C. § 2. Deutsche Bank knew, and acted in reckless disregard of the fact that, Epstein would coerce, defraud, and force Jane Doe 1, as well as other Members of the Class, to engage in commercial sex acts.

385. Deutsche Bank's affirmative conduct of aiding, abetting, and inducing Epstein's violations was committed knowingly, and in reckless disregard of the facts, that Epstein would use cash and financial supported provided by Deutsche Bank as a means of defrauding, forcing, and coercing sex acts from Jane Doe 1 as

well as other Members of the Class. Deutsche Bank's conduct was outrageous and intentional.

386.   Deutsche Bank's knowing and intentional conduct of aiding, abetting, and inducing Epstein's violations has caused Jane Doe 1 and the other members of the Class serious harm including, without limitation, physical, psychological, emotional, financial, and reputational harm.

387.   Deutsche Bank's knowing and intentional conduct of aiding, abetting, and inducing Epstein's violations has caused Jane Doe 1 and the other members of the Class harm that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity, in order to avoid incurring that harm.

388.   This case does not involve mere fraud. Instead, Defendants' criminal conduct in aiding, abetting, and inducing Epstein's violations of the TVPA was outrageous and intentional, because it was in deliberate furtherance of a widespread and dangerous criminal sex trafficking organization. Deutsche Bank's criminal conduct also evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations. Deutsche Bank's criminal conduct was directed specifically at Jane Doe 1 and other members of the Class, who were the victims of Epstein's sexual abuse and sex trafficking

organization.

389. Deutsche Bank's outrageous and intentional conduct in this case is part of a pattern and practice of Deutsche Bank profiting by undertaking illegal "high risk, high reward" clients.

390. By virtue of these knowing and intentional violations of 18 U.S.C. §§ 1591(a)(1), 1595, Deutsche Bank is liable to Jane Doe 1 and the other members of the Class for the damages they sustained and reasonable attorneys' fees.

391. By virtue of these intentional and outrageous violations of 18 U.S.C. §§ 1591(a)(1), 1595, Deutsche Bank is liable to Jane Doe 1 and other members of the Class for punitive damages.

**<u>COUNT IV</u>**
**CONSPIRACY TO COMMIT VIOLATIONS OF THE TRAFFICKING**
**VICTIM PROTECTION ACT, 18 U.S.C. §§ 1594(c), 1591, 1595**

392. Plaintiff Jane Doe 1 realleges and incorporates by reference paragraphs 1 – 314, as if fully set forth in this Count.

393. Jane Doe 1 brings this Count individually and on behalf of the other Class Members she respectively seeks to represent.

394. Deutsche Bank intentionally conspired with others, by agreement and understanding, to violate 18 U.S.C. § 1591(a)(1) & (a)(2) & 1591(d), and to further Epstein's and his co-conspirators' sex-trafficking venture to coerce commercial sex acts from Jane Doe 1 and other Class Members, all in violation of 18 U.S.C. §

1594(c). Deutsche Bank employees directly conspired with Epstein himself to further the sex trafficking venture.

395. Deutsche Bank's conspiracy to violate 18 U.S.C. 1591(a)(1) & (a)(2) was forbidden by 18 U.S.C. § 1594(c), and Deutsche Bank thereby violated Chapter 77, Title 18. Deutsche Bank's conspiracy directly, proximately, and foreseeably harmed Jane Doe 1, as well as other members of the Class, by directly leading to their forcibly being caused to engage in commercial sex acts and in other ways. Deutsche Bank's conspiracy victimized Jane Doe 1 and the other members of the Class.

396. Deutsche Bank's conspiracy to violate 18 U.S.C. 1591(d) was forbidden by 18 U.S.C. § 1594(c), and Deutsche Bank thereby violated Chapter 77, Title 18. Deutsche Bank's conspiracy directly, proximately, and foreseeably harmed Jane Doe 1, as well as other members of the Class, by directly leading to their forcibly being caused to engage in commercial sex acts and in other ways. Deutsche Bank's conspiracy victimized Jane Doe 1 and the other Members of the Class.

397. Deutsche Bank conspired with Epstein and his co-conspirators to further the Epstein sex-trafficking venture and with the purpose of facilitating Epstein's illegal sex trafficking. Deutsche Bank had actual knowledge of Epstein's sex-trafficking venture. Deutsche Bank acted with the specific intent to violate 18 U.S.C. §§ 1591(a)(1) & (a)(2), that is, with consciousness of the nature of Epstein's

sex-trafficking venture and with the specific intent to further venture. Deutsche Bank and Epstein had a meeting of the minds as to the essential nature of the plan.

398. The Epstein sex-trafficking conspirators had a shared and common purpose—securing young women and girls for Epstein to sexually abuse and to commercially sex traffic. Deutsche Bank and other members of the Enterprise associated together for this common purpose. As quid pro quo, in exchange for working toward this common purpose, Epstein rewarded Deutsche Bank.

399. The Epstein sex-trafficking conspiracy was an ongoing organization with the same hierarchy and regularity of function. Epstein was at the top of the hierarchy and effectively served as the CEO of the organization. Deutsche Bank served as the bank for the conspiracy after around August 19, 2013. Before that time, JP Morgan had served as the bank for the conspiracy. The sex-trafficking conspiracy was itself in and affecting interstate and foreign commerce and involved overt acts that were in and affecting interstate and foreign commerce.

400. In and around August 19, 2013, Deutsche Bank purposefully joined Epstein's previously operation, and on-going, sex-trafficking conspiracy. It quickly ratified the previous (from 2005 onward) actions, conduct, intentional torts, and crimes of the conspiracy, by joining the conspiracy, adopting its goals, and taking actions and committing overt acts in furtherance of it.

401. Deutsche Bank's conspiracy with Epstein was part of its participation

in his sex-trafficking venture. Without Deutsche Bank agreeing to facilitate the venture (by, for example, conspiring to keep the existence of cash disbursals secret), Epstein would not have been a position to move forward with his sex-trafficking venture.

402. Deutsche Bank also conspired with Epstein to obstruct, attempt to obstruct, to interfere with, and to prevent the enforcement of the TVPA, violating 18 U.S.C. § 1591(d). The conspiracy included an agreement to keep Epstein's sex-trafficking venture secret or, at least, concealed to the greatest extent possible. Among the means for keeping the venture secret were paying for the commercial sex acts in cash, structuring cash withdrawals in a way to avoid detection, and Deutsche Bank's failing to timely file SARs of Epstein's suspicious activities.

403. Further actions regarding Deutsche Bank's conspiracy to obstruct TVPA enforcement are outlined in Count VI (obstruction) below in paragraphs 445-59, which are hereby incorporated by reference as if set forth in full in this Count.

404. Within this District, Deutsche Bank intentionally committed overt acts in furtherance of the conspiracy, agreement, and understanding to violate 18 U.S.C. § 1591(a) by knowingly playing an active role in assisting, supporting, and facilitating the recruiting, enticing, coercing, harboring, transporting, and inducing and forcibly causing Jane Doe 1 and other Class Members to engage in commercial sex acts, through providing financial support for the Epstein sex-trafficking venture.

405. Among the many overt acts intentionally committed by Deutsche Bank in furtherance of the long-running Epstein sex-trafficking venture were creating and maintaining a special and unusual financial relationship between Deutsche Bank and Epstein within this District designed to facilitate Epstein's sex-trafficking.

406. Acting within this District and in furtherance of the Epstein sex-trafficking venture, on or about August 19, 2013, Deutsche Bank opened brokerage accounts for Southern Trust Company Inc., an Epstein-related company. Deutsche Bank knew, and should have known, that opening this account would facilitate Epstein's sex trafficking.

407. In furtherance of the Epstein sex-trafficking venture, between on or about August 19, 2013, and through about 2018, Deutsche Bank opened about 40 accounts for Epstein, his related entities, and associates. The accounts were in and affecting interstate and foreign commerce. The accounts were opened within this District.

408. In furtherance of the Epstein sex-trafficking venture, between on or about August 19, 2013, and through about July 2020, Deutsche Bank concealed its delivery of hundreds of thousands of dollars in cash to Epstein and his associates. Among its affirmative acts of concealment, Deutsche Bank willfully failed to timely file required SARs with the federal government.

409. Deutsche Bank's continued to participate in the conspiracy through

about July 2020, when it entered into a consent decree with New York banking regulators and admitted some of its actions.

410. Deutsche Bank deliberately and purposely omitted to timely file appropriate SARs about Epstein's cash transactions, wrongful omissions that were actions in furtherance of its conspiracy.

411. Deutsche Bank also deliberately concealed its knowledge about how JP Morgan had previously acted in furtherance in the Epstein's conspiracy.

412. Deutsche Bank's actions in furtherance of Epstein's conspiracy were intertwined with Epstein's sex-trafficking venture, as the funding for the sex-trafficking venture (and particularly cash for the venture) were essential tools for Epstein to commit coercive commercial sex acts.

