# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JANE DOE 1, individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> DEUTSCHE BANK AKTIENGESELLSCHAFT, et al., <br><br> Defendants. | **Case No. 22-CV-10018-UA (JSR)** |
| JANE DOE 1, individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> JP MORGAN CHASE & CO., <br><br> Defendant. | **Case No. 22-CV-10019-UA (JSR)** |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS THE FIRST AMENDED INDIVIDUAL AND CLASS ACTION COMPLAINT ON BEHALF OF DEFENDANTS DEUTSCHE BANK AKTIENGESELLSCHAFT, DEUTSCHE BANK AG NEW YORK BRANCH, AND DEUTSCHE BANK TRUST COMPANY AMERICAS**

David B. Hennes
Lisa H. Bebchick
Andrew S. Todres
**ROPES & GRAY LLP**
1211 Avenue of the Americas
New York, NY 10036
Tel: (212) 596-9000
david.hennes@ropesgray.com
lisa.bebchick@ropesgray.com
andrew.todres@ropesgray.com

James P. Dowden (*admitted pro hac*)
**ROPES & GRAY LLP**
Prudential Tower
800 Boylston Street
Boston, MA 02199
Tel: (617) 951-7970
james.dowden@ropesgray.com

## **TABLE OF CONTENTS**

**Page(s)**

PRELIMINARY STATEMENT ................................................................................................ 1

FACTUAL OVERVIEW ........................................................................................................... 4

ARGUMENT ............................................................................................................................. 6

I.     THE RELEASE BARS THIS ACTION IN ITS ENTIRETY ........................................... 6

II.    PLAINTIFF FAILS TO STATE A TVPA CLAIM (COUNTS I – VI) ........................... 11

     A.     Count I Should Be Dismissed Because Plaintiff Fails to Allege That Deutsche Bank Participated in a Sex Trafficking Venture in Violation of the TVPA ........................................................................................................ 12

            1.     Deutsche Bank Did Not "Participate" in a Venture or Benefit from One ................................................................................... 13

            2.     Plaintiff Fails to Allege That Deutsche Bank Knew or Should Have Known About Epstein's Sex Trafficking Venture ................................... 16

     B.     Count II Should Be Dismissed Because Plaintiff Does Not Allege that Deutsche Bank Directly Trafficked Plaintiff ....................................................... 24

     C.     Counts III Through VI Should Be Dismissed Because Plaintiff Has No Viable Claims Under Section 1595 for Aiding, Abetting, and Inducing, Conspiracy, Attempt, or Obstruction ....................................................... 25

III.    PLAINTIFF FAILS TO STATE A RICO CLAIM (COUNTS VII & VIII) ................... 27

IV.    PLAINTIFF FAILS TO PLEAD ANY STATE LAW CLAIMS (COUNTS IX-XII) ..... 31

     A.     Plaintiff Cannot State a Claim for Aiding or Abetting Battery (Count IX).......... 31

     B.     Plaintiff Cannot State a Claim for IIED (Count X) ................................................ 32

     C.     Plaintiff Cannot State a Claim for Negligence (Counts XI & XII)....................... 32

CONCLUSION......................................................................................................................... 35

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*A.B. v. Hilton Worldwide Holdings, Inc.*,
    484 F. Supp. 3d 921 (D. Or. 2020) ...............................................................17, 18

*In re Agape Litig.*,
    681 F. Supp. 2d 352 (E.D.N.Y. 2010) ..................................................................34

*Aiken v. Interglobal Mergers & Acquisitions*,
    2006 WL 1878323 (S.D.N.Y. July 5, 2006) .........................................................35

*Anza v. Ideal Steel Supply Corp.*,
    547 U.S. 451 (2006)........................................................................................30, 31

*B.M. v. Wyndham Hotels & Resorts, Inc.*,
    2020 WL 4368214 (N.D. Cal. July 30, 2020)........................................................18

*Bank Brussels Lambert, S.A. v. Intermetals Corp.*,
    779 F. Supp. 741 (S.D.N.Y. 1991) .......................................................................33

*Beter v. Murdoch*,
    2018 WL 3323162 (S.D.N.Y. June 22, 2018) .................................................29, 30

*C.S. v. Wyndham Hotels & Resorts, Inc.*,
    538 F. Supp. 3d 1284 (M.D. Fla. 2021)...........................................................18, 24

*Calisch Assocs., Inc. v. Mfg. Hanover Tr. Co.*,
    542 N.Y.S.2d 644 (1st Dep't 1989) ......................................................................33

*CAML Ghana Ltd. v. Westchester Res. Ltd.*,
    2015 WL 405647 (S.D.N.Y. Jan. 30, 2015) ..........................................................11

*Canosa v. Ziff*,
    2019 WL 498865 (S.D.N.Y. Jan. 28, 2019) ................................................. *passim*

*Consumer Fin. Prot. Bureau v. Nat'l Collegiate Master Student Loan Tr.*,
    575 F. Supp. 3d 505 (D. Del. 2021).......................................................................9

*David v. Weinstein Co. LLC*,
    2019 WL 1864073 (S.D.N.Y. Apr. 24, 2019)........................................................32

*Doe #1 v. Red Roof Inns, Inc.*,
    21 F.4th 714 (11th Cir. 2021) .........................................................................16, 17

*Doe S.W. v. Lorain-Elyria Motel, Inc.*,
 2020 WL 1244192 (S.D. Ohio Mar. 16, 2020) ...................................................................18

*Doe v. Fitzgerald*,
 2022 WL 2784805 (C.D. Cal. May 13, 2022) ....................................................................27

*Dubai Islamic Bank v. Citibank, N.A.*,
 256 F. Supp. 2d 158 (S.D.N.Y. 2003)................................................................................29

*Elmaliach v. Bank of China Ltd.*,
 110 A.D.3d 192 (1st Dep't 2013) ......................................................................................34

*E.S. v. Best W. Int'l, Inc.*,
 510 F. Supp. 3d 420 (N.D. Tex. 2021) ..............................................................................21

*G.G. v. Salesforce.com, Inc.*,
 2022 WL 1541408 (N.D. Ill. May 16, 2022) ............................................................. *passim*

*Geiss v. Weinstein Co.*,
 383 F. Supp. 3d 156 (S.D.N.Y. 2019).................................................................13, 16, 29

*Gerber Fin., Inc. v. Volume Snacks Inc.*,
 2021 WL 3038780 (S.D.N.Y. July 14, 2021) ......................................................................7

*Gonzalez v. Societe Generale*,
 908 N.Y.S.2d 5 (1st Dep't 2010) .......................................................................................10

*Halebian v. Berv*,
 644 F.3d 122 (2d Cir. 2011)................................................................................................4

*Hecht v. Commerce Clearing House, Inc.*,
 897 F.2d 21 (2d Cir. 1990)................................................................................................28

*Hemi Grp., LLC v. City of N.Y., N.Y.*,
 559 U.S. 1 (2010)...............................................................................................................30

*Howell v. N.Y. Post Co.*,
 612 N.E. 2d 699 (N.Y. 1993).............................................................................................32

*Int'l Outdoor, Inc. v. RBS Citizens Bank, N.A.*,
 2010 WL 11541842 (E.D. Mich. Sept. 28, 2010)...............................................................29

*J.C. v. I Shri Khodiayar, LLC*,
 2022 WL 4482736 (N.D. Ga. Aug. 29, 2022) ..............................................................18, 24

*Keady v. J.P. Morgan Chase & Co.*,
 2008 WL 638444 (S.D.N.Y. Mar. 3, 2008) .........................................................................7

*Kirschner v. Bennett*,
    648 F. Supp. 2d 525 (S.D.N.Y. 2009)................................................................26

*Kolari v. N.Y.-Presbyterian Hosp.*,
    455 F.3d 118 (2d Cir. 2006)...........................................................................31

*Lawson v. Rubin*,
    2018 WL 2012869 (E.D.N.Y. Apr. 19, 2018) .............................................21

*Leonard v. Reinhardt*,
    799 N.Y.S.2d 118 (2d Dep't 2005)...............................................................32

*Lerner v. Fleet Bank, N.A.*,
    459 F.3d 273 (2d Cir. 2006)...........................................................................33

*Licci v. Am. Exp. Bank Ltd.*,
    704 F. Supp. 2d 403 (S.D.N.Y. 2010)..........................................................34

*Lundstrom v. Choice Hotels Int'l Inc.*,
    2021 WL 5579117 (D. Colo. Nov. 30, 2021) ...............................................18

*Mack v. Parker Jewish Inst. For Health Care & Rehab.*,
    2014 WL 5529746 (E.D.N.Y. Oct. 30, 2014) ..............................................30

*Makarova v. U.S.*,
    201 F.3d 110 (2d Cir. 2000).............................................................................7

*Noble v. Weinstein*,
    335 F. Supp. 3d 504 (S.D.N.Y. 2018)................................................. *passim*

*Picard v. Kohn*,
    907 F. Supp. 2d 392 (S.D.N.Y. 2012)....................................................29, 31

*Pirundini v. J.P. Morgan Inv. Mgmt., Inc.*,
    309 F. Supp. 3d 156 (S.D.N.Y. 2018).............................................................9

*Ratha v. Phatthana Seafood Co.*,
    35 F.4th 1159 (9th Cir. 2022) .......................................................................25

*Ratzlaf v. U.S.*,
    510 U.S. 135 (1994).......................................................................................28

*Red Ball Interior Demolition Corp. v. Palmadessa*,
    173 F.3d 481 (2d Cir. 1999).............................................................................6

*In re Refco Inc. Sec. Litig.*,
    2012 WL 12906289 (S.D.N.Y. Aug. 10, 2012)...............................................7

*Reves v. Ernst & Young*,
   507 U.S. 170 (1993)..................................................................................28

*Ricchio v. McLean*,
   853 F.3d 553 (1st Cir. 2017)...............................................................18, 24

*Rosner v. Bank of China*,
   2008 WL 5416380 (S.D.N.Y. Dec. 18, 2008) .........................................35

*Rothstein v. UBS AG*,
   647 F. Supp. 2d 292 (S.D.N.Y. 2009).......................................................35

*S.J. v. Choice Hotels Int'l, Inc.*,
   473 F. Supp. 3d 147 (E.D.N.Y. 2020) ................................................ *passim*

*S.Y. v. Naples Hotel Co.*,
   476 F. Supp. 3d 1251 (M.D. Fla. 2020).....................................................18

*Samuel et al. v. Rockefeller Univ.*,
   2022 WL 2916784 (N.Y. Sup. Ct. July 25, 2022) ....................................32

*Shea v. Cornell Univ.*,
   192 A.D.2d 857 (3d Dep't 1993).................................................................32

*Smickle v. City of New York*,
   2018 WL 1578381 (S.D.N.Y. Mar. 29, 2018) .......................................7, 8

*Solis v. 666 Fifth Assocs. LLC*,
   2021 WL 5998416 (S.D.N.Y. Dec. 20, 2021) .......................................7, 10

*SPV OSUS Ltd. v. AIA LLC*,
   2016 WL 3039192 (S.D.N.Y. May 26, 2016) ...........................................35

*Stein v. World-Wide Plumbing Supply Inc.*,
   71 F. Supp. 3d 320 (E.D.N.Y. 2014) ....................................................26, 27

*In re Terrorist Attacks*,
   714 F.3d 118 (2d Cir. 2013)..................................................................33, 35

*The Alphas Co. of N.Y. Inc. v. Hunts Point Terminal Prod. Coop., Inc.*,
   2017 WL 1929506 (S.D.N.Y. May 9, 2017) .............................................30

*Thomas v. Westchester Cnty. Health Care Corp.*,
   232 F. Supp. 2d 273 (S.D.N.Y. 2002).........................................................5

