**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Jane Doe 1, individually and on behalf of all others similarly situated, | Case No. 1:22-CV-10018 (JSR) |
| Plaintiff, | |
| v. | |
| Deutsche Bank Akteingesellschaft, et. al., | |
| Defendants. | |
| Jane Doe 1, individually and on behalf of all others similarly situated, | Case No. 1:22-CV-10019 (JSR) |
| Plaintiff, | |
| v. | |
| JPMorgan Chase Bank, N.A., | |
| Defendant. | |

**PLAINTIFF JANE DOE 1'S MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS OF DEFENDANTS DEUTSCHE BANK AKTIENGESELLSCHAFT, DEUTSCHE BANK AG NEW YORK BRANCH, AND DEUTSCHE BANK TRUST COMPANY AMERICAS**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................... 1

FACTUAL OVERVIEW..................................................................................................... 2

ARGUMENT........................................................................................................................ 4

    I.  DOE'S SETTLEMENT AGREEMENT DOES NOT WARRANT
       DISMISSAL............................................................................................................. 4

      A.  The Court Cannot Consider the Settlement Agreement at this Stage. ......................... 4

      B.  Deutsche Bank Is Not a Released Party Under the Terms of the Agreement.............. 6

   II. DOE HAS PROPERLY PLED SIX TVPA CLAIMS (COUNTS I-VI)...................... 10

      A.  The FAC States a Claim for TVPA Beneficiary Liability (Count I). ....................... 10

           1.  Deutsche Bank Participated in the Sex-Trafficking Venture........................ 11

           2.  Deutsche Bank Benefited from its Participation in the Sex-Trafficking
              Venture...................................................................................................... 14

           3.  Deutsche Bank Both Knew and Should Have Known About Epstein's
              Sex-Trafficking Venture. .......................................................................... 15

               a.  Knowledge that Doe Was a Sex-Trafficking Victim ......................... 15

               b.  Knowledge of a Specific Sex-Trafficking Venture ........................... 18

      B.  The FAC States a Claim for TVPA Perpetrator Liability (Count II)......................... 20

      C.  The FAC States TVPA Claims for Aiding and Abetting, Conspiracy, Attempt,
         and Obstruction (Counts III–VI)............................................................................ 21

           1.  Count III Properly Alleges Aiding and Abetting Liability. ........................... 21

           2.  Count IV Properly Alleges Conspiracy Liability........................................... 22

           3.  Count V Properly Alleges Attempt Liability. ................................................ 24

           4.  Count VI Properly Alleges Obstruction Liability.......................................... 25

      D.  The FAC States RICO and RICO Conspiracy Claims (Counts VII–VIII). ............... 26

           1.  The FAC Alleges Predicate Offenses. .......................................................... 26

2.   The FAC Alleges Participation in the Conduct of the Enterprise. ................... 27

3.   The FAC Alleges RICO Injury. .............................................................. 28

4.   The FAC Alleges RICO Causation. ......................................................... 29

5.   The FAC Alleges RICO Conspiracy. ....................................................... 29

**III. DOE HAS PROPERLY PLED HER TORT CLAIMS (COUNTS IX-XII). ............. 30**

A.   The FAC States a Claim for Aiding and Abetting Battery (Count IX). ..................... 30

B.   The FAC States a Claim for Intentional Infliction of Emotional Distress
     (Count X). .......................................................................................... 31

C.   The FAC States Two Claims for Negligence (Count XI–XII). ................................. 33

**CONCLUSION** ................................................................................................. **35**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.B. v. Marriott Int'l, Inc.*,
  455 F. Supp. 3d 171 (E.D. Pa. 2020) ......................................................... 10, 12, 16

*Alix v. McKinsey & Co.*,
  23 F.4th 196 (2d Cir. 2022) ......................................................................... 29

*Allstate Ins. Co. v. Afanasyev*,
  2016 WL 1156769 (E.D.N.Y. Feb. 11, 2016) ............................................. 27

*Ardolf v. Weber*,
  332 F.R.D. 467 (S.D.N.Y. 2019) ................................................................. 10

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ..................................................................................... 4

*B.M. v. Wyndham Hotels & Resorts, Inc.*,
  2020 WL 4368214 (N.D. Cal. July 30,2020) .............................................. 19

*BCS Servs., Inc. v. Heartwood 88, LLC*,
  637 F.3d 750 (7th Cir. 2011) ....................................................................... 29

*Bonner v. Guccione*,
  916 F. Supp. 271 (S.D.N.Y. 1996) .............................................................. 32

*Brown v. Thompson*,
  374 F.3d 253 (4th Cir. 2004) ....................................................................... 23

*C.S. v. Wyndham Hotels & Resorts, Inc.*,
  538 F. Supp. 3d 1284 (M.D. Fla. 2021) ...................................................... 11

*Canosa v. Ziff*,
  2019 WL 498865 (S.D.N.Y. Jan. 28, 2019) ......................................... passim

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
  511 U.S. 164 (1994) ..................................................................................... 21

*Chambers v. Time Warner, Inc.*,
  282 F.3d 147 (2d Cir. 2002) ........................................................................ 4

*Childers v. New York & Presbyterian Hosp.*,
  36 F. Supp. 3d 292 (S.D.N.Y. 2014) ........................................................... 5

*Collins v. Willcox, Inc.*,
  600 N.Y.S.2d 884 (Sup. Ct. 1992) ........................................ 32

*David v. Weinstein Co. LLC*,
  431 F. Supp. 3d 290 (S.D.N.Y. 2019) ................................... 33

*Dubai Islamic Bank v. Citibank, N.A.*,
  256 F. Supp. 2d 158 (S.D.N.Y. 2003) ................................... 27

*E.S. v. Best W. Int'l, Inc.*,
  510 F. Supp. 3d 420 (N.D. Tex. 2021) ................................. 19

*Elmaliach v. Bank of China Ltd.*,
  110 A.D.3d 192 (N.Y. App. Div. 2013) ................................ 34

*Eskridge v. Diocese of Brooklyn*,
  210 A.D.3d 1056 (N.Y. App. Div. 2022) .............................. 32

*Fleites v. MindGeek S.A.R.L.*,
  2022 WL 4456077 (C.D. Cal. July 29, 2022) .................... 22, 23

*Ford v. Grand Union Co.*,
  197 N.E. 266 (N.Y. 1935) ............................................... 33, 34

*G.G. v. Salesforce.com, Inc.*,
  603 F. Supp. 3d 626 (N.D. Ill. 2022) .................................. 14

*Gerber Fin., Inc. v. Volume Snacks Inc.*,
  2021 WL 3038780 (S.D.N.Y. July 14, 2021) ........................... 5

*Giuffre v. Prince Andrew*,
  579 F. Supp. 3d 429 (S.D.N.Y. 2022) ............................... 8, 32

*H.H. v. G6 Hosp., LLC*,
  2019 WL 6682152 (S.D. Ohio Dec. 6, 2019) ................. 12, 14, 15

*In re Barnet*,
  737 F.3d 238 (2d Cir. 2013) ............................................. 21

*In re Corp. Res. Servs., Inc.*,
  849 F. App'x 320 (2d Cir. 2021) ......................................... 9

*In re Refco Inc. Sec. Litig.*,
  2012 WL 12906289 (S.D.N.Y. Aug. 10, 2012) ........................ 5

*In re Skat Tax Refund Scheme Litig.*,
  356 F. Supp. 3d 300 (S.D.N.Y. 2019) ................................. 32

*In re Stock Exchanges Options Trading Antitrust Litig.*,
   317 F.3d 134 (2d Cir. 2003) ........................................................................ 5

*In re World Trade Ctr. Lower Manhattan Disaster Site Litig.*,
   828 F. App'x 734 (2d Cir. 2020) ................................................................. 6

*J.C. v. I Shri Khodiyar, LLC*,
   2022 WL 4482736 (N.D. Ga. Aug. 29, 2022) ........................................... 12

*J.L. v. Best W. Int'l, Inc.*,
   521 F. Supp. 3d 1048 (D. Colo. 2021) ...................................................... 11

*Johnson v. U.S. Dep't of Hous. & Urb. Dev.*,
   911 F.2d 1302 (8th Cir. 1990) ................................................................... 23

*JSC Foreign Econ. Ass'n Technostroyexport v. Weiss*,
   2007 WL 1159637 (S.D.N.Y. Apr. 18, 2007) ............................................ 27

*Kashef v. BNP Paribas S.A.*,
   2021 WL 603290 (S.D.N.Y. Feb. 16, 2021) ............................................. 31

*Kashef v. BNP Paribas S.A.*,
   925 F.3d 53 (2d Cir. 2019) .......................................................................... 4

*Keady v. J.P. Morgan Chase & Co.*,
   2008 WL 6384 (S.D.N.Y. Mar. 3,2008) ..................................................... 5

*LaSalle Nat'l Bank v. Ernst & Young LLP*,
   285 A.D.2d 101 (N.Y.App. Div. 2001) ................................................. 6, 7, 9

*Lateral Recovery, LLC v. Cap. Merch. Servs., LLC*,
   2022 WL 4815615 (S.D.N.Y. Sept. 30, 2022) ............................................ 5

*Lawson v. Rubin*,
   2018 WL 2012869 (E.D.N.Y. Apr. 29, 2018) ...................................... 19, 20

*Licci v. Am. Exp. Bank Ltd.*,
   704 F. Supp. 2d 403 (S.D.N.Y. 2010) ...................................................... 34

*Lundstrom v. Choice Hotels Int'l, Inc.*,
   2021 WL 5579117 (D. Colo. Nov. 30, 2021) ............................................ 19

*M.A. v. Wyndham Hotels & Resorts, Inc.*,
   425 F. Supp. 3d 959 (S.D. Ohio 2019) ......................................... 12, 17, 30

*Matvejs v. Martin County Sheriff's Office*,
   2006 WL 3755202 (S.D. Fla. 2006) .......................................................... 32

*Maurizi v. Callaghan,*
    2022 WL 1446500 (W.D.N.Y. Feb. 25, 2022)................................................ 31

*Midwest Feeders, Inc. v. Bank of Franklin,*
    886 F.3d 507 (5th Cir. 2018)........................................................................ 35

*Nat'l Asbestos Workers Med. Fund v. Philip Morris, Inc.,*
    74 F. Supp. 2d 213 (E.D.N.Y. 1999)............................................................ 28

*Noble v. Weinstein,*
    335 F. Supp. 3d 504 (S.D.N.Y. 2018)............................................... 13, 14, 21

*Norsoph v. Riverside Resort & Casino, Inc.,*
    2020 WL 641223 (D. Nev. Feb. 11, 2020) .................................................. 23

*Old Crompond Rd., LLC v. Cnty. of Westchester,*
    201 A.D.3d 806 (N.Y. App. Div. 2022)......................................................... 7

*Oppenheimer & Co. v. Trans Energy, Inc.,*
    946 F. Supp. 2d 343 (S.D.N.Y. 2013) ........................................................... 9

*Paguirigan v. Prompt Nursing Emp. Agency LLC,*
    286 F. Supp. 3d 430 (E.D.N.Y. 2017)......................................................... 24

*Picard v. Kohn,*
    907 F. Supp. 2d 392 (S.D.N.Y. 2012).......................................................... 28

*Pinkerton v. United States,*
    328 U.S. 640 (1946) .................................................................................... 24

