NEDAADOE1                         Oral Argument

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    JANE DOE 1, Individually and
      on behalf of all others
 4    similarly situated,

 5                  Plaintiffs,

 6          v.                              22 CV 10018 (JSR)

 7    DEUTSCHE BANK
      AKTIENGESELLSCHAFT ET AL.,
 8
                    Defendants.
 9
      ------------------------------x
10                                      New York, N.Y.
                                        March 13, 2023
11                                      4:00 p.m.

12    Before:

13                      HON. JED S. RAKOFF,

14                                      District Judge

15                        APPEARANCES

16    BOIES, SCHILLER & FLEXNER LLP
           Attorneys for Plaintiff Jane Doe
17    BY:  DAVID BOIES
           SIGRID S. MCCAWLEY
18

19    ROPES & GRAY LLP
           Attorneys for Defendant Deutsche Bank
20    BY:  JAMES P. DOWDEN
           ANDREW TODRES
21

22

23

24

25
```

NEDAADOE1                        Oral Argument

```
 1              (Case called)
 2              MR. BOEIS:  Good afternoon, your Honor.
 3              David Boies, of Boies Schiller & Flexner, for
 4    plaintiff.
 5              THE COURT:  Good afternoon.
 6              MS. MCCAWLEY:  Good afternoon, your Honor.
 7              Sigrid McCawley, for of Boies, Schiller & Flexner,
 8    also for plaintiff.
 9              MR. CASSELL:  Paul Cassell, also for plaintiff Jane
10    Doe.
11              MR. EDWARDS:  Brad Edwards and Brittany Henderson,
12    from Edwards Pottinger, on behalf of plaintiff.
13              THE COURT:  Good afternoon.
14              MR. DOWDEN:  Good afternoon, your Honor.
15              James Dowden, from Ropes & Gray, on behalf of Deutsche
16    Bank.
17              MR. TODRES:  Good afternoon, your Honor.
18              Andrew Todres, on behalf of Ropes & Gray, for Deutsche
19    Bank.
20              MS. MCCAWLEY:  Good afternoon, your Honor.
21              MS. BEBCHICK:  Good afternoon, your Honor.
22              Lisa Bebchick, on behalf of defendant.
23              THE COURT:  Good afternoon.
24              MS. ELLSWORTH:  Good afternoon, your Honor.
25              Felicia Ellsworth, Boyd Johnson and Hillary
```

NEDAADOE1                     Oral Argument

1    Chutter-Ames, on behalf of J.P. Morgan Chase.

2            THE COURT:  All right.  My understanding is that we

3    took all the money that was needed to pay the hourly rate of

4    all the attorneys on these matters and contributed it instead

5    to Signatory Bank so that bank could emerge from default but

6    maybe that's just a rumor.

7            As I think my law clerk has already mentioned, it

8    seemed to me that we should set some time limits.  So, we'll

9    hear first with respect to the motions involving Deutsche Bank

10   and because their docket number is one lower than the other,

11   and 20 minutes for moving counsel, 20 minutes for responding

12   counsel, ten minutes for rebuttal, and then we'll move to J.P.

13   Morgan and since many of the issues overlap, 15 minutes for

14   moving counsel, 15 minutes for answering counsel and seven

15   minutes for rebuttal.

16           I've asked my law clerk to strictly enforce those

17   limits and he's a tough guy.  So, just beware.

18           So, let me hear from moving counsel in Deutsche Bank.

19           MR. DOWDEN:  Thank you, your Honor.

20           In our papers Deutsche Bank has raised a threshold

21   question that applies to the claims brought against it.  And

22   that threshold question is the question of a release.  Just two

23   months prior to instituting this action, plaintiff signed a

24   release.  In exchange for that, releasee received a substantial

25   monetary payment.  And corollary to that executed a very broad

1     release with the Epstein estate.

2              Your Honor turns to Exhibit A to our brief, a copy of

3     that release -- and I have a copy for the Court.

4              THE COURT:  Yes.  Hand it up.  I left my papers

5     upstairs.

6              MR. DOWDEN:  May I approach?

7              THE COURT:  Yes.

8              (Pause)

9              MR. DOWDEN:  Your Honor, as shown in Exhibit A, that

10    release was exceedingly broad.  I called the Court's

11    attention --

12             THE COURT:  Well, so you're not a party to this

13    agreement, are you?

14             MR. DOWDEN:  No, your Honor.  However --

15             THE COURT:  And since when under applicable law does a

16    release between two parties extend to possible claims against

17    third parties?

18             MR. DOWDEN:  Your Honor, when the face of the release

19    is clear that it applies to third party beneficiaries --

20             THE COURT:  Where do you say that?

21             MR. DOWDEN:  I'll point to two particular paragraphs

22    in this agreement.  In the now therefore agreement, halfway

23    through it talks about Jeffrey Epstein, his coexecutors,

24    coestate holders, directors, officers and go a little farther

25    down and it says "any entities or individuals who are or have

NEDAADOE1                          Oral Argument

1   ever been engaged by whether as independent contractors or

2   otherwise, employed by or worked in any capacity for Jeffrey

3   Epstein and/or the Epstein estate".  And that is defined as a

4   release.

5          Your Honor, it is clear from the plain language of

6   that test that Deutsche Bank fits within that broad release.

7   I'll start with the first applicable section.  It first applies

8   to any entity engaged by the Epstein estate, engaged by, your

9   Honor, in ordinary common parlance under dictionary definition

10  means to begin services for, to attain the services.  And in

11  fact courts in this jurisdiction have recognized that reviewing

12  banking services can fall within the term "engaged".  In

13  particular, I am recalling the Parundy decision of J.P. Morgan.

14         Your Honor, if we just look at the allegations --

15         THE COURT:  Well, looking at the sentence you're

16  referring to -- which only a lawyer could have drafted since it

17  goes on even longer than a Falkner page -- now, therefore,

18  claimant for and on behalf of herself and her lawyers, devisees

19  legalities, distributees, executors, administrators, trustees,

20  personal representatives, successors and assigns, for and in

21  consideration of the settlement amount, the adequacies and

22  sufficiencies of which are hereby acknowledged, hereby releases

23  and forever discharges the coexecutors of the estate of Jeffrey

24  E. Epstein in both their capacity as coexecutors and

25  individually, the cotrustees of the 1953 trust, the Epstein

1    estate, any entity owned or controlled in whole or in part by

2    Jeffrey Epstein or the the -- typo there on the part of the

3    brilliant draftsman of this, the word the appears twice -- or

4    the the Epstein estate (the Epstein entities) and their

5    respective current and former principals, officers, directors,

6    stockholders, managers, members, partners, limited partners,

7    trustees, beneficiaries, administrators, agents, employees,

8    attorneys -- I am good there are attorneys in there --

9    predecessors, successors, assigns and affiliates.  And if we

10   stopped the music just there -- we're only a third through this

11   wonderful sentence -- that would not excuse you at all, right?

12           MR. DOWDEN:  No, your Honor.

13           THE COURT:  Okay.  So, we go on.

14           And any entities or individuals who are or have ever

15   been engaged by (whether it's as independent contractors or

16   otherwise) employed by or worked in any capacity for Jeffrey E.

17   Epstein and are the Epstein estate jointly and severally the

18   releasees.

19           So, of those terms we're still only two thirds through

20   the sentence, but who's counting?  Which do you say applies to

21   Deutsche Bank?

22           MR. DOWDEN:  Your Honor, I'll point to three

23   exemplars.  One, any entity obviously engaged by, employed by,

24   worked in any capacity.

25           Those are the three I focus on.

NEDAADOE1                    Oral Argument

1         THE COURT:  So, is it unambiguous that that applies to

2    third parties?  For example, would it apply to a restaurant

3    where Mr. Epstein had a dinner or two?

4         MR. DOWDEN:  Your Honor, I would say, as Judge Kaplan

5    recognized in the Prince Andrew case, when a substantial

6    settlement amount such as this is entered into, there is a

7    corollary broad expectation for the breadth of that release so

8    as to bring finality to the case to avoid being brought into

9    future litigation and future claims.

10        So, your Honor, given that, yes, the parties' intent

11   here was clear from the plain language to be broad.  Anyone who

12   worked for, employed by, engaged by the estate, that would,

13   your Honor, apply to a catering service that works at an event

14   at Jeffrey Epstein's house.

15        THE COURT:  Okay.  I'm thinking, he goes into CVS and

16   buys some very upscale hair tonic.  And you say that putting

17   aside the unlikelihood he would have a claim, but assuming for

18   one reason or another he had a claim that CVS would be offer

19   the hook because of his --

20        MR. DOWDEN:  Yes, your Honor, it would.

21        THE COURT:  So, in other words, no one would be off

22   the hook?

23        MR. DOWDEN:  That's actually not true your Honor.  In

24   fact, later on in the release there's a specific set of

25   individuals who are carved out specifically from this

NEDAADOE1                          Oral Argument

1    otherwise --

2              THE COURT:  Well, that's an important point.  I want

3    to get to that in a minute and I'm still on your -- let's just

4    finish this sentence because I don't want to leave the sentence

5    hanging.

6              "From any and all claims demands, actions, causes of

7    actions, suits, debts, dues, sums of money, accounts,

8    variances, trespasses, damages and judgments, whether sounding

9    in equity, tort, common law, contract statute, regulation or

10   otherwise, and whether now existing, hereafter existing or

11   revived in the future, whatsoever, in law, admiralty, equity or

