# EXHIBIT Q

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

JANE DOE 1000,

    Plaintiff,

v.

DARREN K. INDYKE and RICHARD D. KAHN,
in their capacities as the executors of the
ESTATE OF JEFFREY EDWARD EPSTEIN,

    Defendants.

CASE NO:

**COMPLAINT**

BOIES SCHILLER FLEXNER LLP

1

Plaintiff Jane Doe 1000, by her attorneys Boies Schiller Flexner LLP, for her Complaint against Defendants, Darren K. Indyke and Richard D. Kahn in their capacities as the executors of the Estate of Jeffrey Edward Epstein ("Epstein"), avers upon personal knowledge as to her own acts and status and upon information and belief and to all other matters as follows:

## NATURE OF THE ACTION

1. This suit arises out of Jeffrey Epstein's sexual abuse of Plaintiff.

2. Jane Doe 1000 was sexually trafficked by Epstein as part of his organized ring of procuring young and underage girls for sex. One of Epstein's co-conspirators contacted Jane Doe after a modeling appearance and arranged to have Jane Doe meet Epstein under the false pretense that he was involved in the modeling industry and wanted to interview her about opportunities. Rather than help her with her modeling career, Epstein manipulated and intimidated Jane Doe and subjected her to years of sexual abuse in his New York mansion.

3. Epstein's trafficking scheme involved recruiting young females by making false promises and using his wealth, power and threats to intimidate the females into submission to his demands. This same pattern was repeated numerous times with numerous young women.

4. As United States District Judge Kenneth Marra found, "From between about 1999 and 2007, Jeffrey Epstein sexually abused more than 30 minor girls . . . at his mansion in Palm Beach Florida, and elsewhere in the United States and overseas. . . . In addition to his own sexual abuse of the victims, Epstein directed other persons to abuse the girls sexually. Epstein used paid employees to find and bring minor girls to him. Epstein worked in concert with others to obtain minors not only for his own sexual gratification, but also for the sexual gratification of others." *Doe 1 v. United States*, 359 F. Supp. 3d 1201, 1204 (S.D. Fla. 2019) (internal citations omitted).

5.  Epstein organized this sex trafficking network to obtain hundreds of young females for himself for sex, and also lent these females out to other powerful and wealthy individuals to be sexually abused.

6.  Epstein conspired with others and hired staff to maintain and keep secret this network of sexual abuse for years, which sprawled throughout Epstein's residences in New York, Florida, New Mexico, the United States Virgin Islands, and Paris. Epstein's preference was to have three different young females a day for his sexual pleasure.

7.  Despite his significant criminal activity, in 2008 Epstein received a shockingly minimal charge pleading guilty to a single Florida state law charge of procuring a minor for prostitution and a non-prosecution agreement (a "NPA") with the U.S. Attorney for the Southern District of Florida. Unknown to the public and the victims at the time, Epstein's lawyers were pressuring the Government to commit to the NPA without informing the victims. Epstein's multiple victims were kept in the dark and told to be "patient" while Epstein's lawyers worked to protect him and other potential co-conspirators from prosecution. Epstein served one year in jail, but was afforded the privilege of being able to leave the jail to go to work for twelve hours per day, six days per week.

8.  The NPA allowed Epstein to escape proportionate punishment for his actions and to continue operating his sex trafficking enterprise with liberty.

9.  A few years later, Epstein flippantly referred to his sexual abuse of multiple minors, and the slap on the wrist he had received for it, in a 2011 interview with the New York Post: "Billionaire pervert Jeffrey Epstein is back in New York City – and making wisecracks about his just-ended jail stint for having sex with an underage girl. 'I am not a sexual predator, I'm an offender,' the financier told The Post yesterday. 'It's the difference between a murderer and a

3

person who steals a bagel,' said Epstein." Amber Sutherland, *Billionaire Jeffrey Epstein: I'm a Sex Offender Not a Predator*, N.Y. Post (Feb. 25, 2011),

https://nypost.com/2011/02/25/billionaire-jeffrey-epstein-im-a-sex-offender-not-a-predator/.

