**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

Jane Doe 1, individually and on behalf of
all others similarly situated,

    Plaintiff,

       v.

Deutsche Bank Akteingesellschaft, et. al.,

    Defendants.

Case No. 1:22-CV-10018 (JSR)

<u>**PLAINTIFF JANE DOE 1'S MEMORANDUM OF LAW IN**</u>
<u>**SUPPORT OF MOTION FOR CLASS CERTIFICATION**</u>

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................................... 3

PRELIMINARY STATEMENT ................................................................................................. 1

FACTUAL BACKGROUND ..................................................................................................... 2

I.      Jeffrey Epstein's Sex-Trafficking Venture ..................................................................... 2

II.     Deutsche Bank's Facilitation of the Sex-Trafficking Venture ........................................ 4

III.    Jane Doe 1's Trafficking by Epstein ................................................................................ 6

ARGUMENT ............................................................................................................................. 7

I.      The Requirements of Rule 23(a) Are Satisfied. .............................................................. 8

        A.      Rule 23(a)(1)—Numerosity Is Satisfied With the Trafficking Venture Injuring
                Hundreds of Potential Victims During the Class Period. ..................................... 8

        B.      Rule 23(a)(2)—Common Questions of Law and Fact Clearly Exist. .................... 9

        C.      Rule 23(a)(3)—Plaintiff's Claims Are Typical. ................................................. 11

        D.      Rule 23(a)(4)—Plaintiff Will Adequately Represent the Class. .......................... 13

II.     The Rule 23(b) Requirements Are Satisfied. ................................................................ 14

        A.      Rule 23(b)(3)'s Requirements Are Satisfied. ..................................................... 14

                1.      Common Questions of Law and Fact Predominate. ................................ 14

                2.      A Class Action Is Superior to Other Methods of Adjudication. .............. 18

        B.      The Rule 23(b)(1) Requirements Are Satisfied. .................................................. 19

III.    Ascertainability—The Class Is Sufficiently Ascertainable. ........................................... 21

IV.     In the Alternative, a Rule 23(c)(4) Issues Class Is Appropriate. ..................................... 22

V.      The Court Should Appoint Boies Schiller Flexner LLP,  Edwards Pottinger LLC, and Paul
        Cassell as Class Counsel. ............................................................................................. 23

CONCLUSION ........................................................................................................................ 24

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Amchem Prods., Inc v. Windsor*,
    521 U.S. 591 (1997)....................................................................................... 19, 20

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
    568 U.S. 455 (2013)....................................................................................... 7, 14

*Beltran v. InterExchange, Inc.*,
    No. 14-CV-03074-CMA-CBS, 2018 WL 1948687 (D. Colo. Feb. 2, 2018)............... 8

*Biediger v. Quinnipiac Univ.*,
    2010 WL 2017773 (D. Conn. May 20, 2010)....................................................... 22

*Casilao v. Hotelmacher LLC*,
    No. CIV-17-800-SLP, 2021 WL 4487984 (W.D. Okla. Sept. 30, 2021) ................ 13

*Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*,
    504 F.3d 229 (2d Cir. 2007)................................................................................ 9

*Chalmers v. City of New York*,
    No. 20 CIV. 3389 (AT), 2022 WL 4330119 (S.D.N.Y. Sept. 19, 2022)................ 14

*Consol. Rail Corp. v. Town of Hyde Park*,
    47 F.3d 473 (2d Cir. 1995).................................................................................. 8

*Denney v. Deutsche Bank AG*,
    443 F.3d 253 (2d Cir. 2006)................................................................................ 13

*Ebin v. Kangadis Food Inc.*,
    297 F.R.D. 561 (S.D.N.Y. 2014) ........................................................................ 21

*Espinoza v. 953 Assocs. LLC*,
    280 F.R.D. 113 (S.D.N.Y. 2011) ........................................................................ 21

*In re Drexel Burnham Lambert Grp., Inc.*,
    960 F.2d 285 (2d Cir. 1992)................................................................................ 13

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
    299 F. Supp. 3d 430 (S.D.N.Y. 2018).................................................................. 22

*In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*,
    241 F.R.D. 185 (S.D.N.Y. 2007) ........................................................................ 20

*In re MF Global Holdings Ltd. Inv. Litig.*,
    310 F.R.D. 230 (S.D.N.Y. 2015) ................................................................. 13, 19

*In re Petrobras Secs.*,
    862 F.3d 250 (2d Cir. 2017)................................................................................ 14

*In re Smith Barney Transfer Agent Litig.*,
    290 F.R.D. 42 (S.D.N.Y. 2013) .......................................................................................... 12

*In re USC Student Health Ctr. Litig.*, No.
    2:18-cv-04258-SVW, 2019 WL 3315281 (C.D. Cal. June 12, 2019) ...................................... 8

*In re White*,
    64 F.4th 302 (D.C. Cir. 2023)............................................................................................ 20

*Jane Doe 30's Mother v. Bradley*,
    64 A.3d 379 (Del. Super. Ct. 2012) .................................................................................. 19

*K.A. v. City of New York*,
    413 F. Supp. 3d 282 (S.D.N.Y. 2019).................................................................................. 8

*Katz v. United Synagogue of Conservative Judaism*,
    135 A.D.3d 458 (N.Y. App. Div. 2016) .............................................................................. 11

*M.K.B. v. Eggleston*,
    445 F. Supp. 2d 400 (S.D.N.Y. 2006) ............................................................................ 7, 14

*Marisol A. v. Giuliani*,
    126 F.3d 372 (2d Cir. 1997)............................................................................................ 7, 13

*Menocal v. GEO Grp., Inc.*,
    882 F.3d 905 (10th Cir. 2018) .......................................................................... 8, 10, 18, 19

*Mullen v. GLV, Inc.*,
    330 F.R.D. 155 (N.D. Ill. 2019)......................................................................................... 8

*New Castle v. Yonkers Contracting Co.*,
    131 F.R.D. 38 (S.D.N.Y. 1990) ......................................................................................... 9

*Novoa v. GEO Grp., Inc.*,
    No. EDCV172514JGBSHKX, 2019 WL 7195331 (C.D. Cal. Nov. 26, 2019)...................... 12

*Owino v. CoreCivic, Inc.*,
    60 F.4th 437 (9th Cir. 2022) ............................................................................................. 8

*Paguirigan v. Prompt Nursing Emp. Agency LLC*,
    No. 17-CV-1302 (NG) (JO), 2018 WL 4347799 (E.D.N.Y. Sept. 12, 2018)................ 8, 15, 21

*Pub. Employees' Ret. Sys. of Mississippi v. Merrill Lynch & Co.*,
    277 F.R.D. 97 (S.D.N.Y. 2011) .................................................................................. passim

*Roach v. T.L. Cannon Corp.*,
    778 F.3d 401 (2d Cir. 2015)............................................................................................. 18

*Robidoux v. Celani*,
    987 F.2d 931 (2d Cir. 1993)............................................................................... 9, 11, 12, 13