413. It was part of the conspiracy that Deutsche Bank would financially benefit from providing financial support for the Epstein sex-trafficking venture. Deutsche Bank did financially benefit from its participation in the venture, including receiving valuable deposits from Epstein and Epstein-related entities into Deutsche Bank.

414. Deutsche Bank's participation in furthering Epstein's sex-trafficking venture was intentional and willful and, therefore, Deutsche Bank intentionally and willfully caused Epstein's commission of the forcible commercial sex acts with Jane Doe 1 and other Class Members through its affirmative and overt acts supporting

Epstein.

415.   Deutsche Bank knew, acted in reckless disregard of the fact, and should have known, that its conspiracy would directly and proximately lead to unlawful coercive commercial sex acts by Epstein with young women and girls, including Jane Doe 1 and other Class Members.

416.   The conspiracy that Deutsche Bank joined had specific knowledge that Jane Doe 1, as well as other Members of the Class, were being coercively sex trafficked by Epstein. The conspiracy's knowledge extended to the names of Epstein's victims, because Epstein and his co-conspirators knew the names of the victims, including Jane Doe 1's name.

417.   Deutsche Bank conspired to violate 18 U.S.C. § 1591(a) with Epstein and through its affirmative acts and substantial support to Epstein committed, perpetrated, and directly and proximately caused Jane Doe 1 and other Class Members to engage in commercial sex acts through means of force, threats of force, fraud, coercion, and a combination of such means.

418.   In addition to acting with knowledge that they were conspiring to support the Epstein sex-trafficking venture, Deutsche Bank benefited financially from conspiring to participate in the Epstein sex-trafficking venture, which Deutsche Bank knew and should have known that had engaged in coercive sex trafficking in violation of 18 U.S.C. § 1591(a)(1) & (a)(2).

419. Deutsche Bank's conspiracy has caused Jane Doe 1 and other Class Members serious harm, including, without limitation, physical, psychological, financial, and reputational harm. That harm was directly and proximately caused by the conspiracy and the harm resulting from conspiracy was foreseeable.

420. Deutsche Bank's conspiracy has caused Jane Doe 1 harm that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm.

421. This case does not involve mere fraud. Instead, Deutsche Bank's criminal conduct in conspiring to violate the TVPA was outrageous and intentional, because it was in deliberate furtherance of a widespread and dangerous criminal sex trafficking organization. Deutsche Bank's conspiracy also evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations. Deutsche Bank's conspiracy was directed specifically at Jane Doe 1 and other Class Members, who were the victims of Epstein's sex trafficking organization.

422. By virtue of these violations of 18 U.S.C. §§ 1594(c), 1595, Deutsche Bank is liable to Jane Doe 1 and the other Class Members for the damages they sustained and reasonable attorneys' fees.

423. By virtue of its intentional and outrageous conspiracy to violate 18 U.S.C. §§ 1594(c), 1595, Deutsche Bank is liable to Jane Doe 1 and other Class Member for punitive damages.

<u>**COUNT V**</u>
**ATTEMPT TO COMMIT VIOLATIONS OF THE TRAFFICKING VICTIM PROTECTION ACT, 18 U.S.C. §§ 1594(a), 1591, 1595**

424. Plaintiff Jane Doe 1 realleges and incorporates by reference paragraphs 1 – 314, as if fully set forth in this Count.

425. Jane Doe 1 brings this Count individually and on behalf of the other Class Members she respectively seeks to represent.

426. Deutsche Bank intentionally attempted to violate 18 U.S.C. § 1591(a)(1) & (a)(2), and to further Epstein's sex-trafficking venture to coerce commercial sex acts from Jane Doe 1 and other Class Members, all in violation of 18 U.S.C. § 1594(a).

427. Deutsche Bank employees deliberately took substantial steps to attempt to violate 18 U.S.C. § 1591(a)(1) & (a)(2) within this District, from around 2013 through around July 2020.

428. Deutsche Bank deliberately took substantial steps toward attempting to violate 18 U.S.C. § 1591(a), by providing substantial financial support for the Epstein sex-trafficking venture. The financial support included hundreds of thousands of dollars in cash. This support was in and affecting interstate and foreign

commerce.

429.   Among the many substantial steps taken by Deutsche Bank to deliberately attempt to violate 18 U.S.C. § 1591(a) were creating a special and unusual financial relationship between Deutsche Bank and Epstein within this District that was designed to, and did, facilitate Epstein's sex-trafficking venture and the sex trafficking of Jane Doe 1, as well as other Members of the Class.

430.   Acting within this District and in attempting to further the Epstein sex-trafficking venture, on or about August 19, 2013, Deutsche Bank opened brokerage accounts for Southern Trust Company Inc., an Epstein-related company. These accounts were in and affecting interstate and foreign commerce.

431.   In attempting to further the Epstein sex-trafficking venture, between on or about August 19, 2013, and through about 2018, Deutsche Bank opened about 40 accounts for Epstein, his related entities, and associates.  The accounts were in and affecting interstate and foreign commerce.  Deutsche Bank opened the accounts within this District for the purpose of facilitating Epstein's sex-trafficking venture.

432.   In opening 40 accounts for Epstein, his related entities, and associates, Deutsche Bank took a substantial step toward benefitting from participating in Epstein's sex-trafficking venture. Deutsche Bank also took other substantial, concrete steps toward benefits from the venture.

433.   It was part of the attempt to violate 18 U.S.C. 1591(a) that Deutsche

Bank would financially benefit from providing financial support for the Epstein sex-trafficking venture. Deutsche Bank did financially benefit from its participation in the venture, including receiving valuable deposits from Epstein and Epstein-related entities into Deutsche Bank.

434.    Deutsche Bank's attempt to violate the TVPA by furthering Epstein's sex-trafficking venture was intentional and willful and, therefore, Deutsche Bank intentionally and willfully caused Epstein's commission of sexual abuse and commercial sex acts with Jane Doe 1 and other Class Members through its affirmative and overt acts supporting Epstein.

435.    Deutsche Bank knew and acted in reckless disregard of the fact, that its acts and conduct attempting to support and facilitate Epstein would lead to sexual abuse and unlawful coercive commercial sex acts by Epstein with young women and girls, including Jane Doe 1 and other Class Members.

436.    In addition to acting intentionally and with knowledge that they were supporting the Epstein sex-trafficking venture, Deutsche Bank benefited financially from attempting to participate in the Epstein sex-trafficking venture which Deutsche Bank should have known that had engaged in coercive sex trafficking in violation of 18 U.S.C. § 1591(a)(1).

437.    This case does not involve mere fraud.  Instead, Defendants' criminal conduct in attempting to violate the TVPA was outrageous and intentional, because

it was a deliberate attempt to further the crimes of a widespread and dangerous criminal sex trafficking organization. Deutsche Bank's criminal attempts also evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations. Deutsche Bank's criminal attempt was directed specifically at Jane Doe 1 and other members of the Class, who were the victims of Epstein's sex trafficking organization.

438. Deutsche Bank's conduct has caused Jane Doe 1 and other Class Members serious harm, including, without limitation, physical, psychological, financial, and reputational harm. This harm was a direct, proximate, and foreseeable result of Deutsche Bank's attempt in violation of 18 U.S.C. § 1594(a).

439. By virtue of these violations of 18 U.S.C. §§ 1594(a), 1595(a), Deutsche Bank is liable to Jane Doe 1 and the other Members of the Class for the damages they sustained and reasonable attorneys' fees.

440. By virtue of its intentional and outrageous attempt to violate 18 U.S.C. §§ 1594(a), 1595, Deutsche Bank is liable to Jane Doe 1 and other members of the Class for punitive damages.

## COUNT VI
## OBSTRUCTION OF THE ENFORCEMENT OF THE TRAFFICKING VICTIM PROTECTION ACT, 18 U.S.C. § 1591(d)

441. Plaintiff Jane Doe 1 realleges and incorporates by reference paragraphs 1 – 314, as if fully set forth in this Count.

442. Jane Doe 1 brings this Count individually and on behalf of the other Class Members she respectively seeks to represent.

443. Deutsche Bank and its employees knowingly and intentionally obstructed, attempted to obstruct, interfered with, and prevented the enforcement of 18 U.S.C. §§ 1591(a)(1) & (a)(2), all in violation of 18 U.S.C. § 1591(d). This activity is hereinafter referred to collectively simply as "obstruction." The obstruction occurred from around 2013 to around July 2020.

444. Deutsche Bank's obstruction of the enforcement of 18 U.S.C. §§ 1591(a)(1) and (a)(2) was forbidden by 18 U.S.C. § 1591(d), and Deutsche Bank thereby violated Chapter 77, Title 18. Deutsche Bank's obstruction described in the preceding paragraph directly, proximately, and foreseeably harmed Jane Doe 1, as well as other members of the Class, by directly resulting in them coercively being caused to engage in commercial sex acts and in other ways. These actions were in and affecting interstate and foreign commerce, including the substantial sums of currency which affected interstate and foreign commerce.