*U.S. v. Anderson*,
   747 F.3d 51 (2d Cir. 2014)........................................................................27

*U.S. v. Farhane*,
   634 F.3d 127 (2d Cir. 2011)..................................................................................27

*U.S. v. Stennis*,
   2022 WL 2312214 (D. Minn. June 27, 2022)........................................................27

*U.S. v. Svodoba*,
   347 F.3d 471 (2d Cir. 2003).............................................................................26, 27

*Velez v. Sanchez*,
   693 F.3d 308 (2d Cir. 2012)..................................................................................25

*Wang v. Paterson*,
   2008 WL 5272736 (S.D.N.Y. Dec.18, 2008) ........................................................7

*Winters v. Dowdall*,
   2009 WL 423706 (N.Y. Sup. Ct. Jan. 26, 2009)...................................................35

*Wolkstein v. Morgenstern*,
   713 N.Y.S.2d 171 (1st Dep't 2000) ......................................................................32

*World Wrestling Ent., Inc. v. Jakks Pac., Inc.*,
   530 F. Supp. 2d 486 (S.D.N.Y. 2007)...................................................................29

*Wultz v. Bank of China Ltd.*,
   2012 WL 5431013 (S.D.N.Y. Nov. 5, 2012) ...................................................33, 34

## Statutes

18 U.S.C. § 1591 ......................................................................................... *passim*

18 U.S.C. § 1595......................................................................................... *passim*

18 U.S.C. § 1962 ..................................................................................................28

31 U.S.C. § 5322 ..................................................................................................28

Patriot Act, Pub. L. 107-56, § 326 (2001) ......................................................34, 35

## Other Authorities

Fed. R. Civ. P. 12........................................................................................1, 7, 10

9 C.J.S. Banks and Banking § 474......................................................................10

Defendants Deutsche Bank Aktiengeselleschaft, Deutsche Bank AG New York Branch, and Deutsche Bank Trust Companies America (collectively, "Deutsche Bank" or the "Bank") respectfully submit this memorandum of law in support of their Motion to Dismiss the First Amended Individual and Class Action Complaint (the "FAC") filed by Plaintiff Jane Doe 1, individually and on behalf of all others similarly situated ("Plaintiff"), for lack of subject matter jurisdiction and for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6).[1]

## PRELIMINARY STATEMENT

In this action, Plaintiff seeks damages against Deutsche Bank under the Trafficking Victims Protection Act ("TVPA"), the federal racketeering statute ("RICO"), and New York state law for allegedly participating in Jeffrey Epstein's criminal sex trafficking venture.  Plaintiff's claims fail for two independent reasons:  (i) Plaintiff released her claims as part of a settlement with the Epstein Estate before commencing this action, and (ii) the FAC does not come close to curing the deficiencies in the original Complaint, as identified in the Bank's first motion to dismiss; instead, it merely adds dozens of pages of conclusory allegations but fails to allege any facts that the Bank was part of Epstein's sex trafficking ring.

*First*, Deutsche Bank recently learned—only after specifically inquiring of Plaintiff's counsel—that Plaintiff entered into a General Release and Settlement Agreement with the Epstein Estate on ██████████ (the "Settlement Agreement"), ██████████████ before commencing this action (while being represented by the same counsel that negotiated the settlement).  As consideration for a ████████████████ payment of ██████████ from the Epstein Estate, Plaintiff knowingly and with the advice of counsel agreed to a "broad release" of any and all claims, including relating to "acts of sexual abuse or sex trafficking" by Epstein, against not only Epstein

---

[1] Unless otherwise stated, all emphasis is added, and any internal quotation marks and citations have been omitted.  Citations to the FAC are "¶ _."

and his Estate, but also against a wide array of other individuals and entities, including any entity that was ever "engaged by" or "worked in any capacity for" Epstein (the "Release").  Agmt. at 1.[2] Under these plain terms (and several others), the Release clearly covers Plaintiff's claims against the Bank, which are predicated entirely on allegations that Epstein engaged the Bank to provide banking services (*e.g.*, custodial services)—and on conclusory allegations that this "work" included "aid[ing] in the operation of [Epstein's] sex trafficking venture."  ¶ 89.  Indeed, the Settlement Agreement even carved out from the Release and ███████████ claims against certain entities and individuals but did not carve out the Bank.  Agmt. at 3.  Because Plaintiff released her claims against the Bank, the Court lacks subject matter jurisdiction over this action.

*Second*, while the Release bars this action in its entirety, the FAC also fails to state a claim. Although the FAC is more than 60 pages longer than the original Complaint and was filed to attempt to cure the deficiencies identified in the Bank's first motion to dismiss, it contains few new factual allegations.  Instead, it offers repetitive conclusory allegations that the Bank purportedly had knowledge of Epstein's trafficking of Plaintiff (*e.g.*, repeating the words "knew" or "knowingly" over 100 times without any corresponding factual allegations), thus confirming Plaintiff's inability to plead any facts to support her original claims (despite having had an opportunity to amend).  Nor can these conclusory allegations sustain any of the FAC's new TVPA, RICO, and state law claims, such as the wholly unsupported claims that the Bank was somehow an actual *perpetrator* of Epstein's sex trafficking ring or aided, abetted, or induced Epstein's sexual assaults on victims.

To establish TVPA beneficiary liability for criminal sex trafficking, the FAC must

---

[2] A copy of the Settlement Agreement provided by Plaintiff to the Bank is attached as Exhibit A to the Declaration of David B. Hennes filed contemporaneously with this motion.

adequately allege both that the Bank participated in a venture with Epstein, *and* that it did so with knowledge that the venture was actively engaged in specific acts of trafficking of Plaintiff.  The FAC contains no such allegations.  Instead, in response to the unequivocal line of cases cited in the Bank's first motion to dismiss establishing that a TVPA plaintiff must plead that a defendant *observed signs of trafficking as to that specific plaintiff* to state a beneficiary claim (which Plaintiff failed to do), the FAC merely adds a vague allegation that "trafficking victims"—but not Plaintiff—were hypothetically "*observable*" (¶ 236) to Bank employees when they attended a *single* meeting at Epstein's residence.  But the FAC does not allege that any *actual* observation of trafficking took place or that Plaintiff was even there, much less that the Bank had knowledge she was a victim.  This insufficient allegation underscores that Plaintiff lacks the facts necessary to plead that the Bank knew about and participated in Epstein's sex trafficking, let alone that the Bank was *a perpetrator* of it, as the FAC now claims.  These pleading failures are also fatal to Plaintiff's aiding and abetting, conspiracy, attempt, and obstruction claims, which are generally invalid under the applicable statutory text.  As such, the six TVPA claims (Counts I – VI) should be dismissed.

Nor can Plaintiff allege a RICO violation—or a RICO conspiracy—because the FAC does not plausibly allege that the Bank committed any predicate offense or directed a criminal enterprise, or that Plaintiff suffered an economic injury, as required by the RICO statute.  Moreover, the FAC plainly establishes that the actions of Epstein and his co-conspirators were the direct cause of Plaintiff's injuries—not the Bank's rendering of routine banking services.  As such, the two RICO claims (Counts VII – VIII) should be dismissed.

The FAC likewise fails to state a New York state law claim.  Plaintiff's new claims for "aiding, abetting, and facilitating battery" and intentional infliction of emotional distress ("IIED")

fail for the same reasons:  the FAC does not allege that the Bank had knowledge of Epstein's

trafficking, let alone that it intended to harm Epstein's victims.  Plaintiff's negligence claims fail

because the FAC does not plausibly allege—nor could it—that the Bank had a legal duty to protect

Plaintiff from Epstein's crimes, or that the Bank was the cause of the alleged harm Epstein and his

co-conspirators inflicted.  Thus, the four state law claims (Counts IX – XII) should be dismissed.

## FACTUAL OVERVIEW

In 2006, Epstein was arrested following an investigation into allegations that he paid a 14-

year-old girl for a "massage."  ¶¶ 42, 188-189.  In 2007, as set forth in a non-prosecution agreement

made public in 2008 ("NPA"), Epstein pled guilty to two crimes (¶ 191) related to prostitution

(NPA at 1, Ex. B, Hennes Decl.).[3]  The NPA granted Epstein and his alleged co-conspirators

immunity from a variety of charges, including sex trafficking.  ¶ 191.

From approximately 1998 through around August 2013, Epstein was a banking client of

JP Morgan Chase ("JPM").  ¶ 68.  During that time, Plaintiff alleges that Epstein's "relationship

with" the then-head of JPM's investment bank, Jes Staley, was "a key alliance that enabled Epstein

to run his illegal operation" and that "Staley knew exactly what [Epstein] was doing."  ¶¶ 69-70.

In November 2012, a relatively low-level JPM employee named Paul Morris, who had worked on

Epstein's accounts, left JPM and joined Deutsche Bank as a relationship manager.  ¶¶ 21, 201-

202.  Plaintiff does not allege that Mr. Morris knew of or ever spoke to Mr. Staley while working

---

[3] The original Complaint accurately alleged that the guilty plea was for prostitution offenses, but
the FAC has attempted to obscure that fact—a matter of public record—by striking reference to it
and stating merely that Epstein "pled guilty to two sex felony offenses."  ¶ 191.  This maneuver is
a transparent and improper effort by Plaintiff to plead that the Bank, based on its knowledge of
those prior crimes, was "aware of . . . Epstein's sex abuse and sex trafficking" at the time of
Epstein's onboarding.  ¶ 198; *see also* Section II.A.2, *infra*.  The NPA, on its face, contradicts
Plaintiff's unsupported and conclusory allegation, and can be considered in connection with this
motion because it is a public court record "incorporated by reference in the complaint" and was
"relied on [by Plaintiff] in bringing suit."  *Halebian v. Berv*, 644 F.3d 122, 131 n.7 (2d Cir. 2011).

4

for JPM.  Shortly after joining Deutsche Bank, Mr. Morris allegedly identified Epstein, who was known to have "an extensive network of friends and connections that included prominent financial institutions, politicians, royalty, and billionaires" (¶ 186), as a potential client.  ¶ 202.  Nine months later, on August 19, 2013, Epstein was "officially" onboarded as a client.  ¶ 210.

In November 2018, the *Miami Herald* published an investigative report detailing Epstein's history of sexual abuse.  ¶ 269.  Shortly thereafter, on December 21, 2018, Deutsche Bank ended its relationship with Epstein.  ¶ 271.  On July 2, 2019, Epstein was indicted for one count of criminal sex trafficking conspiracy and one count of criminal sex trafficking, both in violation of 18 U.S.C. § 1591, and he was arrested on July 8, 2019.  ¶¶ 122-123.

Most of the allegations in the FAC are based on (and often copied and pasted from) a July 6, 2020 Consent Order (the "Consent Order" or "CO") that the Bank entered into with the New York State Department of Financial Services ("DFS") to resolve an investigation into its banking relationship with Epstein.  ¶ 174; CO, Ex. C., Hennes Decl.[4]  The FAC relies on statements in the Consent Order—and frequently distorts them—to try to support the claim that the Bank *knew* that certain financial transactions "were being used by Epstein to facilitate his sex abuse and his sex-trafficking venture."  ¶ 281 (purporting to cite DFS "conclu[sions]").  Plaintiff also now adds a conclusory allegation that the Bank "purposeful[ly]" failed to timely file Suspicious Activity Reports ("SARs") with the federal government in relation to Epstein.  ¶¶ 274-276.