*Potomac Elec. Power Co. v. Elec. Motor and Supply, Inc.,*
    262 F.3d 260 (4th Cir. 2001)........................................................................ 29

*Ratha v. Phatthana Seafood Co.,*
    35 F.4th 1159 (9th Cir. 2022)...................................................................... 24

*Ricchio v. McLean,*
    853 F.3d 553 (1st Cir. 2017) ................................................................. 12, 24

*Roche Diagnostics Corp. v. Priority Healthcare Corp.,*
    407 F. Supp. 3d 1216 (N.D. Ala. 2019) ...................................................... 30

*Rodland v. Judlau Contracting, Inc.,*
    844 F. Supp. 2d 359 (S.D.N.Y. 2012).......................................................... 34

*S.J. v. Choice Hotels Int'l, Inc.,*
    473 F. Supp. 3d 147 (E.D.N.Y. 2020)............................................ 10, 11, 16, 17

*S.Y. v. Best Western Int'l, Inc.*,
  2021 WL 2315073 (M.D. Fla. June 7, 2021) ...................................................... 12

*S.Y. v. Naples Hotel Co.*,
  476 F. Supp. 3d 1251 (M.D. Fla. 2020) .............................................................. 11

*Salinas v. United States*,
  522 U.S. 52 (1997) .............................................................................................. 30

*Scollo ex rel. Scollo v. Nunez*,
  847 N.Y.S.2d 899 (Sup. Ct. 2007) ................................................................. 30, 31

*Scurry v. New York City Hous. Auth.*,
  193 A.D.3d 1 (N.Y. App. Div. 2021) ................................................................ 35

*Shea v. Cornell Univ.*,
  192 A.D.2d 857 (N.Y. App. Div. 1993) ............................................................. 31

*Solis v. 666 Fifth Assocs. LLC*,
  2021 WL 5998416 (S.D.N.Y. Dec. 20, 2021) ..................................................... 6

*Staehr v. Hartford Fin. Servs. Grp., Inc.*,
  547 F.3d 406 (2d Cir. 2008) ................................................................................ 5

*Stagl v. Delta Airlines, Inc.*,
  52 F.3d 463 (2d Cir. 1995) ................................................................................ 33

*Turner v. Manhattan Bowery Mgmt. Corp.*,
  28 N.Y.S.3d 651 (Sup. Ct. 2015) ....................................................................... 32

*U.S. Bank Nat'l Ass'n v. GreenPoint Mortg. Funding, Inc.*,
  105 A.D.3d 639 (N.Y. App. Div. 2013) .............................................................. 6

*United States v. Afyare*,
  632 F. App'x 272 (6th Cir. 2016) ...................................................................... 16

*United States v. Alonso*,
  740 F.2d 862 (11th Cir. 1984) ........................................................................... 30

*United States v. Gershman*,
  31 F.4th 80 (2d Cir. 2022) ................................................................................. 24

*United States v. Haggard*,
  41 F.3d 1320 (9th Cir. 1994) ............................................................................. 25

*United States v. Hoover*,
  175 F.3d 564 (7th Cir. 1999) ............................................................................. 25

*United States v. Space Hunters, Inc.*,
  429 F.3d 416 (2d Cir. 2005) ................................................................. 4

*United States v. The Boeing Co.*,
  2022 WL 13829875 (S.D. Tex. Oct. 21, 2022) ..................................... 25

**Statutes**

18 U.S.C. § 1591 ................................................................................. *passim*

18 U.S.C. § 1594 ......................................................................................... 22

18 U.S.C. § 1595 ..................................................................... 21, 22, 23, 24

18 U.S.C § 1961 .......................................................................................... 26

18 U.S.C. § 1962 .................................................................................. 26, 27

18 U.S.C. § 1964 ......................................................................................... 26

18 U.S.C. § 2 ............................................................................................... 22

18 U.S.C. §§ 1581–97 .......................................................................... 21, 26

*Abolish Trafficking Reauthorization Act of 2022*,
  P.L. 117-347, 136 Stat. 6199 (2023) .................................................. 23

*Trafficking Victims' Protection Act of 2000*,
  P.L.106-386, 114 Stat. 1466 (2000) ...................................................... 1

**Rules**

Fed. R. Civ. P. 8(d)(2)................................................................................. 32

**Other Authorities**

Restatement (Third) of Torts: Phys. & Emot. Harm § 7 (2010) ................. 33

Plaintiff Jane Doe 1 ("Doe") submits this memorandum of law in opposition to Defendants Deutsche Bank Aktiengesellschaft, Deutsche Bank AG New York Branch, and Deutsche Bank Trust Companies America's ("Deutsche Bank") Motion to Dismiss ("MTD") her First Amended Complaint ("FAC").

## PRELIMINARY STATEMENT

Jeffrey Epstein would not have been able to commit the horrific crimes the world has come to know without constant access to cash flowing from a bank willing to ignore the law and help conceal Epstein's conduct, all just to make a significant profit. Up until Epstein's death, Deutsche Bank was that bank. In her complaint, on behalf of herself and a class of Epstein victims, Doe has alleged that Deutsche Bank aided and abetted Epstein's sex-trafficking venture. She has also alleged that Deutsche Bank knowingly benefitted from participating in the sex-trafficking venture, in violation of the Trafficking Victims' Protection Act of 2000 ("TVPA").

Deutsche Bank's motion to dismiss attempts to escape liability for its active participation in Epstein's sex trafficking in two primary ways. First, it tries to hide behind a release in Doe's 2022 settlement agreement with Epstein's estate, which by its own terms was never intended to protect a bank or to cover Deutsche Bank's conduct. Second, despite the overwhelming and specific allegations to the contrary, Deutsche Bank insists that it was not involved in the sex trafficking and (incredibly) contends that it did not know that Epstein—a convicted pedophile who was constantly withdrawing large sums of cash and facing public scrutiny for paying children for massages—was a trafficker at all. Deutsche Bank's arguments willfully ignore the serious, specific, and well-pled allegations in the FAC in an effort to paint itself as an innocent bystander to Epstein's conduct. The reality is that Deutsche Bank did not only participate in the trafficking—it was *essential* to Epstein's scheme and is one of the primary reasons he was able to continue

harming young girls all over the world for decades. The Court should reject Deutsche Bank's efforts to escape liability for its conduct at this early stage in the litigation given the detailed factual allegations in the FAC, and should deny Deutsche Bank's motion in its entirety.

## FACTUAL OVERVIEW

Before Jeffrey Epstein became Deutsche Bank's client in 2013, he was already well known as a registered sex offender who spent his day-to-day life sexually abusing young females and recruiting others. FAC ¶ 24. From its inception until Epstein's 2019 arrest for sex trafficking, Epstein's sex-trafficking venture operated with the purpose of luring young women and girls into a position where Epstein and his co-conspirators could coerce them to engage in commercial sex acts and commit sexual offenses against them. *Id.* ¶ 29. Epstein maintained his sex-trafficking venture and conspiracy with the assistance of other influential individuals and entities who knew he was trafficking young girls, yet supported his operation to obtain favors from Epstein. *Id.* ¶ 31.

Epstein's sex-trafficking venture and conspiracy was not possible without the assistance and knowing complicity of a banking institution to provide his operation with not only the means to conduct sex trafficking but also the appearance of legitimacy, ensuring its continued operation without fear of being reported to law enforcement or being arrested. *Id.* ¶ 32. From on or about August 19, 2013, through 2019, Deutsche Bank was that bank. Deutsche Bank knowingly and intentionally participated in Epstein's sex-trafficking venture, conspiracy, and racketeering activity by (among other things) providing the financial underpinnings for the venture. *Id.* ¶ 154.

After Deutsche Bank joined the venture, it became aware that Epstein's venture had been ongoing for many years and ratified the conspiracy's earlier conduct and crimes. *Id.* Deutsche Bank enabled Epstein to have reliable access to resources—including cash—to recruit, solicit, entice, harbor, obtain, provide, and transport young women and girls (including Doe) to cause

them to engage in commercial sex acts. *Id.* ¶ 155. And Deutsche Bank financially benefitted by earning millions of dollars from its participation in the Epstein-sex-trafficking venture. *Id.* ¶ 164. When considering whether to participate in the sex-trafficking venture, Deutsche Bank estimated that it would earn between $2,000,000 to $4,000,000 annually from serving as Epstein's banker. *Id.* ¶ 163. Faced with the choice between profiting from Epstein's sex-trafficking venture or following the law, Deutsche Bank intentionally chose to profit. *Id.* ¶ 165.

Deutsche Bank's intentional and outrageous participation in Epstein's sex-trafficking venture was not a "one off." *Id.* ¶ 288. To the contrary, its deliberate participation fits within Deutsche Bank's pattern and practice of profiting by undertaking illegal "high risk, high reward" clients. *Id.* (citing Court's prior opinion in related case finding plausible allegations that Deutsche Bank executives "routinely overruled compliance staff so that the Bank's wealth management business could commence or continue relationships with high-risk, ultra-rich clients, such as Russian oligarchs, the convicted sex trafficker Jeffrey Epstein, founders of terrorist organizations, persons associated with Mexican drug cartels, and people suspected of financing terrorist organizations"). As it did with its Epstein relationship, Deutsche Bank intentionally planned to profit from being the banker for individuals and organizations that other banks knew they could not lawfully handle. *Id.* ¶ 299. For Deutsche Bank, this "high risk, high reward" approach ensured that it would earn greater profits than it would if it were complying with the law. *Id.*

From 2003 through 2018, and during Deutsche Bank's relationship with Epstein, Epstein abused Doe and caused her to engage in commercial sex acts. *Id.* ¶¶ 133–36. Epstein used Deutsche Bank to withdraw large sums of cash to pay Doe, and forced Doe to open an account with Deutsche Bank. *Id.* ¶¶ 155, 158, 169, 218.

## ARGUMENT

The Court should deny Deutsche Bank's motion to dismiss Doe's claims. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face . . . . A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). The Court must "accept[] all factual allegations in the complaint as true and draw[] all reasonable inferences in the plaintiff's favor." *Kashef v. BNP Paribas S.A.*, 925 F.3d 53, 58 (2d Cir. 2019). Drawing all reasonable inferences in Doe's favor, Deutsche Bank has failed to demonstrate that Doe cannot state a plausible claim.

## I.   DOE'S SETTLEMENT AGREEMENT DOES NOT WARRANT DISMISSAL.

Deutsche Bank's attempt to hide behind a release in a settlement agreement from a different case, Dkt. 45-1 ("Settlement Agreement" or "Agreement"), fails for several reasons. First, the Agreement cannot be considered at the motion-to-dismiss stage. Second, the plain language of the Agreement is unambiguous and makes clear that Deutsche Bank was not an intended releasee.