12   otherwise, including without limitation and any and all claims

13   or causes of action that arise or may arise from or which

14   otherwise concerns acts of sexual abuse or sex trafficking by

15   Mr. Epstein (the claims), which against the releasees claimant

16   ever had, now has or hereafter can, shall, or may have, for a

17   time or by reason of any manner, clause or thing, whatsoever,

18   from the beginning of the world through the date of the general

19   release and settlement agreement."

20             Boy, you know, a legal education is a wonderful thing.

21             MR. DOWDEN:  Your Honor, counsel sitting at the table

22   in front of us actually entered into this settlement agreement.

23   So, they're well aware of the terms of this agreement and the

24   breadth of this agreement.

25             THE COURT:  Well, let's talk, which I frankly may be

NEDAADOE1                          Oral Argument

1    more nicely pertinent to what you were about to turn to, which

2    is on page 2.

3               I'm sorry.

4               MR. DOWDEN:  The carve out, your Honor, is on page

5    three.

6               THE COURT:  Three, yes.  I'm sorry.

7               MR. DOWDEN:  It would be the paragraph that begins

8    "while the parties".

9               THE COURT:  Thank you very much.

10              "While the parties do not believe there is any

11   reasonable interpretation that this general release could be

12   construed to release Jane's Jess Staley Leon Black or their

13   respective entity affiliations.  For clarity, this general

14   release and settlement agreement specifically does not include

15   Jess Staley Leon Black or any company or entity which either is

16   or was beneficially owned or controlled by Jess Staley or Leon

17   Black as a releasee or release party under this general release

18   and settlement agreement."

19              Now, the first part of that sentence is that "The

20   parties, both sides do not believe there is any reasonable

21   interpretation that this general release could be construed to

22   release James Staley Leon Black or their respective entity

23   affiliations".

24              So, aren't the parties jointly saying that if I

25   construe this agreement the way you would like me to construe

NEDAADOE1                          Oral Argument

1   it, they agree that would be an unreasonable interpretation?

2              MR. DOWDEN:  Your Honor, two things.  First, those two

3   individuals there are close friends and associates of

4   Mr. Epstein.  They're not to have alleged to have engaged in,

5   worked for or otherwise been limited by Mr. Epstein.  But

6   rather, two specific individuals who are friends or associates

7   that were carved out from the otherwise very broadly --

8              THE COURT:  But it applies to their affiliated

9   entities?

10             MR. DOWDEN:  To the sense that they are owned or

11   controlled those affiliated entities.

12             THE COURT:  Where does it say that?  It just says --

13             MR. DOWDEN:  "Beneficially owned or controlled by",

14   your Honor.

15             THE COURT:  I'm sorry.  No, no, no.  That's the second

16   sentence.  I'm still on the first sentence.  The parties do not

17   believe there is any reasonable interpretation that this

18   general release could be construed to release James Staley Leon

19   Black or their respective entity affiliations, which in the

20   case of Mr. Staley is your co-defendant, yes?

21             MR. DOWDEN:  Yes, your Honor, which envisioned --

22             THE COURT:  Do you interpret that provision as -- let

23   me ask two questions.  First, do you interpret that provision

24   as barring any claim by plaintiffs that, against Mr. Staley's

25   affiliate?

NEDAADOE1                          Oral Argument

1          MR. DOWDEN:  Your Honor, I would say two things.  One,

2     there may be some debatability around that point, given the

3     subsequent language which talks about owned or beneficial owner

4     or control.

5          THE COURT:  Well, the second sentence, the one I'm

6     referring to says, all parties expressly acknowledge, agree and

7     understand -- I hope some day someone will tell me what the

8     difference is between those three items.  But anyway, all

9     parties expressly acknowledge, agree and understand that any

10    and all claims that claimants has or may have against Jess

11    Staley Leon Black or any company or entity beneficially owned

12    or controlled by Jess Staley or Leon Black are expressly

13    preserved.  Doesn't that create an ambiguity with respect to

14    the language I just read from the first sentence?

15         MR. DOWDEN:  With respect, perhaps, your Honor, to the

16    entity owned or controlled by Jess Staley or Leon Black, not

17    for Deutsche Bank, your Honor.  Because if the intent of

18    parties was to carve out individuals or their affiliates, the

19    parties could have and should have carved out Deutsche Bank as

20    reserved -- instead, this carve out is exceedingly narrow from

21    the otherwise very, very broadly drafted broad release.

22         And, your Honor, in the paragraph right before the one

23    you were reading, it is contemplated that this release may be

24    used by third party beneficiaries.  So, if you look at the last

25    sentence of the paragraph beginning "neither", however, this

general release and settlement agreement may be introduced in

any proceeding concerning or arising from, including as

evidence of liability or wrongdoing and on the part of the

party, as well as breached the terms hereof.

THE COURT:  Okay.  Because I have had to limit

everyone's time, although, you're all getting about twice the

time you would get in the Second Circuit because they're so

much smarter than this Court, let me just shift gears for a

second to one other question I had growing out of your papers.

When you argue that Deutsche Bank did not participate

in Mr. Epstein's sex trafficking venture, you say in effect

that it merely provides usual services.  But doesn't the

compliant allege that Deutsche Bank differentiated its services

for Mr. Epstein by, for example, assisting him in structuring

his cash withdrawal so as to evade alerts by failing to

implement guidance recommended by its reputational risk

committee, et cetera?

So, isn't there enough in the complaint, take it as I

must, most favorably to the plaintiff, to suggest that he was

treated differently and this wasn't usual services and that it

wasn't usual services because they had reason to believe that

he was engaged in the --

MR. DOWDEN:  Your Honor, let me start by -- courts

have been very clear in interpreting the participation

requirement of the TVPA, that it is not limited.  However, your

1   Honor, it has to have in some sort of active step, some

2   concrete step.  A mere passive facilitation is not enough.

3   Cases have even held providing the tools that allow the venture

4   to continue are not enough.

5          Here, as alleged in the complaint --

6          THE COURT:  What case that's -- on me, says that?

7          MR. DOWDEN:  Your Honor, there are two cases I call

8   your attention to, Choice Hotels, which was decided by Judge

9   Kogan in the Eastern District of New York.

10          THE COURT:  It's the Eastern District.

11          MR. DOWDEN:  Persuasive authority, actually.

12          THE COURT:  Of course, I always paid as close as

13   attention to my brilliant colleagues in the Eastern District.

14   That goes without saying, but I don't think it's binding on me.

15          MR. DOWDEN:  Yes, your Honor, Noble decided by this

16   court by Judge Sweet in the Southern District --

17          THE COURT:  That's one of the greatest judges ever to

18   serve on this court.  So, that give me a little more pause.

19          MR. DOWDEN:  Your Honor, in Noble, dealing with the

20   Weinstein case, there was an allegation that Mr. Weinstein's

21   brother actively participated in Mr. Weinstein's conduct.  And

22   the specific facts that were alleged there were that he

23   assisted in arranging travel and actually, paid out settlement

24   money.  The Court found that that was not enough, your Honor.

25   And that's because the Paradime case and TVPA requires more.

NEDAADOE1                          Oral Argument

1    It requires that, Southern District decided in the Canosa case,

2    the Canosa case is yet another case involving Weinstein

3    employees who actively engaged in providing sex paraphernalia

4    coverups and otherwise.  Those are the Paradime participation

5    cases.  Even, your Honor, in the Second Circuit, the Perlis

6    case, a head of school who traveled to a foreign country and

7    didn't stop what was going on, was enough.

8           Your Honor, that's why the Paradime cases under the

9    TVPA for participation are hotel cases.  Hotels that sort of

10   allow this to continue observe sex trafficking happen, those

11   are the Paradime cases.  Extending it to a banking institution

12   is a lot farther than --

13          THE COURT:  All right.  Unfortunately, we've more than

14   gone the 20 minutes.  So, you'll have rebuttal for a few

15   minutes.

16          So let's hear from your adversary.

17          MS. MCCAWLEY:  Sigrid McCawley, on behalf of the Does,

18   your Honor.

19          THE COURT:  So, what about the settlement agreement

20   and what about in particular, the parties went to some length

21   to carve out from what otherwise appears to be a very broad

22   settlement, claims against other persons and entities but not

23   Deutsche Bank.  So, why isn't that reasonable inference, maybe

24   a binding inference that this doesn't apply or that this

25   agreement let's Deutsche Bank off the hook?

NEDAADOE1                          Oral Argument

1            MS. MCCAWLEY:  Well, your Honor was correct when you

2    talked about the language in the agreement and how it wouldn't

3    cover a situation like.  This is a financial institution.  That

4    simply wasn't contemplated by the parties.  You can tell that

5    from the plain language of the agreement.

6            And the provision that you talk about in the back,

7    your Honor, where it says starts with the language "while the

8    parties do not believe there is any reasonable interpretation",