10. In August 2018, just one year before his death, Epstein told a New York Times reporter "that criminalizing sex with teenage girls was a cultural aberration and that at times in history it was perfectly acceptable." James B. Stewart, *The Day Jeffrey Epstein Told Me He Had Dirt on Powerful People*, N.Y. Times (Aug. 12, 2019),

https://www.nytimes.com/2019/08/12/business/jeffrey-epstein-interview.html.

11. When Plaintiff was a young woman, Epstein added her to his long list of victims by committing sexual assault and battery against her. As such, Epstein is responsible for battery and intentional infliction of emotional distress pursuant to New York common law. The damage to Plaintiff has been severe and lasting.

12. This action has been timely filed pursuant to N.Y. C.P.L.R. § 215(8)(a), which provides that a plaintiff shall have at least one year from the termination of a criminal action against the same defendant to commence an action with respect to the event or occurrence from which the criminal action arose. A criminal action against Epstein with respect to the same sex trafficking enterprise from which Plaintiff's claims arise was terminated on August 29, 2019.

13. This action has also been timely filed pursuant to N.Y. C.P.L.R. § 213-C, which provides that a plaintiff shall have 20 years to file civil claims "for physical, psychological or other injury or condition suffered by such person as a result of conduct which would constitute" certain sex crimes under New York Penal Law Article 130. Epstein and Ghislaine Maxwell sexually assaulted Plaintiff by forcible compulsion within 20 years of filing this Complaint, and that sexual assault constitutes one or more sex crimes described in N.Y. C.P.L.R. § 213-C.

4

14. Any statute of limitations applicable to Plaintiff's claims, if any, is tolled due to the continuous and active deception, duress, threats of retaliation, and other forms of misconduct that Epstein and his co-conspirators used to silence his many victims, including Plaintiff. Epstein's actions deprived Plaintiff of the opportunity to commence this lawsuit before his death. Until his death, Plaintiff feared that Epstein and his co-conspirators would harm her or her family, or ruin her life, if she came forward.

15. Defendants are equitably estopped from asserting a statute of limitations defense. Allowing Defendants to do so would be unjust. Epstein and his co-conspirators intimidated each of his victims into silence by threatening their lives and their livelihoods. They therefore prevented Plaintiff from commencing this lawsuit before his death. By using threats, along with his wealth and power, Epstein was able to escape punishment for his intolerable and brutal crimes against countless young women and underage girls for the duration of his life.

## PARTIES

16. Plaintiff Jane Doe 1000 is a citizen and resident of New Jersey.

17. Defendant Darren K. Indyke is sued in his capacity as an appointed executor of the Estate of Jeffrey E. Epstein.

18. Defendant Richard D. Kahn is sued in his capacity as an appointed executor of the Estate of Jeffrey E. Epstein.

## JURISDICTION AND VENUE

19. Jeffrey Epstein was a citizen of the United States domiciled in the U.S. Virgin Islands at the time of his death. Jeffrey Epstein maintained a residence in the Southern District of New York. As the legal representatives of the Estate of Jeffrey E. Epstein, Darren K. Indyke and Richard D. Kahn are deemed citizens of the U.S. Virgin Islands.

20. The amount in controversy in this action exceeds the sum or value of $75,000.00 excluding interests and costs and is between citizens of different states. Accordingly, jurisdiction is proper under 28 U.S.C. § 1332.

21. Venue is proper in this Court as Epstein's sexual abuse of Plaintiff began and occurred in New York, New York, where he recruited her, physically molested her, and began grooming her for sex in his organized sex trafficking ring.

22. Many of the events giving rise to these causes of action occurred in the Southern District of New York, where a substantial amount of Epstein's property is located. Thus, venue in this district is proper. 28 U.S.C. § 1391(b)(2).