*S.J. v. Choice Hotels Int'l, Inc.*,
    473 F. Supp. 3d 147 (E.D.N.Y. 2020) ...................................................................... 10, 15, 16

*Scott v. Aetna Servs., Inc.*,
    210 F.R.D. 261 (D. Conn. 2002)..................................................................... 19

*Sykes v. Mel Harris & Assocs. LLC,*
    780 F.3d 70 (2d Cir. 2015)........................................................................... 10

*Tyson Foods, Inc. v. Bouaphakeo*,
    577 U.S. 442 (2016).................................................................................... 14

*Villella v. Chem. & Mining Co. of Chile Inc*.,
    333 F.R.D. 39 (S.D.N.Y. 2019) ..................................................................... 12

**Statutes**

18 U.S.C. § 1591........................................................................................... 10, 16

NY Penal Law § 130....................................................................................... 16, 17

Trafficking Victims' Protection Act of 2000.......................................................... 10

**Other Authorities**

Newberg & Rubenstein on Class Actions § 4:54...................................................... 18

**Rules**

Fed. R. Civ. P. 23 ........................................................................................ passim

Plaintiff Jane Doe 1 ("Doe" or "Plaintiff") respectfully submits this memorandum of law, together with the declarations of David Boies, Bradley J. Edwards, and Paul Cassell, in support of her Motion for Class Certification pursuant to Federal Rule of Civil Procedure 23.  Doe seeks certification of the following Class:

> All women who were sexually abused or trafficked by Jeffrey Epstein during the time when Deutsche Bank began maintaining bank accounts for Epstein and/or Epstein-related entities, which was on or about August 19, 2013, through Epstein's death on August 10, 2019, both dates inclusive (the "Class Period").

## PRELIMINARY STATEMENT

Jeffrey Epstein will go down in history as the world's most brazen and serial sex offender who, with the assistance of a money-hungry bank, Deutsche Bank, ran a decades-long sex-trafficking operation and destroyed the lives of literally hundreds of young females.  The crucial element that allowed Jeffrey Epstein to perpetrate these crimes for years was his access to loads of cash from a bank that knew exactly what he was doing and helped him avoid regulators' scrutiny so that the bank could have its take.  Deutsche Bank was Epstein's secret weapon that made years of sexual abuse and trafficking possible.  Doe respectfully requests that this Court grant class certification to allow the Epstein survivors to have their day in Court as a class.

Doe is confident that each of Rule 23's requirements is readily satisfied in this case.  First, there is no doubt that the number of victims who were abused or trafficked during Epstein's long-standing relationship with Deutsche Bank satisfies the numerosity requirement, as more than 100 women were compensated by the Epstein Victims' Compensation Program alone and Deutsche Bank's own records show well over 100 wire transfers to women for no legitimate business purpose.  Further, common issues of law and fact exist and Doe's claims are typical of the class's. Each class member's claims, including Doe's, arise from one course of conduct—Deutsche Bank's facilitation of sex trafficking while knowing that Epstein was using the bank to harm young women

and girls, and its negligence in allowing that sex trafficking to continue for years.  For these same reasons, common questions predominate over any individualized inquiries.  Proceeding as a class also meets the superiority requirement, as requiring hundreds of Jeffrey Epstein's victims to individually litigate against one of the largest banks in the world would be inefficient, unjust, and an inferior way to resolve the common issues that would arise in any claim that any victim brings against Deutsche Bank.

Finally, Doe and her counsel will adequately represent the class.  Doe, like all victims, seeks to hold accountable those, like Deutsche Bank, who assisted Epstein in facilitating one of the most robust criminal enterprises in history.  Doe's counsel includes attorneys experienced in class actions and complex litigation, attorneys highly dedicated to this matter who were integral to the arrest and prosecution of Epstein, Ghislaine Maxwell, and Jean-Luc Brunel, and attorneys who are widely renowned as experts on crime victims' rights.  Accordingly, the Court should certify the proposed class and appoint the undersigned attorneys as class counsel.

## FACTUAL BACKGROUND

### I.    Jeffrey Epstein's Sex-Trafficking Venture

Jeffrey Epstein operated a worldwide sex-trafficking venture for decades, from the early 1990s through his death in 2019, during which time he trafficked hundreds of young women.  First Amended Complaint ("FAC") ¶¶ 40, 49.  He targeted girls with vulnerabilities that he could exploit, and dangled money, opportunities, and celebrities in front of them to groom and coerce them into submission.  Epstein preferred young attractive females, and he would threaten and intimidate his victims to press them to introduce him to new victims.

At one of Epstein's mansions, a victim would be forced to provide a massage—often after being instructed to undress—during which Epstein sexually assaulted her in some manner, such as by touching her breasts or genitals, using sex toys on her, or even penetrating her.  Ex. D at 28, 34,

39–40;[1] Ex. E ¶¶ 55–59; Ex. F at 54–56; Ex. G at 14–15; Ex. L ¶¶ 38, 63; Ex. E ¶ 3.  The victim would then be provided several hundred dollars in cash, typically immediately.  Ex. D at 29, 51, 52, 56, 79.

Epstein would then take actions to ensure his victims were beholden to him, including sending them to doctors and psychiatrists, to dentists to get their teeth whitened, and to celebrity hairstylists to get their hair done.  *See, e.g.*, Ex. H.  In addition to dangling opportunities in front of them, Epstein provided housing to many young girls and aspiring models in a building on East 66th Street, along with car services and cell phones so he could track their every move.  Ex. I at 7; Ex. J at 22; Ex. K ¶ 52; Ex. E ¶ 97.

Epstein abused and trafficked his victims by means of not only coercion, grooming, and control, but also by fraud, force, intimidation, and threats.  Epstein and his co-conspirators often directly threatened their victims.  Ex. M at 56–57; Ex. N at 169; Ex. D at 73; Ex. K ¶ 49; Ex. O ¶¶ 75–76.  Epstein and his lawyers would gather information about the girls to use against them if they ever disobeyed him.  Ex.  P; Ex. Q ¶ 43.  Epstein made certain that his victims were aware that he socialized and conducted business with the most powerful people in the world and he would wield that power against his victims if they dared disobey him.   Ex. R; Ex. K ¶ 50; Ex. S ¶ 27; Ex. T ¶¶ 14, 25.

Epstein was charged for the conduct underlying his sex-trafficking venture twice.  After receiving a complaint, the Palm Beach Police Department ("PBPD") identified more than 30 girls who Epstein sexually abused at his Palm Beach mansion.  Ex. D.  In 2006, the PBPD investigation was turned over to the United States Attorney's Office, which after identifying nearly 40 underage victims entered into a non-prosecution agreement ("NPA") pursuant to which Epstein plead guilty

---

[1]     Citations to "Ex." are exhibits to the Declaration of David Boies, filed concurrently hereto.

to prostitution charges.  Ex. U.  A decade later, on July 2, 2019, the U.S. Attorney's Office for the

Southern District of New York charged Epstein with sex trafficking conspiracy and sex trafficking

in violation of 18 U.S.C. § 1591.  Ex. V.  Epstein died in jail on August 10, 2019.