445. As alleged in the fact section of this Complaint, the United States Department of Justice (including the U.S. Attorney's Office for the Southern District of New York and the U.S. Attorney's Office for the Southern District of Florida) was investigating Epstein's federal criminal liability for violating (among other laws) the TVPA up to and following the return of an indictment against Epstein on

or about July 8, 2019. On or about that date, the U.S. Attorney's Office for the Southern District of New York indicted Epstein (and unnamed "associates") for violating the TVPA. Later, on about June 29, 2020, the same Office indicted Epstein's co-conspirator, Ghislaine Maxwell, for conspiracy to entice minor victims to travel to be abused by Epstein. The federal criminal investigation of Maxwell included investigation of possible violations of the TVPA.

446. By providing and concealing financing for Epstein's sex trafficking organization from about August 2013 through about July 2020, Deutsche Bank obstructed, interfered with, and prevented the federal government's enforcement of the TVPA against Epstein. To the extent that the federal government was able to ultimately charge Epstein with TVPA violations, the filing of those charges was delayed by Deutsche Bank's actions. Because of that delay, Jane Doe 1 as well as other members of the Class, were coercively caused to engage in commercial sex acts.

447. As one example of how Deutsche Bank obstructed, attempted to obstruct, interfered with, and prevented the federal government's enforcement of the TVPA, Deutsche Bank provided large amounts of cash (about $200,000 per year) to Epstein and his associates so that the coercive commercial sex acts would escape the detection of federal law enforcement and prosecuting agencies. Deutsche Bank provided large amounts of cash to further the Epstein sex-trafficking venture and

with the purpose of helping Epstein evade criminal liability for violating the TVPA.

448. As another example of how Deutsche Bank obstructed, attempted to obstruct, interfered with, and prevented the federal government's enforcement of the TVPA, Deutsche Bank did not follow conditions imposed by the ARRC in around January 2015. These conditions included a requirement that Deutsche Bank would review transactions in the Epstein's Deutsche Bank accounts for a determination of whether they "involve[d] any unusual and/or suspicious activity or are in a size that is unusually significant or novel in structure." If Deutsche Bank had observed these conditions, then it would have prevented many of the subsequent transactions committed by the Epstein sex-trafficking venture. Deutsche Bank knowingly did not observe these conditions because it knew that doing so would have prevented Epstein's secret cash transactions that were necessary to his sex-trafficking operation escaping knowledge of federal investigative and prosecuting agencies. Without Deutsche Bank's cash, Jane Doe 1, as well as other members of the Class, would not have been coercively forced to engage in commercial sex act.

449. As another example of how Deutsche Bank obstructed, attempted to obstruct, interfered with, and prevented the federal government's enforcement of the TVPA, Deutsche Bank failed to timely file with the federal government the required SARs that financial institutions must file with FinCEN whenever there is a suspected case of money laundering or fraud. Timely filing of these reports is required by the

Bank Secrecy Act and related laws and regulations. These reports are tools that the federal government uses to detect and prosecute, among other illegal activities, sex trafficking in violation of the TVPA. By failing to timely file the required SARs regarding Epstein's cash transactions, Deutsche Bank obstructed, attempted to obstruct, interfered with, and prevented the federal government's enforcement of the TVPA by concealing from the federal government's attention Epstein's cash transaction in aid of sex trafficking.

450. Deutsche Bank can disclose its failure to file appropriate SARs without disclosing the existence of an SAR. Deutsche Bank is not protected from liability for failure to file a required SAR.

451. Deutsche Bank's failure to timely file SARs about Epstein's sex-trafficking venture, in spite of numerous red flags, was wrongful and purposeful.

452. If Deutsche Bank had filed timely required SARs about Epstein's sex-trafficking venture with the federal government, the appropriate federal agencies would have been well positioned to investigate Epstein's sex-trafficking venture's TVPA violations. Deutsche Bank's failure to timely file the required SARs obstructed the federal government's ability to investigate those TVPA violations, including violations harming Jane Doe 1 and other Class Members. If Deutsche Bank had timely filed the required SARs, it would have prevented the continuation of Epstein's sex trafficking venture, which required the ability to secretly use cash

to pay off victims.

453.   By providing large amounts of cash (about $200,000 per year) to Epstein and his associates, Deutsche Bank intended and knew that Epstein's coercive commercial sex acts would escape the detection of federal law enforcement and prosecuting agencies for some period of time.   Deutsche Bank provided large amounts of cash to further the Epstein sex-trafficking venture and with the purpose of helping Epstein evade criminal liability for violating the TVPA.

454.   Deutsche Bank's obstruction, attempted obstruction, interference with, and prevention of the enforcement of the TVPA were all done intentionally and knowingly.   For example, Deutsche Bank knew that Epstein was "high risk"— specifically, high risk to violate the TVPA through continuing criminal sex trafficking activities.

455.   Deutsche Bank was well aware that Epstein had pleaded guilty and served prison time for engaging in sex with a minor—a crime closely connected with sex trafficking in violation of the TVPA.   Deutsche Bank was also well aware that there were public allegations that his illegal conduct was facilitated by several named co-conspirators.   But Deutsche Bank concealed from the federal government its numerous cash payments to those co-conspirators.   Deutsche Bank continued its affirmative conduct of providing cash to Epstein so that he could make those cash payments to his co-conspirators with knowledge that such cash transaction did not

produce a clear paper trail. Deutsche Bank's intentional conduct obstructed, attempted to obstruct, in many ways interfered with, and prevented the enforcement of the TVPA by federal investigators and prosecuting agencies.

456. Deutsche Bank's relationship with Epstein in providing to him $200,000 in cash per year went far beyond a normal (and lawful) banking relationship. Deutsche Bank knew, and intended, that its relationship with Epstein would go far beyond a normal banking relationship. Deutsche Bank knew that its decision to beyond a normal banking relationship with Epstein obstructed the ability of federal law enforcement and prosecuting agencies to enforce the TVPA.

457. Deutsche Bank's obstruction continued through around July 2020, as it was not until that time that Deutsche Bank entered into its consent agreement with New York banking regulators.

458. Deutsche Bank's obstruction of the federal government's TVPA and other law enforcement efforts was intentional and willful and, therefore, Deutsche Bank intentionally and willfully caused Epstein's commission of the forcible commercial sex acts with Jane Doe 1 and other Class Members through its obstruction supporting the concealment of Epstein's sex-trafficking venture.

459. Deutsche Bank knew, acted in reckless disregard of the fact, and should have known, that its obstruction in violation of 18 U.S.C. § 1591(d) would directly and proximately lead to unlawful coercive commercial sex acts by Epstein with

young women and girls, including Jane Doe 1 and other Class Members.

460. Deutsche Bank's obstruction has caused Jane Doe 1 and other Class Members serious harm, including, without limitation, physical, psychological, financial, and reputational harm. That harm was directly and proximately caused by the obstruction and the harm resulting from obstruction was foreseeable.

461. Deutsche Bank's obstruction has caused Jane Doe 1 harm that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm.

462. This case does not involve mere fraud. Instead, Deutsche Bank's criminal conduct in obstructing enforcement of the TVPA was outrageous and intentional, because it was in deliberate furtherance of a widespread and dangerous criminal sex trafficking organization. Deutsche Bank's obstruction also evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations. Deutsche Bank's obstruction was directed specifically at Jane Doe 1 and other members of the Class, who were the victims of Epstein's sex trafficking organization.

463. By virtue of these violations of 18 U.S.C. § 1591(d), Deutsche Bank is liable to Jane Doe 1 and the other Members of the Class for the damages they

sustained and reasonable attorneys' fees by operation of 18 U.S.C. § 1595. Deutsche Bank perpetrated an obstruction of the TVPA, and therefore perpetrated a violation of Chapter 77, Title 18.

464. By virtue of its intentional and outrageous obstruction to prevent enforcement of the TVPA, in violation 18 U.S.C. § 1591(d), Deutsche Bank is liable to Jane Doe 1 and other members of the Class for punitive damages by operation of 18 U.S.C. § 1595.

## COUNT VII
## VIOLATIONS OF RICO, 18 U.S.C. §§ 1962(c), 1964(c)

465. Plaintiff Jane Doe 1 realleges and incorporates by reference paragraphs 1 – 314, as if fully set forth in this Count.

466. Jane Doe 1 brings this Count individually and on behalf of the other Class Members she respectively seeks to represent.

467. From around August 2013 through around July 2020, Deutsche Bank violated RICO, 18 U.S.C. § 1962(c), within this District and elsewhere, for which Jane Doe 1 and the other Class Members are entitled to recover damages under 18 U.S.C. § 1964(c). Deutsche Bank and others acting in concert with them as part of the aforementioned enterprise engaged in a pattern of racketeering activity within the meaning of RICO, 18 U.S.C. §1961(5), when they committed two or more separate acts constituting a pattern of racketeering activity, the last of which occurred within ten years after the commission of a prior act of racketeering activity.