However, as is clear on its face, the Consent Order contains no finding or conclusion that the Bank participated in or should have known that Epstein was engaged in criminal sex trafficking

---

[4] The Court can consider the Consent Order on a motion to dismiss because Plaintiff relies on and incorporates it by reference into the FAC, and it is judicially-noticeable.  *See Thomas v. Westchester Cnty. Health Care Corp.*, 232 F. Supp. 2d 273, 276 (S.D.N.Y. 2002) (court can take judicial notice of administrative enforcement orders).

while he was a client or that the Bank failed to timely file SARs (let alone that it did so intentionally).  Rather, the Consent Order states that the Bank "failed to scrutinize" Epstein's accounts for evidence of sex trafficking (CO ¶ 56), which failure was "compounded by a series of procedural failures, mistakes, and sloppiness in how the Bank managed and oversaw the Epstein accounts" (CO ¶ 58) in alleged violation of anti-money laundering ("AML") obligations under the Bank Secrecy Act ("BSA").  Nowhere in the Consent Order is any knowledge of Epstein's criminal conduct attributed to the Bank.  *See* CO ¶ 57 (whether Epstein used Deutsche Bank accounts for criminal activity or another purpose are "questions that must be left to the criminal authorities").

On ████████ Plaintiff, who was represented and advised by the law firm of Edwards Pottinger, LLC (also her counsel in this action), entered into the Settlement Agreement with the Epstein Estate.  In exchange for a ████ settlement payment of ████, Plaintiff expressly agreed to a "broad release" of claims against the Epstein Estate and, among many others, any entities that were ever "engaged by . . . or worked in any capacity" for Epstein.  Agmt. at 1.  The only claims ██████████ and not subject to the "broad release" were ██████

████████████████████████████

████████████████████ *Id.* at 3.  On November 24, 2022, Plaintiff filed this action against the Bank, and another alleged victim of Epstein filed an action against JPM.

## ARGUMENT

As a threshold matter, the Court lacks subject matter jurisdiction over this action because Plaintiff expressly released her claims against the Bank.  The FAC should be dismissed for the separate reason that it, in any event, fails to state any claim upon which relief can be granted.

## I.    THE RELEASE BARS THIS ACTION IN ITS ENTIRETY

It is well-settled that "[s]ettlement agreements are contracts and must therefore be

construed according to general principles of contract law." *Red Ball Interior Demolition Corp. v. Palmadessa*, 173 F.3d 481, 484 (2d Cir. 1999). "Where the language of [a] release is clear, effect must be given to the intent of the parties as indicated by the language employed." *Wang v. Paterson*, 2008 WL 5272736, at *4 (S.D.N.Y. Dec. 18, 2008). Here, Plaintiff's release of Deutsche Bank from the claims in this action is clear on the face of the Settlement Agreement, which (i) described the Release as "a broad release" of "any and all claims . . . including without limitation" claims relating to Epstein's conduct against a wide range of individuals and entities, including the Bank as an entity "engaged by" Epstein to provide services, and (ii) ███████████ claims against certain entities and individuals, but did *not* preserve claims against Deutsche Bank or any current or former Bank personnel. Agmt. at 1, 3. Thus, this action must be dismissed for lack of subject matter jurisdiction. *See Solis v. 666 Fifth Assocs. LLC*, 2021 WL 5998416, at *3 (S.D.N.Y. Dec. 20, 2021) (dismissing case under Rule 12(b)(1) where defendant was intended as a third-party beneficiary of a broad, general release by plaintiff in a prior settlement agreement).[5]

***"Broad Release."*** "When general language is used in [a] releasing document, the release is to be construed most strongly against the releasor." *Smickle v. City of New York*, 2018 WL

---

[5] Dismissal based on a prior release is also appropriate under Rule 12(b)(6). *See, e.g.*, *Gerber Fin., Inc. v. Volume Snacks Inc.*, 2021 WL 3038780, at *6 (S.D.N.Y. July 14, 2021) (Rakoff, J.) (granting Rule 12(b)(6) motion to dismiss based on broad release). In either case, the Court can consider the Settlement Agreement on this motion. *See Makarova v. U.S.*, 201 F.3d 110, 113 (2d Cir. 2000) ("In resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a district court . . . may refer to evidence outside the pleadings."); *In re Refco Inc. Sec. Litig.*, 2012 WL 12906289, at *3 (S.D.N.Y. Aug. 10, 2012), *report and recommendation adopted sub nom. In re Refco Sec. Litig.*, 2012 WL 4009175 (S.D.N.Y. Sept. 12, 2012) (Rakoff, J.) (in resolving a motion to dismiss for failure to state a claim based on a prior release, "if the Settlement Agreement would dispose of this matter . . . it makes no sense to deny dismissal simply because it was not referenced in the Complaint"); *see also Keady v. J.P. Morgan Chase & Co.*, 2008 WL 638444 (S.D.N.Y. Mar. 3, 2008) (Rakoff, J.), *aff'd sub nom. Keady v. JP Morgan Chase & Co.*, 328 F. App'x 23 (2d Cir. 2009) (converting motion to dismiss into one for summary judgment to "take account of the Release []" and grant judgment for releasee).

1578381, at *3 (S.D.N.Y. Mar. 29, 2018) (dismissing complaint based on broad, unambiguous release).  By its terms, the Settlement Agreement was drafted to effectuate a "broad release" of claims against not only the Epstein Estate and Epstein-controlled entities, but also, among others, "any entities or individuals who are or have ever been engaged by (whether as independent contractors or otherwise), employed by, or worked in any capacity for" Epstein in exchange for a ████ payment to Plaintiff.  Agmt. at 1.  Deutsche Bank qualifies as such an entity because this entire action is predicated on Epstein's engagement of the Bank and its purported "work with Epstein to aid in the operation of the sex trafficking venture."  ¶ 89.

As the FAC alleges, (i) in 2013, after "being on the precipice of losing his accounts at JP Morgan . . . [Epstein] immediately needed a new financial institution" (¶ 72), (ii) in the spring of 2013, he had "discussions [with the Bank] about a potential relationship," (iii) on August 19, 2013, he "*officially began*" his "*relationship*" with the Bank (¶ 210), and (iv) from then until the Bank determined to "stop[] being Epstein's banker" on December 18, 2018 (¶ 271), Epstein "*used* Deutsche Bank for all [banking] matters relating to his criminal sex-trafficking enterprise" (¶ 226) that the Bank purportedly "direct[ed]" (¶ 479).  These allegations—and countless others in the FAC—squarely fit the dictionary definition of "engage."  *See Engage*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/engage (last visited Feb. 7, 2023) ("to arrange to obtain the use or services of"; "to begin and carry on an enterprise or activity"); Black's Law Dictionary (11th ed. 2019) ("to employ or involve oneself; to take part in; to embark on").[6]

---

[6] The FAC is filled with allegations that Epstein was a "client of the Bank"—the FAC describes him as such over 40 times—and that he engaged the Bank to carry out Epstein's "enterprise." *See, e.g.*, ¶¶ 75 (the Bank "facilitate[d] the commercial aspect" of Epstein's enterprise), 473 ("Deutsche Bank [] provided the funding for the enterprise"), 479 (the Bank "direct[ed] the affairs" of Epstein's enterprise), 477 (the Bank "participated, directly and indirectly, in the conduct" of Epstein's enterprise), 478 (same), 479 (the Bank "exercised a significant degree of direction over" and "played a part in directing the affairs of" Epstein's enterprise), 513 (the Bank "funded"

To that end, courts have interpreted the ordinary meaning of "engage" as "broad" and clearly encompassing Deutsche Bank's "banking relationship" with Epstein" (a phrase used repeatedly throughout the FAC, *e.g.*, ¶¶ 76, 198, 271, 456).  *See Consumer Fin. Prot. Bureau v. Nat'l Collegiate Master Student Loan Tr.*, 575 F. Supp. 3d 505, 509 (D. Del. 2021) (stating that the Black's Law Dictionary definition of "engage" is "broad enough to encompass actions taken on a person's behalf by another, at least where that action is central to his enterprise"); *Pirundini v. J.P. Morgan Inv. Mgmt., Inc.*, 309 F. Supp. 3d 156, 160, 169 (S.D.N.Y. 2018) (Daniels, J.), *aff'd*, 765 F. App'x 538 (2d Cir. 2019) (noting that in addition to serving as an investment advisor, bank was "*engaged* to provide numerous other [banking] services to the fund").  Indeed, some of the "numerous other services" that the bank in *Pirundini* was "engaged to provide" included "custodial" services (*id.* at 160), which are the same routine custodial services that Plaintiff alleges Deutsche Bank was engaged by Epstein to provide, such as opening "accounts . . . to hold marketable securities and cash and to invest long term [sic] with the [B]ank" (¶ 210).[7]

In providing these services and others—*e.g.*, "mak[ing] wire transfers" (¶ 212), "open[ing] checking and money market accounts" (¶ 214)[8] —the Bank also indisputably "worked" in at least *some* "capacity" for Epstein (Agmt. at 1) and is also covered under that term of the Release.  *See Work*, Black's Law Dictionary (11th ed. 2019) ("To exert effort; to perform, either physically or

---

Epstein's enterprise), 525 (the Bank "agreed to facilitate, conduct, and participate" in Epstein's enterprise), 526 (same), 527 (the Bank acted "to further" Epstein's enterprise), 586 (the Bank "facilitat[ed]" Epstein's enterprise).

[7] *See also Custody Services, Comptroller's Handbook*, U.S. Office of the Comptroller of Currency, at 1 ("[Custody] services provided by a bank custodian are typically the settlement, safekeeping, and reporting of customers' marketable securities and cash."), https://www.occ.gov/publications-and-resources/publications/comptrollers-handbook/files/custody-services/pub-ch-custody-services.pdf (last visited Feb. 7, 2023).

[8] *See also* ¶¶ 210, 232, 245, 323, 406, 407, 430, 431, 486, 581 (describing the work the Bank performed for Epstein).

mentally, *e.g.*, lawyers work long hours during trial"). Indeed, while also repeatedly classifying the Bank's work as "non-routine banking assistance" (*e.g.*, ¶ 579), the FAC still repeatedly describes that assistance as "work" for Epstein. ¶¶ 89 (the Bank "work[ed] with Epstein to aid in the operation of the sex trafficking venture"), 90 (the Bank "adopted the goals of the Epstein sex trafficking venture and conspiracy and *worked* to further those goals").

The work the Bank allegedly performed for Epstein also qualifies it as a releasee under various other terms of the intentionally "broad" Release. As a matter of hornbook banking law, the Bank served as Epstein's "agent" (Agmt. 1) in connection with the "over 120 wires" that Plaintiff alleges "furthered Epstein's sex abuse and the sex-trafficking venture" (¶ 217) and is thus released under that term. *See* 9 C.J.S. Banks and Banking § 474 ("In the ordinary agreement to transmit money or credit, the relationship established between the remitting bank and its customer is . . . a relationship of principal and agent."); *Gonzalez v. Societe Generale*, 908 N.Y.S.2d 5, 5 (1st Dep't 2010) (bank is agent for customer in connection with transfer of funds). Plaintiff also alleges that the Bank was Epstein's "partner" (¶ 72) and "participated in the operation and management of the [sex-trafficking] enterprise itself" (¶ 478), which covers the Bank under the Settlement Agreement's release of all claims against Epstein's "managers, members, or partners" (Agmt. at 1).

In short, Plaintiff expressly released her claims against the Bank under numerous provisions of the Settlement Agreement. *See Solis*, 2021 WL 5998416, at *3 (dismissing action under Rule 12(b)(1) because "on its face, [the] Settlement Agreement cover[ed] claims against [defendant]" as a "joint employer" and Plaintiff "describe[d] [defendant] as [a] joint employer[] in the Complaint," so "[defendant] is thus a third-party beneficiary of the Settlement Agreement and may enforce its terms").