### A.  The Court Cannot Consider the Settlement Agreement at this Stage.

The Settlement Agreement is not mentioned, described, or referenced in the FAC, and for purposes of a Rule 12(b)(6) motion, the Court may only consider a "written instrument attached to [the complaint] as an exhibit or any statements or documents incorporated in it by reference" as well as any documents "integral" to the complaint, *i.e.*, "where the complaint relies heavily upon [the document's] terms and effects." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002). Because the invocation of the Agreement's release raises an affirmative defense, the Court may only grant a motion to dismiss if it is "beyond doubt that the plaintiff can prove no set of facts in support of [her] claim that would entitle [her] to relief." *United States v. Space Hunters,*

4

*Inc.*, 429 F.3d 416, 426 (2d Cir. 2005) (internal quotation marks omitted); *see also Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) ("[A] defendant may raise an affirmative defense in a pre-answer Rule 12(b)(6) motion [only] if the defense appears on the face of the complaint."). Here, Deutsche Bank asks the Court not only to consider a document not mentioned in the FAC at all, but also to interpret the terms of that document in its favor without submitting any evidence supporting its interpretation. Such is inappropriate at this stage.[1]

To have the Court consider documents outside the pleadings, Deutsche Bank asserts that its release argument is a matter of subject-matter jurisdiction under Rule 12(b)(1). MTD at 7. But Deutsche Bank's release defense is not jurisdictional—it is well-settled that the invocation of a release is an affirmative defense that can be waived. *See Lateral Recovery, LLC v. Cap. Merch. Servs., LLC*, 2022 WL 4815615, at *27 (S.D.N.Y. Sept. 30, 2022) (explaining that release is an affirmative defense and holding that it could not consider settlement agreement on Rule 12(b)(6) motion). Accordingly, the release defense is not an issue of subject-matter jurisdiction. *See, e.g.*, *In re Stock Exchanges Options Trading Antitrust Litig.*, 317 F.3d 134, 151 (2d Cir. 2003) ("Affirmative defenses can be waived, [but] lack of subject matter jurisdiction cannot be waived."). Further, Doe was not required to anticipate or plead around that affirmative defense in the FAC in order to survive dismissal at this stage. *See Childers v. New York & Presbyterian Hosp.*,

---

[1]     Each of the cases Deutsche Bank cites (in a footnote) for the proposition that dismissal is appropriate under Rule 12(b)(6) is inapposite. Dkt. 44 ("MTD") at 7 n.5. In *Gerber*, the release at issue was attached to the complaint. *Gerber Fin., Inc. v. Volume Snacks Inc*., 2021 WL 3038780, at *3 (S.D.N.Y. July 14, 2021). *In re Refco* concerned a special master's report and recommendation to which no party objected; it involved a third-party defendant squarely released by a settlement agreement in the very litigation at issue; and the third-party defendant moved for dismissal under Rule 56 in the alternative. *In re Refco Inc. Sec. Litig*., 2012 WL 12906289, at *3–4 (S.D.N.Y. Aug. 10, 2012), *report and recommendation adopted*, 2012 WL 4009175 (S.D.N.Y. Sept. 12, 2012). And in *Keady*, the Court converted the motion into one for summary judgment *and* the release was "mentioned both in the Complaint itself" and an attachment thereto. *Keady v. J.P. Morgan Chase & Co*., 2008 WL 638444, at *2 (S.D.N.Y. Mar. 3, 2008).

36 F. Supp. 3d 292, 315 (S.D.N.Y. 2014) ("[A] complaint does not need to anticipate potential affirmative defenses . . . and to affirmatively plead facts in avoidance of such defenses.").

The sole case Deutsche Bank cites that considered a release as affecting a court's subject-matter jurisdiction, *Solis v. 666 Fifth Assocs. LLC*, 2021 WL 5998416 (S.D.N.Y. Dec. 20, 2021), is distinguishable. In *Solis*, the plaintiff was terminated and sued his former employers. *Id.* at *1. Months after filing suit, Solis entered into a release with one employer that released "any co-employers or joint employers." *Id.* at *2. After the second employer sought to enforce that release, the court determined that the release mooted Solis's claims against the released employer, and therefore that it lacked subject matter jurisdiction. *Id.* at *3–4.[2] Unlike in *Solis*, the Settlement Agreement here resolved a different case between different parties (Doe and the Epstein Estate).

### B. Deutsche Bank Is Not a Released Party Under the Terms of the Agreement.

Even if the Court considered the Settlement Agreement at this stage, its plain language demonstrates that the parties did not intend for the release to benefit Deutsche Bank. Because it is not a party to the Agreement, in order to avail itself of the release, Deutsche Bank must establish that it is a third-party beneficiary by showing "(1) the existence of a valid and binding contract between other parties, (2) that the contract was intended for [its] benefit and (3) that the benefit to [it] is sufficiently immediate, rather than incidental, to indicate the assumption by the contracting parties of a duty to compensate [it] if the benefit is lost." *State of California Pub. Employees' Ret. Sys. v. Shearman & Sterling*, 741 N.E.2d 101, 104 (N.Y. 2000). "The parties' intent to benefit the third party must be apparent from the face of the contract." *LaSalle Nat'l Bank v. Ernst & Young LLP*, 285 A.D.2d 101, 108 (N.Y. App. Div. 2001); *see also U.S. Bank Nat'l Ass'n v. GreenPoint*

---

[2]     The only case *Solis* relies on for the proposition that a settlement release implicates a federal court's subject-matter jurisdiction, *In re World Trade Ctr. Lower Manhattan Disaster Site Litig.*, 828 F. App'x 734 (2d Cir. 2020) (also unpublished), has nothing to do with a release.

*Mortg. Funding, Inc.*, 105 A.D.3d 639, 640 (N.Y. App. Div. 2013). "Absent *clear contractual language* evincing such intent, New York courts have demonstrated a reluctance to interpret circumstances to construe such an intent." *LaSalle*, 285 A.D.2d at 108–09 (emphasis added). In other words, absent a showing that the parties to the contract intended to benefit the third party, the third party is merely an "incidental beneficiary" with no right to enforce the contract. *See Old Crompond Rd., LLC v. Cnty. of Westchester*, 201 A.D.3d 806, 808 (N.Y. App. Div. 2022).

On its face, the Agreement releases claims against the Epstein Estate and any entities, employees, attorneys, agents, and entities who were "engaged by, employed by, or worked in any capacity" for Epstein or his estate from claims relating to Epstein's sex trafficking/abuse. Dkt. 45-1 at 1. The Agreement makes no mention of banks with which Epstein had accounts. To the contrary, the Agreement makes clear that it was *never* intended to cover claims against financial institutions or their officers or employees:



*Id.* at 3. For reference, ███████████████████████████████████████████████ ███████████████████████████████████████████████ If the release were as broad as Deutsche Bank says—covering claims against bankers and financial institutions—then the drafters would not have unequivocally stated that there was ███████████████████████████ ███████████████████████████████████████████. Accordingly, the Agreement is unambiguous that the parties did not intend to release banks.

If this language were not enough, the Agreement contains a strict non-disclosure provision

prohibiting the parties from "mak[ing] any disclosure of this General Release and Settlement Agreement." Dkt. 47-1 at 2–3. Deutsche Bank admits that it only recently became aware of the Agreement. MTD at 1. Yet it does not explain how the parties could have both intended Deutsche Bank to benefit from the Agreement *and* agreed that they would not share the Agreement with Deutsche Bank. *See Giuffre v. Prince Andrew*, 579 F. Supp. 3d 429, 446 (S.D.N.Y. 2022) (construing confidentiality agreement in release to mean it was not intended to benefit third party).

Deutsche Bank focuses on the following emphasized words: "any entities or individuals who are or have ever been *engaged* by (whether as independent contractors or otherwise) employed by, or *worked* in any capacity for Jeffrey E. Epstein and/or the Epstein Estate." *See* MTD at 8–9 (emphasis added). But Deutsche Bank's self-serving interpretation has no limiting principle, and it is unreasonable to believe that Doe intended to release every person who ever took any action "on [Epstein's] behalf" (MTD at 9), including, for example, his dry-cleaning service.

In contrast, Doe's interpretation of the Agreement is far more reasonable, as the language makes clear that the settling parties never intended for the release to cover banks. The Agreement's definition of "Releasee" includes Epstein's affiliated companies as well as his former employees and other members of his entourage or household whom he controlled. The Agreement makes clear, however, that the term "Releasee" does *not* include other individuals or entities who were independent or outside his inner circle by referencing other "co-conspirators" and "joint tortfeasors." Dkt. 45-1 at 1. Deutsche Bank, as an entity independent from Epstein and his Estate (the bank was never Epstein's employee or his independent contractor), falls outside what the Agreement considers a Releasee and within what it envisioned would be a potential "co-conspirator" or "joint tortfeasor." For this reason, the Agreement includes additional language specifically stating that there is no ███████████████ that the release could apply to

certain other ███████ *Id.* at 2.

To get around this clear language, Deutsche Bank suggests that because the parties excluded specific ███████ but not Deutsche Bank, the parties intended to release Deutsche Bank. MTD at 11. This argument is nonsensical, as under Deutsche Bank's interpretation Doe would have had to list out every possible person she intended to *preserve* claims against. This flips the third-party beneficiary doctrine on its head, which says that a third party can *only* benefit from a contract if it contains "clear contractual language" on "the face of the contract" that shows "[t]he parties' intent to benefit the third party," *LaSalle*, 285 A.D.2d at 108–09—not if the contract clearly states that the third party is *not* an intended beneficiary. The only commonsense interpretation of the Settlement Agreement that also comports with the law is Doe's—that is, that there is no reasonable interpretation of the Agreement that releases a bank.[3]

But even if Deutsche Bank's interpretation of the Settlement Agreement were reasonable, its argument at most raises an ambiguity that cannot be resolved on a motion to dismiss. *See Oppenheimer & Co. v. Trans Energy, Inc.*, 946 F. Supp. 2d 343, 349 (S.D.N.Y. 2013) ("when the language of a contract is ambiguous, its construction presents a question of fact, which of course precludes summary dismissal on a Rule 12(b)(6) motion" (cleaned up)). Deutsche Bank offers no argument about the parties' intent (it cannot), and there is no evidence suggesting that both Doe and the Epstein Estate had a meeting of the minds to release banks. *See, e.g.*, *In re Corp. Res. Servs., Inc.*, 849 F. App'x 320, 321 (2d Cir. 2021) ("Whether the signatories to a contract intended

---

[3]     Deutsche Bank makes much ado about a single phrase in the Agreement saying that it is a "broad release of any and all Claims of Claimant against any and all Releasees" (Dkt. 45-1 at 1), and manipulates that phrase to argue that the Agreement was meant to broadly capture potential releasees. *See, e.g.*, MTD at 10. But this argument ignores the actual language of the provision, which states that the release is a "broad" release of "*claims*," meaning that Doe intended to release a broad category of *claims* against the releasees, not that she intended to release a limitless category of *releasees*. Dkt. 45-1 at 1–2.

the scope of a release of liability to extend to other parties or claims is a question of fact.”). The Court should reject Deutsche Bank’s arguments concerning the release.

## II.     DOE HAS PROPERLY PLED SIX TVPA CLAIMS (COUNTS I-VI).

The TVPA provides a civil cause of action for sex-trafficking victims against those who, like Deutsche Bank, participate in a sex-trafficking venture. In her FAC, Doe brings six claims against Deutsche Bank under the TVPA, and the Court should deny Deutsche Bank’s motion to dismiss each of those claims. Deutsche Bank does not contest that Doe is a sex-trafficking victim, that Jeffrey Epstein ran a sex-trafficking venture, or that the TVPA includes a private right of action. Deutsche Bank argues only (1) that Doe’s allegations are insufficient to allege that it participated in a sex-trafficking venture, (2) that Doe’s allegations are insufficient to allege that it knew or should have known about the sex-trafficking venture, and (3) that Doe’s aiding-and-abetting, conspiracy, attempt, and obstruction claims are not viable. The Court should reject each of these arguments as to Doe’s six TVPA claims.