9    that means they didn't contemplate any reasonable

10   interpretation that these individuals or financial institutions

11   that were related with would be covered by this release.

12           So, that is the death knell for them because that is

13   the language that makes it very, very clear --

14           THE COURT:  Why didn't the agreement end there of this

15   sentence end there?  In other words, if that sentence means

16   everything you say it means, then you didn't need the rest of

17   the sentence.

18           MS. MCCAWLEY:  Your Honor, I think that for the rest

19   of the sentence they are just trying to further elaborate on

20   what they were concerned with with respect to those two

21   individuals, but the focus here is not on the individuals but

22   the entities.  So, when you look at the beginning os the -- and

23   we talked about what the parties were focused on, you'll

24   remember from our complaint that Epstein holds a lot of

25   different companies.  The bank alone opened a number of

NEDAADOE1                         Oral Argument

1    accounts.  He had many holding companies, many things that his

2    estate concerned with protecting.  So, that's what the focus

3    was on.  It wasn't focused on things like separate financial

4    institutions and protecting that financial institution.  It was

5    focused on protecting the employees of the household for

6    example, like the -- these kinds of individuals.  It wasn't

7    focused on the large financial institutions who were

8    independent.  And what guides, your Honor, in that

9    understanding is the nondisclosure agreement.

10           THE COURT:  Well -- Go ahead.

11           MS. MCCAWLEY:  So, your Honor was talking earlier

12   about the case law.  And of course, opposing counsel mentioned

13   the Prince Andrew case which we were counsel on.  And in that

14   case the Court focused on the fact that the agreement contained

15   a similar to here, a nondisclosure provision and that's because

16   the case law as you talked about in New York, you have to

17   establish that you are an intended third-party beneficiary to

18   the agreement.  When there is a nondisclosure provision in the

19   agreement, very strong here, Deutsche Bank didn't even know

20   about this agreement until they got into this case.

21           In other words, there was no intention of Epstein or

22   Jane Doe to protect the financial institution with respect to

23   this.

24           THE COURT:  I'm not sure -- helps me out.  So, in my

25   hypothetical say this agreement does not any away, shape or

1   form preclude me from suing CVS -- I apologize to CVS for using

2   them as a hypo.  Next time it'll be Walgreen's.  That means

3   that even though I've said in the agreement that we will not

4   sue CVS, but I can still sue CVS?

5            MS. MCCAWLEY:  Well, no, your Honor.  But when you

6   talk about what the Court looks at when they're analyzing an

7   agreement like, the nondisclosure does weigh on that, what the

8   parties' intent was.  So, in this instance when there are broad

9   terms as there are in this agreement and there's no reference

10  to a financial institution and there's a nondisclosure

11  provision like this, as Judge Kaplan says in the Dufrey that

12  leans in favor when you're looking at it from the perspective

13  of whether it is unambiguous or ambiguous, that leans in lever

14  of the nondisclosure being that they didn't intend to cover

15  that beneficiary.  It didn't intend to cover a financial

16  institution.

17           THE COURT:  So, for the sake of argument, if I were to

18  decide that in the relevant respects, this agreement is

19  ambiguous, then I would have to hear extrinsic evidence from

20  the negotiations or whatever as to what the intent of the

21  parties was, right?

22           MS. MCCAWLEY:  That's correct, your Honor.

23           THE COURT:  You were one of the parties, one of the

24  lawyers who negotiated this, right.

25           MS. MCCAWLEY:  I was not, your Honor.

1      THE COURT:  Okay.  What evidence of that sort, if any,

2  do you think would be relevant?

3      MR. DOWDEN:  I'll start with the point that we made in

4  our brief we think the language is clear --

5      THE COURT:  I understand.  But it's a classic

6  contractual dispute because each side says the language is

7  absolutely crystal clear no reasonable person could possibly

8  think otherwise, they totally disagree.  But assuming that in

9  my confusion I decide that there might be some ambiguity, what

10  kind of evidence should I look to?

11      MS. MCCAWLEY:  There could be evidence entered as to

12  who they intended to cover.  And certainly the Epstein estate

13  was a party to this agreement.  And I think the fact that they

14  were obviously at Epstein's bank regularly with those banking

15  financial institutions was the intended cover that they would

16  have made that clear in this agreement and they didn't.

17      So, we do believe that the agreement was very clear on

18  the face of it.  But to the extent you were to consider

19  extrinsic evidence, it would be those types of things to get at

20  what the parties did intend with the language that they chose.

21      THE COURT:  Lets go back to the first page, the end of

22  the sentence that we mentioned before.  Any entities or

23  individuals who are or have ever been engaged by (whether as

24  independent contractors or otherwise, employed by, or worked in

25  any capacity for Jeffrey E. Epstein and or the Epstein estate),

1    why isn't Deutsche Bank an entity that was engaged by and

2    worked in some capacity for Mr. Epstein?

3            MS. MCCAWLEY:  As your Honor noted before, that would

4    be too broad.  And it's also very clear from the language, the

5    limiting language in the Wile paragraph in the back that they

6    didn't intend to cover financial institutions.  So entities was

7    not intended to have that breadth.  And it's also tide to the

8    language that your Honor read in the beginning where the focus

9    is really on the clear language deals with the coexecutors of

10   the estate, both in their capacity as coexecutors, individually

11   and cotrustees of the 1953 trust, the Epstein estate and any

12   entities owned or controlled in whole or in part by Jeffrey

13   Epstein or the Epstein estate.  They were looking at protecting

14   that inner circle, your Honor.  They were making sure that

15   Epstein wasn't getting dragged in for those types of holding

16   companies and things that were within the inner circle of the

17   Epstein entity.  They were not looking to protect outside third

18   parties of that nature.  Certainly, not a financial institution

19   of the size and depth of J.P. Morgan and Deutsche Bank or any

20   significant financial institution.

21           And certainly, if they did intend that, your Honor,

22   then this is a very long sentence.  They have plenty of room to

23   write that in and they didn't choose to.

24           THE COURT:  So, you cannot imagine how disappointed I

25   was that this sentence wasn't even longer.

NEDAADOE1                         Oral Argument

1              So, let me turn to some other issues in the case just
2       because, again, we have limited time.
3              (Continued on next page)

N3DGdoeO2

1          THE COURT:  So with your claim for intentional

2    infliction of emotional distress.

3          MS. MCCAWLEY:  Yes, your Honor.

4          THE COURT:  There's a case from the appellate division

5    *Shea v. Cornell University,* which holds that substantial

6    assistance requires, quote, intentional or deliberate acts

7    directed at causing harm, which would rise to the level of

8    actionable conduct in relation to the subject assault or,

9    quote, overt encouragement of the offensive behavior.  How do

10   you meet either of those prongs?

11         MS. MCCAWLEY:  Well, your Honor, there's a plethora of

12   allegations, there are a plethora of allegations in our

13   complaint that hit this issue specifically.  What we have

14   focused on is the conduct of the banks and how extreme and

15   outrageous and continuous that conduct was to help facilitate

16   the trafficking.

17         So, for example, opening over 40 accounts, having one

18   attorney make 97 cash withdrawals in a very short time period,

19   all within the range of $7,500 to effectuate the structuring,

20   and no red flags.  Even when they call into the bank to report

21   that, nothing is done.  There's just a repeat of over and over

22   red flags within the bank that we've enunciated in our

23   complaint, and nothing is done.  So over 200,000 --

24         THE COURT:  So I guess the question I'm raising is,

25   given that language in the appellate division -- this

N3DGdoeO2

1    particular claim is a state law claim -- what you are

2    describing are many acts of facilitation, if you will.  But

3    that's a little bit different, is it not, from either overt

4    encouragement or intentional or deliberate acts directed at

5    causing harm, which would rise to the level of actionable

6    conduct in relation to the assault.  Let me start with the

7    latter.

8            Is there any evidence of overt encouragement of the

9    assaults?

10           MS. MCCAWLEY:  Yes, your Honor.

11           So in the complaint, for example, we allege that

12   Packard and Morris actually went to Jeffrey Epstein's home and

13   witnessed the trafficking.  These are high level individuals

14   within the bank who are supposed to be protecting these people,

15   and instead are witnessing the trafficking and they're helping

16   facilitate it and are actively participating in it.  So those

17   are the types of allegations.  While it's a little bit

18   different, your Honor, I understand the struggle here on the

19   intentional infliction of emotional distress count.  What the

20   case law says, like *Canosa v. Ziff* and also this came up again

21   in the Prince Andrew/Giuffre case, it's that continuous,

22   extreme, outrageous conduct, the continuous, severe conduct

23   that comes up in this conduct, we have it here.  Because

24   without the bank providing loads and loads of cash, Jeffrey

25   Epstein cannot commit the crimes he committed, right.  He had

N3DGdoeO2