## FACTUAL ALLEGATIONS

### A. Epstein's Sex Trafficking Enterprise

23. Jeffrey Epstein was widely renowned as a billionaire who used his vast connections to powerful individuals, and seemingly unlimited wealth and resources, to create a web of transcontinental sex trafficking that served himself, his coconspirators, and some of the most powerful people in the world.

24. Epstein owned multiple residences and frequently travelled between them, including at 9 East 71st Street, New York, New York 10021, where the illegal sexual crimes against Plaintiff occurred. Epstein conservatively valued his New York townhome at $55,931,000.00. Epstein conservatively valued his ranch at 49 Zorro Ranch Road, Stanley, New Mexico 87056, at $17,246,208.00. In addition, Epstein owned residences in the Virgin Islands, Florida, France, and even on his own island, Great St. James Island, where his transcontinental sex trafficking of hundreds of young girls servicing him, his co-conspirators, and wealthy and powerful individuals around the world occurred.

6

25.     The allegations herein concern Epstein's tortious acts against Plaintiff while in New York, where Epstein was staying at his mansion.

26.     At all times material to this cause of action, Jeffrey Epstein utilized his seemingly unlimited power, wealth, and resources, as well as his deep connections to powerful and politically connected individuals to intimidate and manipulate his victims of sexual abuse.

27.     Epstein and his co-conspirators had perfected a scheme for manipulation and abuse of young females. As part of the scheme, a female "recruiter" would approach a young female and strike up a conversation in an effort to quickly learn about the young female's background and any vulnerabilities they could expose. The recruiter would then manipulate the young female into coming back to one of Epstein's residences by offering the young female something she needed. At times the recruiter's lure would be a modeling opportunity, money for education, help for the young female's family, and a whole host of other related offers depending on their target's situation. Once in the residence, the recruiter and Epstein would work in concert to impress and intimidate the young female with displays of vast wealth, including having employees that were butlers and maids formally dressed around the house. They would also strategically place photographs of very powerful political and social figures amongst photographs and art displaying nude females in an effort to normalize the sexual abuse. They would also normalize the sexual abuse by placing a massage table and spa related products around the massage area in an effort to legitimize the area where the abuse was set to occur. Once abused, Epstein and his co-conspirators continued to manipulate the victims, using their financial power, promises, and threats to ensure that the victim returned as directed and remained compliant with their demands.

B. **The Arrest, Prosecution, and Death of Epstein**

28. The sexual trafficking ring described herein started at least as early as 1995 and continued up until at least July 2, 2019, when the U.S. Attorney's Office for the Southern District of New York ("SDNY") charged Epstein with sex trafficking conspiracy and sex trafficking in violation of 18 U.S.C. § 1591. He was arrested on July 8, 2019, pursuant to the SDNY's Sealed Two Count Indictment, which is attached as Exhibit A.

29. The Indictment described Epstein's conduct and his abuse and trafficking of females in the same trafficking operation he used to abuse and traffic Plaintiff.

30. Epstein's last will and testament (the "Will") was executed on August 8, 2019, at the Metropolitan Correctional Center. The witnesses were Mariel Colón Miró and Gulnora Tali. The Will included affidavits from Darren K. Indyke and Richard D. Kahn, in which they swear an "Oath of Willingness to Serve as Executor and Appointment of Local Counsel."

31. Epstein was found dead in his cell at the Metropolitan Correctional Center on August 10, 2019.

32. Epstein's last will and testament was filed on August 15, 2019, in the Probate Division of the Superior Court of the Virgin Islands.

33. Darren K. Indyke and Richard D. Kahn filed a Certificate of Trust in the Superior Court of the Virgin Islands for Epstein's 1953 Trust on August 26, 2019. *See* Certificate of Trust, *In the Matter of the Estate of Jeffrey E. Epstein*, Probate No. ST-19-PB-80 (Super. Ct. V.I. Aug. 26, 2019).