## II.   Deutsche Bank's Facilitation of the Sex-Trafficking Venture

Epstein's sex trafficking venture and conspiracy would not have been possible without the

assistance and knowing complicity of a financial institution that provided his operation not only

with the means to conduct sex trafficking but also provided an appearance of legitimacy.  FAC

¶ 32.  In 2013, Epstein was terminated as a client of JPMorgan Chase Bank for negative attention

related to his sexual abuse of females in conjunction with suspicious banking activity.  From

August 2013 through February 2019, during the time he continued his sex-trafficking venture and

conspiracy, Jeffrey Epstein was a client of Deutsche Bank.  As a result of its admitted fundamental

failure to protect Epstein's victims in accordance with its responsibilities, Deutsche Bank entered

into a consent order with the New York State Department of Financial Services ("DFS") on July

6, 2020, and agreed to pay a $150,000,000 fine. The DFS found:

> The Bank's fundamental failure was that, although the Bank
> properly classified Mr. Epstein as high-risk, the Bank failed to
> scrutinize the activity in the accounts for the kinds of activity that
> were obviously implicated by Mr. Epstein's past.  The Bank was
> well aware not only that Mr. Epstein had pled guilty and served
> prison time for engaging in sex with a minor but also that there were
> public allegations that his conduct was facilitated by several named
> co-conspirators.  Despite this knowledge, the Bank did little or
> nothing to inquire into or block numerous payments to named co-
> conspirators, and to or on behalf of numerous young women, or to
> inquire how Mr. Epstein was using, on average, more than $200,000
> per year *in cash*.

Ex. W ("Consent Order") ¶ 56.

During its entire relationship with Epstein, Deutsche Bank was fully aware of Epstein's

sex-trafficking venture.  During the onboarding process, an employee created a background report

regarding Epstein using publicly available sources.  Ex. X; Ex. Y at 97:3–99:16.   The report noted that "Epstein was charged with soliciting prostitution in 2008"; that Epstein was "registered as a sex offender in Florida"; that Epstein "was accused of paying young woman for massages and sex acts in his Florida home"; and that Epstein "has made 17 out-of-court settlements."  Ex. X. Nevertheless, Deutsche Bank determined that Epstein posed no reputational risk, and Epstein was onboarded.  Ex. Z.  During the relationship, employees of Deutsche Bank communicated with each other over email and chat about the allegations against Epstein and his sex-trafficking venture. Exs. AA, AB.  AML employees raised issues relating to developments in the press concerning the sex-trafficking venture.  Consent Order ¶¶ 33, 35; Ex. AC.

Deutsche Bank ignored all the allegations about Epstein's sex trafficking and instead continued to facilitate the venture.  In fact, without any formal documented approval from compliance, Deutsche Bank's business line managers overrode ███████████████████████ █████████████████████████████████████████████████████████████████████████████ █████████████████████ . Exs. AD, AE.

Over the course of the relationship, Epstein and his representatives used Deutsche Bank accounts to send dozens of wires, directly and indirectly, including at least 18 wires in the amount of $10,000 or more, to alleged co-conspirators who had been the subject of past press reports. Consent Order ¶ 27.  Deutsche Bank facilitated Epstein's trafficking by facilitating wires to victims, which bank employees said were for things like ███████████████████ and a friend's "tuition" when questioned about their purpose.  *See* Consent Order ¶¶ 46, 46; Exs. AF, AG.  Deutsche Bank also assisted Epstein's attorney, Darren Indyke, in withdrawing large sums of cash to pay victims ████████████████████████, structuring cash withdrawals so that they would not trigger any alerts, and ██████████████████████████████████████████

██████████████████████████. Consent Order at ¶¶ 48, 50–52; Exs. AH, AI, AJ, AK, AL.

Epstein used his Deutsche Bank accounts to send over 120 wires totaling $2.65 million to young women, including several with Eastern European surnames. Consent Order ¶ 31; Ex. Y at 196–210. Finally, Deutsche Bank failed to implement oversight imposed by its Americas Reputational Risk Committee, which was a deliberate omission that allowed Epstein to continue funding his sex-trafficking venture through suspicious transactions that would have otherwise been prevented. FAC ¶ 325.

In November 2018, the Miami Herald released an article on Epstein detailing his 2008 plea deal. While the article contained no new or original information and instead was just a rehashing of prior reporting, the public resurfacing of old information prompted senior members of Wealth Management to reassess the relationship's reputational risk and ultimately terminate the Epstein Relationship. Consent Order ¶ 53. On December 21, 2018, Deutsche Bank informed Epstein by letter that it would no longer be servicing his accounts but drafted reference letters to two other financial institutions, on its letterhead, indicating that it was "unaware of any problems relating to the operation or use of [the] accounts." *Id*. ¶¶ 53–54.

## III.   Jane Doe 1's Trafficking by Epstein

Doe was one of Epstein's many victims while he banked with Deutsche Bank. Doe, like many victims, was lured to meet Epstein with a promise of professional opportunities. FAC ¶¶ 107, 114, 121. Doe was told, like countless other victims, that she could meet him at his New York mansion and give him a massage for money. *Id*. ¶¶ 64, 107; Ex. C ("Khodarkovsky Rep.") ¶¶ 60, 61, 64, 65. Like many others, Doe was vulnerable to being victimized. FAC ¶¶ 107, 129, 131; Ex. D at 28, 34, 39–40. When Doe arrived at Epstein's mansion, Epstein attempted to learn as much as he could about her family life, her goals, and inevitably her vulnerabilities as he could.

Epstein made promises to advance her career and education, made clear that he was enormously wealthy and powerful, and made her believe he cared about her and her future in the modeling industry.  FAC ¶¶ 113–114, 130.  Epstein sexually assaulted Doe during the massage, and then paid her several hundred dollars in cash.  *Id.* ¶¶ 52, 53, 108, 127; Ex. D at 29, 51, 52, 56, 79.

Doe was forced to remain in contact with Epstein and was consistently abused by Epstein, including through sexualized massages during which he penetrated Doe.  *Id.* ¶¶ 128, 133, 158. Over time, Epstein made clear that he could advance her career, made various false promises to Doe, and provided her gifts to keep her quiet. *Id.* ¶¶ 130–32, 139, 146.  At the same time, he made clear that if she were to ever turn on him, he could and would cause her serious reputational and financial harm.  *Id.* ¶¶ 109, 137–39, 141, 149–53.  The more time Doe spent with Epstein, the more control he obtained over her life, including by controlling where she lived and how to speak about him.  *Id.* ¶¶ 26, 143, 144.  Eventually, Epstein even demanded that Doe open an account at Deutsche Bank.  *Id.* ¶ 169.