Specifically, Deutsche Bank and others in the Enterprise committed multiple acts in violation of 18 U.S.C. § 1962(c) over the course of several years from about 2013 to about December 2018, during which time Jane Doe 1 was sexually assaulted and sexually trafficked.

468. Deutsche Bank's pattern of racketeering activity extended over a substantial period of time—*i.e.*, during the multiple years that Deutsche Bank financially furthered and supported the Epstein Sex Trafficking Enterprise.

469. Deutsche Bank violated RICO, 18 U.S.C. § 1962(c), which makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ." Deutsche Bank was associated with the Epstein Sex-Trafficking Enterprise and conducted and participated (directly and indirectly) in the conduct of the enterprise's affairs by financially supporting the Epstein sex trafficking enterprise and also engaging in a pattern of racketeering activity as alleged above. Deutsche Bank's actions, including its predicate acts, directly and proximately injured Jane Doe 1 and the Class Members in their business and property.

## 1. The RICO Enterprise

470. Deutsche Bank, along with Epstein and his employees, agents, and co-

conspirators, was engaged in a RICO "enterprise," which "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(3). Deutsche Bank and others employed by or associated with it or others acting in concert with Deutsche Bank, promoted, facilitated, financed, and otherwise effectuated the Epstein sex-trafficking venture and Epstein's coercive commercial sex acts, as alleged in this complaint, and constituted an "enterprise" under the RICO definition. This enterprise is described herein as the "Epstein Sex-Trafficking Enterprise," or simply the "Enterprise." References in this complaint to the Epstein Sex-Trafficking Venture and Epstein Sex-Trafficking Conspiracy are also references to the Enterprise.

471. The Epstein Sex-Trafficking Enterprise had a shared and common purpose—securing young women and girls for Epstein to sexually abuse and to commercially sex traffic. Deutsche Bank and other members of the Enterprise associated together for this common purpose.

472. The Epstein Sex-Trafficking Enterprise was an ongoing organization with the same hierarchy and regularity of function. Epstein was at the top of the hierarchy and effectively served as the CEO of the organization.

473. The Epstein Sex-Trafficking Enterprise consisted of more than Epstein and Epstein's own employees and agents. It also included other persons, including

Deutsche Bank's employees and agents. The Enterprise operated together as an association-in-fact. The persons who operated together as an association-in-fact included, but were not limited to, Defendant Deutsche Bank, Jeffrey Epstein, Attorney-1, Accountant-1, Ghislaine Maxwell, Sarah Kellen, Leslie Groff, Adriana Ross, Nadia Marcinkova, Charles Packard, Patrick Harris, Paul Morris, and Jan Ford. These individuals knew of, and agreed to, the general criminal objective of the Epstein Sex-Trafficking Enterprise. These individuals also agreed that Deutsche Bank would provide the funding for the enterprise and that Deutsche Bank would be rewarded as a result.

474. The Epstein Sex-Trafficking Enterprise had a relationship among the associates, including a relationship among Epstein's employees and agents and Deutsche Bank's employees and agents. The associates coordinated their actions to facilitate the actions of the sex-trafficking enterprise, including ensuring that the Enterprise had sufficient financing to pursue its purpose.

475. The Epstein Sex-Trafficking Enterprise lasted for many years, but from (at least) around 2013 through around July 2020, permitting the associates in the Enterprise to successfully pursue the Enterprise's purpose. As a result of the longevity of the Enterprise, many young women and girls were sexually abused and sexually trafficked by Epstein. In this way, those involved in the Enterprise helped it achieve the common purpose.

476. The participation and agreement of Deutsche Bank was necessary to allow the commission of this scheme.

## 2. Nexus Between the "Deutsche Bank" and the "Enterprise"

477. Deutsche Bank, acting through its employees and officers, participated, directly and indirectly, in the conduct of the affairs of the Epstein Sex-Trafficking Enterprise. Deutsche Bank's agents, acting within the apparent scope of their authority, participated, directly and indirectly, in the conduct of the affairs of the Epstein Sex-Trafficking Enterprise.

478. Deutsche Bank, acting through its employees and officers, participated in the operation and management of the enterprise itself. For example, Deutsche Bank officers met personally with Epstein at his New York mansion, during which they collectively shaped the conduct of the affairs of the Epstein Sex Trafficking Enterprise.

479. Deutsche Bank, acting through its employees and officers, exercised a significant degree of direction over the affairs of the Enterprise and played a part in directing the affairs of the Enterprise.

480. Deutsche Bank, acting through its employees and officers, aided and abetted Epstein, who participated in the operation and management of the Enterprise.

## 3. Acts of Racketeering

481. Deutsche Bank and others acting in concert with them as part of the

Epstein Sex-Trafficking Enterprise engaged in racketeering activity within the meaning of RICO, 18 U.S.C. § 1961(1)(B), when they engaged in acts "indictable under" 18 U.S.C. §§ 1581–1594 (the statutes relating to peonage, slavery, and trafficking in persons), to wit, the acts in violation of 18 U.S.C. §§ 1591 to 1594 alleged in Counts I–VI and otherwise specified throughout this complaint.

482. Deutsche Bank and others acting in concert with them as part of the Epstein Sex-Trafficking Enterprise engaged in racketeering activity within the meaning of RICO, 18 U.S.C. § 1961(1)(B), when they engaged in acts "indictable under" 31 U.S.C. § 5322 (the Bank Secrecy Act) and failing to adhere to the minimum due diligence requirements contained in 31 C.F.R. § 1010.620, by (among other things) (1) failing to ascertain the source of Epstein's funds and the purpose and expected use of his accounts; and (2) ensuring that the activity in Epstein's accounts was consistent with the information Deutsche Bank obtained about Epstein's source of the funds and stated purpose and expected use of the accounts. Deutsche Bank's knowing, intentional, and willful failure to comply with federal laws and banking regulations constituted a felony under 31 U.S.C. § 5322(a).

483. The acts of racketeering described in the paragraphs above occurred within about August 2013 and about July 2020.

484. As an example of acts of racketeering, on multiple occasions Deutsche Bank participated in TVPA violations by provided substantial sums of cash to

Epstein, which he then used to conclude coercive acts of commercial sex abuse and sex trafficking, in violation of the TVPA (as elaborated in detail in Count II and elsewhere above).

485.   As another example of acts of racketeering, on multiple occasions Deutsche Bank knowingly received benefits from participated in sex trafficking by provided substantial sums of cash to Epstein, which he then used to conclude coercive acts of commercial sex abuse and sex trafficking, in violation of the TVPA (as elaborated in detail in Count I and elsewhere above).

486.   Among the acts constituting a pattern of racketeering activity, on or about August 19, 2013, Deutsche Bank opened brokerage accounts for Southern Trust Company Inc., a self-described "database company and services" founded in the U.S. Virgin Islands in 2011, and Southern Financial LLC, a wholly owned subsidiary of Southern Trust Company Inc.  Opening these accounts for the Epstein Sex-Trafficking Enterprise constituted acts which were indictable under 18 U.S.C. §§ 1581–94, and 18 U.S.C. § 2, for the reasons described above.

487.   Among the acts constituting a pattern of racketeering activity, over the course of its relationship with the Epstein Sex-Trafficking Enterprise from about 2013 to December 2018, Deutsche Bank would open and allow Epstein to fund more than 40 accounts at Deutsche Bank.  Opening these accounts for the Epstein Sex-Trafficking Enterprise constituted acts which were indictable under 18 U.S.C. §§

1581–94, and 18 U.S.C. § 2, for the reasons described above.

488.    Among the acts constituting a pattern of racketeering activity, over the course of its relationship with the Epstein Sex-Trafficking Enterprise, Deutsche Bank sent over 120 wires totaling $2.65 million to beneficiaries of the Butterfly Trust.   These transfers furthered the sex-trafficking enterprise, including funds paying directly for commercial sex acts, funds paid to professionals for carrying out illegal acts for the operation of the sex-trafficking venture, and paying funds to others for committing crimes necessary to continue the operation of the sex-trafficking venture.   Sending the wires for the Epstein Sex-Trafficking Enterprise constituted acts which were indictable under 18 U.S.C. §§ 1581–94, and 18 U.S.C. § 2, for the reasons described above.

489.    Deutsche Bank knowingly facilitated Epstein using Deutsche Bank accounts to pay for coerced commercial sex acts by Jane Doe 1.   Helping Epstein provide the funding for commercial sex acts constituted acts of racketeering activity because they were indictable under 18 U.S.C. §§ 1581–94, and 18 U.S.C. § 2, for the reasons described above.

**4. Pattern of Racketeering Activity**

490.    During around August 2013 through the end of 2018, Deutsche Bank engaged in a pattern of racketeering activity.

491.    Deutsche Bank's pattern of racketeering activity included repeatedly

134

providing approximately $200,000 in cash to the Epstein Sex-Trafficking Enterprise on a yearly basis.