10

***Claims Against Deutsche Bank Were Not*** ██████████████  The intent of the

parties to the Settlement Agreement to release the Bank is confirmed by the plain language of the

Settlement Agreement, which contains a specific carve-out for certain entities and individuals from

the Release, but *not* Deutsche Bank.  The Settlement Agreement provides that ████████████



Agmt. at 3.[9]  Thus, the Settlement Agreement reflects that the parties specifically considered

whether to ██████████████ claims against certain entities or individuals —*and chose not to*

*do so with respect to Deutsche Bank.  See CAML Ghana Ltd. v. Westchester Res. Ltd.*, 2015 WL

405647, at *5 (S.D.N.Y. Jan. 30, 2015) (Engelmayer, J.) (parties' "express exclusion" of one party

from a stipulation "makes clear, by implication," that the stipulation's provisions apply to other

non-carved-out parties "because they are not similarly excluded").

Accordingly, Plaintiff's action against Deutsche Bank—which Plaintiff initiated just

months after agreeing to a broad, general release of her Epstein-related claims—is barred by the

Release in the Settlement Agreement.

## II.   PLAINTIFF FAILS TO STATE A TVPA CLAIM (COUNTS I – VI)[10]

Section 1595 of the TVPA enables victims of criminal sex trafficking to seek damages

from those who participated in the venture that caused them harm.  The statute provides, in relevant

part, that "[a]n individual who is a victim of a violation of this chapter may bring a civil action

---

[9] The parties to the Settlement Agreement acknowledged ████████████████████████████

████████████████ *Id.*

[10] In the FAC, Plaintiff now three brings new TVPA claims:  perpetrating a sex trafficking venture in violation of the TVPA (Count II); aiding, abetting, and inducing a sex trafficking venture in violation of the TVPA (Count III); and obstruction of the enforcement of the TVPA (Count VI).

against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known was engaged in an act in violation of this chapter)."  Here, each of Plaintiff's six TVPA claims should be dismissed because Plaintiff wholly fails to allege that Deutsche Bank (i) participated in any venture or had knowledge of any specific sex trafficking of Plaintiff or of sex trafficking more generally; (ii) directly perpetrated the trafficking of Plaintiff; (iii) aided, abetted, or induced Epstein's sex trafficking venture; (iv) agreed with Epstein to facilitate his sex trafficking operations; (v) intended to finance those operations; or (vi) obstructed the enforcement of the TVPA.

### A.    Count I Should Be Dismissed Because Plaintiff Fails to Allege That Deutsche Bank Participated in a Sex Trafficking Venture in Violation of the TVPA

Plaintiff's first claim is that Deutsche Bank allegedly "participated" in Epstein's sex trafficking venture in violation of Section 1591(a)(2) of the TVPA (¶¶ 315-355), which provides that "whoever knowingly benefits, financially or by receiving anything of value, from participation in a venture which has engaged in" sex trafficking shall be criminally liable.  18 U.S.C. § 1591(a)(2).  To state a claim for Section 1591(a)(2) liability under Section 1595, a plaintiff is required to plead, at minimum, that "'the defendant [has] either actual or constructive knowledge that the venture—in which it voluntarily participated and from which it knowingly benefited— violated [Section 1591] *as to the plaintiff*."  *G.G. v. Salesforce.com, Inc.*, 2022 WL 1541408, at *13 (N.D. Ill. May 16, 2022) (emphasis in original) (quoting *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 726 (11th Cir. 2021)); *see also S.J. v. Choice Hotels Int'l, Inc.*, 473 F. Supp. 3d 147, 151-53 (E.D.N.Y. 2020) (allegations that defendant failed to adequately detect signs of sex trafficking or had general awareness of sex trafficking insufficient to state a claim).

Here, the FAC does not adequately allege that Deutsche Bank participated in a venture of any sort with Epstein, much less received a benefit from Epstein for that purpose.  And even if it

did (it does not), Plaintiff's claim would still fail because the FAC contains no factual allegation that the Bank knew or should have known that a particular Epstein venture was engaged in specific acts of sex trafficking involving Plaintiff.

      1.      <u>Deutsche Bank Did Not "Participate" in a Venture or Benefit from One</u>

Plaintiff's claim fails at the outset because the FAC does not allege that Deutsche Bank "participat[ed] in a venture" with Epstein. 18 U.S.C. § 1595. To plead "participation in a venture," Plaintiff must allege facts that the Bank engaged in "specific conduct that furthered the sex trafficking venture." *Noble v. Weinstein*, 335 F. Supp. 3d 504, 524 (S.D.N.Y. 2018) (Sweet, J.); *see also Canosa v. Ziff*, 2019 WL 498865, at *24 (S.D.N.Y. Jan. 28, 2019) (Engelmayer, J.) (plaintiff must allege that defendant took "concrete steps" to aid criminal sex trafficker). However, "'participation' itself requires more than just passive facilitation, but some level of active engagement." *Salesforce.com*, 2022 WL 1541408, at *14 (citing Black's Law Dictionary (11th ed. 2019)). Moreover, Plaintiff must also separately allege that the Bank received a benefit for its participation in that venture. *See Geiss v. Weinstein Co.*, 383 F. Supp. 3d 156, 169 (S.D.N.Y. 2019) (plaintiff must allege a "causal relationship between affirmative conduct furthering the sex-trafficking venture and receipt of a benefit"). Plaintiff alleges nothing even remotely of the sort.

Two recent cases in this District make the distinction between actual "participation" and "passive facilitation" clear. In *Noble*, an alleged victim of Harvey Weinstein alleged that Robert Weinstein participated in his brother's sex trafficking venture by "facilitat[ing]" his brother's travel and knowingly "[paying] for prior settlements of claims made by women against" him. 335 F. Supp. 3d at 169. Judge Sweet rejected this claim, holding that these allegations were not "factual allegations of participation," in part because Robert was not "present for any of the alleged assaults and was not told about the assaults." *Id.* In *Canosa*, Judge Engelmayer applied the same standard to sustain a participation claim against a Harvey Weinstein-affiliated company where, "in contrast"

to the allegations against Robert Weinstein in *Noble*, the Weinstein company was alleged to have "actively participated in the recruitment and enticement of women," by giving Harvey "medication and other paraphernalia [] that he needed to perform sexual acts" and helping to "cover [] up" assaults after they occurred.  2019 WL 498865, at *3, *24.

Here, the FAC comes nowhere close to alleging facts like those alleged in *Canosa*, or even the allegations in *Noble* that were rejected as insufficient, and it contains no facts whatsoever involving any participation in sex trafficking activity by Deutsche Bank.  For example, the FAC does not allege that the Bank actually took any "concrete steps" to aid Epstein's sex trafficking ring, such as recruiting women or covering up sexual assaults.  *Canosa*, 2019 WL 498865, at *3, *24.[11]  Nor does the FAC allege that the Bank paid settlements to Epstein's victims with its own money to protect Epstein, as Robert Weinstein allegedly did for his brother.  *See Noble*, 335 F. Supp. 3d at 524 (holding even this allegation insufficient to state claim against Robert Weinstein).

Rather, Plaintiff generally alleges that Deutsche Bank "participated in, assisted, supported, and facilitated" (¶ 317) Epstein's sex trafficking venture by "providing the financial underpinnings for Epstein to have ready and reliable access to resources—including cash" (¶ 77; *see also* ¶ 154)

---

[11] Instead, in a transparent attempt to meet this standard, which the Bank set out in its original motion to dismiss, Plaintiff merely parrots the language of *Canosa* repeatedly, alleging conclusorily that the Bank took "concrete steps" to "aid Epstein's sex trafficking venture."  ¶¶ 318, 323-325, 363, 432.  But the only facts Plaintiff alleges in connection with these repetitive, conclusory allegations are the Bank's alleged compliance failures referenced in the Consent Order, which did not contain any findings that the Bank had knowledge of Epstein's criminal activity and expressly stated that it did not contain any findings as to whether Epstein used his accounts with the Bank to engage in criminal activity.  *See* CO ¶¶ 43-47 ("red flags"), 48-52 ("suspicious cash activity"), 57 (purpose of Epstein's transactions is a question for criminal authorities).  Plaintiff's only other allegation of a "concrete step"—that the Bank willfully failed to timely file SARs (¶ 324)—is a factually unsupported conclusion found nowhere in the Consent Order.  Not a single one of these allegations reflects a "concrete step" to further Epstein's sex trafficking venture (despite Plaintiff labeling them so).  Indeed, Plaintiff's only attempt to link these alleged compliance failures to Epstein's sex trafficking is a conclusory allegation that "Deutsche Bank knew that it would gain far-from-routine financial benefits by ignoring red flags[.]"  ¶ 322.

to pay for expenses, such as travel (¶ 258), legal expenses (¶ 257), and rent (*id.*).  Plaintiff also alleges that the Bank "participated in" Epstein's sex trafficking venture by "opening up more than 40 accounts at Deutsche Bank for Epstein, his related entities, and associates."  ¶ 323.  In other words, the Bank was providing routine banking services to a high-net-worth client, nothing more.[12] These allegations do not nearly qualify as "active engagement" in a *sex trafficking venture*, and therefore cannot sustain a claim under the TVPA.  *Salesforce.com*, 2022 WL 1541408, at *12.

The decision in *Salesforce* illustrates this point.  There, the court addressed and rejected a similar argument as to claims that technology company Salesforce participated in sex trafficking by helping to build the infrastructure of notorious sex trafficking website, Backpage, and had "continued to provide software and support to Backpage" even during a period when Backpage had been the subject of "persistent controversy and allegations regarding sex trafficking."  *Id.* at *2.  The court rejected those claims, holding that the "fact that Salesforce's software played a critical role in Backpage's expansion, indeed, even if such expansion would not be possible without the capabilities provided by that software, is not enough to demonstrate Salesforce's own participation in any venture with Backpage."  *Id.* at *15.

Nor is Plaintiff's allegation that the Bank onboarded Epstein based on estimates that it might earn between "$2-4 million annually over time" from providing banking services to him

---

[12] Plaintiff claims that the "cash that Deutsche Bank provided went far beyond providing routine banking facilities to a client" and that "[i]t was far from routine for Deutsche Bank to provide $200,000 per year in cash to someone like Epstein, who did not have an apparent need for such extravagant sums."  ¶ 320.  This conclusory allegation is irrelevant to the question of whether the Bank actually participated in his sex trafficking venture, and is in any event contradicted by Plaintiff's other allegations that Epstein was a "wealthy man with hundreds of millions of dollars in assets and an extensive network of friends and connections that included prominent financial institutions, politicians, royalty, and billionaires" (¶ 186) and who owned "multiple residences in the United States, including a New York City mansion, a New Mexico Ranch, an apartment in Paris, France, a Palm Beach mansion, and an island in the U.S. Virgin Islands" (¶ 104).

(¶ 205) tantamount to "participat[ing] in an alleged common undertaking" with him to engage in a sex trafficking venture. *Red Roof*, 21 F.4th at 727.[13]  Considerations internal to the Bank in evaluating whether to onboard a prospective client—such as potential revenue estimates—do not constitute evidence of participating in a common undertaking with that prospective client.  Earning fees from providing routine banking services to a client does not qualify, either.  As such, the FAC also fails to allege any "causal relationship between [the Bank's alleged] participation in sex trafficking and [the] purported benefit [the Bank received]." *Geiss*, 383 F. Supp. 3d at 169.[14]

In short, the FAC is devoid of any allegations from which the Court could infer that Deutsche Bank participated in Epstein's sex trafficking operation, much less that it received any kind of benefit from Epstein doing so.  As such, the participation claim fails for the reasons above.