The Court must construe the TVPA broadly because remedial provisions, like Section 1595 of the TVPA, require broad interpretation. *See, e.g.*, *A.B. v. Marriott Int’l, Inc.*, 455 F. Supp. 3d 171, 189 (E.D. Pa. 2020); *Ardolf v. Weber*, 332 F.R.D. 467, 473 (S.D.N.Y. 2019); *Canosa v. Ziff*, 2019 WL 498865, at *23 (S.D.N.Y. Jan. 28, 2019).

### A.  The FAC States a Claim for TVPA Beneficiary Liability (Count I).

The elements of a beneficiary liability claim under Section 1591(a) are: “(1) the person or entity must ‘knowingly benefit, financially or by receiving anything of value,’ (2) from participating in a venture, (3) that the ‘person knew or should have known has engaged in an act in violation of this chapter.’” *S.J. v. Choice Hotels Int’l, Inc.*, 473 F. Supp. 3d 147, 152–53 (E.D.N.Y. 2020). In her FAC, Doe has adequately alleged each of these elements.

10

1.   <u>Deutsche Bank Participated in the Sex-Trafficking Venture.</u>

Deutsche Bank contends that the FAC "does not allege that Deutsche Bank 'participat[ed] in a venture' with Epstein.'" MTD at 13. Specifically, Deutsche Bank maintains that Doe must further "allege facts that Deutsche Bank engaged in 'specific conduct that furthered the sex trafficking venture' with Epstein," and draws a distinction between "passive facilitation" and actual "participation." *Id*. The FAC alleges, however, far more than "passive facilitation."

The FAC contains specific, factual allegations demonstrating that Deutsche Bank was an active participant in Epstein's sex-trafficking venture.[4] Among many other detailed factual allegations, the FAC alleges that Deutsche Bank: (1) provided the venture "$200,000 per year in cash" (FAC ¶ 321); (2) "concealed its delivery of hundreds of thousands of dollars in cash to Epstein and his associates" by willfully failing to file reports (*id.* ¶ 324); (3) "structured" 97 cash withdrawals by Epstein's co-conspirators in the amount of $7,500 per withdrawal to avoid alerting authorities to suspicious transactions (*id.* ¶ 337); (4) failed to implement oversight imposed by its Americas Reputational Risk Committee ("ARRC"), which was "a deliberate omission" that "allowed Epstein to continue funding his sex-trafficking venture through suspicious transactions that would have otherwise been prevented" (*id.* ¶ 325); and (5) allowed Epstein to use its accounts "to send dozens of wires, directly and indirectly, including at least 18 wires in the amount of $10,000 or more to then known co-conspirators." (*id.* ¶¶ 212, 213).

These specific allegations demonstrate that Deutsche Bank not only participated in the sex-trafficking venture by giving Epstein the tools he needed to pay hundreds of young girls for

---

[4]      Further, most district courts have rejected the argument that an overt act in furtherance of sex-trafficking is required to state a beneficiary liability claim. *See, e.g.*, *C.S. v. Wyndham Hotels & Resorts, Inc.*, 538 F. Supp. 3d 1284, 1296 (M.D. Fla. 2021); *J.L. v. Best W. Int'l, Inc.*, 521 F. Supp. 3d 1048, 1062 (D. Colo. 2021); *S.Y. v. Naples Hotel Co.*, 476 F. Supp. 3d 1251, 1256 (M.D. Fla. 2020).

sex and to pay his crucial recruiters, but that it also participated by willfully concealing the venture so that it could persist for years. This continuous, sustained, and significant business relationship between Deutsche Bank and Epstein's sex-trafficking venture easily and adequately alleges active participation in the sex-trafficking venture. As another district court recently explained, the factor that "appears to differentiate plaintiffs who adequately state [TVPA] beneficiary claims from those who do not is that the successful plaintiffs 'connect the dots' between the plaintiff's traffickers and the specific defendant in the case." *J.C. v. I Shri Khodiyar, LLC*, 2022 WL 4482736, at *5 (N.D. Ga. Aug. 29, 2022). "One way to connect the dots is to allege a 'continuous business relationship' between a defendant hotel and a sex trafficker where the defendant rented rooms to people it knew or should have known were engaged in sex trafficking." *Id.*; *see also Ricchio v. McLean*, 853 F.3d 553, 555 (1st Cir. 2017); *S.Y. v. Best Western Int'l, Inc.*, 2021 WL 2315073, at *4 (M.D. Fla. June 7, 2021); *H.H. v. G6 Hosp., LLC*, 2019 WL 6682152, at *5 (S.D. Ohio Dec. 6, 2019); *M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959, 971 (S.D. Ohio 2019). Here, just like hotel owners who provided hotel rooms for trafficking, Deutsche Bank continuously and knowingly provided cash and other direct financial support for Epstein and his co-conspirators to propel the venture forward. *See A.B.*, 455 F. Supp. 3d at 191 (denying motion to dismiss beneficiary liability claim against hotel that "financially benefits from its ongoing reputation for privacy, discretion, and the facilitation of commercial sex"); *M.A. v. Wyndham Hotels & Resorts, Inc*., 425 F. Supp. 3d 959, 970 (S.D. Ohio 2019) (denying motion to dismiss beneficiary liability claim against hotel because "M.A. alleges that the hotels repeatedly rented rooms" and "that the trafficker and the hotels have established a pattern of conduct or could be said to have a tacit agreement").

*Canosa*, 2019 WL 498865, a case involving a TVPA claim against Harvey Weinstein-controlled companies, is instructive. The complaint in that case alleged "specific means

and methods used by multiple company employees to facilitate Weinstein's sexual assault and to cover them up afterwards . . . with the predictable effect of enabling future assaults by Weinstein." *Id*. at *24. Here, the same is true: Deutsche Bank provided the cash that paid for and facilitated Epstein's sex trafficking, including the trafficking of Doe (*see, e.g.*, FAC ¶¶ 217, 218), facilitated his payments to victims and recruiters (*id.* ¶¶ 212, 280–81), and helped him hide the trafficking from authorities despite many red flags (*id.* ¶¶ 172, 272–73, 274–76). Deutsche Bank attempts to distinguish *Canosa* by arguing that, in that case, the companies took "concrete steps" to aid Weinstein. But, once again, Deutsche Bank fails to give a fair reading to the FAC, which repeatedly alleges such "concrete steps," such as providing hundreds of thousands of dollars in cash, which made the sex-trafficking venture possible. *See, e.g.*, FAC ¶¶ 154–287, 318, 324–25. Deutsche Bank's attempt to distinguish *Canosa* lays bare the core factual dispute in this case. Deutsche Bank asserts that the FAC's allegations do not describe "active engagement" in a sex-trafficking venture because "the Bank was providing routine banking services to a high-net-worth client, nothing more." MTD at 15. But a normal high-net-worth client would not, for example, open the more than 40 accounts that Deutsche Bank admits Epstein did while banking with Defendant, and to say that Deutsche Bank's services were "routine" begs the question of why it consciously ignored multiple red flags that, if caught, would have prevented Epstein's operation from continuing until 2019. The FAC's allegations adequately plead "the pattern of facilitation and cover-up" that the *Canosa* court found sufficient to sustain a claim of participation. *Canosa*, 2019 WL 498865, at *24.

*Noble v. Weinstein*, another Harvey Weinstein-related case Deutsche Bank cites, is readily distinguishable. 335 F. Supp. 3d 504 (S.D.N.Y. 2018). That case—which dealt with claims against Robert Weinstein in connection with his brother's conduct—involved *only* allegations that the defendant facilitated the perpetrator's travel without linking that travel to the plaintiff's trafficking.

*Id.* at 524. Here, as alleged and already explained, Deutsche Bank provided financial assistance that directly enabled ongoing sex-trafficking by Epstein, including the trafficking of Doe (*see, e.g.*, FAC ¶¶ 155, 158, 169), and helped him cover it up until his arrest in 2019.

Deutsche Bank tries to analogize this case to *G.G. v. Salesforce.com, Inc.*, but fails. 603 F. Supp. 3d 626 (N.D. Ill. 2022). The court there explained that the plaintiff had *only* alleged that Salesforce provided its standard software to sex-trafficking website Backpage, without alleging that Salesforce took "part in the construction of the business itself." *Id.* at 648. Here, the FAC explains repeatedly why Deutsche Bank's actions were far from routine banking services. For example, Doe has alleged that "[i]t was far from routine for Deutsche Bank to provide $200,000 per year in cash to someone like Epstein, who did not have an apparent need for such extravagant sums. Moreover, the circumstances in which Epstein was requesting such large amounts were far from routine and raised numerous 'red flags'—taking it well outside routine circumstances." FAC ¶ 320. The FAC also alleges that, after providing cash to the venture, Deutsche Bank concealed what it had done by failing to file required reports with the government and refusing to enforce oversight requirements over Epstein that it was pretending were in place. *Id.* ¶¶ 324–25.[5]

   2. Deutsche Bank Benefited from its Participation in the Sex-Trafficking Venture.

Deutsche Bank does not dispute that it financially benefited from Epstein's business, but argues that Doe failed to allege any "causal relationship" between Deutsche Bank's participation in sex trafficking and the benefit it received.[6] MTD at 16. Not so. The FAC alleges in detail the

---

[5] Notably, *Salesforce* distinguished cases where there was "'a showing of a continuous business relationship between the trafficker and the [defendant]," including the line of cases cited *supra* at 12. 603 F. Supp. 3d at 644.

[6] Some courts have held that no such "causal relationship" between the benefit and participation and sex trafficking is required. *See HH v. G6 Hospitality, Inc*., 2019 WL 6682152, at *2 (S.D. Ohio Dec. 6, 2019). The Second Circuit has not decided this issue, but in any event, such a causal relationship is clearly alleged in the FAC.

quid pro quo between Epstein and Deutsche Bank, and the benefits Deutsche Bank received in direct exchange for its facilitation of and participation in the venture. *See, e.g.*, FAC ¶¶ 143, 144, 148–50, 152, 340. As explained in the FAC, Paul Morris, the relationship manager who brought Epstein to Deutsche Bank, "noted how lucrative becoming Epstein's banker could be, stating '[e]stimated flows of $100-300 [million] overtime [*sic*] (possibly more) w/ revenue of $2-4 million annually over time.'" *Id*. ¶ 205. Morris also proposed "that all Epstein-related accounts be for 'entities' affiliated with Epstein, 'not personal accounts,'" to help conceal Deutsche Bank's participation in Epstein's sex-trafficking venture and the existence of the venture. *Id.*; *see also id.* ¶ 243 (member of ARRC was comfortable with continuing Epstein relationship because of "number of sizable deals" it was obtaining). These allegations do not reflect Deutsche Bank merely evaluating "potential revenue estimates," as Deutsche Bank suggests (MTD at 16), but raise the plausible inference that Deutsche Bank knowingly participated in the venture in exchange for this substantial revenue. *See Canosa*, 2019 WL 498865, at *24 (allegation that by "facilitating and covering up Weinstein's sexual assaults, TWC made Weinstein more likely to continue to work for TWC" adequately pleaded knowingly benefiting from trafficking).