```
1    to have a facility that was willing to disregard laws, look the

2    other way, not pay attention to these things, not bring them to

3    the authorities, right, in order for the trafficking to be

4    facilitated.  So yes, they are working hand in hand with him.

5    Without the bank --

6              THE COURT:  I guess my last question -- then I want to

7    move to something else before we lose the remaining time -- so

8    it's one thing to say they gave him lots of money and

9    disregarded the rules relating to that and all like that, and

10   so they must have known that something fishy was going on.  But

11   at least one reading of this Shea case would be they have to

12   know, for this particular tort, they have to know more than

13   that; they have to actually say, use this money and go out and

14   commit an intentional infliction of harm.

15             MS. MCCAWLEY:  And that's what we've alleged, your

16   Honor.  I mean, they were incentivized to help Epstein because

17   they got lucrative, lucrative accounts as a result, right.

18   They got Epstein, all of his friends, coming in, putting their

19   money into the bank.  So this was a quid pro quo.  They were

20   very, very successful in what they were doing.  They were

21   helping facilitate the trafficking, because why; they got huge

22   benefits from it.

23             There's emails that we have alleged in the complaint,

24   2 to $4 million in a year, 3 to $4 million in accounts coming

25   in.  The bank was very, very incentivized to make sure that
```

N3DGdoeO2

1   this trafficking continued and they kept Epstein happy because

2   they could those accounts.  So we do allege there was active

3   participation in the trafficking in the complaint.

4         THE COURT:  How much time do we have?  We've got five

5   minutes.  We've got time for more than one question.

6         So for your claim of aiding and abetting the TVPA,

7   doesn't the *Rothstein* case kind of preclude that and, more

8   generally, isn't the civil cause of action limited to, quote,

9   this chapter, which would not pick up Section 2 of Title 18?

10        MS. MCCAWLEY:  Your Honor, the case didn't address the

11   argument that we've put forward in our allegations, which is --

12   in our briefs -- which is the textual argument.  So it's really

13   not in contrast, because that argument wasn't made.

14        So what we're saying is that, under the language, just

15   the plain language of 18 USC Chapter 2, aiding and abetting of

16   the TVPA is not precluded.  And you'll remember, your Honor, in

17   the cases like *A.B. v. Marriott,* they talk about the broad

18   remedial purpose of the statute.

19        And so what we're saying here is, under the text of

20   the statute --

21        THE COURT:  This is --

22        MS. MCCAWLEY:  Sorry.

23        THE COURT:  -- a hybrid statute, civil and criminal.

24        MS. MCCAWLEY:  Correct, your Honor.

25        THE COURT:  So for every argument that it should be

N3DGdoeO2

1   broadly construed, there could be an argument that it should be

2   narrowly construed because it's both civil and criminal, but

3   it's one statute.

4          MS. MCCAWLEY:  I understand, your Honor.  I think that

5   what we have seen in the case law is the focus on it being a

6   remedial statute that is supposed to be broadly construed.  But

7   nevertheless, even if you set that aside --

8          THE COURT:  I hear that.  Let me just pull out the

9   relevant section.  So this is Section 1595, yes.

10         MS. MCCAWLEY:  Correct.

11         THE COURT:  Quote, an individual who is a victim of a

12  violation of this chapter may bring a civil action against the

13  perpetrator or whoever knowingly benefits financially or by

14  receiving anything of value from participation in a venture

15  which that person knew or should have known has engaged in an

16  act in violation of this chapter, an appropriate district court

17  of the United States may recover damages and attorneys' fees.

18         Now, there are two things about that.  First, it's

19  limited to someone who is a victim of a violation of this

20  chapter.  So this chapter doesn't include Section 2, does it?

21         MS. MCCAWLEY:  Well, your Honor, we contend that

22  18 U.S.C. Section 2 makes an aider and abetter punishable as a

23  principal, and that means if they're a principal, they're a

24  principal punishable under Chapter 77.

25         THE COURT:  That may be true as to the criminal

N3DGdoeO2

1    provisions, but here we're talking about the civil remedy.  And

2    the civil remedy speaks of this chapter, rather than the

3    entirety of the federal criminal code.  So I'm wondering if

4    that's a problem for you.  And then the other bit, which I just

5    alluded to before, it only can be brought by an individual who

6    is a victim of a violation and against the perpetrator, et

7    cetera.

8            Don't those terms have to be interpreted the same as

9    they would be under the criminal provisions?  They're directly

10   referencing the criminal provisions.  And isn't the rule of

11   construction that criminal provisions should be narrowly

12   construed?

13           MS. MCCAWLEY:  It's a fair point, your Honor.  I would

14   just point to the fact that it's really a textual argument.  I

15   understand that your Honor may have a different interpretation

16   of the plain language, and we certainly accept that.  But we do

17   believe that the point of the Trafficking Victims Protection

18   Act was to provide broad protection of victims.

19           THE COURT:  Let me take the liberty of interrupting

20   you because, once again, we have exceeded the time.

21           MS. MCCAWLEY:  Thank you, your Honor.

22           THE COURT:  And let me hear a rebuttal from moving

23   counsel.

24           MR. DOWDEN:  Thank you, your Honor.

25           Before I begin, I just have one very significant

N3DGdoeO2

1    factual correction to make from the last presentation.  There

2    is no allegation in the complaint that anyone at Deutsche Bank

3    saw sex trafficking victims.  There is one allegation that is

4    conclusory and hypothetical that it suggests at one meeting a

5    sex trafficking victim was observable.  That's not a fact, your

6    Honor; that is a conclusory hypothetical found at

7    paragraph 236.  That is as far as the complaint on its face can

8    go on that point.

9          THE COURT:  Well, let's assume that the complaint

10    alleges enough to suggest that the bank was doing things that

11    were different for Mr. Epstein than for most people and may be

12    in violation of its own internal, normal practices and rules.

13    And they knew, did they not, that he had been convicted of

14    trying to lure an underage person into prostitution or

15    something like that -- I can't remember the precise

16    allegation -- so it wasn't that they were totally ignorant of a

17    practice in which he may have engaged?

18          MR. DOWDEN:  Your Honor, what the complaint pleads is

19    that Deutsche Bank was aware that, seven years prior,

20    Mr. Epstein was convicted of solicitation of a minor, was

21    sentenced, imprisoned and paid settlements.  That does not mean

22    that seven years later the bank knew that he was engaged in sex

23    trafficking.

24          THE COURT:  Well, I understand that as a general

25    proposition, but I'm glomming together, assuming that he seems

N3DGdoeO2

1   to be seeking to get cash directly through a lawyer and so

2   forth in ways that are suspicious, and you know that he's done

3   this before, indeed was found guilty and it was sufficiently

4   serious; no one thought it was an accidental matter that could

5   lead to probation or anything like that.  He got serious time.

6   Why wasn't that a red flag flying, as they say?

7          MR. DOWDEN:  Your Honor, a couple things I would say.

8   That separate sort of AML type conduct was the subject of other

9   litigation, a subject of a DFS penalty that Deutsche Bank has

10  already paid.  It does not give a basis for a private cause of

11  action for sex trafficking.

12         As *Choice Hotels* says, failing to adequately detect

13  signs of sex trafficking and potentially violation of other

14  statutes does not give rise to liability under the statute.

15         One other point, your Honor, I want --

16         THE COURT:  What case were you referring to?

17         MR. DOWDEN:  That was Choice Hotels, your Honor, that

18  was Justice Hogan, again.

19         One other thing I want to make clear, in the release

20  in the Giuffre/Prince Andrew case, there was a specific carve

21  out for third-party beneficiaries.  The agreement said, there

22  is no third-party beneficiaries here.  That is not present in

23  the carve out in this release.  And it intended the release to

24  carve out broad swaths of institutions engaged by or worked by

25  that should have been in the release.  Plaintiffs can't have

N3DGdoeO2

1   their cake and eat it too.

2             THE COURT:  I wish I had said that.

3             MR. DOWDEN:  Your Honor, in the complaint, there is

4   very specific allegations of engagement, of sort of providing

5   services, providing investment in long-term securities, wires.