34. Epstein's will was entered into probate on September 6, 2019, and the Superior Court of the Virgin Islands accordingly authorized Darren K. Indyke and Richard D. Kahn to administer Epstein's estate. *See* Order for Probate, *In the Matter of the Estate of Jeffrey E. Epstein*, Probate

8

No. ST-19-PB-80 (Super. Ct. V.I. Sept. 6, 2019); Letters Testamentary, *In the Matter of the Estate of Jeffrey E. Epstein*, Probate No. ST-19-PB-80 (Super. Ct. V.I. Sept. 6, 2019).

35. The Will's first article directs Epstein's executors "to pay from my estate all expenses of my last illness, my funeral and burial expenses, the administration expenses of my estate and all of my debts duly proven and allowed against my estate." The Will further directs that "after the payments and distributions provided in Article FIRST," Epstein "give[s] all of my property, real and personal, wherever situated…to the then acting Trustees of The 1953 Trust."

36. Following Epstein's death, SDNY submitted a proposed nolle prosequi order in the criminal matter against him because it was required by law to do so after Epstein was deceased. On August 29, 2019, U.S. District Judge Richard Berman formally dismissed SDNY's indictment against Epstein, terminating the criminal action against him. Plaintiff's claims are therefore timely under N.Y. C.P.L.R. § 215(8)(a).

**C.    Jane Doe 1000**

37. Jane Doe 1000 grew up in extreme poverty. At various times throughout her childhood, her mother had been homeless. Jane Doe was unable to enroll in high school because she did not have a residence and often lived without running water or electricity.

38. In late 1999, Jane Doe made a modeling appearance. A man called her and told her that Jeffrey Epstein had connections to various modeling jobs and asked her if she would like to meet with Epstein to discuss opportunities. The opportunity sounded enticing to Jane Doe, so she agreed and met Epstein at his New York City mansion on 71st Street.

39. Upon meeting Jane Doe, Epstein offered her a position modeling with Victoria's Secret, a lingerie retailer. He explained that he was friends with Les Wexner, the chief executive of

9

Victoria's Secret's parent company. Epstein reiterated his connection to Victoria's Secret each time he saw and spoke with Jane Doe.

40. Eventually, Epstein moved Jane Doe into his apartment building on 66th Street, where he housed other models and young women that he sexually abused, so that he could have complete control over her life. Her relationship with Epstein quickly turned into one of sexual abuse. Ghislaine Maxwell, one of Epstein's main "recruiters," along with additional unidentified co-conspirators, would call Jane Doe and direct her to go to Epstein's mansion to give him a massage. The massages quickly escalated into Epstein forcing himself on Jane Doe against her will and engaging in one or more sex act with her for his own sexual gratification. Jane Doe was terrified of Epstein, who repeatedly threatened her and made representations about his wealth, power, and connections.

41. During Jane Doe's time with Epstein, he forced her to give him sexual massages and made her use sex toys.

42. Epstein also flew Jane Doe to his residence in Palm Beach, Florida, where she was also forced to give Epstein sexual massages.

43. On one occasion, Epstein forced Jane Doe to meet with a lawyer, even though she did not express any need for a lawyer to Epstein. The lawyer she met with was a prominent attorney and a law professor who was described to Jane Doe as Epstein's close friend and lawyer. The lawyer appeared to be interviewing her, asking personal questions about her family's financial situation. The meeting had no legal purpose, and Epstein later used the information that the lawyer had obtained through his meeting with Jane Doe to intimidate her and to keep her compliant in his sex-trafficking scheme.

44. Epstein made very clear to Jane Doe that he was incredibly wealthy, powerful and regularly in contact with world leaders. In fact, in his New York mansion he had photographs displayed of significant political figures to ensure that any young female entering the home would know that he had extensive government connections. Epstein was not to be disobeyed and he made clear by his words and actions that there would be consequences if Jane Doe did not comply with his demands.

45. Epstein constantly promised Jane Doe modeling opportunities with Victoria's Secret each time she saw him. He continued to make that promise for years, up until the last time Jane Doe saw Epstein.