## ARGUMENT

Class certification is warranted when four prerequisites are met: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy—and the action qualifies under one of Rule 23(b)'s subdivisions.  *See M.K.B. v. Eggleston*, 445 F. Supp. 2d 400, 440 (S.D.N.Y. 2006) (Rakoff, J.).  "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013).  Courts must interpret Rule 23 liberally and must "adopt a standard of flexibility" when determining whether a proposed class satisfies its requirements.  *Marisol A. v. Giuliani,* 126 F.3d 372, 377 (2d Cir. 1997) (internal quotations omitted).

Here, the proposed class easily meets Rule 23(a)'s requirements, and this action qualifies for certification under Rule 23(b)(3) or 23(b)(1).  In fact, courts often grant certification in similar cases involving trafficking or sex abuse claims.[2]  In the alternative, the Court can certify several issue classes pursuant to Rule 23(c)(4).

## I.      The Requirements of Rule 23(a) Are Satisfied.

A.  Rule 23(a)(1)—Numerosity Is Satisfied With the Trafficking Venture Injuring Hundreds of Potential Victims During the Class Period.

Numerosity is satisfied when "the class is so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  Numerosity is presumed when the proposed class contains 40 or more members.  *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995).  Here, there can be no doubt that Jeffrey Epstein trafficked or abused more than 40 girls and women during the class period.  Epstein perpetuated—and Deutsche Bank facilitated—a large-scale sex-trafficking venture in which he abused three to four individuals per day.  FAC ¶ 45.

During the investigation that resulted in Epstein's 2008 conviction, officials identified 36 victims who Epstein paid for sex acts and massages in his Florida mansion.  Ex. D.  Epstein's

---

[2]      *See, e.g.*, *Owino v. CoreCivic, Inc.,* 60 F.4th 437 (9th Cir. 2022) (affirming class certification in a TVPA forced labor case); *Menocal v. GEO Grp., Inc*., 882 F.3d 905 (10th Cir. 2018) (same); *K.A. v. City of New York*, 413 F. Supp. 3d 282, 302 (S.D.N.Y. 2019) (denying motion to dismiss class action for female prisoners raising § 1983 claims regarding numerous improper intimate examinations); *In re USC Student Health Ctr. Litig*., No. 2:18-cv-04258-SVW, 2019 WL 3315281 (C.D. Cal. June 12, 2019) (preliminarily approving settlement class in case involving USC doctor involved in repeated sexual misconduct); *Mullen v. GLV, Inc.,* 330 F.R.D. 155, 168 (N.D. Ill. 2019) (granting class certification in case involving coach sexually abusing multiple underage players); *Paguirigan v. Prompt Nursing Emp. Agency LLC*, No. 17-CV-1302 (NG) (JO), 2018 WL 4347799, at *8 (E.D.N.Y. Sept. 12, 2018) (certifying TVPA forced labor class); *see also Beltran v. InterExchange, Inc.,* No. 14-CV-03074-CMA-CBS, 2018 WL 1948687, at *5 (D. Colo. Feb. 2, 2018) (certifying class where national RICO Class's claim arose out of "the same course of events" and the "same purported overall fraud").

phone book, which has now become public, contains an extensive list of phone numbers for underage girls listed as "masseuses." Ex. AM at 70, 88, 96, 97. It has been publicly reported that Epstein settled "at least two dozen lawsuits with young women" for similar allegations. Ex. AN. Shortly after Epstein's 2019 indictment, he died in his jail cell and Judge Berman provided 23 victims with the opportunity to speak in open court about the trafficking and the harm they suffered as a result. Ex. AO. Plaintiff's attorneys have themselves collectively represented more than 70 of Jeffrey Epstein's victims since 2008. Boies Decl. ¶ 9; Ex. A ("Edwards Decl.") ¶ 4. The Epstein Victim's Compensation Fund deemed about 150 victims eligible for compensation from Epstein's estate. Ex. AP. And, finally, Plaintiff's expert witness estimates that there will be more than 100 class members based on Deutsche Bank's own financial records. Khodarkovsky Rep. ¶¶ 67–68. Accordingly, Plaintiff can demonstrate by a preponderance of the evidence that the number of class members well exceeds forty.[3]

B. Rule 23(a)(2)—Common Questions of Law and Fact Clearly Exist.

Rule 23's commonality requirement is met if all class members' claims share a common question of law or of fact. *See Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 245 (2d Cir. 2007). "Even a single common question of law or fact may suffice to satisfy the commonality requirement." *Pub. Employees' Ret. Sys. of Mississippi v. Merrill Lynch & Co.*, 277 F.R.D. 97, 105 (S.D.N.Y. 2011) (Rakoff, J.). A question is common to the class if it is "capable of classwide resolution—which means the determination

---

[3]      If the Court had any doubt that the class contains fewer than 40 members, it can still find numerosity satisfied. *See, e.g.*, *New Castle v. Yonkers Contracting Co.*, 131 F.R.D. 38, 41 (S.D.N.Y. 1990) (certifying a class of thirty-six members). The "[d]etermination of practicability depends on all the circumstances surrounding the case, not on mere numbers." *Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir. 1993) (internal citations omitted). The dispersion of victims across the United States and abroad would make joinder impracticable here and weighs strongly in favor of numerosity. *See id.* Even within the U.S., Epstein's sex-trafficking venture operated in at least six states. *See* FAC ¶¶ 104, 120.

of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Lopez v. Setauket Car Wash & Detail Ctr.*, 314 F.R.D. 26, 28 (E.D.N.Y. 2016) (internal citation omitted).  The "one stroke" rule is often satisfied where, as here, there is a uniform policy or practice that affected all class members.  *See Sykes v. Mel Harris & Assocs. LLC,* 780 F.3d 70, 80 (2d Cir. 2015); *Menocal*, 882 F.3d at 920 (finding commonality where plaintiffs based TVPA claims on a common policy).

Doe brings two claims under the Trafficking Victims' Protection Act of 2000 ("TVPA") on behalf of the class: (1) a beneficiary liability claim under 18 U.S.C. § 1591(a), the elements of which are that "(1) the person or entity must knowingly benefit, financially or by receiving anything of value, (2) from participating in a venture, (3) that the person knew or should have known has engaged in an act in violation of this chapter." *S.J. v. Choice Hotels Int'l, Inc*., 473 F. Supp. 3d 147, 152–53 (E.D.N.Y. 2020) (internal quotations omitted); and (2) an obstruction of TVPA enforcement claim, which requires proof that Deutsche Bank acted to obstruct, attempt to obstruct, interfere with, or prevent an investigation or prosecution into Epstein for trafficking. 18 U.S.C. § 1591(d).

As explained further below with regards to predominance, each element of the beneficiary liability claim is common to the class—if each class member brought an individual action, each would have to prove that Deutsche Bank knew about Epstein's sex-trafficking venture through testimony and evidence from Deutsche Bank's employees themselves; that Deutsche Bank benefited from the trafficking venture through evidence of revenues Deutsche Bank earned from Epstein's accounts; and that Deutsche Bank participated in the venture by, for example, facilitating cash withdrawals used to directly pay class members for commercial sex, paying funds to co-conspirators, deliberately failing to file reports that might result in government intervention,

"structuring" cash withdrawals, and failing to file SARs.  *See* Khodarkovsky Rep. ¶¶ 77–90, 94–98.  As to the obstruction claim, each class member would have to prove that Deutsche Bank obstructed a prosecution or investigation.