492.   Deutsche Bank's pattern of racketeering activity included repeatedly failing to file required SARs for suspicious cash and other transactions of the Epstein Sex-Trafficking Enterprise.

493.   Many of the suspicious cash withdrawals made by the Epstein Sex-Trafficking Enterprise were made in the same way by the same person at the same branch bank.  The cash withdrawals those involved similar methods.

494.   The cash withdrawals all bore a relationship to each other, because they were providing the necessary funding for the coercive commercial sex trafficking and sex abuse of the Epstein Sex Trafficking Venture.  Indeed, some of the cash withdrawals necessarily related directly and precisely to each other, because they were "structured" together to avoid triggering certain current transaction reporting requirements.

495.   The funding involved similar goals and effects of providing sufficient cash to allow the Epstein Sex-Trafficking Venture to pay victims for commercial sex acts in cash, thereby avoiding a paper trail.

## 5. Effect on Interstate Commerce

496.   The Epstein Sex Trafficking Enterprise engaged in, and had activities which affect, interstate and foreign commerce.

497.    Among the activities of the Enterprise which had an effect on interstate commerce were cellular and other telephone calls to Epstein's victims to schedule time for sexual abused.

498.    Among the activities of the Enterprise which had an effect on interstate commerce were cash withdrawals from Deutsche Bank, which does business in and effecting interstate commerce.

499.    Among the activities of the Enterprise which had an effect on interstate commerce were movements of Epstein, his confederates, and his victims on aircraft moving in interstate commerce.

### 6. Injury to Business and Property by Reason of the RICO Violation

500.    By reason of its violations of 18 U.S.C. § 1962(c), Deutsche Bank has directly and proximately caused Jane Doe 1 and the Class Members serious and permanent economic injury to their businesses and property, including, without limitation, pecuniary harm to their careers and professional prospects, in an amount to be determined at trial.  Deutsche Bank's violations continue to cause economic harm and injury to Jane Doe 1 and other Members of the Class.

501.    Deutsche Bank's acts of racketeering and activities as part of the Epstein's Sex-Trafficking Enterprise, described above, have directly and proximately caused Jane Doe 1 and the Class Members serious and permanent economic injury to their businesses and property, including, without limitation,

pecuniary harm to their careers and professional prospects, in an amount to be determined at trial.

502. As an example of the injury to business and property suffered by Jane Doe 1 and other Class Members, because of being coercively sex trafficked and sexually abused by Epstein, Jane Doe 1 and other Class Members were preventing from pursuing other employment opportunities. As a direct and proximate result of the acts of the RICO Enterprise generally and Deutsche Bank in particular, Jane Doe 1 and the Class Members lost legitimate employment opportunities. The lost opportunities produced concrete financial loss.

503. As another example of the injury to business and property suffered by Jane Doe 1 and other class members, because of being coercively sex trafficked and sexually abused by Epstein and the Enterprise, Jane Doe 1 and other Class Members directly and proximately lost an ability to pursue gainful employment while being coercively sexually trafficked and sexually abused by Epstein. Indeed, it is these lost opportunities—which themselves constituted injury to business and property— were the Enterprise's direct target, because the lost opportunities rendered Jane Doe 1 and the other Class Members more economically and financially reliant on the Sex-Trafficking Enterprise and therefore more vulnerable to the trafficking and abuse. It was part of Epstein's coercive sex trafficking that he would discourage and prevent Jane Doe 1 and the Class Members from obtaining employment and income

outside of that provided by the Sex-Trafficking Enterprise.

504. Direct and proximately because of the pattern of racketeering activity by the Epstein Sex-Trafficking Enterprise, Jane Doe 1 and other Class Members were rendered, in whole or substantial part, economically dependent on the Enterprise and therefore more vulnerable to the Enterprise's sex trafficking. Indeed, it was part of the Enterprise's pattern of racketeering activity—and a goal of that activity— to render its victims economically vulnerable to any effort to escape from Epstein's sex trafficking.

505. As another example of the injury suffered by Jane Doe 1 and other class members, because of being coercively sex trafficked and sexually abused by Epstein, Jane Doe 1 and other Class Members were falsely promised certain employment and professional opportunities by Epstein, which prevented them from pursuing other employment opportunities. Again, these false promises were part of the Enterprise's operation, because they forced and caused Epstein's victims to participate in commercial sex acts. Forcing sex-trafficking victims into a position of economic dependency on their traffickers is a well-known means of coercion—one that Deutsche Bank should have recognized and, in fact, did recognize.

506. As another example of the injury suffered by Jane Doe 1 and other class members, Jane Doe 1 and other Class Members incurred alleged debts to the Epstein Sex-Trafficking Enterprise, which constituted injury to business and property. Jane

Doe 1 and the other Class Members would then be forced to pay off those debts by submitting to Epstein's sexual demands. More generally, the Epstein Sex-Trafficking Enterprise forced Jane Doe 1 and the Class Members to participate in commercial sex acts by creating economic dependency on the Enterprise.

507. The losses to their business and property that Jane Doe 1 and the Class Members suffered were by reason of the Epstein-Sex Trafficking Enterprise and its RICO violations. These losses were directly and proximately caused by the Enterprise's misconduct, including the predicate acts committed by the Enterprise. Because the losses stemmed from being forced to engage in commercial sex acts, the Enterprise's violations of 18 U.S.C. § 1591 were the direct (*i.e.*, the "but-for") cause of the losses. Because those commercial sex acts were readily foreseeable (and, indeed, were foreseen) by the participants in the Enterprise—including Deutsche Bank—the losses were proximately caused by the Enterprise's violations of 18 U.S.C. §§ 1591–94 and 1962(c).

508. The losses to the business and property that Jane Doe 1 and the Class Members suffered were directly caused by Deutsche Bank's violations of 18 U.S.C. §§ 1591–94 and 1962(c). There was a direct relationship between Deutsche Bank's violations of 18 U.S.C. §§ 1591–94 and 1962(c). Put directly, the Epstein Sex-Trafficking Enterprise was committing coercive sex-trafficking; and Jane Doe 1 and the Class Members were the direct and intended victims of that coercive-sex

139

trafficking. There was no attenuation between the Enterprise and the injuries to business and property it caused to Jane Doe 1 and the Class Members. There were no intervening causes of the injuries to business and property suffered by Jane Doe 1 and the Class Members.

509. Jane Doe 1 and the Class Members are in the best position to enforce the legal requirements in question, including the legal requirements stemming from 18 U.S.C. § 1591–94 and 18 U.S.C. § 1962(c). They are young women who have suffered losses to business and property from the coercive sex-trafficking by the Epstein Sex-Trafficking Enterprise and are seeking to hold accountable those responsible for the losses to business and property from that victimization. There are no more directly injuries parties who could bring this suit.

510. Jane Doe 1 and the other Class Members will be able to provide reasonable quantification of the losses to their business and property at trial. Determining those losses will not be difficult and no complicated rules will be required to avoid the risk of multiple recoveries.

511. Jane Doe 1 and other Class Members will be able to acquire additional evidence supporting their RICO losses through discovery.

512. Deutsche Bank received income in interstate commerce, derived directly and indirectly from participating in a pattern of racketeering activity, specifically by obtaining interest and other things of value from financially

supporting and participating in the Epstein Sex-Trafficking Enterprise.

513.   Deutsche Bank and its employees participated directly and indirectly in the conduct of the Epstein Sex-Trafficking Enterprise, through a pattern of racketeering activity, including knowingly funding the Enterprise's commercial sex trafficking.

514.   Deutsche Bank's RICO violations are both the but-for cause and the proximate cause of business and property injuries to Jane Doe 1 and the Class Members' injuries.  As explained throughout, Deutsche Bank bankrolled the Epstein Sex-Trafficking Enterprise and enabled Epstein to have ready and reliable access to resources—including cash and a variety of bank accounts and other financial tools—to recruit, entice, solicit, harbor, provide, obtain, and transport young women and girls to sexually abuse them and to cause them to engage in commercial sex acts. Deutsche Bank's actions both directly and foreseeably resulted in the trafficking of Jane Doe 1 and the Class Members and the resulting injuries to their businesses and property.

515.   Pursuant to 18 U.S.C. § 1964(c), Jane Doe 1 and the Class Members are entitled to treble damages, plus costs and attorneys' fees from Deutsche Bank.

## COUNT VIII
## CONSPIRACY TO COMMIT VIOLATIONS OF RICO, 18 U.S.C. §§ 1962(d), 1964(c)

516.   Plaintiff Jane Doe 1 realleges and incorporates by reference paragraphs

1 – 314, as if fully set forth in this Count.

517.  In this RICO conspiracy count, Jane Doe 1 realleges and incorporates by reference paragraphs 470 – 514 of this complaint, which allege a substantive RICO violation.