> ### 2.    Plaintiff Fails to Allege That Deutsche Bank Knew or Should Have Known About Epstein's Sex Trafficking Venture

In addition to participation in a venture, Plaintiff must also allege, at a minimum, that Deutsche Bank knew or should have known that the venture "was involved in sex trafficking *of the plaintiff*" (*Salesforce.com*, 2022 WL 1541408, at *14), and that the Bank knew or should have known that the venture it was participating in was "a *particular* sex trafficking venture." *Choice Hotels*, 473 F. Supp. 3d at 154 (emphasis in original) ("having only an abstract awareness of sex trafficking in general" is insufficient); *see also Salesforce.com*, 2022 WL 1541408, at *14

---

[13] Plaintiff's allegation that the Bank's profit estimate and onboarding decision was tied to Epstein's "sex-trafficking venture" (¶ 81) grossly misrepresents the language in the Consent Order. The allegation purports to quote a Bank e-mail cited in the Consent Order, but the actual e-mail quoted in the Consent Order does not link the Bank's onboarding decision to a desire to profit off of a "sex trafficking venture." CO ¶ 21 (noting generally "how lucrative the [Epstein] relationship could be," including estimated "revenue of $2-4 million annually over time").

[14] The FAC contains no factual support for the conclusory allegations that the Bank could "justify charging Epstein higher" by "providing the financial infrastructure to Epstein's illegal operation" (¶ 228) or that the Bank's purported "willingness to provide large amounts of cash to Epstein was the quid pro quo for it receiving financial benefits from Epstein" (¶ 318).

(knowledge of "sex trafficking more generally" insufficient).  Allegations that a defendant failed to adequately detect signs of sex trafficking potentially in violation of "other statutes, [] contracts, or the common law" are also insufficient.  *Choice Hotels*, 473 F. Supp. 3d at 154 ("[T]here is no basis to read such a responsibility into the text of the TVPA.").[15]

Here, Plaintiff's attempt to plead that Deutsche Bank had the requisite knowledge fails for two fundamental reasons.  *First*, the FAC contains no allegations whatsoever that the Bank knew or should have known that Plaintiff herself was a victim of sex trafficking.  *Second*, the FAC fails to adequately allege that the Bank knew or should have known that Epstein was engaged in a sex trafficking venture when the Bank onboarded him as a client in 2013 or anytime thereafter.  Rather, the FAC only alleges that (i) at the time of Epstein's onboarding, the Bank was on notice of Epstein's prior conviction of solicitation, a different offense, six years earlier (¶ 204), (ii) that unidentified "trafficking victims" *other than Plaintiff* were hypothetically "*observable*" by Bank personnel during a single meeting at Epstein's New York residence (¶ 236), and (iii) that Deutsche Bank "failed to scrutinize" Epstein's accounts for evidence of sex trafficking ((¶ 278) (quoting CO ¶ 56)) while he was a client.  These allegations do not support a reasonable inference nor plausibly allege that the Bank knew or should have known that Epstein was involved in the trafficking of Plaintiff—or even in sex trafficking more generally—while he was a client.

---

[15] In fact, courts in this District have imposed a more stringent knowledge standard, requiring a plaintiff to plead that a defendant had actual, and not merely constructive, knowledge that it was participating in a sex trafficking venture.  *See Noble*, 335 F. Supp. 3d at 523-24; *Canosa*, 2019 WL 498865, at *24.  *Choice Hotels* and courts in other Districts have criticized the more stringent standard as improperly imposing a criminal *mens rea* standard onto a civil remedy statute.  *See Choice Hotels*, 473 F. Supp. 3d at 153; *see also Red Roof*, 21 F.4th at 725-26; *A.B. v. Hilton Worldwide Holdings, Inc.*, 484 F. Supp. 3d 921, 937-38 (D. Or. 2020).  The Second Circuit has yet to address this issue.  In any event, Plaintiff's allegations fall well short of establishing that the Bank "should have known" that it was participating in a particular sex trafficking venture as to Plaintiff, much less that it actually knew.

*Knowledge of Trafficking of Plaintiff.*  As a threshold matter, Plaintiff's participation claim fails because the FAC does not allege that Deutsche Bank knew or should have known at any point that Plaintiff herself was a victim of Epstein's sex trafficking venture.  It is well-settled that "a claim under [Section] 1595 requires that 'the defendant must have either actual or constructive knowledge that the venture—in which it voluntarily participated and from which it knowingly benefited—violated [Section 1591] *as to the plaintiff*.'"  *Salesforce.com*, 2022 WL 1541408, at \*13 (emphasis in original) (quoting *Red Roof,* 21 F.4th at 726 (collecting cases)); *see also Lundstrom v. Choice Hotels Int'l Inc.*, 2021 WL 5579117, at \*8 (D. Colo. Nov. 30, 2021) (failure to allege defendant "should have known about plaintiff's sex trafficking at its hotels"); *A.B.*, 484 F. Supp. 3d at 938-39 (failure to "allege[] facts which sufficiently link notice of Plaintiff['s] sex trafficking to any of these Defendants"); *B.M. v. Wyndham Hotels & Resorts, Inc.*, 2020 WL 4368214, at \*5 (N.D. Cal. July 30, 2020) (same).[16]

The most striking example of the FAC's numerous deficiencies is Plaintiff's attempt to address this unequivocal line of cases, which the Bank cited in its original motion to dismiss.  The FAC now alleges that Bank personnel attended a single meeting at Epstein's New York residence where "trafficking victims" generally—but not Plaintiff—were hypothetically "*observable*."

---

[16] TVPA complaints that have survived dismissal at the pleading stage contain specific allegations that defendants were on notice of specific trafficking *of the plaintiff*—allegations that are wholly absent here.  *See, e.g.*, *Ricchio v. McLean*, 853 F.3d 553, 555-56 (1st Cir. 2017) (trafficker physically abused plaintiff "in plain daylight view of the front office of the motel"); *J.C. v. I Shri Khodiayar, LLC*, 2022 WL 4482736, at \*5 (N.D. Ga. Aug. 29, 2022) (hotel employees observed plaintiff "exhibit[ing] obvious signs, characteristics, and behaviors of a minor victim of sex trafficking"); *C.S. v. Wyndham Hotels & Resorts, Inc.*, 538 F. Supp. 3d 1284, 1297-99 (M.D. Fla. 2021) (employees observed signs of physical abuse of plaintiff); *S.Y. v. Naples Hotel Co.*, 476 F. Supp. 3d 1251, 1257 (M.D. Fla. 2020) (hotel staff observed traffickers escort the plaintiffs into hotels and heard plaintiffs' screams); *Doe S.W. v. Lorain-Elyria Motel, Inc.*, 2020 WL 1244192, at \*5-6 (S.D. Ohio Mar. 16, 2020) ("Plaintiff points to behavior that she alleges hotel staff should have recognized as signs of *her trafficking*.").

¶ 236.[17]  These allegations are insufficient, and they confirm that Plaintiff cannot allege in good faith that any Bank employee ever observed her being trafficked—or observed any signs of sex trafficking more generally.[18]  While the FAC alleges that "*Epstein and his co-conspirators* [] forced Jane Doe 1 to open an account at Deutsche Bank" (¶ 169),  there is no allegation that the Bank had any reason to suspect, let alone know, that Plaintiff was being trafficked, or that her account had anything to do with trafficking.  Nor does the FAC allege that Plaintiff was ever publicly identified as a sex trafficking victim prior to or during the time that the Bank provided banking services to Epstein.  Plaintiff is unable to allege that the Bank was aware of her sex trafficking, and her beneficiary claim must be dismissed.

*Alleged Knowledge at the Time of Onboarding.*  Plaintiff's TVPA claim fails for the independent reason that, other than purely conclusory allegations (*see, e.g.*, ¶¶ 73, 198, 199, 209, 327, 328, 330, 333), the FAC does not allege that the Bank knew Epstein was engaged in a sex trafficking venture at the time of his onboarding (or thereafter).  To plead such "constructive knowledge," Plaintiff must allege more than "knowledge or willful blindness of a general sex trafficking problem[,] [which] does not satisfy the *mens rea* requirements of the TVPA."  *Choice Hotels*, 473 F. Supp. 3d at 154.  Rather, as Judge Cogan explained, the question is "whether a defendant satisfies the knowledge element as to a *particular* sex trafficking venture" because the text of Section 1595 "speaks in singular terms—'participation in *a* venture which that person . . .

---

[17] Plaintiff's other conclusory allegations confirm that the Bank had no such knowledge:  "Even if Deutsche Bank did not know all the names of Epstein's victims, it knew that specific victims (*e.g.*, Jane Doe 1) of a specific trafficker (Epstein) at a specific time period (various dates between 2013-19) existed and were being forced to engage in commercial sex acts."  ¶ 331.

[18] By contrast, the plaintiff in the action against JPM alleges that a JPM employee "personally observed [the plaintiff]" at Epstein's U.S. Virgin Islands estate (and, even still, does not allege facts to show that the employee observed the plaintiff being trafficked or abused).  *See Jane Doe 1 v. JP Morgan Chase & Co.*, 1:22-CV-10019 ("JPM FAC") ¶ 115.

should have known *has* engaged in *an* act in violation of this chapter.'" *Id.* (emphasis in original); *see also id.* (allegations that large hotel franchisors were "generally aware that sex trafficking sometimes occurred on their franchisees' properties unjustifiably bridges the scienter gap between 'should have known' and 'might have been able to guess'").

Here, the FAC merely (i) states that Epstein pled guilty to a non-trafficking offense six years prior to onboarding (¶ 191), and (ii) concludes that the Bank was aware that Epstein had a "well-publicized reputation related to the sexual trafficking and sexual abuse of young women" based on that prior non-trafficking offense and "press reports" that he was "involved with Eastern European women" and "helped fund" a modeling agency with "known sexual abuser Jean Luc Brunel" (¶¶ 187-196). These allegations do not come close to meeting "the knowledge element as to a *particular* sex trafficking venture." *Choice Hotels*, 473 F. Supp. 3d at 154. Nothing about Epstein's prior conviction or the publicity of his plea deal and out-of-court settlements "related to his 2007 conviction" (¶ 204) would have put the Bank on notice at the time of his onboarding *in 2013* that Epstein was involved in a particular sex trafficking venture.[19] Indeed, this plain reliance on a "well-publicized reputation" (¶ 187) demonstrates that Plaintiff cannot plead facts establishing the Bank's knowledge of any specific venture or sex trafficking activity.

---

[19] Nor can the FAC establish such knowledge through its conclusory allegations that Mr. Morris "had actual and constructive knowledge of Epstein's sex-trafficking venture because of his previous time at JP Morgan" (¶ 215) that could be imputed to the Bank. Neither the FAC in this action nor the one filed against JPM allege that Mr. Morris learned anything about Epstein's prior conduct while he was at JPM. Rather, the plaintiff in each case attempts to allege that JPM knew Epstein was operating a sex trafficking venture based on Epstein's relationship with Mr. Staley. *See* ¶¶ 69-71; *see also* JPM FAC ¶¶ 115, 122-157. But the FAC does not allege that Mr. Staley and Mr. Morris even knew each other, let alone that Mr. Staley told Mr. Morris anything about Epstein. Plaintiff's remaining allegations about Mr. Morris's purported knowledge are beyond conclusory. *See, e.g.*, ¶¶ 84 ("Morris knew that Epstein was continuing his ongoing sex-trafficking venture and conspiracy. Morris had a special relationship with Epstein."); 216 ("Morris had knowledge that [Sarah] Kellen was part of the Epstein sex-trafficking venture."); 218 ("Morris and others at Deutsche Bank knew [Plaintiff] was a victim of Epstein's illegal operation").