   3. <u>Deutsche Bank Both Knew and Should Have Known About Epstein's Sex-Trafficking Venture.</u>

  Deutsche Bank next contends that the FAC alleges only that it had some sort of "abstract awareness of sex trafficking in general"—not awareness of Epstein's sex-trafficking venture in particular. MTD at 16. This argument fails for several reasons.

   a. Knowledge that Doe Was a Sex-Trafficking Victim

  Deutsche Bank first claims that the TVPA somehow requires that it specifically knew that Doe was one of Epstein's specific victims. MTD at 16–19. But nothing in the TVPA's language requires that a defendant have specific knowledge of the identity of the plaintiff. Under the plain

text of the statute, the victim need only allege "that (1) the person or entity . . . knowingly benefit[ted], financially or by receiving anything of value, (2) from participating in a venture, [and] (3) that the person knew or should have known [he] has engaged in an act in violation of this chapter." *S.J.*, 473 F. Supp. 3d at 152–53 (internal quotation marks omitted). *Nothing* in the language of the TVPA requires specific knowledge of a particular victim, and Deutsche Bank cites no controlling precedent imposing such a pleading requirement.

As Deutsche Bank recognizes (MTD at 17 n.15), a district court within this Circuit has effectively rejected the argument that a TVPA defendant must have specific knowledge of the identity of a specific trafficking victim. In *Choice Hotels*, the court considered the argument that the defendant must have had knowledge of "some participation in the sex trafficking act itself." 473 F. Supp. 3d at 153. This requirement was adopted in *Noble*, which relied on an unpublished Sixth Circuit decision in a criminal case, *United States v. Afyare*, 632 F. App'x 272, 285 (6th Cir. 2016). But as the *Choice Hotels* court explained, *Afyare* was analyzing a criminal provision of the TVPA, and "thus several courts have rejected this further element as inapplicable to a distinct" civil provision, § 1595. *Choice Hotels*, 473 F. Supp. 3d at 153; *A.B.*, 455 F. Supp. 3d at 188–89.

The *Choice Hotels* court held that not requiring specific knowledge of a sex-trafficking act in civil cases was "correct, not only because of the inherent differences between civil and criminal liability, but because Congress intended to broaden the behavior that can form the basis of civil liability when it amended the [TVPA] in 2008." 473 F. Supp. 3d at 153. Congress did so by including the "knew or *should have known*" language in § 1595, the civil provision, while the TVPA's criminal provision does not contain the "should have known" language and thus requires actual knowledge. 18 U.S.C. § 1591 (emphasis added). "In effect, the broader understanding of § 1591 means that a person may be held liable if he *should have known* that he was facilitating a

sex trafficking venture, even if his participation [was] not direct participation in the sex trafficking." *Choice Hotels*, 473 F. Supp. 3d at 153. (emphasis added). Here, the FAC alleges that Deutsche Bank was knowingly providing cash and other financial support to "people it knew or should have known were engaged in sex trafficking"—that is, Jeffrey Epstein and his co-conspirators. *See* FAC ¶ 211–19.

Even if knowledge that the particular plaintiff was trafficked is required under the statute (it is not), the "knew or should have known" language in § 1595's civil liability provision establishes a negligence/constructive knowledge standard rather than an actual knowledge standard. *See M.A.*, 425 F. Supp. 3d at 966. Under this standard, a defendant "need not have actual knowledge of the sex trafficking in order to have participated in the sex-trafficking venture for civil liability under the [TVPA], otherwise the 'should have known' language in § 1591(a) would be meaningless." *Id.* at 971. Here, as the FAC explains, Deutsche Bank knew that specific individual women and girls were being coercively sex trafficked by Epstein and "[e]ven if Deutsche Bank did not know all the names of Epstein's victims, it knew that specific victims (*e.g.*, Doe) of a specific trafficker (Epstein) at a specific time period (various dates between 2013–19) existed and were being forced to engage in commercial sex acts." FAC ¶ 331. If Deutsche Bank wanted to know the identities of those victims, it could have obtained (or at least attempted to obtain) that information, especially given that Doe alleges that certain of its employees attended meetings at Epstein's home when victims were present. *Id.* ¶ 236. And, of course, Doe herself was forced to open a bank account *with Deutsche Bank*, all while Deutsche Bank was ignoring red flags and public reports of Epstein's sex-trafficking venture and helping to conceal it from authorities. *Id.* ¶ 169. At the very least, Doe has alleged that Deutsche Bank should have known that she was a victim of Epstein's long running, widespread, trafficking venture.

17

b.   Knowledge of a Specific Sex-Trafficking Venture

Deutsche Bank next argues that Doe merely alleges awareness of a "general sex trafficking problem" as opposed to a "particular sex-trafficking venture." MTD at 19–24. This argument is meritless. Before his onboarding at Deutsche Bank, Epstein was *convicted* of soliciting a minor for prostitution and received immunity for sex-trafficking charges. FAC ¶ 42–43, 279. Deutsche Bank waves away this extensive public knowledge about Epstein's conduct (from before its onboarding of Epstein) because the charge was a "non-trafficking charge." MTD at 20. But the requirement that Deutsche Bank knew or should have known about a sex-trafficking venture does not require a sex-trafficking conviction. Further, Epstein's immunity deal was made public in 2008, and received widespread attention detailing the sex-trafficking charges that Epstein *could have* been charged with and the trafficking conduct underlying the investigation. FAC ¶¶ 191–193.

The FAC specifically alleges that Deutsche Bank knew about Epstein's specific sex-trafficking venture, not that sex trafficking generally existed in the world, beginning at the latest in 2013, when it began opening accounts for him. *Id.* ¶ 210. For years before, Epstein had been running the venture with JP Morgan, where Paul Morris "had been a member of the team servicing Epstein's account" and was aware of the venture. *Id.* ¶ 201. In November 2012, Morris joined Deutsche Bank, "bringing with him the knowledge he had acquired at JP Morgan about Epstein's sex-trafficking venture and conspiracy"—beyond the knowledge that Deutsche Bank *already had* at this time due to Epstein's widely publicized conviction and conduct. *Id.* ¶ 202. The FAC also specifically discusses the onboarding memorandum that Morris sent to higher-ups at Deutsche Bank about bringing Epstein over—a memorandum reviewing Epstein's history of sex trafficking. *Id.* ¶¶ 203–08. Despite this, Deutsche Bank never undertook a formal Know Your Customer ("KYC") investigation for Epstein "because it knew what the investigation would reveal,

18

and that it would not be able to serve Epstein after such an investigation based on his well-documented and publicized history of sex trafficking." *Id.* ¶¶ 208, 209.

Deutsche Bank's knowledge of Epstein's sex-trafficking venture only continued to expand after his onboarding. *Id.* ¶¶ 211–87. Beginning around November 2013, Epstein began using Deutsche Bank to send sizable wire transfers to his sex-trafficking co-conspirators, whose names had been made public years earlier. *Id.* ¶¶ 212–16. Further, in 2014 and into 2015, an internal department alerted Deutsche Bank management about "Epstein's sex trafficking," but management chose to ignore it. *Id.* ¶ 231. On January 22, 2015, Deutsche Bank's senior management actually "met privately and in person with Epstein at his New York home," "Packard asked Epstein about his involvement in sex trafficking," and observed victims present in the home. *Id.* ¶¶ 235, 236.[7] And "other Deutsche Bank employees also met with Epstein personally outside the bank and made observations consistent with Epstein's daily sex trafficking activities, which included being surrounded by certain of his victims." *Id.* ¶ 238.

Further demonstrating knowledge, around January 2015, Deutsche Bank's ARRC placed three conditions on the relationship that "were necessary (although not sufficient) to prevent Epstein from using Deutsche Bank accounts in furtherance of sex abuse and coercive sex

---

[7]     Deutsche Bank's meeting with the trafficker (Epstein) at the place of the trafficking (his mansion) in the presence of his victims distinguishes this case from those Deutsche Bank cites finding that general knowledge that sex-trafficking is a problem is insufficient. *See, e.g.*, *Lundstrom v. Choice Hotels Int'l, Inc.*, 2021 WL 5579117, at *8–9 (D. Colo. Nov. 30, 2021) (allegations that a defendant hotel franchisor was "on notice about the prevalence of sex trafficking generally at its hotels and in the hotel industry" was "not sufficient to show that the defendant should have known about what happened to [the] plaintiff" and thus could not sustain § 1595 claim); *E.S. v. Best W. Int'l, Inc.*, 510 F. Supp. 3d 420, 428 (N.D. Tex. 2021) (complaint lacked any allegations as to how defendants hotel franchisor and parent company knew or should have known about trafficking); *B.M. v. Wyndham Hotels & Resorts, Inc.*, 2020 WL 4368214, at *5–6 (N.D. Cal. July 30, 2020) (same); *Lawson v. Rubin*, 2018 WL 2012869, at *13 (E.D.N.Y. Apr. 29, 2018) ("Plaintiffs did not claim that [defendant] had actual notice of the alleged activity, only that it should have known about alleged trafficking based on its duty to monitor the premises.").

trafficking." *Id.* ¶ 245. Deutsche Bank also knew about Epstein's suspicious cash transactions. *Id.* ¶¶ 258–68. Between 2013 through 2017, a close associate of Epstein made a total of 97 cash withdrawals amounting to hundreds of thousands of dollars from Deutsche Bank's Park Avenue Branch from Epstein's personal accounts. *Id.* ¶ 258. These withdrawals appeared to have been structured (in amounts of $7,500) to avoid triggering the filing Currency Transaction Reports with the U.S. Treasury Department. *Id.* ¶¶ 258–59. Indeed, Epstein's associate discussed with Deutsche Bank employees how to avoid "creating some sort of alert." *Id.* ¶ 260.

If that were not enough, a confidential witness reported that "Deutsche Bank had a KYC 'special deal' for Epstein and other high-net-worth individuals" who "were not required to submit to the normally required KYC documentation." *Id.* ¶ 266. Deutsche Bank gave Epstein this "special deal" because "applying standard KYC regulations would have more fully exposed Epstein's sex-trafficking venture." *Id.*; *see also id.* ¶ 268. All these allegations go far beyond merely failing "to take appropriate steps to detect and prevent sex trafficking" or a generalized knowledge about sex trafficking as an issue in the world, as Deutsche Bank describes them. MTD at 21. Indeed, as the FAC accurately summarizes, "Deutsche Bank did not simply fail to adequately detect signs of Epstein's sex trafficking; it *did* detect multiple signs of Epstein's sex-trafficking venture and continue to participate in the venture." FAC ¶ 327 (emphasis in original).

In sum, Doe has properly pled that Deutsche Bank had both actual and constructive knowledge that Epstein was engaged in a particular and ongoing coercive sex-trafficking venture that harmed her. The Court should deny Deutsche Bank's motion to dismiss Count I.

### B.  The FAC States a Claim for TVPA Perpetrator Liability (Count II).

Doe has also stated a claim against Deutsche Bank as a direct perpetrator of sex trafficking under 18 U.S.C. § 1591(a)(1), because it knowingly perpetrated, assisted, supported, and facilitated a sex-trafficking venture with Epstein. Deutsche Bank cursorily asserts that the Court should

20

dismiss Count II for the same reasons as Count I. MTD at 24–25. But Deutsche Bank ignores the FAC's allegations that, for example, the cash that Deutsche Bank provided Epstein was part of the "recruitment" of Doe and other victims. FAC ¶¶ 52, 55, 58, 67, 77, 108, 215, 217, 218, 226, 263, 264, 268. The Court should deny Deutsche Bank's motion to dismiss Count II.