6   Your Honor, that's engaged, that's work, that's the plain

7   language of the unambiguous release, not carved out to

8   third-party beneficiaries.

9             THE COURT:  Let me ask the question I asked your

10  adversary.  If I were to find this agreement ambiguous -- I

11  know you think it's not -- but if I were to find it ambiguous,

12  what kind of extrinsic evidence should I be looking at?

13            MR. DOWDEN:  Your Honor, for example, there are public

14  statements, including in filings, where the plaintiffs have

15  said, counsel has said, other third parties were intended to be

16  released by these releases.  Ms. Maxwell, for example, was

17  intended to be released in these purposefully because the

18  Epstein estate was looking for finality.  In exchange for a

19  substantial payment, a broad release was executed.  There are

20  good policy reasons for that, and that was recognized, again,

21  by Judge Kaplan in the Giuffre case.

22            THE COURT:  Did you want to respond to anything on the

23  aiding and abetting or any of that stuff?

24            MR. DOWDEN:  No, your Honor.  I think the law --

25            THE COURT:  Very good.  Thank you so much.

N3DGdoeO2

1          Let's turn to JPMorgan.  Let me hear from moving

2     counsel.

3          MS. ELLSWORTH:  Thank you, your Honor.  Felicia

4     Ellsworth for JPMorgan.

5          With the privilege of going second, let me jump into

6     the questions that you asked counsel in the first argument.

7     The allegations of the complaint against JPMorgan contain no

8     nonconclusory allegations of any activity by JPMorgan that was

9     anything other than routine banking activity.  And the courts

10     in the Second Circuit and New York are clear that routine

11     banking activity, provision of routine banking activity does

12     not give rise to any sort of duty, doesn't give rise to a

13     negligence claim, and also doesn't give rise to any liability

14     for any use that might be made of the funds that is illicit,

15     even if --

16          THE COURT:  So what about the situation, if what is

17     otherwise a routine transaction is one, in my hypothetical,

18     that the bank knows is being used for an illegal purpose,

19     doesn't that change the situation?

20          MS. ELLSWORTH:  So first of all, there's no

21     allegations like that in the complaint.  But second, to answer

22     your question --

23          THE COURT:  I will see about that, but go ahead.

24          MS. ELLSWORTH:  To answer your question, if it were

25     pled adequately and in a nonconclusory fashion that there was

N3DGdoeO2

1    actual knowledge that the bank would use the funds -- excuse

2    me -- that the customer might use the funds for illicit ends,

3    then perhaps there could be some liability.

4            But even in the terrorism context, in cases like the

5    *Lerner* case, this court's case in *Rothstein,* there are similar

6    allegations about suspicions for what the funds might be going

7    towards, knowledge of public information similar to what's

8    being alleged in the complaint here, and that's been held to be

9    insufficient.

10           THE COURT:  Let's assume arguendo that Mr. Staley knew

11   that the bank was being used to facilitate Mr. Epstein's

12   trafficking, his improper activity, isn't that knowledge

13   imputed to the bank?

14           MS. ELLSWORTH:  So the allegations of the complaint

15   and the allegations of the third-party complaint are that, to

16   the extent that Mr. Staley had knowledge, that knowledge was of

17   sexual misconduct and not of trafficking.  As your Honor is

18   well aware, the statute has very specific requirements,

19   trafficking is a legal definition, and it requires commercial

20   sex obtained by force, fraud or coercion.  There are no

21   allegations in the complaint that Mr. Staley had any knowledge

22   as to, number one, any corrupt sex acts or, number two, force,

23   fraud or coercion.

24           THE COURT:  Assuming all that for the moment, you're

25   not contesting, though, are you, that whatever knowledge he did

N3DGdoeO2

 1    have is imputed to the bank?

 2            MS. ELLSWORTH:  No, I am contesting that, your Honor.

 3    Particularly because --

 4            THE COURT:  Why?

 5            MS. ELLSWORTH:  -- the knowledge would have been

 6    obtained in the course of committing an alleged crime, as is

 7    outlined in our third-party complaint.  Case law is clear that

 8    that would be outside the scope of his employment, to be sure,

 9    it is contrary to the interest of JPMorgan, obviously, and

10    would serve only Mr. Staley's personal interests, which would

11    mean that it's not within the scope of his employment and it

12    should not be imputed to JPMorgan because it is contrary to

13    JPMorgan's own interest.  But even if -- we do contest

14    imputation -- but even assuming that that knowledge is imputed

15    to JPMorgan, it's still insufficient to show a violation under

16    the TVPA.

17            THE COURT:  So again, maybe I'm not fully capturing

18    your argument, the complaint, I think, if I recall, alleges

19    that JPMorgan provided services for Jeffrey Epstein that were

20    special, for lack of a better word, structuring his cash

21    withdrawals so as to avoid or evade alerts, delaying filing of

22    suspicious activity reports, et cetera.

23            So why isn't that enough to take this case out of the

24    case law regarding the usual services?

25            MS. ELLSWORTH:  I'll say a couple things in response.

N3DGdoeO2

1    I think your Honor has correctly identified what the complaint

2    has attempted to plead, in terms of what makes the activity,

3    the bank activity unusual.  The suggestion that structuring

4    transactions were ignored or not reported, the suggestion that

5    suspicious activity reports should have been filed -- of

6    course, the evidence has not yet come in on whether or not they

7    were -- and then there's a suggestion that --

8         THE COURT:  Yes, but of course -- and you all know

9    this, but I'll state it for the record -- on these motions, I

10   have to take every well pleaded allegation most favorably to

11   the plaintiff.

12        MS. ELLSWORTH:  Agreed.  And I don't think those

13   allegations are sufficient to take this outside of the routine

14   banking activity paradigm.  He was allowed to withdraw his own

15   money, and it was allowed to be used.  To the extent that there

16   are claims, as Mr. Dowden suggests, that money laundering rules

17   were not sufficiently followed, that is not a basis for some

18   private liability under the TVPA.

19        And let me just move to the sort of three things that

20   plaintiff needs to demonstrate under the TVPA; they need to

21   show knowledge, participation and benefit.  I would note, at

22   the outset, that the plaintiff in the JPMorgan case, the

23   allegations are outside of the ten-year statute of limitations

24   for the TVPA, because the banking relationship with JPMorgan

25   actually ended in 2013.  There are no allegations in the

N3DGdoeO2

1    complaint about a specific act involving plaintiffs after

2    November 24th, 2012, which would be required to bring it inside

3    the statute of limitations.  But putting aside that, we talk

4    about knowledge already and the imputation of Mr. Staley's

5    knowledge.  Even if we assume that his knowledge is imputed to

6    JPMorgan, there are no allegations that he was aware of

7    trafficking.  But again, putting that to the side, there is

8    insufficient allegations of participation and benefit, which

9    are two additional requirements of the statute.

10              As to participation, the three SDNY cases that have

11   addressed the TVPA; *Canosa, Geist* and *Noble,* in *Geist* and

12   *Noble,* as Mr. Dowden was indicating, in both of those cases,

13   the allegations were that the defendant had made what are

14   called hush payments to victims of Harvey Weinstein.  Those

15   were decisions by Judge Sweet and Judge Hellerstein to show

16   participation.  The *Canosa* case has very, very different

17   allegations, I won't go through them again -- I'm sure your

18   Honor is familiar with it -- but they involve direct assistance

19   with the actual sexual misconduct.  We don't have any

20   allegations like that in this case.

21              And then moving to benefit, in the *Geist* case, the

22   benefit there was alleged to be that the Weinstein companies

23   were allowed to continue to employ Harvey Weinstein.  That was

24   found also to be insufficient to show benefit from knowing

25   participation in a venture, which is what's required under the

N3DGdoeO2

|    |                                                                            |
|----|----------------------------------------------------------------------------|
| 1  | TVPA.  So none of that is pled.  This case is much more similar            |
| 2  | to *Noble* and *Geist* than it is to *Canosa* to be sure.                  |
| 3  | THE COURT:  I understand the argument from the first                       |
| 4  | part.  On benefit, maybe I'm missing your point.                          |
| 5  | So assuming -- which I know you contest -- but                             |