46. One day, Epstein had someone call Jane Doe to his mansion. When Jane Doe arrived, Maxwell was waiting for her and led her upstairs to Epstein's master bedroom. When they got to the bedroom, sex toys were laid out on the bed. Epstein and Maxwell proceeded to sexually assault Jane Doe simultaneously and by forcible compulsion. Maxwell forcibly penetrated Jane Doe with a sex toy. She was horrified and terrified by the experience and knew she had to try to get away from Epstein even though she risked harm to herself by disobeying Epstein. She proceeded to move out of the 66th Street apartment building and, having nowhere else to go, found shelter at the Salvation Army housing facility.

47. Jane Doe was deeply affected by her harrowing experiences at the hands of Epstein. She suffers extreme emotional distress from an experience that has affected her for her entire life.

48. Epstein's sexual assault and battery of Jane Doe continues to cause her significant distress and harm.

## FIRST CAUSE OF ACTION

### (Battery)

49. Plaintiff repeats and re-alleges the allegations stated above in paragraphs 1–48 as if fully set forth herein.

50. Epstein intentionally committed battery by sexually assaulting Plaintiff when she was a young woman. As described above, on multiple occasions, Epstein intentionally sexually assaulted and touched Plaintiff in an offensive and sexual manner without her consent.

51. Epstein's actions constitute sexual offenses as defined in New York Penal Law Article 130, including but not limited to Article 130.35, inasmuch as Epstein and Maxwell sexually assaulted Plaintiff by forcible compulsion within 20 years of filing this Complaint. *See* N.Y. C.P.L.R. § 213-C.

52. A criminal action against Epstein with respect to the same sex trafficking enterprise from which Plaintiff's first cause of action arises was terminated on August 29, 2019, less than one year prior to the filing of this Complaint. *See* N.Y. C.P.L.R. § 215(8)(a).

53. As a direct and proximate result of Epstein's conduct, Plaintiff has in the past and will in the future continue to suffer extreme emotional distress, humiliation, fear, psychological trauma, loss of dignity and self-esteem, and invasion of her privacy.

## SECOND CAUSE OF ACTION

### (Intentional Infliction of Emotional Distress)

54. Plaintiff repeats and re-alleges the allegations stated above in paragraphs 1–48 as if fully set forth herein.

55. As a direct result of these allegations as stated, Epstein committed intentional infliction of emotional distress against Plaintiff.

12

56. Epstein's actions, described above, constitute extreme and outrageous conduct that shocks the conscience. Epstein's plan to recruit, entice, and assault Plaintiff on multiple occasions goes beyond all possible bounds of decency and is intolerable in a civilized community.

57. Epstein knew or disregarded the substantial likelihood that these actions would cause Plaintiff severe emotional distress.

58. A criminal action against Epstein with respect to the same sex trafficking enterprise from which Plaintiff's second cause of action arises was terminated on August 29, 2019, less than one year prior to the filing of this Complaint. *See* N.Y. C.P.L.R. § 215(8)(a).

59. As a direct and proximate result of Epstein's conduct, Plaintiff has in the past and will in the future continue to suffer extreme emotional distress, humiliation, fear, psychological trauma, loss of dignity and self-esteem, and invasion of her privacy.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests judgment against Defendants, awarding compensatory, consequential, exemplary, and punitive damages in an amount to be determined at trial; costs of suit; attorneys' fees; and such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all causes of action asserted within this pleading.

Dated: November 14, 2019.

/s/ Joshua I. Schiller

David Boies
BOIES SCHILLER FLEXNER LLP
333 Main Street
Armonk, NY 10504
(914) 749-8200

Joshua I. Schiller
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, NY 10001
(212) 446-2300

Sigrid McCawley
(Pro Hac Vice Pending)
BOIES SCHILLER FLEXNER LLP
401 E. Las Olas Blvd., Suite 1200
Ft. Lauderdale, FL 33301
(954) 356-0011