Doe also brings two negligence claims alleging that: (1) Deutsche Bank negligently failed to exercise reasonable care to prevent the physical harm of Epstein's victims; and (2) Deutsche Bank negligently failed to exercise reasonable care as a banking institution providing non-routine banking.  To state a claim for negligence under New York law, "a plaintiff must show that the defendant owed the plaintiff a duty and breached that duty, and that the breach proximately caused the plaintiff harm."  *Katz v. United Synagogue of Conservative Judaism*, 135 A.D.3d 458, 459 (N.Y. App. Div. 2016).  As highlighted in the parties' motion to dismiss briefing, these negligence claims involve both legal and factual issues common to the class.  For example, Deutsche Bank has argued that it owes no duty of care to non-customers, while Doe argues the opposite—that legal issue will be one common to the class.  *See* ECF Nos. 44 at 33–34, 48 at 34–35.  Further, factual issues relevant to the element of breach are common to the class, as each class member would argue that Deutsche Bank's breached its duty of care by, for example, directly participating in the sex-trafficking venture that harmed them and helping Epstein conceal the venture from authorities, allowing it to persist for decades.  Accordingly, common questions of law and fact exist.

C.  Rule 23(a)(3)—Plaintiff's Claims Are Typical.

"Rule 23(a)(3)'s typicality requirement is satisfied when each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability."  *Robidoux*, 987 F.2d at 936.  "Plaintiffs are not required, in proving typicality, to show that the situations of the named representatives and the class members are identical."  *Pub. Employees' Ret. Sys. of Mississippi*, 277 F.R.D. at 109; *see also Robidoux*, 987

F.2d at 936-37 (the typicality requirement is usually met "irrespective of minor variations in the fact patterns underlying individual claims").  And typicality does not "require that damages be identical among class members." *Villella v. Chem. & Mining Co. of Chile Inc.*, 333 F.R.D. 39, 55 (S.D.N.Y. 2019); *see also Pub. Employees' Ret. Sys. of Mississippi*, 277 F.R.D. at 108; *Novoa v. GEO Grp., Inc.*, No. EDCV172514JGBSHKX, 2019 WL 7195331, at *14 (C.D. Cal. Nov. 26, 2019) (explaining in TVPA case that "[t]he typicality requirement can be met notwithstanding varying fact patterns supporting class member claims, and this extends to disparity in damages by the representative plaintiffs").  "Courts in this Circuit have held that the typicality requirement is not demanding."  *Pub. Employees' Ret. Sys. of Mississippi*, 277 F.R.D. at 107.

As explained above, Plaintiff's claims are representative of those of the class.  Like the other class members, Plaintiff was victimized by the sex-trafficking venture pursuant to Epstein's well-oiled *modus operandi* during Epstein's relationship with Deutsche Bank.  *See* Khodarkovsky Rep. ¶ 72.  The fact that the circumstances of Epstein's trafficking of Plaintiff may slightly differ from the circumstances by which each class member was victimized is irrelevant to the class certification inquiry.  *See In re Smith Barney Transfer Agent Litig.*, 290 F.R.D. 42, 45-46 (S.D.N.Y. 2013) (where "it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims").

The claims in this action are not against the trafficker (Epstein) and instead are directed at Deutsche Bank's course of conduct, and how that conduct affected the class.  *See* Khodarkovsky Rep. ¶¶ 73, 76.  More specifically, Plaintiff's claims and the class members' claims are based on the same "course of events"—Deutsche Bank's relationship with Epstein—and similar "legal arguments to prove the defendant's liability"—Deutsche Bank's participation in Epstein's sex-

trafficking venture and negligence in failing to prevent harm to Epstein's victims.  *See Robidoux*, 987 F.2d at 936; *see also Marisol A.*, 126 F.3d at 377 (finding no abuse of discretion in typicality finding where class members' injuries resulted from a "unitary course of conduct by a single system"); *Casilao v. Hotelmacher LLC*, No. CIV-17-800-SLP, 2021 WL 4487984, at *7 (W.D. Okla. Sept. 30, 2021) (rejecting argument that "personal experiences unique to certain class members and not experienced by others demonstrate a lack of typicality" in TVPA case where "the class members' claims are based on the same legal theories and the same operative conduct of Defendants as the claims brought by the Named Plaintiffs").  Thus, Plaintiff's claims are typical of the claims of the other class members.

D.  <u>Rule 23(a)(4)—Plaintiff Will Adequately Represent the Class.</u>

Under Rule 23(a)(4), adequacy requires that the representative parties will "fairly and adequately protect the interests of the class."  *See In re MF Global Holdings Ltd. Inv. Litig.*, 310 F.R.D. 230, 239 (S.D.N.Y. 2015).  "A finding that a proposed class representative satisfies the typicality inquiry constitutes strong evidence that [its] interests are not antagonistic to those of the class; the same strategies that will vindicate plaintiff['s] claims will vindicate those of the class." *Pub. Employees' Ret. Sys. of Mississippi*, 277 F.R.D. at 109.  Even if a conflict exists, it does not "necessarily defeat class certification—the conflict must be fundamental."  *Denney v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006).

Here, Plaintiff will "fairly and adequately" represent the class; she has actively participated in and monitored the litigation, and she is scheduled to sit for a deposition soon.  Plaintiff's interests align with the class members' interests, and she will continue to prosecute this matter vigorously.  Further, Plaintiff's counsel is "qualified, experienced and generally able to conduct the litigation."  *See In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 291 (2d Cir. 1992). Accordingly, the adequacy requirement is met.

**II.      The Rule 23(b) Requirements Are Satisfied.**

In addition to meeting the four prerequisites under Rule 23(a), Doe can also demonstrate that two different types of class action are appropriate under Rule 23(b).  First, a class under Rule 23(b)(3) is appropriate because common questions of law or fact predominate over any questions affecting individual class members and the class action is the superior way to adjudicate these issues.  Second, a class under Rule 23(b)(1) is appropriate because individual adjudications would establish incompatible standards of conduct under Rule 23(b)(1).

A.  Rule 23(b)(3)'s Requirements Are Satisfied.

1. *Common Questions of Law and Fact Predominate.*

Rule 23(b)(3) certification turns on whether common issues predominate over individualized issues.  "[A] common question is one where the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof."  *In re Petrobras Secs.*, 862 F.3d 250, 270 (2d Cir. 2017) (citing *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016)).  Plaintiff need not "prove that each elemen[t] of [her] claim [is] susceptible to classwide proof." *Amgen*, 568 U.S. at 469.  Similarly, "predominance does not require a plaintiff to show that there are no individual issues."  *Pub. Employees' Ret. Sys. of Mississippi*, 277 F.R.D. at 111.  The requirement calls "only for predominance, not exclusivity, of common questions."  *See Chalmers v. City of New York*, No. 20 CIV. 3389 (AT), 2022 WL 4330119, at *17 (S.D.N.Y. Sept. 19, 2022).