518.  Jane Doe 1 brings this Count individually and on behalf of the other Class Members she respectively seeks to represent.

519.  RICO makes it unlawful "for any person to conspire to violate" the provisions of 18 U.S.C. § 1962(a)–(c).  18 U.S.C. § 1962(d).  RICO's conspiracy provision does not require the commission of an overt act, although Deutsche Bank did commit overt acts in furtherance of the RICO conspiracy in this District.

520.  Between about August 2013 and about July 2020, Deutsche Bank unlawfully, knowingly, and willfully, combined, conspired, confederated, and agreed together with members of the Epstein Sex-Trafficking Enterprise to violate 18 U.S.C. § 1962(c) as described above, in violation of 18 U.S.C. § 1962(d). Deutsche Bank specifically conspired and agreed to the commission of two or more predicate acts, which were described in the previous Count.  For example, Deutsche Bank conspired and agreed that Epstein would commit multiple acts of coercive sex trafficking in violation of the TVPA, 18 U.S.C. §§ 1591–94.  As another example, Deutsche Bank conspired and agreed that it would commit multiple violations of federal banking laws, including 31 U.S.C. § 5332(a) and 31 C.F.R. § 1010.620.

521.   In addition to participating in the conduct of the affairs of the Epstein Sex-Trafficking Venture, Deutsche Bank conspired with Epstein in his conduct of the affairs of the Epstein Sex-Trafficking Venture.  Deutsche Bank knew many of the details of the Epstein Sex-Trafficking Venture, including in particular the funding of the venture. Epstein was, along with others (including Deutsche Bank) operating and managing the Epstein-Sex Trafficking Venture.

522.   Deutsche Bank's conspiracy was central to the affairs of the Epstein-Sex Trafficking Venture.  Without its agreement to fund and conceal the activities of the Venture, Epstein would not have been able to move forward with the Venture.

523.   Deutsche Bank knew that, as part of the Epstein Sex-Trafficking Venture, Epstein was going to commit multiple predicate acts under RICO, including coercive commercial sex acts and sex trafficking.  Deutsche Bank also new that these acts would constitute a pattern and practice of the venture, because the coercive commercial sex acts and sex trafficking would be committed against Jane Doe 1 and the Class Members in a substantially similar way.

524.   By and through Deutsche Bank's unique and special relationships with Epstein and his co-conspirators and its close coordination in the affairs of the Epstein Sex-Trafficking Enterprise, Deutsche Bank knew the criminal nature of the Enterprise and knew that the Enterprise extended beyond Deutsche Bank's role. Moreover, through the same connections and coordination, Deutsche Bank knew

that it was joining with Epstein and his associates in a conspiracy to commit sex trafficking, in violation of 18 U.S.C. §§ 1581–94.

525.   Deutsche Bank knowingly conspired and agreed to facilitate, conduct, and participate in the aforementioned Enterprise engaged in racketeering activity within the meaning of RICO, 18 U.S.C. §1961(1)(B), when it engaged in acts "indictable under" 18 U.S.C. §§ 1581–1594 (the statutes relating to peonage, slavery, and trafficking in persons), including the acts in violation of 18 U.S.C. § 1591–94 alleged in Counts I–VI and otherwise specified throughout this complaint, as well as acts in violation of 18 U.S.C. § 2.

526.   Deutsche Bank knowingly conspired and agreed to facilitate, conduct, and participate in the aforementioned Enterprise engaged in racketeering activity within the meaning of RICO, 18 U.S.C. §1961(1)(B), when it engaged in acts "indictable under" 31 U.S.C. § 5322(a).

527.   Deutsche Bank also committed multiple crimes in furtherance of the conspiracy, as alleged in the preceding counts of this Complaint.  Deutsche Bank intended its crimes to further the Enterprise's affairs.

528.   Deutsche Bank's agreement and conspiracy was necessary to allow the commission of this conspiracy.

529.   Jane Doe 1 and the Class Members have been and will continue to be directly and proximately injured in their business and property by reason of Deutsche

Bank's violations of 18 U.S.C. § 1962(d). Deutsche Bank's conspiracy directly and proximately caused these injuries because, without the conspiracy, the injuries would not have occurred.

530.    As a direct and proximate result of its violation of 18 U.S.C. § 1962(d), Deutsche Bank has directly and proximately caused Jane Doe 1 and the Class Members serious and permanent economic injury to their businesses and/or property, including, without limitation, pecuniary harm to their careers and professional prospects, in an amount to be determined at trial. Deutsche Bank's violations continue to cause economic harm and injury to Jane Doe 1 and other Members of the Class.

531.    Pursuant to 18 U.S.C. § 1964(c), Jane Doe 1 and the Class Members are entitled to treble damages, plus costs and attorneys' fees from Deutsche Bank.

## COUNT IX
## AIDING, ABETTING, AND FACILITATING BATTERY

532.    Plaintiff Jane Doe 1 realleges and incorporates by paragraphs 1 – 314, as if fully set forth in this Count.

533.    Jane Doe 1 brings this Count individually and on behalf of the other Class Members she respectively seeks to represent.

534.    Between about August 19, 2013, and August 10, 2019, in this District in New York, Epstein intentionally committed batteries and other intentional tortious conduct, including crimes in violation of New York Penal Law Chapter 130 such as

New York Penal Law §§ 130.20, 130.35, 130.50, 130.52, and 130.66 (hereinafter "Chapter 130 crimes"), against Jane Doe 1 and Class Members. Epstein committed the batteries, intentional tortious conduct, and crimes against Jane Doe 1 and Class Members when they were 18 or older. As described throughout this complaint, Epstein intentionally and non-consensually touched Jane Doe 1 and the Class Members in a harmful and offensive manner that resulted in substantial injuries, including damages from physical and psychological injury, extreme emotional distress, humiliation, fear, psychological trauma, loss of dignity and self-esteem, and invasion of privacy.

535. The resulting injuries that Jane Doe 1 and the Class Members suffered include injuries directly and proximately suffered as a result of sex offenses committed by Epstein and criminalized under article 130 of the New York Penal Laws. The offenses included sexual intercourse without consent and oral sexual conduct without consent, forbidden by New York Penal Law § 130.20. The offenses included forcible touching of sexual or other intimate parts without consent, forbidden by New York Penal Law §§ 130.20, 130.35, 130.50, 130.52, and 130.66.

536. Regardless of when these Chapter 130 crimes were committed by Epstein, the crimes are now civilly actionable, regardless of any statute of limitations to the contrary, because they are covered by the one-year "look back" window in New York Adult Survivors Act. *See* N.Y. C.P.L.R. § 214-j.

537.   Between about August 19, 2013, and August 10, 2019, Deutsche Bank knowingly and intentionally aided, abetted, and facilitated Epstein's intentional tortious conduct (*e.g.*, sexual battery), through his Chapter 130 crimes, of Jane Doe 1 and the Class Members.  Because Deutsche Bank aided, abetted, and facilitated Epstein's tortious conduct, battery, and crimes, it is vicariously and otherwise liable for damages caused by Epstein's tortious conduct, battery, and crimes.

538.   Between about August 19, 2013, and August 10, 2019, when it provided substantial assistance to Epstein, Deutsche Bank was well aware of its important and substantial role as a part of Epstein's intentionally tortious and illegal activity in committing Chapter 130 Crimes.

539.   Deutsche Bank substantially assisted, and indeed encouraged, Epstein to commit sexual battery against Jane Doe 1 and the Class Members by financially aiding and enabling Epstein's sex-trafficking venture, as outlined throughout this complaint.  By aiding Epstein through providing hundreds of thousands of dollars in cash, which was a necessary and required part of Epstein's sex-trafficking organization, Deutsche Bank was a substantial factor in the battery of Jane Doe 1 and the other Members of the Class.

540.   At the time of Epstein's batteries, intentionally tortious conduct, and crimes against Jane Doe 1 and the Class Members, Deutsche Bank was well aware of Epstein's sex-trafficking venture and that its acts in furtherance of the venture

were also aiding, abetting and facilitating his batteries, tortious conduct, and crimes.

541.  At the time of Epstein's crimes against Jane Doe 1 and the Class Members, Deutsche Bank knowingly provided substantial assistance in Epstein's tortious conduct.  That knowing substantial assistance went beyond mere knowledge and approval of Epstein's wrongdoing.  For example, Deutsche Bank knowingly and intentionally provided the cash and the financial support that made it possible for Epstein to commit the coercive sex offenses described in the preceding paragraphs in this Count.  Without that cash and financial support, Epstein could not have committed his tortuous conduct and crimes—a fact that Deutsche Bank knew.

542.  Deutsche Bank knowingly committed both overt acts in support of Epstein and substantial deliberate omissions in support of Epstein.  For example, Deutsche Bank deliberately omitted to take important steps (such as filing SARs) that substantially assisted Epstein to commit his crimes against Jane Doe 1 and Class Members in violation of New York Penal Law Chapter 130.