*Alleged Knowledge After Onboarding.*   As to the knowledge the Bank allegedly acquired during its banking relationship with Epstein, it is well-settled that allegations that a defendant missed "red flags" or failed to take appropriate steps to detect and prevent sex trafficking—even in violation of other legal duties—do not establish that the defendant "had the requisite knowledge of a specific sex trafficking venture [for it to] be held directly liable under the TVPA."  *Choice Hotels*, 473 F. Supp. 3d at 154; *see also E.S. v. Best W. Int'l, Inc.*, 510 F. Supp. 3d 420, 427-28 (N.D. Tex. 2021) (allegations that defendants "failed to take any steps to alert the authorities, properly intervene in the situation, or take reasonable security steps to improve awareness of sex trafficking and/or prevent sexual exploitation on their properties" insufficient to state a claim); *Lawson v. Rubin*, 2018 WL 2012869, at *13 (E.D.N.Y. Apr. 19, 2018) ("Plaintiffs did not claim that [defendant] had actual notice of the alleged activity, only that it should have known about alleged trafficking based on its duty to monitor the premises.").

Here, virtually all the alleged constructive knowledge Deutsche Bank purportedly acquired during its banking relationship with Epstein is based on the language of the Consent Order that the Bank failed to meet certain AML obligations under the BSA with respect to Epstein.  But the Consent Order contains *no* findings that the Bank should have known of a sex trafficking venture while Epstein was a client.  *See* CO ¶ 57 ("Whether or to what extent those payments or that cash was used by Epstein to cover up old crimes, to facilitate new ones, or for some other purpose are questions that must be left to the criminal authorities.").  Rather, the Consent Order states that Deutsche Bank failed to recognize risk associated with Epstein, and that "[t]his substantive failure was compounded by a series of procedural failures, mistakes, and sloppiness" in violation of

banking laws.  CO ¶ 58.[20]  As such, Plaintiff's conclusory allegation that "[i]n light of the[] red

flags [identified in the Consent Order] . . . Deutsche Bank was (at a minimum) willfully blind and

should have known that it was facilitating a sex abuse and a sex-trafficking venture" (¶ 264) is

contradicted by the plain language of the Consent Order itself.[21]

For example, based on the Consent Order, Plaintiff alleges that in 2014, the Bank approved

additional accounts for Epstein's "Butterfly Trust," despite allegedly knowing that the trust's

beneficiaries included co-conspirators from his 2007 solicitation offense and women with Eastern

European surnames.  CO ¶ 28; ¶ 214.  But allegations that the Bank knew certain trust beneficiaries

were linked to Epstein's non-trafficking offense from seven years earlier—or contained Eastern

European surnames—are wholly insufficient to establish knowledge of any particular, ongoing sex

trafficking venture.  *See Choice Hotels*, 473 F. Supp. 3d at 154 (the question is "whether a

defendant satisfies the knowledge element as to a *particular* sex trafficking venture").

---

[20] Despite claiming that the FAC "extend[s] beyond" and "sweeps more broadly" than the facts of
the Consent Order (¶ 177), the only other allegations in the FAC not based on the Consent Order
are drawn from alleged confidential witness statements in the *Karimi* class action securities fraud
complaint against Deutsche Bank before this Court.  *See* No. 22-cv-2854, Dkt. 86 at 6-7 (S.D.N.Y.
June 13, 2022).  These allegations are that:  (i) there were "Board level" discussions about Epstein
prior to onboarding him, and that the Bank's Reputational Risk Committee repeatedly determined
to keep him as a client because they were "interested solely in making money for the Bank"
(¶¶ 265, 267); (ii) Deutsche Bank gave Epstein and "other high-net-worth individuals" a "special
deal" exempting them from certain KYC procedures "because of the amount of business they
generated" (¶¶ 266-267); and (iii) the Bank "did not treat him as a high-risk client."  ¶ 268.  But
an allegation that Epstein and *other high-net-worth clients* were exempted from KYC procedures
or a desire to retain Epstein for profit reasons does not in any way establish that Deutsche Bank
knew or should have known Epstein was engaged in a sex trafficking venture.
[21] The FAC repeatedly distorts the Consent Order and the documents cited therein.  *Compare*, *e.g.*,
¶ 81 ("Deutsche Bank estimated that it would earn between \$[2-4 million] annually *by funding the
sex trafficking venture* and handling the accounts of Epstein-related entities."), *with* CO ¶ 21
(quoting e-mail among Deutsche Bank employees prior to Epstein onboarding noting generally
"how lucrative the relationship [with Epstein] *could be*," including estimated "revenue of \$2-4
million annually over time"); ¶ 217 (alleging \$2.65 million in transfers through Deutsche
Bank accounts were "pa[id] directly for coercive and commercial sex acts"), *with* CO ¶ 31 (\$2.65 million
in transfers were for "the stated purpose of covering hotel expenses, tuition, and rent").

Plaintiff also alleges that in 2015, Deutsche Bank's Americas Reputational Risk Committee implemented enhanced monitoring on Epstein's accounts as a condition to retaining him as a client and communicated this to "several senior Bank personnel, up to and including the Bank's CEO of the Americas," but not to "all members of the Epstein Relationship team" (and that an AML officer misinterpreted some of those conditions).  CO ¶¶ 38-41; *see also* ¶¶ 245, 247-248.  Plaintiff further alleges that in 2017, the Bank's AML transaction monitoring team met to discuss "suspicions of cash structuring" by an attorney acting on Epstein's behalf who had asked the Bank for guidance on how to withdraw cash on a regular basis without triggering a required filing of a "currency transaction report" with the Treasury Department.  CO ¶ 51; ¶ 261.  But, again, allegations that the Bank may have violated banking laws related to monitoring or maintaining effective controls and procedures—or made "mistakes" or was "slopp[y] in how [it] managed and oversaw Epstein's accounts"—are not enough to plead constructive knowledge of a sex trafficking venture under the TVPA.[22]  As Judge Cogan stated in *Choice Hotels*:  "[That defendants are not liable under the TVPA] doesn't necessarily absolve [defendants] of the responsibilities they may have—under other statutes, their franchising contracts, or the common law—to train [] staff about the warning signs of sex trafficking and what to do if they appear[,] *[b]ut there is no basis to read such a responsibility into the text of the [TVPA]*."  473 F. Supp. 3d at 154.[23]

---

[22] The FAC also cites language in the Consent Order that in 2018, Epstein's attorney withdrew $100,000 in cash from a Bank branch near Epstein's house, stating that Epstein needed the funds for "tipping and household expenses," and that over a roughly four-year period, Epstein withdrew $800,000 in cash total (including for travel).  CO ¶¶ 51-52; ¶¶ 261-262.  But it is not reasonable to infer that cash withdrawals by a high-net-worth individual put the Bank on notice that Epstein was engaged in a sex trafficking venture, particularly when Epstein's *attorney* explained that the withdrawals were for non-criminal purposes.

[23] To try to plead around this standard, the FAC musters only one conclusory and non-factual allegation:  that the Bank's "actions extend well beyond a situation of failing to train its staff about

Rather, cases where courts have sustained "constructive knowledge" allegations of sex trafficking at the pleading stage—mainly against hotel or motel operators or franchisors whose hotels or motels were used for sex trafficking—universally involve factual allegations of specific acts that put the defendant on notice of a particular and ongoing sex trafficking venture. *See, e.g.*, *Ricchio*, 853 F. 3d at 555 (allegations of "high-fives" between the trafficker and motel owner and that trafficker physically abused plaintiff "in plain daylight view of the front office of the motel"); *I Shri Khodiayar, LLC*, 2022 WL 4482736, at *5-6 (hotel employees observed victim "exhibit[ing] obvious signs, characteristics, and behaviors of a minor victim of sex trafficking such as 'inappropriate' appearance, physical deterioration, poor hygiene, fatigue, sleep depravation, injuries, loitering, and soliciting male patrons"); *Wyndham Hotels & Resorts, Inc.*, 538 F. Supp. 3d at 1297-99 (hotel employees observed signs of physical abuse, rooms containing sex and drug paraphernalia, and multiple men per day coming and going from these rooms without luggage).[24]

The allegations in the FAC do not come close to this level, and Plaintiff cannot "bridge[] the scienter gap between 'should have known' and 'might have been able to guess.'" *Choice Hotels*, 473 F. Supp.3d at 154. Because the FAC does not allege that Deutsche Bank had actual or constructive knowledge that Epstein was engaged in a particular and ongoing sex trafficking venture as to Plaintiff, Count I should be dismissed.[25]

**B.    Count II Should Be Dismissed Because Plaintiff Does Not Allege that Deutsche Bank Directly Trafficked Plaintiff**

Because Plaintiff cannot plead that the Bank had any knowledge that Epstein was engaged

---

recognizing the warning signs of sex trafficking" because the Bank's "employees did recognize the signs of Epstein's sex trafficking" and "knew about Epstein's sex trafficking venture." ¶ 328.

[24] In light of this high bar to establish constructive knowledge, it is unsurprising that hotel-related cases predominate among civil TVPA cases. Because hotels physically house traffickers and victims, their operators and franchisors are uniquely able to observe evidence of sex trafficking.

[25] Because Plaintiff fails to allege that the Bank had constructive knowledge, the claim also fails under the "actual knowledge" standard adopted in this District by *Noble* and *Canosa*.

in a particular sex trafficking venture while he was a client—and concedes that the Bank had no knowledge that Plaintiff was a victim—Plaintiff cannot meet the much higher standard of pleading that the Bank directly and knowingly trafficked Plaintiff as a *perpetrator* of Epstein's crimes, as is required to state a Section 1595 claim under Section 1591(a)(1) or (a)(2).  *See* 28 U.S.C. § 1591(a)(1) (crime to "*knowingly* [] (1) recruit[], entic[e], harbor[], transport[], provide[], obtain[], or maintain[] by any means a person; (2) knowing, or in reckless disregard of the fact, that means of force, threats of force, fraud . . . or any combination of such means will be used; (3) to cause the person to engage in a commercial sex act"); U.S.C. § 1591(a)(2) (crime to "knowingly assist, support, or facilitate" violation of § 1591(a)(1)).  Thus, Count II should be dismissed.

### C.   Counts III Through VI Should Be Dismissed Because Plaintiff Has No Viable Claims Under Section 1595 for Aiding, Abetting, and Inducing, Conspiracy, Attempt, or Obstruction

Plaintiff's remaining TVPA claims for (i) aiding, abetting, and inducing, (ii) conspiracy, (iii) attempt, and (iv) obstructing the federal government's enforcement of the TVPA, cannot be maintained.  As a threshold matter, the version of Section 1595 that governs the relevant conduct in this action—all of which occurred prior to 2023—does not create causes of action against alleged beneficiaries for attempt or conspiracy.[26]  As the Ninth Circuit held—and the subsequent amendment to the TVPA to add Section 1595 attempt and conspiracy liability confirms—"[t]he text of [the relevant version of] § 1595 does not extend liability to those who *attempt* to benefit from a perpetrator's TVPRA violation."  *Ratha v. Phatthana Seafood Co.*, 35 F.4th 1159, 1176 (9th Cir. 2022), *cert. denied*, 2022 WL 17408202 (U.S. Dec. 5, 2022) (holding attempt claim unavailable under TVPA against a beneficiary); *see also* 18 U.S.C. § 1595 (prior to amendment,

---

[26] Congress amended § 1595(a) effective January 2023 to add civil beneficiary claims for attempt and conspiracy, but these amendments do not apply retroactively.  *Cf. Velez v. Sanchez*, 693 F.3d 308, 325 (2d Cir. 2012) (other amendments to § 1595(a) do not apply retroactively).

applies only to those who benefit from actual "participation in a venture"). Moreover, even if the TVPA's civil remedy could be construed more broadly or retroactively, the FAC contains no well-pled allegations in support of any claim that the Bank—as either a beneficiary or direct perpetrator—aided and abetted, conspired, or attempted to violate the TVPA, or that it obstructed a TVPA investigation.