### C. The FAC States TVPA Claims for Aiding and Abetting, Conspiracy, Attempt, and Obstruction (Counts III–VI)

With respect to the next four counts in Doe's complaint, Deutsche Bank maintains that the FAC fails to state an actionable civil claim under TVPA's "civil remedy" provision, 18 U.S.C. § 1595(a). The civil remedy provision provides a remedy for any violation of "this chapter." 18 U.S.C. § 1595(a). Deutsche Bank reads this broad language as permitting civil actions for only certain limited violations of "this chapter"—specifically, only for § 1591(a). *See* MTD at 25–27. If Congress wanted to limit the TVPA's civil remedy to a few select subsections of "this chapter" (*i.e.*, Chapter 77, 18 U.S.C. §§ 1581–97), it could have said so. *See, e.g.*, *In re Barnet*, 737 F.3d 238, 246 (2d Cir. 2013) ("[S]tatutory interpretation requires us to presume that the legislature says in a statute what it means and means in a statute what it says there.") (cleaned up). It did not.

#### 1. Count III Properly Alleges Aiding and Abetting Liability.

Regarding Count III (aiding and abetting), Deutsche Bank argues that Section 1595 does not provide for aiding and abetting liability. MTD at 26 (citing *Noble*, 335 F. Supp. 3d at 525). In turn, *Noble* cites as authority *Central Bank of Denver*, which held that there is no civil liability for aiding and abetting a violation of Section 10(b) of the 1934 Securities Act. *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 186–92 (1994). But *Central Bank of Denver* concerned an "implied cause of action." *See id.* at 191. Here, in clear contrast, Congress has explicitly provided a statutory civil cause of action for "a victim of a violation of *this chapter* . . . against the perpetrator . . . ." 18 U.S.C. § 1595(a). And, under 18 U.S.C. § 2, anyone who aids

and abets a violation of the chapter is "punishable as a principal," making that person a perpetrator of a violation of the chapter. *Noble* did not consider this argument—and, accordingly, it reached the wrong conclusion. And for all of the reasons explained above, *see supra* at 11–14, the FAC alleges that Deutsche Bank knowingly assisted Epstein's sex-trafficking venture.

2.   <u>Count IV Properly Alleges Conspiracy Liability.</u>

Under Section 1594(c), Doe has adequately pled that Deutsche Bank conspired with Epstein to violate Section 1591(a)(2) by conspiring to knowingly benefit financially from sex trafficking—a conspiracy prohibited by 18 U.S.C. § 1594(c) ("Whoever conspires with another to violate section 1591" is guilty of an offense). Here, as explained above, Epstein was engaged in a criminal, sex-trafficking venture (which Deutsche Bank does not dispute), and Deutsche Bank knowingly provided Epstein with the means to effectuate and continue that criminal venture with the accounts, cash, and other tools it provided him, all while knowing about the venture and the ways in which Deutsche Bank could profit from it. *See supra* at 11–20. Such is sufficient to state a claim for TVPA conspiracy. *See Fleites v. MindGeek S.A.R.L.*, 2022 WL 4456077, at *10 (C.D. Cal. July 29, 2022) (plaintiff adequately alleged TVPA conspiracy claim based on "Visa's alleged knowing decision to provide the means through which MindGeek could monetize child porn videos, like those featuring Plaintiff").

Deutsche Bank argues that there is no cause of action for conspiracy under the TVPA. But conspiracy in violation of Section 1594(c) falls within the ambit of the civil liability provision of § 1595 because it is within "*this chapter*" (*e.g.*, Chapter 77 of Title 18, §§ 1581–97). Deutsche Bank asserts that "the version of Section 1595 that governs the relevant conduct in this action— all of which occurred prior to 2023—does not create causes of action against alleged beneficiaries for attempt or conspiracy." MTD at 25. But recent legislation affirms that liability for attempt or conspiracy was *always* part of the statute. A few weeks ago, Congress passed the *Abolish*

22

*Trafficking Reauthorization Act of 2022*, P.L. 117-347, 136 Stat. 6199 (Jan. 5, 2023), which added a "technical and clarifying update to [the] civil remedy" provision in Section 1595, adding explicit liability for a person who "attempts or conspires to benefit" from a TVPA violation. *Id.* § 102 (emphasis added). Because Congress viewed this amendment as a "clarifying" amendment, it applies to this case even though it was passed after this lawsuit was filed. *Norsoph v. Riverside Resort & Casino, Inc.*, 2020 WL 641223, at *9 (D. Nev. Feb. 11, 2020) ("Clarifying legislation is not subject to any presumption against retroactivity and is applied to all cases pending as of the date of its enactment.") (cleaned up); *see also Brown v. Thompson*, 374 F.3d 253, 259 (4th Cir. 2004); *Johnson v. U.S. Dep't of Hous. & Urb. Dev.*, 911 F.2d 1302, 1308 (8th Cir. 1990).

Deutsche Bank also argues that the FAC "fails to allege that Deutsche Bank conspired to commit violations of the TVPA." MTD at 26. But Count IV alleges precisely such a conspiracy in detail. *See* FAC ¶¶ 392–423. For example, the FAC specifically alleges that "[t]he Epstein sex-trafficking conspirators had a shared and common purpose"—securing young women and girls for Epstein to sexually abuse and to commercially sex traffic (*id.* ¶ 398). The FAC also alleges that Deutsche Bank: agreed to facilitate the venture by, for example, conspiring to keep the cash disbursals secret (*id.* ¶ 401); opening 40 accounts for Epstein (*id.* ¶ 407); concealing its delivery of hundreds of thousands of dollars in cash to Epstein (*id.* ¶ 408); purposely failing to file required suspicious activity reports (*id.* ¶¶ 408, 410); and doing so while knowing about the sex-trafficking venture (*id.* ¶ 342–45). *See MindGeek*, 2022 WL 4456077, at *10 ("Visa's agreement to financially benefit from child porn can be inferred from its decision to continue to recognize MindGeek as a merchant despite allegedly knowing that MindGeek monetized . . . child porn.").

Deutsche Bank repeats its claim that it needed to have "actual knowledge" of the sex-trafficking venture to be liable for conspiracy. MTD at 26. But Doe has alleged actual

knowledge of the venture. *See supra* at 15–20. Even if she had not, Deutsche Bank overstates the knowledge requirements for a conspiracy claim—it is well-settled that a person, by virtue of being a party to a conspiracy, may be held responsible for the actions of his "partner[s] in crime." *Pinkerton v. United States*, 328 U.S. 640, 647 (1946); *see also United States v. Gershman*, 31 F.4th 80, 99 (2d Cir. 2022) (discussing "*Pinkerton* liability" under which a defendant may be held responsible for crime he did not personally commit); *Paguirigan v. Prompt Nursing Emp. Agency LLC*, 286 F. Supp. 3d 430, 440 (E.D.N.Y. 2017) (conspiracy can be inferred if the co-conspirators "entered into a joint enterprise with consciousness of its general nature and extent"). Under this established principle, once Deutsche Bank agreed with Epstein to further his sex-trafficking venture in violation of the TVPA, it became liable for Epstein's actions in furtherance of the conspiracy. And, of course, Epstein coercively trafficked Doe and knew that he was trafficking Doe. Deutsche Bank is thus properly subject to a civil claim for TVPA conspiracy. *See, e.g.*, *Ricchio v. McLean*, 853 F.3d 553, 555–58 (1st Cir. 2017).

### 3. Count V Properly Alleges Attempt Liability.

Deutsche Bank rehashes similar, unpersuasive arguments in asking the Court to dismiss Count V, which alleges attempt liability. As explained above, any doubt about the propriety of a TVPA attempt claim was eliminated several weeks ago in Congress's "*technical and clarifying*" amendment to Section 1595, adding explicit civil liability for a person who "*attempts*" to benefit from a TVPA violation. *See supra* at 22–23.[8] The FAC also properly alleges the elements of attempt liability, alleging both that (1) Deutsche Bank intended to knowingly benefit from the sex-trafficking venture and (2) Deutsche Bank's conduct amounted to a substantial step towards the

---

[8]     The out-of-circuit case Deutsche Bank cites, *Ratha v. Phatthana Seafood Co.*, was decided before Congress passed the January 5, 2023, clarifying amendment to the TVPA. 35 F.4th 1159, 1176 (9th Cir. 2022), *cert. denied*, 2022 WL 17408202 (U.S. Dec. 5, 2022).

TVPA offense. MTD at 27. The FAC makes clear Deutsche Bank's direct quid pro quo between Epstein and the bank, demonstrating that it intended to benefit from the sex-trafficking through the millions of dollars it received in exchange for facilitating the trafficking. FAC ¶¶ 143, 144, 148–50, 152, 205, 214, 340. The FAC also alleges countless "substantial steps" that Deutsche Bank took to facilitate the trafficking with the intent of financially benefiting, including, for example, providing the venture "$200,000 per year in cash" (*id.* ¶ 321), willfully failing to file suspicious activity reports "because doing so would imperil its ability to profit from the sex-trafficking venture" (*id.* ¶ 324), and structuring cash withdrawals to avoid detection (*id.* ¶ 337).

#### 4.   Count VI Properly Alleges Obstruction Liability.

Deutsche Bank next argues that the Court should dismiss Count VI, which alleges obstruction of TVPA enforcement. Deutsche Bank claims that the only "victim" of obstruction is the government. MTD at 27. But sex-trafficking victims can also be directly and proximately harmed, which is exactly what Doe alleges here. FAC ¶ 459. Federal courts have recognized government process crimes can harm not only the government, but also individuals. *See, e.g.*, *United States v. The Boeing Co.*, 2022 WL 13829875, at *7–9 (S.D. Tex. Oct. 21, 2022) (those killed in Boeing crashes were "victims" under Crime Victims' Rights Act of Boeing's conspiracy to defraud FAA because conspiracy "directly and proximately" caused crashes); *see also United States v. Hoover*, 175 F.3d 564, 566–69 (7th Cir. 1999) (university was "victim" of false statement offense because it provided loans based on misrepresentations); *United States v. Haggard*, 41 F.3d 1320, 1325 (9th Cir. 1994) (mother of kidnapping victim, in a prosecution for making false statements to the FBI, was herself a victim of defendant's crimes for restitution purposes).

Citing cases with different facts, Deutsche Bank also contends that an obstruction count is not proper unless Deutsche Bank knew about a government investigation. MTD at 27. But here, the FAC specifically alleges Deutsche Bank was aware it was obstructing several criminal

investigations being pursued in both the Southern District of Florida and in this District that could have resulted in the trafficking ending sooner. FAC ¶¶ 42–46, 60–63, 188–99, 212–13, 445–48. In addition, unlike cases not involving banks, Deutsche Bank was required to file suspicious activity reports with the federal government. The FAC explains how Deutsche Bank's willful failure to file those reports obstructed TVPA enforcement and harmed Doe. *Id.* ¶¶ 448–54.

### D.  The FAC States RICO and RICO Conspiracy Claims (Counts VII–VIII).

Doe has pled a RICO claim, under 18 U.S.C. § 1962(c) (Count VII), and a RICO conspiracy claim, under 18 U.S.C. § 1962(d) (Count VIII), both actionable under 18 U.S.C. § 1964(c). FAC ¶¶ 465–531. Deutsche Bank advances three reasons for dismissal. None are persuasive.