| 6  | assuming that they knew what was going on, then there was an               |
| 7  | obvious benefit in the structuring, in going along with the way            |
| 8  | he wanted to structure these various transactions and                      |
| 9  | withdrawals and so forth because you got money from doing that.            |
| 10 | MS. ELLSWORTH:  But the benefit needs to be more than                      |
| 11 | just receiving money.  The Weinstein companies received money.            |
| 12 | The benefit needs to be benefit from participating in a sex                |
| 13 | trafficking venture.  That's the *Salesforce* case, that's the            |
| 14 | Eleventh Circuit *Red Roof Inn* case.  The benefit needs to be            |
| 15 | tied to the participation in the venture.                                  |
| 16 | And the participation needs to be overt acts that are                      |
| 17 | sort of participating in something together.  The venture as              |
| 18 | referred to by the plaintiffs in their complaint is a sex                  |
| 19 | trafficking venture, and so what the plaintiffs need to have               |
| 20 | pled and what they have not pled, is that there was in fact a              |
| 21 | meeting of the minds between JPMorgan Chase and Epstein to                 |
| 22 | participate in a sex trafficking venture.  There's nothing in             |
| 23 | the complaint that would allow that conclusion to be drawn.                |
| 24 | THE COURT:  Let me, again, with apologies, shift                           |
| 25 | gears.                                                                      |

N3DGdoeO2

1          You make the argument that a plaintiff here doesn't

2     count as a victim of obstruction under 18 U.S.C. Section

3     1595(a) because the victim was the government.  But why isn't

4     the effect of obstructing a government investigation into

5     sexual assaults or whatever also something that victimizes the

6     persons who suffer from the assaults?

7          MS. ELLSWORTH:  So, your Honor, I guess I would have

8     two responses to that.  The first is the *Doe* case that we cite

9     in our brief holds that in fact there is no private right of

10    action under the TVPA's obstruction clause because the victim

11    is the government.  Even putting that to the side, there's no

12    allegation of an ongoing investigation that JPMorgan was aware

13    of and that these actions alleged in the complaint would have

14    obstructed.  So the time period that we are talking about here

15    is a time period during which there's no at least publicly

16    known federal investigation.  There's no allegations of any

17    attempts by JPMorgan to obstruct anything like that.

18         There is one allegation in the complaint -- or maybe

19    it's in the motion to dismiss briefing -- about responding to a

20    subpoena.  As we said in our reply brief, it was the product of

21    a motion that was granted by default against JPMorgan.  So I

22    don't think there's any facts that get to the obstruction,

23    putting aside the fact of a private right of action or whether

24    the victim is somebody like Jane Doe or is in fact the

25    government.

N3DGdoeO2

1          Just briefly on a few of the other TVPA claims that

2     plaintiff has attempted to bring, aiding and abetting, the

3     *Noble* case, again, Judge Sweet says there's no aiding and

4     abetting liability under the TVPA, because it's to be covered

5     by the secondary liability provision.  Conspiracy and attempt,

6     those were --

7          THE COURT:  For me to remain, as I always will, in the

8     law of Judge Sweet, who was still actively hearing cases in

9     this court when he was in his mid to late 90s -- and then went

10    off, I think he was 97 or so, for his usual winter skiing trip

11    to Lake Tahoe, skied all day and then did not wake up that

12    evening -- if you got to go, that's the way to go -- but go

13    ahead, that was just unfortunate, but something I couldn't help

14    myself from mentioning.

15         MS. ELLSWORTH:  Understood, your Honor.  Understood.

16         The attempt and conspiracy claims of the TVPA, those

17    are not added until January of this year.  Many courts have

18    held that additional liability amendments to the TVPA that

19    provide additional liability are not retroactive.  These do

20    expand the scope of liability substantially, and of course are

21    not themselves retroactive, so those claims are barred.  They

22    don't apply.  The statute didn't allow it.

23         The last point I would make, your Honor, on the common

24    law claims, I talked a little about the negligence and the

25    duty, I think your Honor correctly pointed out in the prior

N3DGdoeO2

1    argument that for intentional affliction of emotional distress,

2    and I would say for the aiding and abetting battery claim, an

3    overt act is required, more than what is alleged in the

4    complaint here, in addition to all the other faiilings,

5    including particular causation.

6            THE COURT:  Where do we stand?

7            You have a full minute.  I have run out of questions.

8            MS. ELLSWORTH:  I can keep going, your Honor.

9            THE COURT:  Yes, please.

10           MS. ELLSWORTH:  I also wanted to make the point that

11   in the TVPA context, in particular, the requirement is –- and

12   again, this comes from the Eleventh Circuit in the *Red Roof Inn*

13   case, as well as other cases, the knowledge needs to be of a

14   particular violation, a single violation of the statute for

15   this 1595(a) participation civil liability.  So there needs to

16   be an allegation that, in fact, as to this plaintiff there was

17   knowledge by JPMorgan of her trafficking.  And again, there are

18   no such allegations.

19           THE COURT:  I'm not quite sure what the reasoning is

20   to that argument.  If, hypothetically, I know trafficking is

21   going on, I intentionally participate and facilitate it, I've

22   got to know exactly who is the victim?

23           MS. ELLSWORTH:  You do, your Honor.

24           THE COURT:  Why?

25           MS. ELLSWORTH:  Because the way the statute works for

N3DGdoeO2

1    the secondary liability is it sweeps back into 1591, which

2    requires an actual violation of the trafficking statute.  So in

3    order to be liable for -- under secondary liability -- in

4    addition to knowledge, participation and benefit, that

5    knowledge needs to be a violation of the underlying statute.

6    And that violation of the underlying statute needs to be as to

7    a particular individual.

8            You don't necessarily need to know that individual's

9    name, but, for example, in the hotel cases, which are the TVPA

10   cases, typically, when these cases are brought, sometimes

11   they're brought against franchisees and sometimes against

12   franchisors.  The franchisees were people on the ground who

13   might see a victim, hear cries for help, et cetera.  Most of

14   the cases find that allegations that are sufficiently well

15   pleaded as to those defendants, can proceed forward.  But

16   allegations against franchisors, like Marriott or a Wyndham

17   hotel where the allegations simply are that there was sex

18   trafficking going on in one of their franchise hotels, those

19   are held to be insufficient under the TVPA because there's no,

20   among other things, specific knowledge of a specific violation

21   of the statute.

22           THE COURT:  All right.  I hear you.  It still sounds a

23   little strange to me, but okay, I need to look more at those

24   cases.  So let me hear from your adversary.

25           MS. ELLSWORTH:  Thank you, your Honor.

N3DGdoeO2

1          MR. BOIES:  May it please the Court.

2          Let me just try to clear up what the complaint

3     alleges.  The complaint does allege that they had specific

4     knowledge of the trafficking, for example, of the plaintiff,

5     the named plaintiff here.  That's in, for example,

6     paragraphs 107 and 115 of the complaint.  In paragraphs 227 and

7     226 of the complaint, we also lay out what top executives of

8     JPMorgan knew about, knew personally about, in terms of the sex

9     trafficking.

10          This is not a case like the *Noble* case, your Honor.

11     And I have the privilege and Ms. McCawley as well, had the

12     privilege of trying one of the last cases in front of Judge

13     Sweet, which was a case in which we represented sex trafficking

14     victims.  And what Judge Sweet ruled in the *Noble* case is that

15     with respect to Weinstein, there was no proof that he knew

16     about the illegal activity going on.  Here, we have proof in

17     paragraphs 226, 227, 107, 115 --

18          THE COURT:  If those are fairly short paragraphs, can

19     you read them to me.

20          MR. BOIES:  Sure.

21          In 107, "There came a time when Epstein forced Jane

22     Doe to give massages to his powerful friends.  During some of

23     these massages, Jane Doe was sexually abused by force and

24     against her will by Epstein's friends, by whom she had been

25     required to do massage.  At least one of Epstein's friends used

N3DGdoeO2