In this case, Plaintiff brings claims for negligence and violation of the TVPA.  *See* ECF No. 56.  Those claims will be proven with common evidence.  Factual questions affecting individual members cannot defeat class certification given the common issues regarding Deutsche Bank's liability.  *See, e.g.*, *Eggleston*, 445 F. Supp. at 400 (certifying class of immigrants denied public benefits even though "each member of the class was denied benefits for slightly different

14

reasons and under slightly different circumstances"). Indeed, because the "TVPA's explicit statutory language makes clear that a 'reasonable person' standard applies in determining whether a particular harm (or threat of harm) is sufficiently serious" to force compliance, any claim that litigating "coercion" under the TVPA "would require an individualized consideration of each putative class member is mistaken." *Paguirigan*, 2018 WL 4347799, at *8. Proof pertaining to specific class members does not predominate over the core common questions regarding Deutsche Bank's liability to the class members.

        i.    Common Questions Predominate for Plaintiff's TVPA Claims.

Plaintiff's TVPA claims for beneficiary liability and obstruction of TVPA enforcement will require the adjudication of primarily issues common to the class and subject to common proof, including but not limited to the following:

- **Existence of a Sex-Trafficking Venture.** Each class member asserting a beneficiary liability claim would have to prove that Epstein ran a sex-trafficking venture in violation of the TVPA. *See S.J.*, 473 F. Supp. 3d at 152–53. Proof of this venture would, of course, be common to the class, as it would consist of testimony from victims and witnesses about the operation of Epstein's trafficking venture and documents from law enforcement regarding the venture, among other things.

- **Deutsche Bank's Knowledge.** Each class member asserting a beneficiary liability claim would have to prove Deutsche Bank "knew or should have known" about Epstein's sex-trafficking venture. *See id*. This factual issue can and will be proven with common evidence, such as the testimony of Deutsche Bank's employees, written communications discussing the venture and media reports regarding the venture, and publicly available information about the venture demonstrating that Deutsche Bank should have known about the venture if it claims it lacked actual knowledge. *See* Khodarkovsky Rep. ¶¶ 107–109.

- **Deutsche Bank's Participation.** Each class member asserting a beneficiary liability claim would have to prove Deutsche Bank participated in the sex-trafficking venture. *See S.J.*, 473 F. Supp. 3d at 152–53. This element can be proven with common evidence, such as Deutsche Bank's account records, Deutsche Bank employees' communications, and Deutsche Bank's employees' testimony evidencing Deutsche Bank paying funds to victims of trafficking and co-conspirators from Epstein-related accounts; permitting Epstein and his co-conspirators to withdraw large sums of cash to pay victims and to structure those withdrawals to avoid detection; housing accounts for known co-conspirators to which

Epstein transferred tens of millions of dollars; and deliberately failing to file reports in the face of red flags.  *See* Khodarkovsky Rep. ¶ 106.

- **Deutsche Bank's Benefit.**  Each class member asserting a beneficiary liability claim would have to prove Deutsche Bank benefited from its participation in the venture. *See S.J.*, 473 F. Supp. 3d at 152–53.  This element can be proven with common evidence, including Deutsche Bank documents and employee testimony showing that Deutsche Bank earned millions of dollars from accounts it knew Epstein used for trafficking, from the additional wealthy clients that Epstein brought Deutsche Bank, and from lucrative business opportunities that Epstein offered.

- **Deutsche Bank's Obstruction**.  Each class member asserting an obstruction claim would have to prove that Deutsche Bank obstructed the government's enforcement of the TVPA. 18 U.S.C. § 1591(d).  This element can be proven with common evidence such as documentary and testimonial evidence from Deutsche Bank itself showing that Deutsche Bank failed to file SARs with FinCEN in hinderance of the DOJ's investigation of Epstein.

Accordingly, common issues subject to common proof predominate over individualized issues relating to Plaintiff's TVPA claims.

   ii.  Common Questions Predominate for the Negligence Claims.

  Plaintiff has also brought two negligence claims against Deutsche Bank—one for Deutsche Bank's negligent failure to exercise reasonable care to prevent physical harm, and one for Deutsche Bank's negligent failure to exercise reasonable care as a banking institution providing non-routine banking.  As to her claim for negligent failure to exercise reasonable care to prevent physical harm, the legal and factual issues common to all class members include, among others:

- Deutsche Bank's duty to exercise reasonable care to avoid conduct that would combine with Epstein's crimes, and permit Epstein's crimes, in violation of New York Penal Law Chapter 130 (FAC ¶ 557);

- Deutsche Bank breaching its duty by providing financial and other support for Epstein's sex trafficking venture which set the forces in motion that directly and proximately injured and caused physical harm to Doe and the Class Members (*id.* ¶ 558);

- Deutsche Bank reasonably foreseeing that its negligent failure to prevent physical harm would result in physical harm to Doe and the Class Members (*id.* ¶ 559);

- Deutsche Bank failing to act reasonably in failing to take precautions to prevent Epstein's intentional tortious conduct and sex crimes in violation of Chapter 130 (*id.* ¶ 560);

- Deutsche Bank realizing the likelihood that it was creating an opportunity for Epstein to commit intentional tortious conduct against Doe and the Class Members (*id.* ¶ 561);

- Deutsche Bank knowing that its own conduct was necessary to give Epstein opportunities to engage in that conduct and commit those crimes (*id.*); and

- Deutsche Bank's negligent acts and omissions foreseeably creating substantial risk of Epstein and his co-conspirators committing sex crimes against young women with whom he was in contact (*id.* ¶ 564).

Common issues also predominate Doe's second negligence claim for failure to exercise reasonable care as a banking institution providing non-routine banking:

- Deutsche Bank owing a duty not to knowingly provide non-routine banking support and assistance for Epstein that it knew, and had reason to know, would lead to and support intentional tortious conduct and Chapter 130 crimes by Epstein (*id.* ¶ 570);

- Deutsche Bank breaching said duty by providing non-routine banking support to Epstein, including: providing hundreds of thousands of dollars in cash to Epstein and his co-conspirators when it knew that the cash would be used to facilitate coercive sex acts (*id.* ¶ 572); failing to follow numerous banking requirements in connection with financial dealings with Epstein (*id.* ¶ 573); and deliberately failing to file SARs (*id.* ¶ 578); and

- Deutsche Bank reasonably foreseeing that its actions and omissions in facilitating Epstein's sex trafficking enterprise would lead to intentional torts and sex offenses against Doe and the Class Members (*id.* ¶ 586).

These common issues can likewise be proven with common evidence such as documentary and testimonial evidence showing that Deutsche Bank provided Epstein's sex-trafficking venture $200,000 per year in cash (*id.* ¶ 321); concealed its delivery of cash to Epstein and his associates by willfully failing to file reports (*id.* ¶ 324); structured cash withdrawals by Epstein's co-conspirators to avoid alerting authorities to suspicious transactions (*id.* ¶ 337); failed to implement oversight imposed by its reputational risk committee (*id.* ¶ 325); and allowed Epstein to use its accounts to send dozens of wires to known Epstein co-conspirators (*id.* ¶¶ 212, 213). Accordingly, Doe has met the predominance factor for class certification under Rule 23(b)(3).

iii.   Individualized Damages Determinations Cannot Defeat Class Certification.