543.  In aiding, abetting, and facilitating Epstein's tortious conduct and crimes, Deutsche Bank could readily foresee direct and proximate injury to Jane Doe 1 and the Class Member.  Deutsche Bank should have foreseen direct and proximate injury from its actions and inactions to Jane Doe and the Class Members.  Indeed, Deutsche Bank did foresee injury to Epstein's victims, including Jane Doe 1 and Class Members.

544. As a result of the foregoing, Deutsche Bank is liable civilly for damages it directly, proximately, tortiously, and criminally caused to Jane Doe 1 and the Class Members. Jane Doe 1 and the Class Members according are entitled to bring a cause of action for damages for physical, psychological, or other injury or condition suffered as a direct and proximate result of Deutsche Bank's aiding and abetting Epstein's battery described above and for damages for physical, psychological, or other injury or condition suffered as a direct and proximate result of Epstein's battery.

545. By virtue of acting intentionally, outrageously, and with a high degree of moral turpitude and demonstrating such wanton dishonesty as to imply a criminal indifference to civil obligations, Deutsche Bank is liable to Jane Doe 1 and other Members of the Class for punitive damages.

## COUNT X
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

546. Plaintiff Jane Doe 1 realleges and incorporates by paragraphs 1 – 314, as if fully set forth in this Count.

547. Jane Doe 1 brings this Count individually and on behalf of the other Class Members she respectively seeks to represent.

548. As a direct and proximate result of aiding, abetting, and facilitating Epstein's tortious conduct and sex crimes in violation of Chapter 130, Deutsche Bank intentionally inflicted emotional distress against Jane Doe 1 and the Class

Members.

549.   Deutsche Bank's actions constitute extreme and outrageous conduct that shocks the conscience.   For example, Deutsche Bank intentionally and knowingly participated in Epstein's sex-trafficking venture. Deutsche Bank had a legal duty not to participate in, facilitate, or aid and abet Epstein's sex-trafficking venture and Epstein's Chapter 130 Crimes.

550.   Deutsche Bank's conduct was especially extreme and outrageous due to Jane Doe 1 and the Class Members' particular vulnerabilities as targets of a sex-trafficking venture.

551.   Deutsche Bank intended to cause, and did cause, Jane Doe 1 and the Class Members severe emotional distress. At the very least, Deutsche Bank recklessly disregarded a substantial probability that its actions in aiding, abetting, and facilitating Epstein's sex crimes would cause Jane Doe 1 and the Class Members severe emotional distress.

552.   Because Deutsche Bank intentionally inflicted extreme emotional distress on Jane Doe 1 and the Class Members, it is liable to Jane Doe 1 and the Class Members for damages they suffered as a direct and proximate result.

553.   As a direct and proximate result of Deutsche Bank's conduct, Jane Doe 1 and the Class Members have in the past and will in the future continue to suffer substantial damages from psychological and physical injury, including extreme

emotional distress, humiliation, fear, psychological trauma, loss of dignity and self-esteem, and invasion of privacy. Deutsche Bank's aiding, abetting, and facilitating Epstein's sex crimes in violation of Chapter 130 directly and proximately caused Epstein's sex crimes.

554.   By virtue of acting intentionally, outrageously, and with a high degree of moral turpitude and demonstrating such wanton dishonesty as to imply a criminal indifference to civil obligations, Deutsche Bank is liable to Jane Doe 1 and other Members of the Class for punitive damages.

## COUNT XI
## NEGLIGENT FAILURE TO EXERCISE REASONABLE CARE TO PREVENT PHYSICAL HARM

555.   Plaintiff Jane Doe 1 realleges and incorporates by reference paragraphs 1 – 314, as if fully set forth in this Count.

556.   Jane Doe 1 brings this Count individually and on behalf of the other Class Members she respectively seeks to represent.

557.   In addition to any duties that might arise as a financial institution (as alleged in the next Count, below), Deutsche Bank owed a duty to Jane Doe 1 and the Class Members to exercise reasonable care to avoid conduct that created a risk of physical harm to them. Deutsche Bank's duties included a duty to exercise reasonable care to avoid conduct that would combine with Epstein's (and others') crimes, and permit Epstein's crimes, in violation of Chapter 130.

558. Deutsche Bank's own conduct in providing financial and other support for Epstein's sex trafficking venture set forces in motion that directly and proximately injured and caused physical harm to Jane Doe 1 and the Class Members. These forces that Deutsche Bank set in motion caused Epstein's intentional tortious conduct and Chapter 130 Crimes against Jane Doe 1 and the Class Members, causing physical harm and in themselves constituted physical harm to Jane Doe 1 and the Class Members. Deutsche Bank owed Jane Doe 1 and the Class Members a duty not to set those forces in motion because they unreasonably created a risk of physical harm.

559. Deutsche Bank reasonably could foresee, and did in fact foresee, that its negligent failure to prevent physical harm would result in physical harm to Jane Doe 1 and the Class Members. Deutsche Bank owed a duty to prevent that physical harm.

560. Deutsche Bank failed to act objectively reasonably in failing to take precautions to prevent Epstein's intentional tortious conduct and sex-trafficking and sex crimes in violation of Chapter 130, which were committed against Jane Doe 1 and the Class Members. If Deutsche Bank had acted reasonably to prevent physical harm, it would not have supported and allowed Epstein's sex-trafficking and sex crimes to occur. Deutsche Bank owed Jane Doe 1 and the Class members a duty to act objectively reasonably.

561. At the time of Deutsche Bank's own negligent conduct, Deutsche Bank both realized and should have realized the likelihood that it was creating an opportunity for Epstein to commit intentional tortious conduct and Chapter 130 Crimes against Jane Doe 1 and the Class Members. Indeed, Deutsche Bank knew that its own conduct was necessary to create Epstein's and others' opportunities to engage in that conduct and commit those crimes. Deutsche Bank owed Jane Doe 1 and the Class Members a duty not to create those opportunities for Epstein and others.

562. In aiding, abetting, and facilitating Epstein's tortious conduct and crimes, Deutsche Bank committed intentional torts directed against Jane Doe 1 and the Class Members. Deutsche Bank's aiding, abetting, and facilitating Epstein's tortious conduct and crimes were its own wrongful acts and omissions. Deutsche Bank had a duty not to commit tortious conduct and crimes—specifically aiding, abetting, and facilitating New York sex crimes as described above— directed against Jane 1 and the Class Members.

563. Deutsche Bank's breaches of its legal duties were the direct—*i.e.*, the but-for—cause of physical and psychological injuries to Jane Doe 1 and the Class Members. Without Deutsche Bank's breaches of legal duties, those injuries would not have occurred. The injuries that occurred were readily foreseeable to Deutsche Bank and proximately caused by Deutsche Bank's breaches.

564.  Jane Doe 1 and the Class Members were easily within the zone of foreseeable harm from the Deutsche Bank's negligent acts and omissions.  Deutsche Bank's negligent acts and omissions foreseeably created substantial risk of Jeffrey Epstein and his co-conspirators committing sex crimes against young women with whom he was in contact.  Tragically, Jane Doe 1 and the Class Members fell within that zone.

565.  Because of Deutsche Bank's negligent failure to prevent physical harm to Jane Doe 1 and the Class Members, it is liable to Jane Doe 1 and the Class Members for damages suffered as a direct and proximate result.

566.  As a direct and proximate result of Deutsche Bank's negligent failure to prevent physical harm, Jane Doe 1 and the Class Members have in the past and will in the future continue to suffer substantial damages from psychological and physical injury, including extreme emotional distress, humiliation, fear, psychological trauma, loss of dignity and self-esteem, and invasion of privacy.  Deutsche Bank's aiding, abetting, and facilitating Epstein's tortious conduct and sex crimes in violation of Chapter 130 directly and proximately caused Epstein's sex crimes.

567.  By virtue of acting intentionally, outrageously, and with a high degree of moral turpitude and demonstrating such wanton dishonesty as to imply a criminal indifference to civil obligations, Defendant is liable to Jane Doe 1 and other

Members of the Class for punitive damages.

## COUNT XII
## NEGLIGENT FAILURE TO EXERCISE REASONABLE CARE AS A BANKING INSTITUTION PROVIDING NON-ROUTINE BANKING

568.   Plaintiff Jane Doe 1 realleges and incorporates by reference paragraphs 1 – 314, as if fully set forth in this Count.

569.   Jane Doe 1 brings this Count individually and on behalf of the other Class Members she respectively seeks to represent.

570.   Deutsche Bank owed a duty to Jane Doe 1 and the Class Members not to knowingly provide non-routine banking assistance to Epstein that it knew, and reason to know, would lead to and support intentional tortious conduct and Chapter 130 Crimes by Epstein (and others) against Jane Doe 1 and the Class Members.