*No Aiding, Abetting, or Inducing.* As an initial matter, "aiding and abetting liability is not provided for in Section 1595." *Noble*, 335 F. Supp. 3d at 525. Nor could Plaintiff establish an aiding and abetting claim if it were available. "The focus of aiding and abetting, in the context of civil liability, is whether a defendant *knowingly* gave substantial assistance to the primary violator of the underlying statute." *Id.* As detailed above, Plaintiff fails to allege that the Bank had knowledge of Epstein's sex trafficking, let alone that it knowingly supported it. *See Kirschner v. Bennett*, 648 F. Supp. 2d 525, 533 (S.D.N.Y. 2009) (dismissing claims where defendant "had no actual knowledge of, nor did they substantially assist, the underlying violation").

*No Conspiracy.* The FAC fails to allege that Deutsche Bank conspired to commit violations of the TVPA. "For there to have been a conspiracy, there must have been an agreement to violate the prohibitions on [sex trafficking]." *Stein v. World-Wide Plumbing Supply Inc.*, 71 F. Supp. 3d 320, 330 (E.D.N.Y. 2014) (citing *U.S. v. Svodoba*, 347 F.3d 471, 476 (2d Cir. 2003)). "Without *knowledge*, it cannot be said that plaintiff has adequately stated a conspiracy claim with respect to [a TVPA crime]." *Id.*

As detailed above, the FAC does not allege that the Bank had actual knowledge of Epstein's sex trafficking venture as to Plaintiff or more generally. Nor can any allegations of "constructive knowledge"—none are plausibly alleged here—possibly establish that the Bank was party to an *agreement* to violate the TVPA or "[acted] with the specific intent to aid in the accomplishment of

those unlawful ends," as is required to state a conspiracy claim. *Svoboda*, 347 F.3d at 477; *see also U.S. v. Anderson*, 747 F.3d 51, 61 (2d Cir. 2014) ("general knowledge" insufficient).[27]

**No Attempt.**   The FAC's failure to allege knowledge of a sex trafficking venture is also fatal to Plaintiff's attempt claim because "[a] claim of attempt requires plaintiff to allege that defendants had the intent to commit the underlying crime." *Stein*, 71 F. Supp. 3d at 330.  Without knowledge, Plaintiff certainly cannot allege that the Bank *intended* to receive financial benefits for providing banking services to facilitate sex trafficking.  In addition, because the FAC fails to allege that the Bank participated in Epstein's sex trafficking operation, it cannot possibly plead that the Bank "engaged in conduct amounting to a substantial step towards [violating the TVPA]," as is required to state an attempt claim. *U.S. v. Farhane*, 634 F.3d 127, 145 (2d Cir. 2011).

**No Obstruction of Enforcement.**   There can be no viable cause of action against Deutsche Bank for obstruction of the enforcement of the TVPA in violation of Section 1591(d) because that provision is "limited to government enforcement." *Doe v. Fitzgerald*, 2022 WL 2784805, at *7 (C.D. Cal. May 13, 2022) ("The 'victim' of the obstruction of enforcement set out in section 1591(d) is the state or federal government[.]").  Nor could Plaintiff possibly meet the standard the government is held to in prosecuting such claims because the FAC does not allege that the Bank "knew" that it or anyone else was "being investigated or prosecuted for sex trafficking" of Plaintiff and "intentionally acted in some way to obstruct . . .  that investigation or prosecution." *U.S. v. Stennis*, 2022 WL 2312214, at *6 (D. Minn. June 27, 2022).

## III.   PLAINTIFF FAILS TO STATE A RICO CLAIM (COUNTS VII & VIII)

Plaintiff alleges that providing routine banking services to Epstein amounted to

---

[27] Nor can Plaintiff plead such an agreement into existence merely by making repeated conclusory allegations that the Bank "intentionally conspired with others [] by agreement" (¶ 394) or that "the conspiracy included an agreement."  ¶ 402; *see also* ¶¶ 404, 476, 522, 528.

racketeering activity in violation of the RICO statute, 18 U.S.C. § 1962, and that the Bank conspired to violate that statute. A civil RICO claim requires three elements: "(1) a violation of section 1962; (2) injury to business or property; and (3) causation of the injury by the violation." *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 23 (2d Cir. 1990). None is adequately pled here, which is fatal to both of Plaintiff's RICO claims (Counts VII & VIII).

*No Predicate Offense.* Plaintiff alleges that the Bank engaged in racketeering activity in violation of Section 1962 by purportedly committing predicate violations of the TVPA and the BSA. But for the reasons set forth above, Plaintiff cannot allege a RICO claim based on TVPA violations because the FAC fails to adequately allege any. *See Canosa*, 2019 WL 498865, at *26 (dismissing plaintiff's RICO claims in part for failure to plead a TVPA violation). Nor does the FAC sufficiently allege any predicate criminal violation of the BSA. *See* 31 U.S.C. § 5322(a) (with exceptions not relevant here, only "willful" violations of the BSA are criminal); *Ratzlaf v. U.S.*, 510 U.S. 135, 137 (1994) ("willfully violat[ing]" the BSA means that a defendant "acted with knowledge that [its] conduct was unlawful"). The FAC's conclusory assertion that the Bank "willful[ly]" violated the BSA (¶ 482) is not supported by any factual allegations; nor is there such a finding in the Consent Order. *See* CO ¶ 57.

*No Formation or Management of Criminal Enterprise, or Pattern of Racketeering.* Even if the FAC could establish a predicate act (it cannot), Plaintiff still could not state a violation of Section 1962 because the FAC does not contain any factual allegations to sustain a claim that Deutsche Bank and Epstein formed a criminal enterprise, much less that the Bank had a role in "directing the enterprise's affairs" through a "pattern of racketeering activity." *Reves v. Ernst & Young*, 507 U.S. 170, 177, 180 (1993). As detailed above, the FAC alleges that the Bank made the decision to onboard Epstein on its own, allegedly based on a desire to make a profit for the

Bank, and thereafter provided banking services to him. *See* Section II.A, *supra*. That does not provide a basis for inferring that the Bank formed a criminal enterprise with Epstein, let alone "conducted the [affairs] of the larger [Epstein] enterprise." *Picard v. Kohn*, 907 F. Supp. 2d 392, 401 (S.D.N.Y. 2012) (Rakoff, J.). Courts have uniformly rejected RICO claims against banks based on a failure to allege that they "exert[e]d control over the enterprise," even where, unlike here, the banks were plausibly alleged to have "engag[ed] in wrongful conduct," such as by "provid[ing] banking services [] with knowledge of [a] fraud." *Dubai Islamic Bank v. Citibank, N.A.*, 256 F. Supp. 2d 158, 164 (S.D.N.Y. 2003) (Berman, J.) (collecting cases); *see also Picard*, 907 F. Supp. 2d at 401 (no facts that banks directed enterprise); *Int'l Outdoor, Inc. v. RBS Citizens Bank, N.A.*, 2010 WL 11541842, at *2, *5 (E.D. Mich. Sept. 28, 2010) (no RICO claim against bank that "failed to file Suspicious Activity Reports" and follow other banking regulations because it did not "[make] . . . or knowingly carry[] out decisions of the enterprise").

> ***No RICO Injury.*** As the Bank observed in its original motion to dismiss, RICO claims based on sex trafficking are uniformly dismissed for failure to plead an injury to business or property, as required to have RICO standing. *See, e.g.*, *Geiss*, 383 F. Supp. 3d at 170 ("'[B]usiness or property' excludes personal injuries suffered."); *Canosa*, 2019 WL 498865, at *25 ("[C]ourts have uniformly held that injuries such as emotional distress or physical injury are not cognizable under RICO."). Attempting to address this failure, the FAC added new allegations that Plaintiff "lost legitimate employment opportunities" and "incurred alleged debts" to Epstein's sex trafficking venture. ¶¶ 502-503, 505-506. But these conclusory allegations of "speculative" or "unquantifiable" injuries are insufficient. *World Wrestling Ent., Inc. v. Jakks Pac., Inc.*, 530 F. Supp. 2d 486, 521 (S.D.N.Y. 2007), *aff'd*, 328 F. App'x 695 (2d Cir. 2009); *see also Beter v. Murdoch*, 2018 WL 3323162, at *5 (S.D.N.Y. June 22, 2018) (injury must be a "concrete financial

loss"), *aff'd*, 771 F. App'x 62 (2d Cir. 2019). Courts have uniformly rejected claims of RICO injury based on similar allegations. *See, e.g.*, *The Alphas Co. of N.Y. Inc. v. Hunts Point Terminal Prod. Coop., Inc.*, 2017 WL 1929506, at *4 (S.D.N.Y. May 9, 2017) (allegations of lost income and license necessary to "conduct business and find further employment" too "speculative" to constitute RICO injury); *Mack v. Parker Jewish Inst. For Health Care & Rehab.*, 2014 WL 5529746, at *6 (E.D.N.Y. Oct. 30, 2014) (inability to "seek employment" or "further . . . career" "too speculative" and not cognizable under RICO).

*No Causation.* Plaintiff's RICO claim also fails because the FAC does not establish that Deutsche Bank "directly" caused an injury (had one been adequately pled), as required under the statute. *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006); *see also Hemi Grp., LLC v. City of N.Y., N.Y.*, 559 U.S. 1, 9, 14-15 (2010) (RICO statute requires "direct" and "straightforward" connection between defendant's conduct and plaintiff's injury).

Here, again, Plaintiff's only allegations that the Bank caused her purported RICO injuries are conclusory recitations that she was "directly" injured by the Bank's alleged RICO violation. ¶¶ 507-508, 514. But to the contrary, the FAC makes clear that Epstein and other individuals were the direct cause of her injuries. *See* ¶ 31 ("Epstein did not, and could not, act alone. He created and maintained his sex-trafficking venture and conspiracy with the assistance of *other influential individuals*[.]"). Plaintiff also raises new allegations in the FAC that further undermine her RICO claim, including that Epstein "began his sex-trafficking venture and conspiracy in 1998 and perhaps earlier"—long before the Bank onboarded Epstein in 2013—and continued it after the Bank terminated its banking relationship with him in 2018 until "his subsequent death on August 10, 2019." ¶ 29; *see also* ¶¶ 127-128 (Plaintiff first trafficked in 2003), 133 (same), 140 (same), 142 (Plaintiff required to be in Florida during Epstein's imprisonment in 2008). Moreover,

as Plaintiff alleges, there were numerous intervening factors that led to her alleged injury, including the involvement of a co-conspirator who herself was convicted for facilitating Epstein's operations. *See* ¶ 125 (Ghislaine Maxwell alleged to have "help[ed] Epstein to recruit, groom, and ultimately abuse his victims").[28]  Thus, Plaintiff cannot plausibly allege that the Bank's provision of routine banking services "*directly*" caused her injuries. *Anza*, 547 U.S. at 461.