#### 1.  The FAC Alleges Predicate Offenses.

Deutsche Bank contends the FAC fails to properly allege "predicate offenses." MTD at 28. But this merely reprises its earlier, unpersuasive arguments as to TVPA liability. Because the Court should allow Doe's TVPA claims under Section 1591 to proceed, it should likewise allow her RICO claims to proceed.[9] The FAC also alleges criminal violations of the Currency and Foreign Transactions Report Act (commonly referred to as the Bank Secrecy Act) which are predicate offenses under 18 U.S.C § 1961(1)(E). Deutsche Bank's only argument is that its violations needed to be "willful" to be criminal. MTD at 28. But the FAC alleges that Deutsche Bank acted intentionally or willfully when failing to file required reports with the federal government, which is in fact criminal. FAC ¶¶ 274–76, 324, 365, 482–95.

---

[9]      Moreover, certain TVPA criminal violations (such as obstructing TVPA enforcement, in violation of 18 U.S.C. § 1591(d)) can serve as predicate offenses even if they are not civilly actionable under the TVPA itself. *See* 18 U.S.C. § 1964(c) (providing civil cause of action for violation of § 1962(c), which in turn covers a "pattern of racketeering activity," which in turn is defined in § 1961(1) as any "act indictable" under, among others, 18 U.S.C. §§ 1581–92).

2.   The FAC Alleges Participation in the Conduct of the Enterprise.

18 U.S.C. § 1962(c) requires that Deutsche Bank "participate[d], directly or indirectly, in the conduct of the [criminal enterprise's] affairs." "To show a defendant's 'participation' in the racketeering activity, a plaintiff need only demonstrate that defendant played some part in the operation of the enterprise, even if not the predominant one." *Allstate Ins. Co. v. Afanasyev,* 2016 WL 1156769, at *8 (E.D.N.Y. Feb. 11, 2016), *report and recommendation adopted*, 2016 WL 1189284 (E.D.N.Y. Mar. 22, 2016). At the "pleading stage, the participation element is a relatively low hurdle for plaintiffs to clear." *Id.* (cleaned up). "The word 'participate' makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs, just as the phrase 'directly or indirectly' makes clear that RICO liability is not limited to those with a formal position in the enterprise." *JSC Foreign Econ. Ass'n Technostroyexport v. Weiss*, 2007 WL 1159637, at *8 (S.D.N.Y. Apr. 18, 2007) (cleaned up).

Deutsche Bank appears to concede that the FAC contains the requisite participation allegations. FAC ¶¶ 154–77, 234–36, 470–95 (RICO); *id.* ¶¶ 517–31 (RICO conspiracy). But it briefly complains that the FAC lacks the required factual support. MTD at 28–29. The FAC, however, alleges (among other things) a long-running (seven-year) criminal enterprise, in which Deutsche Bank was a central figure. *Compare Dubai Islamic Bank v. Citibank, N.A.*, 256 F. Supp. 2d 158, 165 (S.D.N.Y. 2003) (dismissing RICO claim against Citibank for lack of "central figure" allegations), *with* FAC ¶¶ 154–77, 470–89 (alleging that Deutsche Bank joined Epstein's sex-trafficking enterprise as part of its "high risk, high reward" strategy and was planning to earn millions of dollars annually). Moreover, unlike other banking cases with more remote connections between the financial institution and the criminals, this case features a nefarious secret "due diligence" meeting directly between Epstein and Deutsche Bank officials—a meeting at Epstein's mansion where sex-trafficking victims were visible (*id.* ¶ 326) and where bank officials

27

deliberately failed to maintain records of what occurred (*id.* ¶¶ 240–41). The FAC also alleges that Deutsche Bank made concerted efforts to cover up Epstein's enterprise. (*Id.* ¶¶ 490–95).

Deutsche Bank relies on *Picard v. Kohn*, a readily distinguishable case involving "paltry, and otherwise unexceptional, factual allegations" of participating in the affairs of Bernie Madoff's fraud. 907 F. Supp. 2d 392, 400–01 (S.D.N.Y. 2012) (dismissing RICO counts because, for example, plaintiff relied on vague references to investigations that did not mention "what conduct prompted the investigation, nor what crimes foreign authorities alleged, nor even that the investigation related, in any way, to UniCredit's evasion of claims by Madoff Securities' customers"). Here, in contrast, the FAC is replete with factual allegations of Deutsche Bank's participation in the financial affairs of the criminal enterprise by taking affirmative steps to conceal (through "structuring" and otherwise) the distribution of hundreds of thousands of dollars in cash to Epstein over many years. *See, e.g.*, FAC ¶¶ 78, 221, 260–63, 491–495.

### 3.   The FAC Alleges RICO Injury.

Doe has properly pled RICO injury to business and property. FAC ¶¶ 500–11. Indeed, the FAC contains specific allegations about how the Epstein criminal enterprise used the economic dependency of its victims to coerce Doe and other victims into commercial sex acts. *Id.* ¶¶ 503–04 (Epstein prevented Doe "from obtaining employment and income outside" the venture, "render[ing] its victims economically vulnerable to any effort to escape"); *see Canosa*, 2019 WL 498865, at *26 (suggesting detriment to career sufficient to allege RICO injury); *Nat'l Asbestos Workers Med. Fund v. Philip Morris, Inc.*, 74 F. Supp. 2d 213, 219 (E.D.N.Y. 1999) ("allowing RICO claims for economic damages associated with personal injuries represents a defensible policy and interpretation of RICO"). And the FAC specifically alleges that the Epstein enterprise created alleged "debts" to coerce sex. FAC ¶ 506. Deutsche Bank does not directly engage these factual allegations regarding injury but complains that the losses are "unquantifiable." MTD at 29.

Doe has not yet had the opportunity to quantify her losses through appropriate expert and other testimony, which will be developed during discovery. In any event, a RICO injury need not be quantifiable, *see Potomac Elec. Power Co. v. Elec. Motor and Supply, Inc.*, 262 F.3d 260, 265 (4th Cir. 2001), and "certainty as to the amount of damages is not required at the pleading stage," *see Alix v. McKinsey & Co.*, 23 F.4th 196, 207 (2d Cir. 2022).

### 4. The FAC Alleges RICO Causation.

Deutsche Bank concedes that Doe properly alleges a direct connection between its conduct and her injuries but complains that the allegations are "conclusory." MTD at 30. The FAC traces through at length, however, how Deutsche Bank's cash was directly used by Epstein as a means of coercing sex. *See, e.g.*, FAC ¶¶ 77–78, 484–85. The Court must "draw all reasonable inferences in [Doe's] favor" and "causation need only be probable." *Alix*, 23 F.4th at 205–06.

Doe has alleged that Deutsche Bank deliberately funded a sex-trafficking venture and only needs to show she "suffered the sort of injury which would be the expected consequence of the defendant's wrongful conduct." *BCS Servs., Inc. v. Heartwood 88, LLC*, 637 F.3d 750, 758 (7th Cir. 2011). Doe's injuries were squarely foreseeable consequences of Deutsche Bank's decision to fund a sex-trafficking venture. Deutsche Bank contends that there were "numerous intervening factors" that led to Doe's injuries. MTD at 31. But "[t]he plaintiff doesn't have to prove a series negatives; [she] doesn't have to offer evidence which positively exclude[s] every other possible cause of the [injury]." *BCS*, 637 F.3d at 757 (internal quotation marks omitted).

### 5. The FAC Alleges RICO Conspiracy.

In addition to properly pleading a RICO claim (Count VII), Doe has also properly pled a RICO conspiracy claim (Count VIII). In its two-sentence response, Deutsche Bank does not contend that Doe's conspiracy claim is defective, but rather that it must be dismissed "because [she] has failed to plead a RICO claim." MTD at 31. A defendant may be liable for a conspiracy,

however, even if it did not commit the substantive acts that could constitute violations of RICO. *See United States v. Alonso*, 740 F.2d 862, 871–72 (11th Cir. 1984) (commission of substantive offense unnecessary for RICO conspiracy conviction); *Roche Diagnostics Corp. v. Priority Healthcare Corp.*, 407 F. Supp. 3d 1216, 1243 (N.D. Ala. 2019) (applying *Alonso*'s principles to civil RICO case). It is undeniable that Epstein committed multiple RICO violations. The only remaining question for the conspiracy count is therefore whether the FAC properly alleges that Deutsche Bank agreed to support him in his violations. Under RICO, if the "conspirators have a plan which calls for some conspirators to perpetrate the crime and others to provide support, the supporters are as guilty as the perpetrators." *Salinas v. United States*, 522 U.S. 52, 63 (1997). The FAC clearly alleges that Deutsche Bank was a deliberate "supporter" of Epstein's RICO violations, and thus it is liable itself for RICO conspiracy entirely apart from the allegations in the substantive RICO count. *Cf. M.A.*, 425 F. Supp. 3d at 970 (participation in sex-trafficking venture for purposes of a beneficiary liability claim can be alleged through "tacit agreement" to facilitate trafficking). Accordingly, Doe has sufficiently alleged Deutsche Bank's participation in the sex-trafficking venture.

## III.     DOE HAS PROPERLY PLED HER TORT CLAIMS (COUNTS IX-XII).

### A.  The FAC States a Claim for Aiding and Abetting Battery (Count IX).

The FAC properly alleges, under black letter New York tort law, that Deutsche Bank aided and abetted Epstein's batteries against her. To allege a cause of action for aiding and abetting an assault and battery, the plaintiff must allege: "(1) a wrongful act producing an injury; (2) the defendant's awareness of a role as a part of an overall illegal or tortious activity at the time he provides the assistance; and (3) the defendant's knowing and substantial assistance in the principal violation." *Scollo ex rel. Scollo v. Nunez*, 847 N.Y.S.2d 899 (Sup. Ct. 2007), *aff'd*, 60 A.D.3d 840 (N.Y. App. Div. 2009). Doe has adequately alleged each element: (1) Doe was sexually abused by

Epstein for years, amounting to battery (FAC ¶¶ 128, 132–36); (2) Deutsche Bank was aware of its role in Epstein's overall illegal activity, his sex-trafficking venture (*see supra* at 15–20); and Deutsche Bank provided knowing and substantial assistance through its direct participation in and facilitation of Epstein's sex-trafficking venture, pursuant to which Doe was battered for years (*see supra* at 11–14). *See, e.g.*, *Maurizi v. Callaghan*, 2022 WL 1446500, at *14 (W.D.N.Y. Feb. 25, 2022), *report and recommendation adopted*, 2022 WL 1444182 (W.D.N.Y. May 5, 2022) (denying motion to dismiss aiding and abetting claims where complaint alleged defendant knew coach was engaging in sexual activity with skaters, yet endorsed him for a coaching position where abuse continued); *Kashef v. BNP Paribas S.A.*, 2021 WL 603290, at *9 (S.D.N.Y. Feb. 16, 2021) (denying motion to dismiss aiding and abetting claims against financial institution where plaintiffs alleged that institution contributed to Sudanese Regime's human rights abuses).