```
1     aggressive force in his sexual assault of her and informed Jane

2     Doe 1 that he had Epstein's permission to do what he wanted to

3     her.  Out of fear, Jane Doe has still not named this powerful

4     executive publicly."  Thereafter, in this case, that powerful

5     executive was identified as Jes Staley.

6              THE COURT:  All right.  So there were other things you

7     wanted to --

8              MR. BOIES:  There were other ones.  And the other

9     gives comparable information.

10             But more important, your Honor, there is no

11    requirement that the defendant know the name or the identity of

12    the individual.  If you know that there's sex trafficking going

13    on, if you rent a room for people to engage in sex trafficking

14    and you profit from that, there is no requirement that you take

15    names at the door, that you see the people going in, that you

16    even know how many people go in.  If you know that the sex

17    trafficking is going on there, it is sufficient.  And there's

18    no case to the contrary.

19             The Choice Hotel situation, your Honor, is a situation

20    in which the franchisor was not held liable because the

21    franchisor didn't know that there was sex trafficking going on

22    in the individual hotels.  But the franchisee, the owner of the

23    hotel, was held liable.  And there was nothing in there that

24    suggested the franchisee had to know the name of every person

25    who came in and out and who was subject to the sex trafficking.
```

N3DGdoeO2

1          THE COURT:  Let me segue from that to a different

2     question, which was sort of quickly alluded to, but I want to

3     focus on it a little bit more, which is the statute of

4     limitations.

5          Does that require proof or allegations that your

6     plaintiff, Jane Doe, was abused within the limitations period,

7     or is it sufficient to simply say -- as I'm sure the complaint

8     does, if I recall correctly -- that the sex trafficking

9     venture, so to speak, continued beyond the cutoff of the

10    statute of limitations?

11         MR. BOIES:  I think it was -- because of our

12    conspiracy allegation -- I think it is sufficient that the sex

13    trafficking continued on.  We do allege that Jane Doe was

14    trafficked and abused in 2013.  And whatever ambiguity there

15    might have been about that prior to the time that she was

16    deposed -- and she's already been deposed in this case -- her

17    deposition made clear that she continued to be trafficked into

18    2013.  So the allegation --

19         THE COURT:  I don't think I can consider that on this

20    motion.

21         MR. BOIES:  No, no.  But all I'm saying --

22         THE COURT:  It might be a basis for leave to amend,

23    but that would be --

24         MR. BOIES:  And all I'm saying, your Honor, is our

25    complaint alleges it goes into 2013.

N3DGdoeO2

1          THE COURT:  You're saying it's been confirmed.

2          MR. BOIES:  I'm just saying it's been confirmed.  They

3    raise some doubt in their papers as to whether our allegations

4    have it or not.

5          THE COURT:  Okay.

6          MR. BOIES:  We do allege it as 2013 in the complaint.

7          And in addition to that, we also allege, because they

8    were participating in a conspiracy and they never withdrew from

9    that conspiracy, at least until 2019, they continue to be

10   liable for acts of that conspiracy even if they are not

11   continuing to take affirmative actions themselves.

12         THE COURT:  What about -- again, if I can, with

13   apologies, shift gears -- what about the issues I was

14   questioning your adversary about aiding and abetting?

15         MR. BOIES:  With respect to aiding and abetting, your

16   Honor, we think all of the three requirements of aiding and

17   abetting are met here.  There's knowledge of the underlying --

18         THE COURT:  No, the question was a more, if you will,

19   picky question about if the statute for this only applies to

20   this chapter, how do you get aiding and abetting, which is not

21   part of this chapter.

22         MR. BOIES:  Well, I think there's an argument, your

23   Honor, that aiding and abetting is part of the chapter in the

24   following sense:  18 Section 2, which makes aiding and

25   abetting -- what Section 2 says there is that if you aid and

N3DGdoeO2

1    abet, you are liable as a principal.  And as the Court is

2    aware, when people are indicted for aiding and abetting in

3    1591, the indictment begins with 1591, and so what they're

4    being charged with is a violation of 1591.  Aiding and abetting

5    simply makes them a principal under 1591.

6              THE COURT:  I guess -- and I don't want to dwell on

7    this -- Section 2, a criminal statute, on its face applies to

8    the entirety of Title 18.  But by contrast, in the civil

9    context, the cause of action is limited to a victim of this

10   chapter.  And the question, therefore, is:  Does that then not

11   import Section 2?

12             MR. BOIES:  It's almost metaphysical.  I guess it

13   really just depends on sort of how you look at it.  They're

14   being charged with violating 1591.  And what Section 2 says is

15   you violate 1591 where you are a principal or as a principal,

16   whether you are the principal or whether you are an aider and

17   abetter, and I --

18             THE COURT:  Okay.  I understand the argument.

19             MR. BOIES:  The other thing, your Honor, is that with

20   respect to -- your Honor raised the question about *Rothstein*.

21   And *Rothstein,* of course, related to Section 2333.  And the

22   language in 1591, 1595 is broader than 2333 at the time that

23   *Rothstein* was decided.

24             Now, after *Rothstein* was decided, Congress amended

25   2333 to in effect reverse *Rothstein*.  And I think that the

N3DGdoeO2

1    Court can take into account here, in interpreting 1591, that

2    congressional expression, it was clear that Congress thought

3    the court got it wrong in interpreting 2333.

4            THE COURT:  Well, I don't know if I can read it that

5    way.  I mean, I agree with you that *Rothstein* is distinctual.

6    But whether I can infer more than that from Congress --

7    Congress can reverse a ruling without necessarily saying we

8    think the court got it wrong.  They can reverse a ruling

9    because they want to make sure that in the future the statute

10   will cover those kinds of things.

11           MR. BOIES:  I think the Court is correct.  It's very

12   hard to interpret.

13           THE COURT:  What about this issue -- again, this is a

14   little bit metaphysical -- what about the question of whether

15   obstruction of a government investigation gives rise to a claim

16   under the statute for someone who was the victim of what was

17   being covered up or obstructed from the investigation?

18           MR. BOIES:  I think, again, that's a difficult

19   question because the question, I think, is, were you damaged by

20   the obstruction.  And if the obstruction comes after you have

21   suffered your damage, you may not have that -- I think that if

22   you go back to the early -- and this may be a problem with any

23   class action or maybe you have to have certain classes -- but I

24   think that if you really think about it, the obstruction harms

25   the people that come after the obstruction.  And I think it's a

N3DGdoeO2

1    complicated --

2                (Continued on next page)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N3DAADOE3

1          THE COURT:  I'll have to think about it.  I'm not sure

2    how I think about that.

3          Let me ask my law clerk how we are doing time-wise.

4    You've got three minutes.  You've got an eternity.

5          MR. BOIES:  Let me say one thing.  This was not a team

6    banking activity.  They were structuring.  There were dozens

7    and dozens of $7,500 withdrawals all in cash all at the same

8    time.  They were not filing the suspicious activity report.

9    They were taking the plans from a Highbridge.  And there may be

10   some doubt about exactly what a Highbridge's ownership was but

11   there's no doubt that high bridge was controlled by the

12   defendant here.  And they were using the Highbridge planes to

13   transport girls.  Jeff daily was himself participating in the

14   sexual abuse, in the sex trafficking and witnessing it.  There

15   can't be any doubt that what JP Morgan Chase did here was

16   nothing like routine banking services.  There's nothing like

17   the kind of situation where somebody provides a neutral

18   product, neutral service without any knowledge about how it's

19   being used.

20          Here, they were actually structuring what they were

21   doing in order to make sex trafficking possible.  The complaint

22   alleges and the proof will clearly show that this sex

23   trafficking could not have gone on the way it did without the

24   financial support of an institution like J.P. Morgan and they

25   knew that at the time and they were profiting at the time.  And