There is no real dispute that each member of the class was harmed by the trafficking the Deutsche Bank facilitated.  While Deutsche Bank may argue that each class member suffered a different amount of harm, "it is well-established that the fact that damages may have to be ascertained on an individual basis is not sufficient to defeat class certification."  *Pub. Employees' Ret. Sys. of Mississippi*, 277 F.R.D. at 119 (granting class certification where damages were not measurable on a class-wide basis because the "Court may determine at a later point that subclasses are appropriate to manage the allocation of damages, but this decision need not be made at this early stage"); *see also Menocal*, 882 F.3d at 922 (holding that the "presence of individualized damages issues does not defeat the predominance of questions common to the TVPA class" and that the district court could limit the class action to liability issues); *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 409 (2d Cir. 2015) ("[I]ndividualized damages determinations alone cannot preclude certification under Rule 23(b)(3).").  The mere fact that damages may have to be ascertained on an individual basis is not, standing alone, sufficient to defeat the predominance requirement.  *See* Newberg & Rubenstein on Class Actions § 4:54 & n.2 ("courts in every circuit have uniformly held that the 23(b)(3) predominance requirement is satisfied despite the need to make individualized damage determinations").

2.  *A Class Action Is Superior to Other Methods of Adjudication.*

Plaintiff can also demonstrate that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  The relevant factors include:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;  (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;  (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum;  and (D) the likely difficulties in managing a class action.

*Id.* A Rule 23(b)(3) class is superior when it allows for the vindication of "the rights of groups of people who individually would be without effective strength to bring their opponents into court at all." *Amchem Prods., Inc v. Windsor*, 521 U.S. 591, 617 (1997).

Here, the TVPA was designed to protect victims of trafficking who are particularly vulnerable, Khodarkovsky Rep. ¶¶ 43, 111–13, and class treatment is therefore superior in such situations. *See Jane Doe 30's Mother v. Bradley*, 64 A.3d 379, 385 (Del. Super. Ct. 2012); *see also Scott v. Aetna Servs., Inc.*, 210 F.R.D. 261, 268 (D. Conn. 2002) (finding class action superior in a case alleging violations of state labor law in part because "class members may fear reprisal"). Further, a class action here would avoid a "multiplicity and scattering of suits" that would follow from numerous victims of one single trafficking venture, enabled by Deutsche Bank, having to independently vindicate their rights in courts across the country. *See In re MF Global Holdings*, 310 F.R.D. at 239; *see also Menocal*, 882 F.3d at 915 (Rule 23(b)(3) class superior where "the putative class members reside in countries around the world"). Litigating this case has required taking substantial discovery from Deutsche Bank, including many depositions and obtaining tens of thousands of documents, that would be relevant to each class member's claims but would be difficult for each class member to obtain on her own in an individual lawsuit. *See* Boies Decl. ¶ 6. Further, Epstein's sex-trafficking scheme operated on an international scale, with victims spanning multiple different countries and multiple states within the U.S. *See* FAC ¶ 120. A class action would efficiently curtail the possibility of the "scattering" of suits across the country and is the superior method of adjudicating this dispute.

B.   The Rule 23(b)(1) Requirements Are Satisfied.

For all the reasons explained above, the Rule 23(b)(3) requirements for class certification are clearly satisfied. Additionally, however, a class can be certified pursuant to Rule 23(b)(1).

Rule 23(b)(1)(A) is satisfied where "prosecuting separate actions by or against individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class." Fed. R. Civ. P. 23(b)(1)(A). Rule 23(b)(1)(A) applies to cases "where the party is obliged by law to treat the members of the class alike (a utility acting towards customers; a government imposing a tax), or where the party must treat all alike as a matter of practical necessity." *Amchem*, 521 U.S. at 614. A class can proceed under Rule 23(b)(1) if "prosecuting separate actions by or against individual class members" would cause confusion or be impracticable. *In re White*, 64 F.4th 302, 304 (D.C. Cir. 2023).

Here, inconsistent or varying adjudications with respect to individual class members would establish incompatible standards for Deutsche Bank. This case presents important issues concerning the obligations of banks in connection with sex-trafficking (and other criminal) organizations. These issues include what constitutes "knowingly benefiting" from a sex-trafficking organization in violation of the TVPA, as well as what constitutes non-routine banking support of sex-trafficking. The resolution of these issues will dictate standards of responsibility for financial (and other) institutions in this area that will have broad applicability. *See, e.g., In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.,* 241 F.R.D. 185, 200 (S.D.N.Y. 2007) (certifying class under Rule 23(b)(1)(A) because if the plaintiffs were to "pursue their negligence claims individually, there is a risk that one jury will find the Defendants acted reasonably while another jury will find that they breached a duty of reasonable care"). Inconsistent adjudications would create grave difficulties for the operation of financial institutions, as well as for the protection of victims of sex-trafficking and other crimes.

### III.    Ascertainability—The Class Is Sufficiently Ascertainable.

The Second Circuit recognizes an implied requirement of ascertainability, or that "the identity of class members must be reasonably ascertainable by reference to objective criteria." *Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561, 566-67 (S.D.N.Y. 2014) (Rakoff, J.).   "Class members need not be ascertained prior to certification, but must be ascertainable at some point in the case." *Espinoza v. 953 Assocs. LLC*, 280 F.R.D. 113, 125 (S.D.N.Y. 2011).   "The standard for ascertainability is 'not demanding' and is 'designed only to prevent the certification of a class whose membership is truly indeterminable.'" *Ebin*, 297 F.R.D. at 567.   "[T]he Second Circuit has instructed that failure to certify an action under Rule 23(b)(3) on the sole ground that it would be unmanageable is disfavored and should be the exception rather than the rule." *Id*. (internal citation omitted).

Here, class membership is ascertainable by objective criteria.   The class is defined to include only women abused or trafficked by Epstein between August 19, 2013, and Epstein's death on August 10, 2019.   First, class members are ascertainable through reference to publicly available information such as law enforcement reports, legal proceedings that dozens of victims have initiated against Epstein and his Estate, and statements to the media in which victims have come forward.   Second, documents produced by Deutsche Bank and Epstein's Estate in this matter identify victims, such as account ledgers reflecting payments from Epstein to victims. Khodarkovsky Rep. ¶¶ 68–71; *see also Paguirigan*, 2018 WL 4347799, at *4 n.4 (finding ascertainability of a TVPA class through the defendant's own produced records).   Third, class members could submit additional documentation identifying themselves as victims, such as contemporaneous communications about the abuse, medical records, victim notification letters that the Department of Justice sent to many victims pursuant to the Crime Victims Protection Act, or determinations of eligibility from the EVCP.   *See, e.g.*, Ex. AQ; Ex. AR at 13–14; Ex. AS at 6.