571.   As described in detail in the fact section of this Complaint, Deutsche Bank did not merely provide routine banking assistance to Epstein. Instead, it participated in, aided and abetted, and facilitating his sex-trafficking venture and his commission of intentional tortious conduct and Chapter 130 crimes. Deutsche Bank also knew, and was willfully blind to the fact, that it was going beyond providing routine banking by facilitating Epstein's sex-trafficking venture and his commission of Chapter 130 crimes.

572.   As an example, in providing hundreds of thousands of dollars in cash to Epstein and his co-conspirators in circumstances where it knew that the cash

would be used to facilitate coercive sex acts, Deutsche Bank took substantial actions outside the scope of routine banking assistance.

573. As another example, Deutsche Bank deliberately failed to follow numerous banking requirements in connection with financial dealings with Epstein, including AML rules, KYC rules, and anti-structing rules. In deliberately ignoring and failing to follow those rules, Deutsche Bank acted in a non-routine way to facilitate and support Epstein's and his co-conspirators' intentional torts, sex-trafficking and commission of Chapter 130 Crimes.

574. Deutsche Bank failed to act objectively reasonably by failing to comply with relevant banking laws and regulations with regard to its interactions with Epstein and his co-conspirators. Deutsche Bank owed a duty to Jane Doe 1 and the Class Members to act objectively reasonably in its interactions with Epstein and his co-conspirators and to exercise reasonable care to prevent them from engaging in foreseeable intentional torts and criminal activity by using Deutsche Bank's exceptional and non-routine banking assistance.

575. Deutsche Bank owed a legal duty to Jane Doe 1 and the Class Members to act objectively reasonably and to not deliberately ignore banking obligations, including KYC and AML laws and regulations described above, so as to provide Epstein and others with an opportunity to engage in coercive sex-trafficking and Chapter 130 Crimes.

576.    Under KYC, AML, and related laws and regulations, Deutsche Bank had special duties not ignore crimes being committed by its customers—duties above and beyond any duties that the general public may have. The inquiries that banks must make include duties to inquire about specific individuals who banks know are being harmed. The regulations establish a duty of care that must be followed by banks, including Deutsche Bank. These duties exist at least in situations where a bank is knowingly going beyond offering routine banking to its customers and offering bank accounts, currency, and other assistance specially adapted to facilitate crimes.

577.    Deutsche Bank also owed Jane Doe 1 and the Class Members a duty of care because it knew, and had reason to know, that Epstein and his co-conspirators were using Deutsche Bank to facilitate a sex-trafficking venture, raising a duty to make a reasonable inquiry about suspicious activity.

578.    Deutsche Bank owed Jane Doe 1 and the Class Member a duty not to deliberately and purposely fail to file SARs, which would have alerted federal authorities to Epstein's and his co-conspirators' illegal activities, including committing Chapter 130 Crimes.

579.    Deutsche Bank also owed Jane Doe 1 and the Class Members a duty to prevent physical harm to them when confronted with explicit information that Epstein and his co-conspirators were using Deutsche Bank's non-routine assistance

to further a sex-trafficking venture harming Jane Doe 1 and the Class Members. Once Deutsche Bank had information about Epstein's use of Deutsche Bank for a sex-trafficking venture that was physically harming Jane Doe 1 and the Class Members, it owed them a duty of care to investigate and prevent Epstein's and his co-conspirators' suspicious and criminal activities.

580.   In the exercise of reasonable care, Deutsche Bank and its employees knew, and should have known, of the dangerous propensities of Jeffrey Epstein to commit violations of article 130 of New York Penal Law against women and girls with whom he was in close proximity, including Jane Doe 1 and the Class Members.

581.   Deutsche Bank also owed Jane Doe 1 a duty of care because Epstein and his agents opened a bank account in her name with Deutsche Bank, making her a customer of Deutsche Bank.

582.   Deutsche Bank breached its legal duties to Jane Doe 1 and the Class Members as described above. Deutsche Bank's breach of its duties led to it failing to prevent Epstein from committing Chapter 130 Crimes against Jane Doe 1 and the Class Members. Deutsche Bank realized that Epstein were committing Chapter 130 Crimes against Jane Doe 1 and the Class Members. The criminal activity that harmed Jane Doe 1 and the Class Members included foreseeable TVPA and Chapter 130 Crimes committed by the Epstein.

583.   As a direct and proximate result of the breach of legal duties by

Deutsche Bank, Jane Doe 1 and the Class Members repeatedly suffered direct and foreseeable injuries from Epstein and his co-conspirators, including federal and state sexual offenses (including sexual assaults) and resulting emotional distress, mental pain and suffering, and other physical, psychological, and other injuries.

584. The breaches of legal duties were the direct—*i.e.*, the but-for—cause of these physical and psychological injuries to Jane Doe 1 and the Class Members. Without Deutsche Bank's breaches of legal duties, those injuries would not have occurred. The injuries that occurred were readily foreseeable to Deutsche Bank.

585. The injuries that Plaintiff Jane Doe 1 and the Class Members suffered included injuries directly and proximately suffered while they were adults who were present in this District. These injuries are permanent in nature and Jane Doe 1 and the other Class Members will continue to suffer these losses in the future.

586. Deutsche Bank could reasonably foresee that their actions and omissions in facilitating Epstein's sex trafficking enterprise would lead to intentional torts and sex offenses against Jane Doe 1and the Class Members. Indeed, Deutsche Bank was aware, and should have been aware, that Epstein was a "high risk" to commit sex offenses against young women and girls. As the New York banking regulators concluded, the fact that Epstein was engaging in suspicious transactions "should have been obvious to [Deutsche] Bank personnel at various levels."

587. Jane Doe 1 and the Class Members were easily within the zone of

foreseeable harm from Deutsche Bank's negligent acts and omissions. Deutsche Bank's acts and omissions foreseeably created substantial risk of Jeffrey Epstein committing sex crimes against young women with whom he was in contact. Tragically, Jane Doe 1 and the Class Members fell within that zone.

588. While the foregoing allegations easily make out a clear case of negligence, this case does not involve mere negligence. Instead, Defendants' tortious conduct in this case evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations. It also involved outrageous and intentional acts and omissions, because it was a deliberate attempt to further the crimes of a widespread and dangerous criminal sex trafficking organization. Defendants' tortious conduct was directed specifically at Jane Doe 1 and other Members of the Class, who were the victims of Epstein's sexual abuse and sex trafficking organization.

589. As a result of Deutsche Bank's negligent actions and omissions described in this Count, Jane Doe 1 and the Class Members have sustained both general and specifical damages from physical and psychological injury in substantial amounts.

590. By virtue of acting intentionally, outrageously, and with a high degree of moral turpitude and demonstrating such wanton dishonesty as to imply a criminal indifference to civil obligations, Deutsche Bank is liable to Jane Doe 1 and other

Members of the Class for punitive damages.

## IX. REQUEST FOR RELIEF

Jane Doe 1 respectfully requests that the Court enter judgment in her favor, and against Deutsche Bank, as follows:

a. That the Court certify the Class, name Jane Doe 1 as Class Representative, and appoint her lawyers as Class Counsel;

b. That the Court award Plaintiff and the other Members of the Class compensatory, consequential, general, and nominal damages against Defendants in an amount to be determined at trial;

c. That the Court award punitive and exemplary damages and treble damages against Defendants in an amount to be determined at trial;

d. That the Court award to Jane Doe 1 and the other Members of the Class the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses;

e. That the Court award pre- and post-judgment interest at the maximum legal rate; and

f. That the Court grant all such other and further relief as it deems just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all claims so triable.

Dated:  January 13, 2023

Respectfully Submitted,
EDWARDS POTTINGER, LLC

By:  */s/ Bradley Edwards*
     Bradley J. Edwards
     425 N. Andrews Ave., Suite 2
     Fort Lauderdale, FL 33301
     (954)-524-2820
     Fax: (954)-524-2822
     Email: brad@epllc.com

     EDWARDS POTTINGER
     Brittany N. Henderson
     1501 Broadway
     Floor 12
     New York, New York
     (954)-524-2820
     Fax: (954)-524-2822
     Email: brittany@epllc.com

     Paul G. Cassell
     *Pro Hac Vice*
     S.J. Quinney College of Law at the
     University of Utah
     383 S. University St.
     Salt Lake City, UT 84112
     Telephone: 801-585-5202
     Facsimile: 801-585-6833
     Email: pgcassell.law@gmail.com

     (institutional address for identification
     purposes, not to imply institutional
     endorsement)

     David Boies
     Boies Schiller Flexner LLP

55 Hudson Yards
New York, New York
Telephone: (212) 446-2300
Facsimile: (212) 446-2350
Email: dboies@bsfllp.com

Sigrid McCawley
Boies Schiller Flexner LLP
401 E. Las Olas Blvd. Suite 1200
Fort Lauderdale, FL 33316
Telephone: (954) 356-0011
Facsimile: (954) 356-0022
Email: smccawley@bsfllp.com
*Pro Hac Vice*