**No RICO Conspiracy**.  Because Plaintiff has failed to plead a RICO claim, her conspiracy claim also fails. *See, e.g.*, *Picard*, 907 F. Supp. 2d at 401 (no claim for RICO conspiracy because Plaintiffs did not adequately allege a substantive RICO violation).  In any event, for the reasons stated above, the FAC does not come close to providing a "factual basis for a finding of a conscious agreement" by Deutsche Bank to facilitate a criminal sex trafficking enterprise, as required to state a RICO conspiracy claim. *Id.*

## IV.   PLAINTIFF FAILS TO PLEAD ANY STATE LAW CLAIMS (COUNTS IX – XII)

Plaintiff's claims for aiding, abetting, or facilitating battery (Count IX), IIED (Count X), and negligence (Counts XI and XII) fail as a matter of black-letter New York law.[29]

### A.   Plaintiff Cannot State a Claim for Aiding or Abetting Battery (Count IX)

For the reasons above, including the FAC's concession that the Bank did not know Plaintiff was an abuse victim, Plaintiff cannot state a claim for aiding, abetting, or facilitating battery:  the Bank could not have "intentional[ly] or deliberate[ly]" sought to cause an assault it did not know

---

[28] The plaintiff in the JPM action also alleges that additional individuals were essential to Epstein's illegal activities. *See* JPM FAC ¶¶ 141-142 ("Without [Jean Luc] Brunel . . . [and] [Les] Wexner, Epstein's sex-trafficking operation could never have occurred to the extent that it did[.]").

[29] Because Plaintiff's federal question claims (Counts I – VIII) should be dismissed, and there is no diversity jurisdiction (¶¶ 1-2), the Court should not exercise supplemental jurisdiction over Plaintiff's remaining state law claims, particularly given the early stage of this case. *See Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 123 (2d Cir. 2006) (abuse of discretion to retain jurisdiction where "Plaintiffs' federal-law claims were eliminated on a motion to dismiss, prior to the investment of significant judicial resources").  If the Court were to retain jurisdiction over Plaintiff's state law claims, they should still be dismissed for the reasons set forth herein.

about.  *Shea v. Cornell Univ.*, 192 A.D.2d 857, 858 (3d Dep't 1993) (no claim against university supervisors for aiding employee's sexual assaults where supervisors not alleged to have engaged in "intentional or deliberate acts directed at causing harm").

### B.     Plaintiff Cannot State a Claim for IIED (Count X)

Plaintiff cannot state an IIED claim for two reasons.  *First*, it is well settled under New York law that "a cause of action for [IIED] is not allowed if essentially duplicative of tort [] causes of action."  *Wolkstein v. Morgenstern*, 713 N.Y.S.2d 171, 172 (1st Dep't 2000).  Here, Plaintiff's IIED allegations are duplicative of her negligence allegations:  Plaintiff alleges the same conduct (¶¶ 549, 557, 560-562, 575, 582) and injuries (¶¶ 553, 566, 583) for both claims.  Therefore, Plaintiff's IIED claim should be dismissed.  *See Leonard v. Reinhardt*, 799 N.Y.S.2d 118, 119 (2d Dep't 2005) (dismissing IIED claim as duplicative of negligence claim); *Samuel et al. v. Rockefeller Univ.*, 2022 WL 2916784, at *2 (N.Y. Sup. Ct. July 25, 2022) (same).

*Second*, a claim for IIED requires "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress."  *Howell v. N.Y. Post Co.*, 612 N.E. 2d 699, 702 (N.Y. 1993).  None of these elements are present here.  The FAC does not allege that the Bank had knowledge of Epstein's sex trafficking venture or the trafficking or abuse of Plaintiff, and it certainly does not allege that it participated in extreme or outrageous conduct, intended to cause Plaintiff emotional distress, or was the cause of any such distress.

### C.     Plaintiff Cannot State a Claim for Negligence (Counts XI & XII)

"To establish a prima facie case of negligence under New York law, a plaintiff must demonstrate (1) a duty owed by the defendant to the plaintiff, (2) a breach thereof, and (3) injury proximately resulting therefrom."  *David v. Weinstein Co. LLC*, 2019 WL 1864073, at *6 (S.D.N.Y. Apr. 24, 2019).  Here, Plaintiff purports to allege two separate claims of negligence—

32

one for "negligent failure to exercise reasonable care to prevent physical harm" (Count XI), and the other for "negligent failure to exercise reasonable care as a banking institution providing non-routine banking" (Count XII)—amounting to a single claim of garden-variety negligence based on multiple purported legal duties.  Neither is valid under New York law.  And even if the FAC could establish that the Bank owed Plaintiff a legal duty (it cannot), Plaintiff's negligence claim would still fail because the FAC does not adequately plead that her injuries were caused by the Bank.

**No Duty.**  Under New York law, "banks do not owe non-customers a duty to protect them against the intentional torts of their customers." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 286 (2d Cir. 2006); *In re Terrorist Attacks*, 714 F.3d 118, 126 (2d Cir. 2013) (same).  Nor do they owe such a duty to their customers.  *See Bank Brussels Lambert, S.A. v. Intermetals Corp.*, 779 F. Supp. 741, 747 (S.D.N.Y. 1991) (bank owes customer a "duty to exercise reasonable skill and care in *carrying out its activities for its customer*").[30]  In an attempt to evade this black-letter New York law that Deutsche Bank cited in its original motion to dismiss, the FAC appears to rely on a series of inapposite cases against the Bank of China decided under *Israeli* law.

Drawing from language contained in decisions in *Wultz v. Bank of China Ltd.*, the FAC alleges in Count XI that the Bank owed a duty "to exercise reasonable care to avoid conduct that created a risk of *physical harm* to [Epstein's victims] . . . includ[ing] a duty to exercise reasonable care to avoid *conduct that would combine* with Epstein's (and others') crimes, and permit Epstein's crimes" (¶ 557).  *See* 860 F. Supp. 2d 225, 234-235 (S.D.N.Y. 2012) (Israeli law recognizes that

---

[30] Plaintiff alleges that the Bank owed her a duty as customer because "Epstein and his agents opened a bank account in her name with Deutsche Bank."  ¶ 581.  The FAC does not allege any further details about Plaintiff's alleged account.  But, as noted above, even assuming the Bank owed her a duty as an account holder, the duty would not extend to protecting Plaintiff from Epstein's intentional torts.  Further, to the extent that the Bank owed Plaintiff contractual duties (none are alleged here), a claim for "negligence cannot be based on a breach of a contractual duty." *Calisch Assocs., Inc. v. Mfg. Hanover Tr. Co.*, 542 N.Y.S.2d 644, 645 (1st Dep't 1989).

banks may have duty to protect third parties when they have "constructive knowledge" that "*injury and death*" are "reasonable foreseeable results" of providing banking services); *Wultz v. Bank of China Ltd.*, 2012 WL 5431013, at *5 (S.D.N.Y. Nov. 5, 2012) (Israeli law "states on its face that joint liability attaches to conduct that *combines* to produce the same injury").  But no such duty exists under New York law.[31]

Similarly, drawing from language in *Elmaliach v. Bank of China Ltd.* (also decided under Israeli law), Count XII alleges that the Bank owed a duty "not to knowingly provide *non-routine banking assistance* to Epstein that it *knew, and reason to know* [sic], would lead to and support intentional tortious conduct."  ¶ 570; *see* 110 A.D.3d 192, 206 (1st Dep't 2013) (contemplating in *dicta* that a bank could be liable for a customer's intentional tort under New York law if acting "outside the scope of [providing] '*routine' banking services*," such as if it "*knew or had reason to know* that it was providing material support to terrorists").  But no such claim could be available here because, again, the FAC does not contain any facts to support its bare conclusion that the Bank "knew or had reason to know" (¶ 570) that it was providing material support to Epstein's sex trafficking venture.  *See Licci v. Am. Exp. Bank Ltd.*, 704 F. Supp. 2d 403, 410 (S.D.N.Y. 2010) ("Absent such allegations, noncompliance with banking laws and industry standards alone will not render a bank negligently liable for the violent attacks committed by a terrorist organization who benefitted, in some general, nondescript manner, from monies passing through the bank during the performance of routine banking services.") (cited by *Elmaliach*, 110 A.D.3d at 206).[32]

---

[31] Even if the standard under Israeli law applied (it does not), for the reasons stated above, Deutsche Bank did not have constructive knowledge of Epstein's crimes, let alone that Epstein was engaged in conduct that could result in injury and death.

[32] Nor is there a valid legal duty based on "KYC and AML laws and regulations" (¶ 575):  the BSA and the USA Patriot Act, which implemented KYC laws (*see* Pub. L. 107-56, § 326), do not create a legal duty from a bank to a customer.  *See In re Agape Litig.*, 681 F. Supp. 2d 352, 360 (E.D.N.Y. 2010) ("[B]ecause the [BSA] does not create a private right of action, [there is] no sound

**No Causation.**  Nor does the FAC adequately allege that any injuries Plaintiff allegedly suffered were caused by the Bank.  Under New York law, the provision of routine banking services to a customer cannot be the proximate cause of injuries suffered by an alleged victim of that customer's conduct.  *See Rothstein v. UBS AG*, 647 F. Supp. 2d 292, 294 (S.D.N.Y. 2009) (Rakoff, J.), *aff'd*, 708 F.3d 82 (2d Cir. 2013) (bank's involvement in transactions with terrorists not the proximate cause of victims' injuries); *In re Terrorist Attacks*, 714 F.3d at 124 (bank did not cause 9/11 victims' injuries by "providing routine banking services to organizations and individuals said to be affiliated with al Qaeda"); *Rosner v. Bank of China*, 2008 WL 5416380, at *13 (S.D.N.Y. Dec. 18, 2008), *aff'd*, 349 F. App'x 637 (2d Cir. 2009) ("conclusory allegation that [] services are 'atypical and non-routine'" insufficient).  Moreover, the FAC's conclusions that the Bank was the "direct and proximate" cause of Plaintiff's injuries (¶¶ 558, 583) are contradicted by other allegations in the FAC, including that Epstein "created and maintained his sex-trafficking . . . with the assistance of other influential individuals and entities" (¶ 31), and that the scheme caused harm to victims long before Epstein was a Bank client and after the Bank terminated its relationship with him (¶ 29).[33]  As such, Plaintiff cannot state a negligence claim.

## CONCLUSION

For all of the foregoing reasons, the FAC should be dismissed with prejudice.

---

reason to recognize a duty of care [] predicated upon the statute's monitoring requirements."); *Aiken v. Interglobal Mergers & Acquisitions*, 2006 WL 1878323, at *2 (S.D.N.Y. July 5, 2006) ("[N]either the [BSA] nor the Patriot Act affords a private right of action."); *see also Winters v. Dowdall*, 2009 WL 423706 (N.Y. Sup. Ct. Jan. 26, 2009), *aff'd* 63 A.D.3d 650 (1st Dep't 2009) (finding no duty owed by bank that allegedly failed to report SARs).

[33] Plaintiff's conclusory allegation that "[w]ithout Deutsche Bank's breaches of legal duties, [Plaintiff's] injuries would not have occurred" (¶¶ 563, 584) is nothing more than a "textbook example of a 'but-for' theory of causation masquerading as a theory of proximate causation." *SPV OSUS Ltd. v. AIA LLC*, 2016 WL 3039192, at *6 (S.D.N.Y. May 26, 2016) (Rakoff, J.).

Dated:  February 7, 2023

By:  */s/ David B. Hennes*

James P. Dowden (*admitted pro hac*)
**ROPES & GRAY LLP**
Prudential Tower
800 Boylston Street
Boston, MA 02199
Tel: (617) 951-7970
james.dowden@ropesgray.com

David B. Hennes
Lisa H. Bebchick
Andrew S. Todres
**ROPES & GRAY LLP**
1211 Avenue of the Americas
New York, NY 10036
Tel: (212) 596-9000
david.hennes@ropesgray.com
lisa.bebchick@ropesgray.com
andrew.todres@ropesgray.com

*Counsel for Deutsche Bank*