In its single-sentence response, Deutsche Bank argues that it could not have "intentionally or deliberately sought to cause an assault it did not know about." MTD at 31–32 (cleaned up). But there need not be a formal agreement to commit the battery; "act[ing] tortiously pursuant to a tacit agreement to assault or batter" the victim is enough to state a claim. *Scollo*, 60 A.D.3d at 840. And unlike in the sole case Deutsche Bank cites, where the plaintiff alleged merely that the defendant "harbored a dangerous person" or gave "tacit approval," *Shea v. Cornell Univ.*, 192 A.D.2d 857, 858 (N.Y. App. Div. 1993), the FAC includes extensive overt acts that Deutsche Bank took to further the sex-trafficking venture, as outlined above.

### B. The FAC States a Claim for Intentional Infliction of Emotional Distress (Count X).

The FAC states a claim for intentional infliction of emotional distress ("IIED"). "The elements of intentional infliction of emotional distress are (1) extreme and outrageous conduct; (2) the intent to cause, or the disregard of a substantial likelihood of causing, severe emotional distress;

31

(3) causation; and (4) severe emotional distress." *Eskridge v. Diocese of Brooklyn*, 210 A.D.3d 1056, 1057–58 (N.Y. App. Div. 2022). Deutsche Bank's conduct in facilitating and concealing Epstein's trafficking was extreme and outrageous, and caused Doe severe emotional distress.

Deutsche Bank first argues that Doe's IIED claim is "duplicative" of her other counts. MTD at 32. But a plaintiff "may plead claims that provide alternative bases for relief," and "a claim is alternative and not duplicative if a plaintiff may fail on one but still prevail on the other." *In re Skat Tax Refund Scheme Litig.*, 356 F. Supp. 3d 300, 325 (S.D.N.Y. 2019); *see also* Fed. R. Civ. P. 8(d)(2); *Giuffre*, 579 F. Supp. 3d at 452 (because "any risk of duplicative recovery may be resolved by jury instructions . . . battery and IIED claims routinely proceed in tandem under New York law"). Deutsche Bank also argues that Doe has not alleged the elements for an IIED claim, but the FAC outlines extensive extreme and outrageous conduct that caused Doe's emotional distress: its efforts to further a long running sex-trafficking scheme and help cover it up. *See* FAC ¶¶ 546–54; *supra* at 11–14. Deutsche Bank's real objection seems to be that its involvement in Epstein's sex trafficking was not so extreme as to justify an IIED claim, but that is an issue of fact that cannot be decided on the pleadings. *See, e.g.*, *Matvejs v. Martin County Sheriff's Office*, 2006 WL 3755202, at *4 (S.D. Fla. 2006).[10]

---

[10]     The extreme and outrageous element of an intentional infliction of emotional distress claim is satisfied where a plaintiff alleges a continuous nature of abusive conduct. *Canosa*, 2019 WL 498865, at *8; *Bonner v. Guccione*, 916 F. Supp. 271, 276–78 (S.D.N.Y. 1996) (entire course of conduct alleged in the aggregate constituted IIED, not any given individual act); *Turner v. Manhattan Bowery Mgmt. Corp.*, 28 N.Y.S.3d 651, at *10 (Sup. Ct. 2015) (while each individual act committed by defendants was not actionable, "when aggregated over time, the continuous nature of the conduct may make it sufficiently outrageous that a jury could reasonably find in plaintiffs' favor on the emotional distress allegation"); *Collins v. Willcox, Inc.*, 600 N.Y.S.2d 884, 886 (Sup. Ct. 1992) (same). For example, in *Canosa*, the court found an actionable IIED claim based on plaintiff's allegations of a "course of intimidating and abusive conduct by [the defendant] spanning August 2010 to August 2017." 2019 WL 498865, at *8. Just as in *Canosa*, here Deutsche Bank's actions, even if not actionable alone, in the aggregate present a claim for IIED.

### C.  The FAC States Two Claims for Negligence (Count XI–XII).

Finally, Doe has properly stated claims for both of her negligence counts. To state a claim for negligence under New York law, Doe must plead "(1) a duty owed by the defendant to the plaintiff, (2) a breach thereof, and (3) injury proximately resulting therefrom." *David v. Weinstein Co. LLC*, 431 F. Supp. 3d 290, 305 (S.D.N.Y. 2019). Deutsche Bank argues that it owed no duty to Doe and that the FAC fails to allege proximate cause. The Court should reject both arguments.

Any person or entity—including a bank—"ordinarily has a duty to exercise reasonable care when the actor's conduct creates a risk of physical harm." Restatement (Third) of Torts: Phys. & Emot. Harm § 7 (2010); *see also* § 19 ("The conduct of a defendant can lack reasonable care insofar as it foreseeably combines with or permits the improper conduct of the plaintiff or a third party."); Reporter's Note, Comment a; *Stagl v. Delta Airlines, Inc.*, 52 F.3d 463, 469 (2d Cir. 1995); *Ford v. Grand Union Co.*, 197 N.E. 266, 268–69 (N.Y. 1935) (citing favorably to Restatement of Torts in extensive discussion of duties). While "[o]rdinarily a person owes no duty to members of the public at large," there is an "except[ion] to avoid injury to them by forces set in motion by such person or those acting as his [or her] agents." *Ford*, 197 N.E. at 269.

That is exactly what Doe has alleged: Deutsche Bank "set [the] forces [] in motion," *id.*, that injured Doe, as its financial support was critical to Epstein's venture. The FAC makes clear that his venture "*was not possible*" without Deutsche Bank, which could provide special treatment to Epstein and ensure the venture's continued operation and sex-trafficking of young women and girls. FAC ¶ 32. Deutsche Bank provided Epstein's sex-trafficking venture $200,000 per year in cash (*id.* ¶ 321); concealed its delivery of cash to Epstein and his associates by willfully failing to file reports (*id.* ¶ 324); structured cash withdrawals by Epstein's co-conspirators to avoid alerting authorities to suspicious transactions (*id.* ¶ 337); failed to implement oversight imposed by its ARRC (*id.* ¶ 325); and allowed Epstein to use its accounts to send dozens of wires to known

Epstein co-conspirators (*id.* ¶¶ 212, 213). Because Deutsche Bank set these events into motion, it had a duty to not cause harm to members of the public like Doe. *Ford*, 197 N.E. at 269.

Deutsche Bank contends that banks owe no duty to non-customers. MTD at 33. But one New York court has stated: "We do not find case law to support the argument that . . . a bank can *never* be held liable to non-customers and particularly when addressing allegations such as those before us in this action." *Elmaliach v. Bank of China Ltd.*, 110 A.D.3d 192, 206 (N.Y. App. Div. 2013) (emphasis in original). *Elmaliach* illustrates how New York law recognizes a cause of action against banks in appropriate cases. In *Elmaliach*, the plaintiffs were victims of terrorist attacks. *Id.* at 195. They alleged that the acts of a Chinese bank were a proximate cause of their injuries in that the bank facilitated the transfer of millions of dollars between terrorist leadership outside Israel and their operatives, enabling acts of terrorism in Israel. *See id.* While the court ultimately applied foreign law, it applied *New York law* in recognizing that a bank may owe a duty to non-customers in certain situations. *Id.* at 206 ("[A] tortfeasor's compliance with relevant laws and regulations will not insulate it from liability if it fails to act objectively reasonably."); *id.* at 207 ("Although New York does not generally recognize a duty on the part of banks to non-customers, that does not mean that New York policy would prohibit recovery under the alleged facts, if proven.").[11]

Other courts have also recognized that banks can face tort liability to non-customers in non-routine cases. *See, e.g.*, *Licci v. Am. Exp. Bank Ltd.*, 704 F. Supp. 2d 403, 410 (S.D.N.Y. 2010) (suggesting that bank could be liable for negligence relating to terrorist attacks if plaintiff alleged bank "had any ties to Hezbollah, or that they knew or had reason to believe that the monies at issue

---

[11]   As this Court has explained, "[w]here the New York Court of Appeals has not ruled on an issue, federal courts are bound to apply the law as interpreted by a state's intermediate appellate courts unless there is persuasive evidence that the state's highest court would reach a different conclusion." *Rodland v. Judlau Contracting, Inc.*, 844 F. Supp. 359, 363 (S.D.N.Y. 2012). Deutsche Bank's motion fails to cite *any* New York state authority regarding bank liability. As a result, there is no "persuasive evidence" to divert from the principles enunciated in *Elmaliach*.

would be used to carry out terrorist attacks on civilian targets"); *cf. Midwest Feeders, Inc. v. Bank of Franklin*, 886 F.3d 507, 518 (5th Cir. 2018) (recognizing that under New York law the rule that banks owe no due to a non-customer "is not without exception").

The FAC carefully lays out precisely the type of non-routine situation that New York courts would find imposes duties on a bank to non-customers. By way of just a few examples, Doe has alleged that "[i]t was far from routine for Deutsche Bank to provide $200,000 per year in cash to someone like Epstein, who did not have an apparent need for such extravagant sums. Moreover, the circumstances in which Epstein was requesting such large amounts were far from routine and raised numerous 'red flags'—taking it well outside routine circumstances." FAC ¶ 320. She also alleges that, after providing cash to Epstein's sex-trafficking venture, Deutsche Bank concealed what it had done through such specific means as failing to file required reports with the government and refusing to enforce oversight requirements over Epstein that it was pretending were in place. *Id.* ¶¶ 324–28. These types of allegations are the exact type that the *Elmaliach* and *Licci* courts were looking for in order to impose a duty on the bank.

Deutsche Bank's causation arguments should be rejected as well. All of the proximate cause cases it cites are distinguishable on the fact that Deutsche Bank *did not* provide routine banking services and actually participated in the customer's tortious and criminal conduct. Moreover, while it tries to point the finger at Epstein as the true proximate cause, the law is clear that there may be *more than one* proximate cause of an occurrence or injury. *See Scurry v. New York City Hous. Auth.*, 193 A.D.3d 1, 8–9 (N.Y. App. Div. 2021). Such is the case here.

## CONCLUSION

The Court should deny Defendants' Motion to Dismiss Doe's FAC in its entirety.

Dated: February 21, 2023

Respectfully Submitted,

*/s/ David Boies*

David Boies
Andrew Villacastin
Boies Schiller Flexner LLP
55 Hudson Yards
New York, NY
Telephone: (212) 446-2300
Fax: (212) 446-2350
Email: dboies@bsfllp.com
Email: avillacastin@bsfllp.com

Sigrid McCawley
*Pro Hac Vice*
Boies Schiller Flexner LLP
401 E. Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33316
Telephone: (954) 356-0011
Fax: (954) 356-0022
Email: smccawley@bsfllp.com

Bradley J. Edwards
Edwards Pottinger LLC
425 N. Andrews Ave., Suite 2
Fort Lauderdale, FL 33301
Telephone: (954) 524-2820
Fax: (954) 524-2822
Email: brad@epllc.com

Brittany N. Henderson
Edwards Pottinger LLC
1501 Broadway
Floor 12
New York, NY
Telephone: (954)-524-2820
Fax: (954) 524-2820
Email: brittany@epllc.com

Paul G. Cassell
*Pro Hac Vice*
S.J. Quinney College of Law at the
University of Utah
383 S. University St.
Salt Lake City, UT 84112

Telephone: (801) 585-5202
Fax: (801) 585-6833
Email: casselp@law.utah.edu
(institutional address for identification
purposes, not to imply institutional
endorsement)

*Counsel for Plaintiff Jane Doe 1*