N3DAADOE3

when people -- and this is alleged in the complaint and it'll

be proven if we get a chance do it at trial.  When people at

the bank went to the high-level people and said we're

supporting the sex trafficker and we ought to stop, the top

management because they wanted to keep those fees and keep what

was going on, said no.  We're going to continue to do that.

              So, this was a situation which they had complete

knowledge and they were not -- and it is not a situation which

is no overt act.  This is not a situation like the Cornell case

where the Court in effect says there's no overt act that is

done.  Here, there were overt acts with Highbridge.  There were

overt acts with structuring.  There were overt acts with not

complying with the responsibility to file the suspicious

activity reports and there were overt acts which the top

executives, JPMorgan Chase participated personally in the sex

trafficking.  So, this is a situation that is unlike any of the

cases that they cite and clearly fits the mold of what 1595 was

trying do.  And it is both a criminal and civil statute.

              The one thing that is clear in terms of construction

is that when you are thinking about the scope of civil remedy

for the violation, that is certainly remedial and that is

certainly where it ought to be given its broad stroke.  what

they're trying to say, yes, there may have been a violation but

you ought to shrink down the remedies that you ought to limit

remedies.  you ought to impose all of these special

N3DAADOE3

1    requirements on who is able to receive the remedy.  That's

2    where the broad construction of this remedial statute is

3    because what you have -- no doubt that there was sex

4    trafficking here.

5         There is no doubt that what J.P. Morgan did made that

6    possible.  There's no doubt that they knew what they were doing

7    at the time.  we got a lot of causes of action here, and some

8    of them are overlapping.  And by the time we get to trial we

9    are going to have to probably pare it down, but none of that

10   affects discovery.  All these causes of action, I think we met

11   the legal requirements to get to the story stage and decide

12   after that how we ultimately try the case.

13        THE COURT:  All right.  Now, we have reached the time.

14        MR. BOIES:  Thank you very much, your Honor.

15        THE COURT:  Let me hear your adversary.

16        MS. ELLSWORTH:  Your Honor, Paragraph 107 of the

17   complaint that Mr. Boies just recited to you, the conduct

18   alleged in that paragraph is abhorrent but it is not sex

19   trafficking.  It is sexual assault.  And the Trafficking

20   Victims Protection Act is not a federal sexual assault statute.

21   It has to do with trafficking.  It has very specific

22   definitions.

23        The other paragraphs that Mr. Boies cited to you, they

24   also do not contain allegations that Mr. Staley witnessed

25   trafficking.  They contain allegations that Mr. Staley

N3DAADOE3

1    witnessed abuse, that he participated in abuse or assault.

2    That is different than trafficking.

3              On the suggestion that there's an allegation or that

4    there is evidence of Highbridge, which is not a subsidiary in

5    the corporate form, is more complicate than that.  But in any

6    event, there is a single, unadorned by factual --

7              THE COURT:  Just going back to your point for a

8    minute, I'm looking at 1591 is what we're talking about, yes?

9              MS. ELLSWORTH:  Correct.  That is the underlying

10   conduct, yes.

11             THE COURT:  Whoever knowingly recruits, entices,

12   harbors, transports, provides, obtains, advertises, maintains,

13   patronizes or solicits by any means, a person or who benefits

14   financially or by receiving anything of value from

15   participation in a venture which has been engaged in an act

16   described in violation of Paragraph One, commits a crime -- I'm

17   leaving some important language out but why do you say -- I

18   don't have the complaint in front of me, but why do you say it

19   doesn't fit that?

20             MS. ELLSWORTH:  For the secondary liability in 1595(A)

21   there needs to be a showing that there is trafficking in the

22   form of a commercial sex act, procured by force, fraud or

23   coercion or for an individual under the age of 18 which is not

24   a plaintiff in this case.  The plaintiff in case was not under

25   the age of 18 at the time that she became involved with

N3DAADOE3

Epstein.

So, the requirement is that the victim be forced to engage in commercial sex acts by force, fraud or coercion.

THE COURT:  So, I should read a little further after the portion I just read.

Knowing or except where the act constituting the violation of Paragraph One is advertising in reckless disregard of the fact.  That means a forced threat of forced fraud or coercion described in Subsection (E) (2) or any combination of such means will be used to cause the person to engage in a commercial sex act or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act shall be punished, et cetera.

So, why isn't it reckless disregard?

MS. ELLSWORTH:  Well, again, there's no evidence pled as against the paragraphs of the complaint that Mr. Boies pointed to are the allegations as to Mr. Staley's conduct. There are no allegations that Mr. Staley was aware of commercial sex acts at all and was aware of any force, fraud or coercion being used to cause, again, the plaintiff in this case to engage in commercial sex act.  There's no allegation of money exchanging hands as to the allegation in Paragraph 107 and the other paragraph --

THE COURT:  I'll have to take a closer look at those paragraphs.

N3DAADOE3

1        MS. ELLSWORTH:  We don't think that knowledge should

2   be excluded.  But even to the extent it's not knowledge of

3   trafficking and that's an important distinction.

4        THE COURT:  Okay.

5        MS. ELLSWORTH:  Allegations as to Highbridge, there is

6   no factual support for it at all in the complaint.  It is in

7   Paragraph 170 and it is a legal conclusion.  It says that the

8   Highbridge plane was used to traffic women.  That's it.  I'm

9   paraphrasing but that's the language.  That's insufficient.

10        On the statute of limitations, I would just point out

11   to the Court that this plaintiff filed a prior case in which

12   alleged the trafficking ended in 2012.  She alleged that her

13   interactions with Epstein ended in 2012.

14        THE COURT:  Given what's alleged here and given what

15   according to your adversary might be a basis to amend if an

16   amendment was necessary, isn't that ultimately a jury question?

17        MS. ELLSWORTH:  It may be, your Honor.  But it is an

18   inconsistent pleading filed by the same lawyers.

19        THE COURT:  Wait.  Wait a minute.  An inconsistent

20   pleading by the same lawyers?

21        MS. ELLSWORTH:  It is.

22        THE COURT:  Is that a capital offense?

23        MS. ELLSWORTH:  It's an allegation signed to Rule 11

24   is that the conduct ended in 2012.  It's important.  The ten

25   years statute of limitation.

N3DAADOE3

1          THE COURT:  All right.

2          MS. ELLSWORTH:  The idea that, again, Mr. Boies

3    finished his argument by noting that Epstein's conduct was made

4    possible by the financing or the fact that J.P. Morgan served

5    as a bank for Epstein, I think that is belied by the fact that

6    then Epstein would go to Deutsche Bank and the same conduct is

7    alleged by Deutsche Bank.  So, the chain of causation is

8    broken, if not established by the complaint here.  The fact

9    that this conduct was made possible by the fact that JP Morgan

10   having a bank account or bank accounts for Mr. Epstein.

11         The last point I would make again is aiding and

12   abetting.  In addition to all of the reasons why it shouldn't

13   apply here, including the Noble case and Perlis case in the

14   Circuit of the District of Connecticut finding that aiding and

15   abetting is not common place.

16         Putting all of that to the side, aiding and abetting

17   also required a deliberate act of some sort and nothing like

18   that is pled in the complaint as to conduct of JP Morgan.

19         THE COURT:  Okay.  Well, I want to thank all counsel

20   for this excellent argument, which is very helpful to the

21   Court.  It is possibly you may have heard I like to move my

22   cases along.  I will get you at least a bottom-line ruling on

23   these motions and on the various prongs of these motions by the

24   end of this month.  I hope to do better than that but I will at

25   least guaranty you that much so that we can move along with the

N3DAADOE3

1    case and you'll know at that point at least what is in

2    discovery and what is not in discovery.

3              Anything else that anyone needs to raise with the

4    Court?

5              MR. BOIES:  Not for the plaintiffs, your Honor.

6              MR. DOWDEN:  Nothing from Deutsche Bank, your Honor.

7              THE COURT:  Very good.  Thanks again.

8                           (Adjourned)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25