21

Accordingly, the class is sufficiently ascertainable at this stage.  *See Biediger v. Quinnipiac Univ.*, 2010 WL 2017773, at *4 (D. Conn. May 20, 2010) (finding class of students subject to sex discrimination sufficiently ascertainable).

## IV.   In the Alternative, a Rule 23(c)(4) Issues Class Is Appropriate.

Plaintiff has demonstrated that this action is appropriate for class certification in its entirety pursuant to Rule 23(a) and Rule 23(b).  In the alternative, however, Plaintiff respectfully requests certification of Rule 23(c)(4) issues classes.  Under Fed. R. Civ. P. 23(c)(4), "an action may be brought or maintained as a class action with respect to particular issues."  *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 464 (S.D.N.Y. 2018).

The Court can certify an issues class resolving the common issues of liability identified in Sections I.B. and II.A.1. *supra*.  As explained above, Plaintiff is pursuing several theories of liability against Deutsche Bank under the TVPA and New York state law.  Within each of those separate theories of liability are particular issues that go to Deutsche Bank's liability, for which class treatment is clearly superior to individualized litigation.  *See supra* Section II.A.2.  For example, the Court may certify a class as to the questions of whether Deutsche Bank knowingly benefited, in violation of the TVPA, from Epstein's sex-trafficking venture; whether Deutsche Bank obstructed enforcement of the TVPA; whether Deutsche Bank owed a duty of care to the class members; and whether Deutsche Bank exercised reasonable care to prevent injury to Plaintiff and other class members.  While Doe maintains that this action may be certified in its entirety under Rule 23(b), in the alternative, the Court should certify a class on each of these issues, in addition to the remaining common issues on liability outlined in Sections I.B. and II.A.1. under Rule 23(c)(4).

## V.     The Court Should Appoint Boies Schiller Flexner LLP, Edwards Pottinger LLC, and Paul Cassell as Class Counsel.

Rule 23(g)(1) provides that "a court that certifies a class must appoint class counsel."  Fed.

R. Civ. P. 23(g)(1).

> In appointing class counsel, the court: (A) must consider: (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class.

Fed. R. Civ. P. 23(g)(1)(a).

Under this criteria, Boies Schiller Flexner LLP ("BSF"), Edwards Pottinger LLC ("EPLLC"), and Paul Cassell (collectively, "Proposed Class Counsel") meet Rule 23(a)(4)'s adequacy requirement and should be appointed as Class Counsel under Rule 23(g).  Proposed Class Counsel have already invested substantial time and resources in investigating Doe's claims, prosecuting this case, and gathering discovery from Deutsche Bank and third parties.  Since the filing of the initial complaint, Proposed Class Counsel have been involved identifying and investigating Plaintiff's claims and facilitating the discovery process, including by engaging experts, deposing key Deutsche Bank employees and other witnesses, responding to Deutsche Bank's motion to dismiss, producing documents to Deutsche Bank, collecting documents from third parties by subpoena, and reviewing the many documents produced by Deutsche Bank thus far.  Boies Decl. ¶ 6; Edwards Decl. ¶¶ 2–3.  Proposed Class Counsel have committed, and continue to commit, substantial time and resources to representing the Class, and have worked vigorously and zealously to competently represent the interests of the members of the Class.  Boies Decl. ¶ 6.

Proposed Class Counsel are eminently qualified to represent the proposed class and its interests.  Proposed Class Counsel have substantial experience handling class actions, complex litigation, banking matters, matters involving trafficking and abuse, and, more specifically, cases

related to Epstein's sex-trafficking venture.  Boies Decl. ¶¶ 3–4, 9; Edwards Decl. ¶¶ 4–5, 9, 11; Ex. B ("Cassell Decl.") ¶¶ 13–15.  David Boies of BSF is one of the most well-known class action attorneys in the United States and has recovered billions of dollars for plaintiffs in class action litigation.  Boies Decl. ¶¶ 3–4, 8.  Sigrid McCawley of BSF has devoted years of her career to seeking justice for Epstein's survivors, and her work contributed to the arrest of Jeffrey Epstein, Ghislaine Maxwell, and Jean-Luc Brunel.  *Id.* ¶¶ 10–11.  Brad Edwards and Brittany Henderson have likewise been leaders in prosecuting actions against Epstein and his co-conspirators and have litigated numerous other high-profile matters for survivors of sexual violence.  Edwards Decl. ¶¶ 4, 9, 11.  Paul Cassell, a former federal judge and one of the nation's leading experts on crime victims' rights, has worked with BSF and EPLLC for years in advocating for Epstein's victims, including in litigating the issue of whether the U.S. Attorney's Office violated the Crime Victims' Rights Act in failing to notify Epstein's victims of Epstein's plea deal in Florida.  Cassell Decl. ¶¶ 8, 14, 18.  Thus, Rule 23(g) is satisfied and the Court should appoint BSF, EPLLC, and Paul Cassell as class counsel.

## CONCLUSION

For the reasons stated herein, Doe respectfully request that the Court issue an Order: (1) certifying this action pursuant to Rule 23 as a class action and certifying the Class defined herein; (2) appointing Jane Doe as the Class Representative; (3) appointing Boies Schiller Flexner LLP, Edwards Pottinger LLC, and Paul Cassell as Class Counsel; and (4) granting such other and further relief as the Court may deem just and proper.

Dated: April 28, 2023                                    Respectfully Submitted,


                                                         */s/ David Boies*
                                                         David Boies
                                                         Andrew Villacastin

24

Sabina Mariella
Boies Schiller Flexner LLP
55 Hudson Yards
New York, New York
Telephone: (212) 446-2300
Fax: (212) 446-2350
Email: dboies@bsfllp.com
Email: avillacastin@bsfllp.com
Email: smariella@bsfllp.com

Sigrid McCawley (*pro hac vice*)
Daniel Crispino (*pro hac vice*)
Boies Schiller Flexner LLP
401 E. Las Olas Blvd. Suite 1200
Fort Lauderdale, FL 33316
Telephone: (954) 356-0011
Fax: (954) 356-0022
Email: smccawley@bsfllp.com
Email: dcrispino@bsfllp.com

Bradley J. Edwards
Edwards Pottinger LLC
425 N. Andrews Ave., Suite 2
Fort Lauderdale, FL 33301
Telephone: (954) 524-2820
Fax: (954)-524-2822
Email: brad@epllc.com

Brittany N. Henderson
Edwards Pottinger LLC
1501 Broadway
Floor 12
New York, NY
Telephone: (954) 524-2820
Fax: (954) 524-2820
Email: brittany@epllc.com

Paul G. Cassell (*pro hac vice*)
S.J. Quinney College of Law at the
University of Utah
383 S. University St.
Salt Lake City, UT 84112
Telephone: 801-585-5202
Fax: 801-585-6833
Email: cassellp@law.utah.edu

25

(institutional address for identification purposes, not to imply institutional endorsement)

*Counsel for Jane Doe 1*