## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Jane Doe 1, individually and on behalf of all others similarly situated, | Case No. 1:22-CV-10018 (JSR) |
| Plaintiff, | |
| v. | |
| Deutsche Bank Aktiengesellschaft, et. al., | |
| Defendants. | |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR AN
## AWARD OF ATTORNEYS' FEES AND EXPENSES

BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, NY 10001
Telephone: (212) 446-2300
Fax: (212) 446-2350

EDWARDS HENDERSON LEHRMAN LLC
425 N. Andrews Ave., Suite 2
Fort Lauderdale, FL 33301
Telephone: (954) 524-2820

Paul G. Cassell (*pro hac vice*)
S.J. Quinney College of Law at the
University of Utah[1]
383 S. University St.
Salt Lake City, UT 84112
Telephone: (801) 585-5202
Fax: (801) 585-6833

*Counsel   for   Settlement   Class
Representative Jane Doe 1 and the Class*

---

[1]    Institutional address for identification purposes, not to imply institutional endorsement.

**TABLE OF CONTENTS**

I.    INTRODUCTION ...........................................................................................................1

II.   HISTORY OF THE LITIGATION ..............................................................................3

III.  CLASS COUNSEL'S FEE REQUEST IS REASONABLE. ........................................5

      A.   Class Counsel Is Entitled to an Award of Attorneys' Fees and Expenses from the
           Common Fund. ...................................................................................................6

      B.   The *Goldberger* Factors Confirm that the Requested Fee Is Reasonable. ..............8

           1.   The Quality of Representation Supports the Requested Fee. .....................8

           2.   The Relationship of the Requested Fee to the Settlement ........................13

           3.   The Time and Labor Expended by Counsel .............................................14

           4.   The Risks of the Litigation .....................................................................19

           5.   The Magnitude and Complexity of the Litigation....................................23

           6.   Public Policy Considerations ..................................................................24

      C.   The Class's Reaction to the Fee Request to Date Supports the Requested Fee. ...24

      D.   The Fee Request Is Reasonable Based on a Lodestar Cross-Check. ....................25

IV.   COUNSEL'S EXPENSES ARE REASONABLE AND WERE NECESSARY TO
      THE PROSECUTION OF THIS LITIGATION..........................................................28

V.    CONCLUSION ...........................................................................................................28

# TABLE OF AUTHORITIES

## Cases

*Alaska Elec. Pension Fund v. Bank of Am. Corp.*,
    2018 WL 6250657 (S.D.N.Y. Nov. 29, 2018) ................................................. 14

*Arbuthnot v. Pierson*,
    607 F. App'x 73 (2d Cir. 2015) ........................................................................ 7

*Bekker v. Neuberger Berman Grp. 401(k) Plan Inv. Comm.*,
    504 F. Supp. 3d 265 (S.D.N.Y. 2020) ........................................................ 24, 27

*Blum v. Stenson*,
    465 U.S. 886 (1984) ........................................................................................ 7

*Boeing Co. v. Van Gemert*,
    444 U.S. 472 (1980) ........................................................................................ 6

*Christine Asia Co. v. Yun Ma*,
    2019 WL 5257534 (S.D.N.Y. Oct. 16, 2019) .................................... 21, 22, 23

*City of Birimingham Ret. & Relife Sys. v. Davis*,
    806 F. App'x 14 (2d Cir. Mar. 12, 2020) ...................................................... 14

*City of Providence v. Aeropostale, Inc.*,
    2014 WL 1883494 (S.D.N.Y. May 9, 2014) ...................................... 7, 24, 26

*deMunecas v. Bold Food, LLC*,
    2010 WL 3322580 (S.D.N.Y. Aug. 23, 2010) ............................................... 17

*Faught v. Am. Home Shield Corp.*,
    668 F.3d 1233 (11th Cir. 2011) ...................................................................... 8

*Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*,
    62 F.4th 704 (2d Cir. 2023) .......................................................................... 23

*Fresno Cnty. Employees' Retirement Ass'n. v. Isaacson/Weaver Family Trust*,
    925 F.3d 63 (2d Cir. 2019) ........................................................................ 6, 27

*Goldberger v. Integrated Res., Inc.*,
    209 F.3d 43 (2d Cir. 2000) .................................................................... passim

*Grice v. Pepsi Beverages Co.*,
    363 F. Supp. 3d 401 (S.D.N.Y. 2019) ........................................................... 13

*In re Agent Orange Prod. Liab. Litig.*,
    818 F.2d 226 (2d Cir. 1987) .......................................................................... 19

*In re AOL Time Warner, Inc. Sec. & ERISA Litig.*,
    2006 WL 3057232 (S.D.N.Y. Oct. 25, 2006) ............................................... 25

*In re Assicurazioni Generali S.p.A. Holocaust Ins. Litig.*,
    2009 WL 762438 (S.D.N.Y. Mar. 24, 2009) ................................................... 7

*In re BHP Billiton Ltd. Sec. Litig.*,

2019 WL 1577313 (S.D.N.Y. Apr. 10, 2019) ....................................................14

*In re Colgate-Palmolive Co. ERISA Litig.,*
36 F. Supp. 3d 344 (S.D.N.Y. 2014) ........................................................27

*In re Comverse Tech., Inc. Sec. Litig.,*
2010 WL 2653354 (E.D.N.Y. June 24, 2010) ..........................................19

*In re CRM Holdings,*
2016 WL 4990290 (S.D.N.Y. Sept. 7, 2016) ..............................................6

*In re Deutsche Telekom AG Sec. Litig.,*
2005 WL 7984326 (S.D.N.Y. June 14, 2005) ...........................................14

*In re Flag Telecom Holdings, Ltd. Sec. Litig.,*
2010 WL 4537550 (S.D.N.Y. Nov. 8, 2010) ........................................9, 14

*In re Global Crossing Sec. & ERISA Litig.,*
225 F.R.D. 436 (S.D.N.Y. 2004) .............................................................28

*In re GSE Bonds Antitrust Litig.,*
2020 WL 3250593 (S.D.N.Y. June 16, 2020) (Rakoff, J.) ........................27

*In re KeySpan Corp. Sec. Litig.,*
2005 WL 3093399 (E.D.N.Y. Sept. 30, 2005) ..........................................26

*In re Lloyd's Am. Trust Fund Litig.,*
2002 WL 31663577 (S.D.N.Y. Nov. 26, 2002) ..........................................7

*In re London Silver Fixing, Ltd. Antitrust Litig.,*
2021 WL 3159810 (S.D.N.Y. June 15, 2021) ...........................................14

*In re Marsh & McLennan Cos., Inc. Sec. Litig.,*
2009 WL 5178546 (S.D.N.Y. Dec. 23, 2009) ...........................................27

*In re Marsh ERISA Litig.,*
265 F.R.D. 128 (S.D.N.Y. 2010) .............................................................12

*In re NASDAQ Mkt.-Makers Antitrust Litig.,*
187 F.R.D. 465 (S.D.N.Y. 1998) .........................................................26, 27

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.,*
991 F. Supp. 2d 437 (E.D.N.Y. 2014) ........................................................8

*In re Pfizer Inc. S'holder Derivative Litig.,*
780 F. Supp. 2d 336 (S.D.N.Y. 2011) (Rakoff, J.).....................................14

*In re Prudential Sec. Inc. Ltd. P'ships Litig.,*
985 F. Supp. 410 (S.D.N.Y. 1997) ...........................................................22

*In re Rite Aid Corp. Sec. Litig.,*
269 F. Supp. 2d 603 (E.D. Pa. 2003)........................................................25

*In re Rite Aid Corp. Sec. Litig.,*
396 F.3d 294, 305 (3d Cir. 2005) ………………………………………… 25

*In re Top Tankers, Inc. Securities Litigation,*

2008 WL 2944620 (S.D.N.Y. 2008) ...........................................................................14

*In re Veeco Instruments Inc. Sec. Litig.*,
    2007 WL 4115808 (S.D.N.Y. Nov. 7, 2007) .............................................................12

*In re WorldCom, Inc. Sec. Litig.*,
    388 F. Supp. 2d 319 (S.D.N.Y. 2005) ......................................................................27

*Landmen Partners, Inc. V. Blackstone Grp., L.P.*,
    2013 WL 11330936 (S.D.N.Y. Dec. 18, 2013) ........................................................14

*Lea v. Tal Educ. Group*,
    2021 WL 5578665 (S.D.N.Y. Nov. 30, 2021) ..........................................................14

*Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.*,
    540 F.2d 102 (3d Cir. 1976) ....................................................................................12

*Maley v. Del Glob. Techs. Corp.*,
    186 F. Supp. 2d 358 (S.D.N.Y. 2002) ......................................................................27

*Missouri v. Jenkins*,
    491 U.S. 274 (1989) .................................................................................................26

*New York State Ass'n for Retarded Child., Inc. v. Carey*,
    711 F.2d 1136 (2d Cir. 1983) ..................................................................................26

*Rapuano v. Trs. of Dartmouth Coll.*,
    2020 WL 3965784 (D.N.H. July 14, 2020) ..............................................................13

*Sewell v. Bovis Lend Lease, Inc.*,
    2012 WL 1320124 (S.D.N.Y. Apr. 16, 2012) ..........................................................27

*St. Louis v. Perlitz*,
    No. 3:13-CV-01332 (D. Conn. Aug. 27, 2019) ........................................................13

*Swedish Hosp. Corp. v. Shalala*,
    1 F.3d 1261 (D.C. Cir. 1993) ....................................................................................8

*Tiro v. Pub. House Investments, LLC*,
    2013 WL 4830949 (S.D.N.Y. Sept. 10, 2013) .........................................................13

**Statutes**

18 U.S.C. § 1591(a) ...........................................................................................................9

**Other Authorities**

Association of Trial Lawyers of America, *Representing the Victim of Sexual Assault and Abuse: Special Considerations and Issues*, Ann.2006 ATLA-CLE 1889 (2006) .......................21

Blanche Bong Cook, *Stop Traffic: Using Expert Witnesses to Disrupt Intersectional Vulnerability in Sex Trafficking Prosecutions*, 24 Berkeley J. Crim. L. 147, 166–67 (2019)....................................................................................................................................20

Chitra Raghavan & Kendra Doychak, *Trauma-coerced Bonding and Victims of Sex Trafficking: Where do we go from here?*, 17(2) International Journal Emergency Mental Health and

iv

Human Resilience (2015) ................................................................................20

Herbert B. Newberg, Newberg on Class Actions § 14:6 ............................................27

I. Bennett Capers, *Real Women, Real Rape*, 60 UCLA L. Rev. 826, 863–64 (2013) .................21

Jane Musgrave, *Prosecutor to Jeffrey Epstein victims: I'm sorry deal labeled you as prostitutes*, Palm Beach Post (Dec. 3, 2020)....................................................................21

Kimberly D. Bailey, *Sex in A Masculinities World: Gender, Undesired Sex, and Rape*, 21 J. Gender Race & Just. 281, 291 (2018) ..........................................................21

Operational indicators of trafficking in human beings, Int'l L. Org. (2009),.............................20

Theodore Eisenberg et. al., *Attorneys' Fees in Class Actions: 2009-2013*, 92 N.Y.U. L. Rev. 937, 952 (2017) ....................................................................................13

## I.    INTRODUCTION

This Settlement is the culmination of a decades-long effort by Class Counsel[2] to bring relief to dozens of sex-trafficking victims whose lives were ruined by Jeffrey Epstein.  Epstein and other powerful individuals lived openly as celebrities for years with impunity while victimizing young women and girls across the globe.  Epstein and his cronies silenced their victims with threats of physical harm and other forms of intimidation, and publicly discredited any who were brave enough to speak out.  Victim-plaintiffs in earlier cases faced an onslaught of oppressive discovery into their personal lives, witness intimidation, and public shaming intended to ruin their lives and serve as a warning to other victims contemplating filing suit on their own.  Epstein and his cohorts also sued victims' lawyers directly for similar reasons.  It is only through the courageous efforts of victims and their lawyers that the truth about Epstein's operations has begun to come out.  As society has learned in recent years, the number of wealthy businessmen, celebrities, and politicians involved with Epstein and his far-flung sex trafficking operation is staggering.

While other lawsuits have sought to hold Epstein and other powerful individuals accountable, this case was the first to allege that one of Epstein's financial institutions was involved in his illegal activities in violation of federal statutes and New York law.  In pursuit of those claims, Class Counsel painstakingly pieced through Epstein's sham businesses and corporate entities and tracked Epstein's (and his cohorts') cash transactions over multiple years.  Relying on their decades of experience representing Epstein's victims, Class Counsel were prepared to argue at trial how a bank's role was

---

[2]    As used herein, "Class Counsel" means Boies Schiller Flexner LLP ("BSF") and Edwards Henderson Lehrman ("EHL").  *See* Declaration of Sigrid S. McCawley filed on behalf of Boies Schiller Flexner LLP in support of Motion for an Award of Attorneys' Fees and Expenses ("BSF Decl."); Declaration of Bradley J. Edwards filed on behalf of Edwards Henderson Lehrman in Support of Motion for an Award of Attorneys' Fees and Expenses ("EHL Decl."); Joint Declaration of David Boies and Bradley Edwards in Support of Motion for Final Approval of Plan of Allocation and an Award of Attorneys' Fees and Expenses ("Boies & Edwards Decl.").

necessary to the sex-trafficking operation and to prove through the evidence compiled that it was a knowing beneficiary of Epstein's illegal activities in violation of the TVPA and New York law.

Class Counsel's performance in this litigation resulted in a settlement of $75 million to be provided to the Class,[3] an amount that will provide life-changing relief to Jeffrey Epstein's victims. Significantly, the average recovery for Class Members will substantially exceed the average recovery they received from Epstein and his estate.

In light of this excellent result and for the additional reasons set forth below, Class Counsel's application for a fee award of 30% is more than justified. The Settlement is an excellent result for the Class given the likely amount of recovery, the defenses to liability and damages that Defendants advanced, and the design of a claim process that allowed survivors to decide the extent to which they wanted to participate given the significant potential for re-traumatization. Class Counsel now respectfully moves the Court for an award of attorneys' fees of 30% of the Settlement Amount and $1,123,965.69 in expenses that were reasonably and necessarily incurred in prosecuting and resolving the Litigation.

As set forth below, the relevant factors articulated in *Goldberger* strongly support the requested award. *See Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 50 (2d Cir. 2000). Following an extensive Court-ordered notice program, 40 Class Members submitted Tier One Forms to the Claims Administrator, and 35 Class Members submitted Tier Two Questionnaires and Releases— despite the geographic distance of many of Epstein's survivors (many of whom were recruited from

---

[3]     Capitalized terms used herein are defined and have the meanings contained in the Amended Stipulation of Settlement (ECF No. 94-1) (the "Stipulation"), the Boies & Edwards Declaration in Support of Motion for Final Approval of Plan of Allocation and an Award of Attorneys' Fees and Expenses, and in the Memorandum of Law in Support of Motion for Final Approval of Class Action Settlement and Approval of Plan of Allocation ("Final Approval Memorandum"), submitted concurrently herewith.

Eastern Europe and are presently living in war-torn countries), and the likelihood that many survivors may have chosen not to participate due to fear of retaliation, cultural differences in those countries, or traumatization.  Not one Class Member has filed an objection to the Settlement or opted out.  The $75 million Settlement that Class Counsel obtained provides the Class with an immediate and certain recovery in a case that faced significant risks at summary judgment, trial, and on appeal.  In achieving this result, Class Counsel worked 11,022 hours on this complex litigation, all on a contingency basis and with no guarantee of ever being paid for their work on behalf of the Class.

Class Counsel believes that an attorneys' fee award of 30% of the Settlement Amount, together with payment of litigation expenses, properly reflects the many significant risks shouldered by Class Counsel in prosecuting the Litigation, as well as the result achieved.  When examined under this Circuit's preferred method for assessing fees in class action litigation, an award of fees of 30% is reasonable and well within the range of attorneys' fees awarded in similar complex contingency cases.  For the reasons set forth below, Class Counsel respectfully submits that this request is fair and reasonable.

## II.   HISTORY OF THE LITIGATION

Class Counsel began investigating this matter in 2021 and ultimately commenced the action on November 24, 2022, by filing an initial individual and class action complaint, which was later amended on January 13, 2023.  The operative Complaint alleges that Jeffrey Epstein's sex trafficking venture was facilitated and enabled by Defendants helping Epstein avoid regulators' scrutiny and providing Epstein with withdrawal and wire services, all so Defendants could profit from Epstein and his associates.  *See* ECF No. 42 (Amended Complaint).  The Amended Complaint alleges that Defendants' assistance to Epstein's sex trafficking enterprise prevented the authorities from discovering his illegal scheme and increased the size and scale Epstein's access to and control of victims, causing damage to members of the Class.

In preparation for the filing of this action, Class Counsel engaged in extensive research, conducted dozens of interviews, and reviewed thousands of documents they have accumulated over the past fifteen years of litigation against Jeffrey Epstein, his Estate, and his associates. Class Counsel have confidentially interviewed at least 100 individuals, including dozens of survivors both in the United States and abroad, as well as a number of other witnesses who were close to or associated with Epstein for many years. Additionally, Class Counsel reviewed an enormous volume of publicly available documents regarding Jeffrey Epstein and his sex-trafficking operation inclusive of civil complaints, police reports, investigative reports, other information obtained through criminal investigations, court transcripts, news articles, audio recordings of survivors, and a multitude of other publicly available sources. Finally, Class Counsel conducted significant research into Defendants, including extensive review of other lawsuits filed against the Defendants and other regulatory findings.

On December 30, 2022, Defendants moved to dismiss the initial complaint. *See* ECF No. 37. Following the filing of the Amended Complaint on January 13, 2023, Defendants moved to dismiss again on February 7, 2023. ECF No. 43. The Court granted in part and denied in part that motion on March 20, 2023. *See* ECF No. 56. Defendants answered the Amended Complaint on April 10, 2023. *See* ECF No. 63.

Class Counsel engaged in extensive discovery efforts spanning several months, supplementing their extensive pre-Complaint work. Hundreds of thousands of pages were reviewed and produced by the Parties and by non-parties in response to subpoenas. Furthermore, 7 fact witnesses (including non-parties) and 4 expert witnesses testified during depositions. Fact discovery was set to close on May 30, 2023. *See* ECF No. 62. On April 28, 2023, Class Representative moved for class certification. *See* ECF No. 68.

From May 9 to May 10, 2023, the Parties engaged in a confidential mediation with experienced mediators in large and complex civil sexual abuse matters and class actions, including Simone Lelchuk.  ECF No. 98-1 ¶ 2.  Class Counsel and Defendants' Counsel each provided the mediators with mediation statements and engaged in a multi-day mediation to reach a settlement in principle.  The Parties negotiated a Term Sheet, memorializing their agreement to settle Class Representative's claims against Defendants and to end the Litigation.  The Parties executed the Term Sheet on May 11, 2023.  The Parties subsequently executed an Amended Stipulation of Settlement on June 16, 2023.  ECF No. 90-1.

After a preliminary fairness hearing, on June 27, 2023, the Court granted, as amended, preliminary approval of the Class and the proposed settlement, as well as the proposed forms of notice.  ECF No. 95.  Since that time, Class Counsel has remained involved in consulting with victims and assisting with claims administration.  For example, Class Counsel provided the Claims Administrator with an extensive list of potential class members and their current contact information based on Class Counsel's own research, past representations, interviews, and meetings with survivors.  In addition, Class Counsel identified a number of other potential class members by conducting an extensive review of documents relating to Epstein, including flight records, wire transfer records, police records, and other materials.  Class Counsel expended significant resources ensuring that all potential Class Members were aware of the settlement.  Class Counsel also spent substantial time speaking with potential Class Members who had questions about the settlement and claims administration process and assisting many Class Members with preparing and submitting their claims.  *See* Boies & Edwards Decl. ¶¶ 43–46.

### III.   CLASS COUNSEL'S FEE REQUEST IS REASONABLE.

In light of the excellent $75 million Settlement, Class Counsel's fee request is reasonable when evaluated under both the percentage method and the lodestar cross-check method.  The fee

request satisfies each factor of the *Goldberger* test this Court applies to assess the reasonableness of fee requests. *See Goldberger*, 209 F.3d at 50. The exceptionally positive reaction by the Class to the fee request similarly supports Class Counsel's request. Finally, as a backstop check on reasonableness, Class Counsel's lodestar multiplier is well within the range of reasonable ratios accepted by this and other courts.

### A. Class Counsel Is Entitled to an Award of Attorneys' Fees and Expenses from the Common Fund.

The Supreme Court has long recognized that "a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980). Courts in this District have consistently adhered to this precedent. *See, e.g.*, *Fresno Cnty. Employees' Retirement Ass'n v. Isaacson/Weaver Family Trust*, 925 F.3d 63, 68 (2d Cir. 2019); *In re CRM Holdings*, 2016 WL 4990290, at *2 (S.D.N.Y. Sept. 7, 2016) ("Pursuant to the 'equitable' or 'common fund' doctrine . . . attorneys who create a common fund to be shared by a class are entitled to an award of fees and expenses from that fund as compensation for their work.").

The purpose of fees awarded pursuant to the common fund doctrine is to fairly and adequately compensate class counsel for services rendered to the class and to ensure that all class members contribute equally toward the costs associated with litigation pursued on their behalf. *See Goldberger*, 209 F.3d at 47. Courts have recognized that awards of attorneys' fees from a common fund "also serve to encourage skilled counsel to represent those who seek redress for damages inflicted on entire classes of persons, and to discourage future alleged misconduct of a similar nature." *See City of Providence v. Aeropostale, Inc.*, 2014 WL 1883494, at *11 (S.D.N.Y. May 9, 2014), *aff'd sub nom. Arbuthnot v. Pierson*, 607 F. App'x 73 (2d Cir. 2015).

"What constitutes a reasonable fee is properly committed to the sound discretion of the district court." *Goldberger*, 209 F.3d at 47.  Typically, courts use one of two methods to determine a reasonable fee: (1) the percentage of recovery method and (2) the lodestar method.  *Id*.  The percentage of recovery method is the preferred method for calculating the reasonableness of attorneys' fees under precedent from the Supreme Court, Second Circuit, and courts in this District. *See Blum v. Stenson*, 465 U.S. 886, 900 n.16 (1984) ("[U]nder the 'common fund doctrine,' . . . a reasonable fee is based on a percentage of the fund bestowed on the class. . . ."); *In re Assicurazioni Generali S.p.A. Holocaust Ins. Litig.*, 2009 WL 762438, at *2 (S.D.N.Y. Mar. 24, 2009) (explaining that while "both the lodestar and the percentage of the fund methods are available to district judges in calculating attorneys' fees in common fund cases," the "trend in this Circuit is toward the percentage [of the fund] method" (first quoting *Goldberger*, 209 F.3d at 50, and then quoting *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc*., 396 F.3d 96, 121 (2d Cir. 2005)).

Courts endorse the percentage of recovery method as the preferred means to determine the reasonableness of attorneys' fees because it "directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation." *Wal-Mart*, 396 F.3d at 121 (quoting *In re Lloyd's Am. Trust Fund Litig.*, 2002 WL 31663577, at *25 (S.D.N.Y. Nov. 26, 2002)).  In contrast, the lodestar method—under which "the district court scrutinizes the fee petition to ascertain the number of hours reasonably billed to the class and then multiplies that figure by an appropriate hourly rate"—has created "temptation for lawyers to run up the number of hours for which they could be paid," and "an unanticipated disincentive to early settlements." *Goldberger*, 209 F.3d at 47-49; *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 991 F. Supp. 2d 437, 440 (E.D.N.Y. 2014) ("The percentage method better aligns the incentives of plaintiffs' counsel with those of the class members because it bases the attorneys'

fees on the results they achieve for their clients, rather than on the number of motions they file, documents they review, or hours they work. . . . The percentage method also accords with the overwhelming prevalence of contingency fees in the market for plaintiffs' counsel.").  The lodestar method also requires courts to "engage in a gimlet-eyed review of line-item fee audits," which is "an inevitable waste of judicial resources."   *Goldberger*, 209 F.3d at 49.  All Courts of Appeals to consider this issue have approved the percentage method, with two circuits requiring its use in common-fund cases.  *See Faught v. Am. Home Shield Corp.*, 668 F.3d 1233, 1242 (11th Cir. 2011) (requiring use of percentage method); *Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261, 1269–71 (D.C. Cir. 1993) (same).

For these reasons, courts in the Second Circuit and this District typically utilize the percentage of recovery method.  Courts are further guided by the criteria set out in *Goldberger* for determining a reasonable fee in a common fund case: (1) the quality of the representation; (2) the requested fee in relation to the settlement; (3) the time and labor expended by counsel; (4) the risk of the litigation; (5) the magnitude and complexities of the litigation; and (6) public policy considerations.   209 F.3d at 50.   Considering these factors, Class Counsel's fee request is reasonable.

### B.   The *Goldberger* Factors Confirm that the Requested Fee Is Reasonable.

Class Counsel seeks attorneys' fees amounting to 30% of the Settlement Amount.  Given the excellent Settlement reached in this action, the percentage of the fund method is particularly appropriate for evaluating the fee request, and the 30% fee request is reasonable under that framework.

### 1.   The Quality of Representation Supports the Requested Fee.

Class Counsel's fee request is substantially premised on the successful outcome obtained for the Class.  *See In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 2010 WL 4537550, at *28

(S.D.N.Y. Nov. 8, 2010) ("The quality of the representation and the standing of Lead Counsel are important factors that also support the reasonableness of the requested fee."). Class Counsel respectfully submits that the outcome was an excellent result and that an appropriate award of fees should follow.

First, the case was factually and legal complex. Class Counsel vigorously pursued claims pursuant to the Trafficking Victims Protection Act ("TVPA") and state-law tort claims against sophisticated defense counsel, litigating the case past a challenging motion to dismiss and through a robust fact and expert discovery period. To Class Counsel's knowledge, Class Representative's claims were the first brought by a sex-trafficking survivor against a banking institution pursuant to 18 U.S.C. § 1595(a), the provision of the TVPA that permits civil litigants to sue those who knowingly benefit from participating in a sex-trafficking venture. With the help of subject-matter expert Professor Cassell, Class Counsel also brought other claims under the TVPA to seek to hold Defendants accountable, including aiding and abetting, obstruction, conspiracy, and RICO claims. Class Counsel vigorously litigated Defendants' motion to dismiss, which raised complex arguments regarding the level of knowledge that courts around the country interpret § 1595(a) to require (*see* ECF No. 44 at 16); the level of participation required to give rise to liability against a bank pursuant to § 1595(a) (*id.* at 13); and the causes of action available to civil litigants pursuant to the TVPA (*id.* at 25). The Court held that Class Representative's Complaint adequately alleged that Defendants knew about, participated in, and benefited from Epstein's trafficking based on the detailed factual allegations in the Complaint. ECF No. 75 at 23–32. The Court also denied Defendants' motion to dismiss Class Representative's TVPA obstruction claim. *Id.* at 32–34.

Class Representative also advanced negligence claims. While Defendants' motion to dismiss argued that banks owe no duty of care to protect non-customers from the intentional torts

of their customers, citing Second Circuit precedent (ECF No. 44 at 33), the Court denied the motion given the extraordinary circumstances alleged (ECF No. 75 at 46–47). Defendants' motion to dismiss also argued that Class Representative released her claims against Defendants in a prior settlement with Jeffrey Epstein's Estate. ECF No. 44 at 6. Further, to Class Counsel's knowledge, no class has ever been certified in a case involving § 1595(a), raising additional legal complexities that required Class Counsel to litigate aggressively to achieve a favorable result for all survivors of Epstein's sex trafficking while Epstein was Defendants' client. This supports the reasonableness of Class Counsel's fee request.

Second, the $75 million settlement is an exceptional result for the Class. Class Members who submitted Tier One Forms, qualified as Eligible Class Members, and were not otherwise determined to be ineligible will receive a guaranteed payment of $75,000, without any deduction for attorneys' fees. ECF No. 90-1 § 1.34; ECF No. 98-1 ¶ 4. Class Members could then seek to receive additional funds up to $5,000,000 by submitting a Tier Two Questionnaire and Release. ECF No. 90-1 § 5.4; ECF No. 98-1 ¶ 4. This system guaranteed payment to all Eligible Class Members who submitted Tier One Forms and were not otherwise determined to be ineligible by the Claims Administrator allowed Class Members to decide to what extent they wished to participate. Depending on the level of harm they suffered and their willingness to participate, Class Members were able to choose from two methods of applying for compensation: (1) applying for only a base payment of $75,000 by submitting the Tier One Form, which requires only basic biographical information, or (2) applying for an enhanced settlement payment of up to $5,000,000 by submitting more intimate and detailed information about the Class Member's experiences with Epstein. The claim process therefore allowed women to decide how and how much they wished to participate in

the process given the traumatic nature of the experiences of many women who encountered Epstein. This choice-based model encourages participation while minimizing re-traumatization.

The Settlement has also opened an avenue of recovery for survivors who otherwise would not have come forward to pursue relief due to aversion to litigation or a reluctance to share sensitive or traumatic experiences with attorneys.  These Class Members will be entitled to payment of up to $5,000,000, and will not need to engage counsel, file their own lawsuits, be subjected to burdensome discovery requests, testify at deposition or trial about their traumatic experiences with Epstein, or wait for payment pending appeal.  35% of any unused portion of the Global Settlement Amount will also be distributed to a charitable organization, another positive and important aspect of the Settlement.  ECF No. 90-1 § 5.12.

The Settlement further exceeds what the Class might have recovered even if Class Representative had prevailed at trial.  There remained critical questions of fact to be determined at trial as to whether Class Representative would be able to prove Defendants' liability under the TVPA or Defendants' negligence.  Each Class Member would also have to prove the amount of damages to which she is entitled based on recounting personal and intimate information.  And because there have been no prior actions against banking institutions under a TVPA beneficiary liability claim, the quantity of damages a jury would award is far from certain.  As a comparator, the Epstein Victims' Compensation Program paid $121 million to approximately 150 eligible claimants, an average of less than $1 million per eligible claimant from the Estate of the direct trafficker.  *See* ECF No. 69-45.  The Settlement amount of $75 million for Eligible Class Members is thus an exceptional financial result for the Class.  As *Goldberger* explained, "the quality of representation is best measured by results, and that such results may be calculated by comparing 'the extent of possible recovery with the amount of actual verdict or settlement.'"  209 F.3d at 55

(quoting *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 540 F.2d 102, 118 (3d Cir. 1976)).  Evaluated on that basis, the Settlement here is particularly strong and Class Counsel's request for 30% of the Settlement Amount is reasonable.

Third, courts also recognize that the quality of the opposition faced by plaintiff's counsel should be taken into consideration in assessing the quality of counsel's performance.  *See, e.g.*, *In re Marsh ERISA Litig.*, 265 F.R.D. 128, 148 (S.D.N.Y. 2010) ("The high quality of defense counsel opposing [p]laintiffs' efforts further proves the caliber of representation that was necessary to achieve the Settlement."); *In re Veeco Instruments Inc. Sec. Litig.*, 2007 WL 4115808, at *7 (S.D.N.Y. Nov. 7, 2007) (finding that among the factors supporting a 30% fee award was that defendants were represented by "one of the country's largest law firms").  Here, Defendants are represented by counsel from Ropes & Gray LLP—one of the nation's preeminent law firms—who spared no effort in representing their clients.  Notwithstanding this formidable opposition, Class Counsel's demonstrated willingness to vigorously prosecute the Litigation through trial and the inevitable appeals enabled Class Representative to achieve an exceedingly favorable Settlement for the benefit of the Class.

Finally, no Class Member has objected to or opted out of the settlement, which is itself a testament to quality of the representation, ECF No. 98-1 ¶ 12, and Class Members have proactively reached out to Class Counsel to express their gratitude for the Settlement.  *See* Final Approval Mem. at 13–14; *Tiro v. Pub. House Investments, LLC*, 2013 WL 4830949, at *14 (S.D.N.Y. Sept. 10, 2013) (crediting the lack of objections to the attorneys' fee award as a factor demonstrating the quality of representation).

In sum, the quality of the representation—on both sides of the "v."—supports the reasonableness of Class Counsel's fee request.

## 2.   The Relationship of the Requested Fee to the Settlement

Lead Counsel's efforts have resulted in a $75 million Settlement for the Class.  This recovery is an outstanding result in a pre-trial settlement in a first-of-its-kind TVPA case.  Accordingly, Class Counsel's request for fees totaling 30% of the Settlement Amount is fair and reasonable in light of the substantial benefit Class Counsel's work has conferred on the Class.

"Courts often look to empirical evidence of attorney's fees awarded in similar cases as a starting point for the baseline reasonable fee inquiry."  *Grice v. Pepsi Beverages Co.*, 363 F. Supp. 3d 401, 407 (S.D.N.Y. 2019).  Class Counsel's request is justified by the strong recovery it achieved for the Class and is on par with what courts have awarded counsel in comparable sexual abuse class actions over the last five years.  *See, e.g.*, *Rapuano v. Trs. of Dartmouth Coll.*, 2020 WL 3965784, at *2 (D.N.H. July 14, 2020) (awarding 35% of sexual abuse class action settlement fund as fees); *St. Louis v. Perlitz*, No. 3:13-CV-01332 (D. Conn. Aug. 27, 2019), ECF Nos. 1089, 1080 ¶ 14 (awarding 31% of sexual abuse class action settlement as fees); *see also* Theodore Eisenberg et. al., *Attorneys' Fees in Class Actions: 2009-2013*, 92 N.Y.U. L. Rev. 937, 952 (2017).  Class Counsel's request is also similar to what courts in this District have awarded in other types of class action settlements of similar sizes, such as securities class actions and derivative suits.  *See, e.g.*, *In re Pfizer Inc. S'holder Derivative Litig.*, 780 F. Supp. 2d 336, 343 (S.D.N.Y. 2011) (Rakoff, J.) (approving $22 million in fees from $75 million settlement fund, amounting to approximately 29% of the settlement); *In re Top Tankers, Inc. Securities Litigation*, 2008 WL 2944620, *13 n.9 (S.D.N.Y. 2008) ("Empirical studies show that, regardless whether the percentage method or the lodestar method is used, fee awards in class actions average around one-third of the recovery.").[4]

---

[4]      *See also In re BHP Billiton Ltd. Sec. Litig.*, 2019 WL 1577313, at *1 (S.D.N.Y. Apr. 10, 2019) (awarding 40% of $50 million settlement plus expenses), *aff'd sub nom. City of Birmingham Ret. & Relife Sys. v. Davis*, 806 F. App'x 14 (2d Cir. Mar. 12, 2020); *Landmen Partners, Inc. v.*

Given that fee requests for 30% of the Global Settlement Amount have been approved as reasonable in this Circuit, Class Counsel's forthcoming request for no more than 30% is appropriate.  As such, Class Counsel's fee request in the present matter is well within what this and other Courts have found to be reasonable.

### 3.  The Time and Labor Expended by Counsel

Class Counsel expended substantial time and effort pursuing the Litigation on behalf of the Class.  Class Counsel and their paraprofessionals, in addition to Professor Cassell, devoted 11,022 hours to prosecuting the Class's claims.  Unlike many firms that regularly participate in class action matters, BSF routinely serves as counsel for both plaintiffs and defendants.  ECF No. 90 ¶ 5.  BSF is primarily a trial firm and prepares its case strategy based on anticipating the requirements for trial and working back from there in implementing strategy for discovery, experts, and motion practice.  BSF took precisely that approach here and respectfully submits that doing so led directly to the successful settlement.  EHL is a litigation firm specializing in the civil representation of survivors of violent crimes, primarily victims of sexual abuse and sex-trafficking.  *Id.* ¶¶ 21–23.  Professor Cassell, a former federal judge and subject-matter expert, provided invaluable strategic insight and litigation skills to bear.  *Id.* ¶ 24.  Together, Class Counsel respectfully submits that the combined approach taken led directly to the successful settlement.

---

*Blackstone Grp., L.P.,* 2013 WL 11330936, at *3 (S.D.N.Y. Dec. 18, 2013) (awarding fees of 33-1/3% of $85 million recovery plus expenses); *In re Deutsche Telekom AG Sec. Litig.*, 2005 WL 7984326, at *4 (S.D.N.Y. June 14, 2005) (awarding 28% of $120 million settlement); *In re London Silver Fixing, Ltd. Antitrust Litig.*, 2021 WL 3159810 (S.D.N.Y. June 15, 2021) (awarding 30% of $38 million in antitrust class action settlement); *Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 2018 WL 6250657 (S.D.N.Y. Nov. 29, 2018) (awarding 26% of $126 million in antitrust class action settlement); *Lea v. Tal Educ. Group*, 2021 WL 5578665, at *12 (S.D.N.Y. Nov. 30, 2021) (noting that fee requests for 33% of the settlement fund have "been approved as reasonable in this Circuit); *Flag Telecom*, 2010 WL 4537550, at *24 (noting that 30% of the "gross" settlement fund "is well within the range of fees awarded . . . by courts in this Circuit").

To effectively prepare this exceedingly complex and novel class action case for trial against highly sophisticated defense counsel, Class Counsel organized and analyzed hundreds of thousands of pages of party and third-party discovery. Class Counsel completed this work not just to defeat dispositive motions but, more importantly, to quickly shepherd the matter to trial under the Court's expedited schedule. As detailed in the Declaration submitted with Class Counsel's Motion for Final Approval, Class Counsel undertook substantial efforts on behalf of the Class. *See* Boies & Edwards Decl. ¶¶ 7–13, 20–46. The work performed and the resources dedicated to pursuing the Litigation are summarized below.

***Fact Discovery and Development.*** Class Counsel began investigating this complex matter in early 2021 and interviewed dozens of witnesses and potential class members. That investigation involved investigating Epstein's worldwide trafficking scheme during the timeframe he banked with Defendants, interviewing survivors, and investigating Defendants' banking relationship with Epstein. After the matter was filed, the Court held the parties to a fast and efficient discovery schedule. In the span of just five months, Class Counsel served 49 documents requests on Defendants, met and conferred extensively with Defendants about their requests, and analyzed the approximately 170,000 documents Defendants produced. Class Counsel took five depositions of key former employees of Defendants with relevant information. Further, Class Counsel negotiated with Defendants' Counsel extensively regarding various deposition topics for Defendants' Rule 30(b)(6) deposition.

During the same compressed timeframe, Defendants served 27 document requests on Class Representative, Class Counsel collected, searched, and reviewed about 150,000 documents collected from Class Representative for relevant information, and Class Counsel produced 7,758 documents to Defendants from Class Representative's files. Class Counsel spent significant time

preparing responses and objections, meeting and conferring with Defendants' Counsel about the scope of their requests, and producing responsive documents.  Class Counsel also prepared Class Representative for her deposition, which involved extensively preparing her to testify about an extremely traumatic and complex period of her life.

Class Counsel also conducted substantial third-party discovery.  Through diligent efforts and multiple meet-and-confers, Class Counsel obtained additional evidence from third parties, including documents from Jeffrey Epstein's Estate.

***Motion Practice.***     At the time of Settlement, Class Counsel had devoted time and resources to two major motions.  Defendants first filed a motion to dismiss all of Plaintiffs' claims on December 30, 2022.  In response, Class Counsel closely analyzed the motion and submitted a First Amended Complaint on behalf of Class Representative to address the issues raised in the motion.  Then, on February 7, 2023, Defendants filed a motion to dismiss all of the claims in Class Representative's First Amended Complaint.  *See* ECF Nos. 43–50.  Defendants' motion involved complex legal theories, as further outlined above (*see supra* II.B.1), and responding to Defendants' motion required substantial resources.  The Court also held oral argument on Defendants' motion, which required significant preparation by Class Counsel.  Second, at the time of Settlement, Class Counsel had filed a motion to certify the class, which was accompanied by a declaration and nearly 50 exhibits.

***Expert Discovery.***   At the time of Settlement, Class Counsel had retained three expert witnesses: Jane Khodarkovsky, Ross Delston, and Marianne Demario.  BSF Decl. ¶ 8(i); Boies & Edwards Decl. ¶ 32.  Defendants deposed Jane Khodarkovsky, who submitted a 33-page report in support of class certification and a 35-page class certification reply report, on May 8, 2023.  In addition to reviewing Ms. Khodorkovsky's report, Class Counsel prepared her for and defended

her deposition.  Ms. Khodarkovsky also prepared a draft report for disclosure on the merits of Class Representatives' claims, as had Mr. Delson and Ms. Demario.  Boies & Edwards Decl. ¶ 33.

In addition, Defendants disclosed three experts relating to class certification.  Class Counsel reviewed and analyzed Defendants' expert reports and deposed all three experts prior to Settlement.  *Id.* ¶ 34.

***Mediation and Settlement.***  From May 9 to 10, 2023, Class Counsel engaged in a multi-day, arms-length confidential mediation with Defendants before experienced mediators in large and complex civil sexual abuse matters and class actions.  The mediation was preceded by the submission of substantial mediation statements by the parties.  Beyond the work already performed, Class Counsel will continue to expend time and resources overseeing the administration of the settlement.  *See deMunecas v. Bold Food, LLC*, 2010 WL 3322580, at *10 (S.D.N.Y. Aug. 23, 2010) ("Class Counsel's fee award will not only compensate them for time and effort already expended, but for time that they will be required to spend administering the settlement going forward.").

After Settlement, Class Counsel combed through hundreds of thousands of documents including banking records produced by Defendants, flight logs, message pads, police reports from multiple states, news articles, and multiple third-party productions including emails from the Estate of Jeffrey Epstein to identify all potential Class Members within Class Counsel's possession.  Class Counsel also hired international Russian and Ukrainian speaking investigators to locate and obtain addresses for potential class members and contacted attorneys known to have represented survivors in previous Epstein related litigation to obtain addresses and ensure that all known or suspected Class Members received proper notice.

Additionally, the investigative team hired by Class Counsel located and corresponded with dozens of potential Class Members in their native language on social media platforms including Facebook, Instagram, and LinkedIn to provide notice of the underlying action and information relating thereto.  With respect to potential Class Members who were not located through the aforementioned means, Class Counsel called and emailed all potential survivors using all known contact information.  Class Counsel further asked each known Class Member to provide the identity and contact information for any additional potential Class Member that they were familiar with and then underwent the same investigative measures to locate and contact those individuals. Lastly, Class Counsel has devoted hundreds of hours traveling to meet with Class Members in person, attending Zoom meetings with Class Members, and engaging in telephone conversations with Class Members in order to assist in the completion of Tier Two Forms in the most trauma-informed manner possible.  Many Class Members have expressed deep gratitude for the way in which Class Counsel handled the administration of this fund as many women had never come forward as a result of language barriers, cultural differences, and deep-rooted fear.

Throughout its time prosecuting the litigation, Class Counsel staffed the matter efficiently and avoided unnecessary duplication of effort.  Moreover, additional hours and resources have and will be expended seeking the Court's final approval of the Settlement, responding to Class Member inquiries, assisting Class Members with the completion and submission of Settlement Forms, assisting the Claims Administrator in overseeing the claims process, and participating in the final approval hearing.  Given the substantial time and effort devoted by Class Counsel to obtain a $75 million recovery, a request for attorneys' fees amounting to 30% of the Settlement Amount is appropriate.

#### 4.   The Risks of the Litigation

Class Counsel faced substantial risks throughout the Litigation, and the Court's consideration of a reasonable fee should account for them.  Indeed, the risk undertaken in the litigation is often considered the most important *Goldberger* factor.  *See Goldberger*, 209 F.3d at 54 ("We have historically labeled the risk of success as 'perhaps the foremost' factor to be considered in determining whether to award an enhancement." (quoting *In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 226, 236 (2d Cir. 1987))); *In re Comverse Tech., Inc. Sec. Litig.*, 2010 WL 2653354, at *5 (E.D.N.Y. June 24, 2010) ("The risk of the litigation is often cited as one of the most important *Goldberger* factors.").  Class Counsel respectfully submits that the risks Class Counsel shouldered throughout the Litigation counsel strongly in favor of the requested fee.

***The Risks of Establishing Liability.***  As set forth in the Final Approval Memorandum and the accompanying Declaration of David Boies and Bradley Edwards, while Class Representative remains confident in her claims, her ability to ultimately prove her case at trial and obtain damages was uncertain.  *See* Boies & Edwards Decl. ¶¶ 48–51; Final Approval Mem. at 9–10.  Defendants raised numerous challenges to the sufficiency of Class Representative's factual allegations supporting her TVPA claims, the legal viability of negligence claims, and her prior settlement with Epstein.  *See also supra* at 23–24.  Defendants were likely to raise whether (1) Plaintiff could prove that Defendants knowingly participated in and benefited from Epstein's sex-trafficking venture and (2) whether Defendants breached a duty of care to Plaintiff by providing Epstein with banking services at summary judgment, trial, and on appeal.

Defendants may have also argued that Class Members' relationships with Epstein were consensual and not the stereotypical trafficking relationship that most jurors would expect.[5]  The

---

[5]    *See, e.g.*, Blanche Bong Cook, *Stop Traffic: Using Expert Witnesses to Disrupt*

jury would be tasked with determining whether the Class Members' relationships with Epstein were consensual, whether they were victims of force, fraud, or coercion, and whether they were trafficked under the statutory definition in the TVPA.  These complex issues create substantial risk in any trafficking case, no matter the strength of the evidence, and would require competing expert testimony about concepts like coercion, force, and trauma bonding.[6]  Research shows that jurors' own biases and assumptions about sexual assault and trafficking, their personal perceptions of a victim's character and lifestyle, and their beliefs about how much a victim must resist sexual abuse in order to be entitled to the protections of the justice system could heavily influence the outcome of the trial.[7]  Indeed, Epstein's own attorneys successfully advanced the narrative that those he

---

*Intersectional Vulnerability in Sex Trafficking Prosecutions*, 24 Berkeley J. Crim. L. 147, 166–67 (2019) ("As a general matter, jurors are more inclined to recognize criminality in cases involving child sex trafficking or cases involving aggressive or sensationalized displays of force.").

[6]      *See, e.g.*, Operational indicators of trafficking in human beings, Int'l L. Org. (2009), http://www.ilo.org/wcmsp5/groups/public/@ed_norm/@declaration/documents/publication/wcm s_105023.pdf ("There are questions concerning what is meant by terms such as 'coercion', 'deception', 'fraud', 'abuse of power or of a position of vulnerability', 'control over another person' and 'exploitation'. Without further clarification there is a risk that interpretations of these terms may continue to diverge widely from one country to another or even within countries, from one researcher or practitioner to another."); Chitra Raghavan & Kendra Doychak, *Trauma-coerced Bonding and Victims of Sex Trafficking: Where do we go from here?*, 17(2) International Journal Emergency Mental Health and Human Resilience (2015) (explaining that victims of abuse can form emotional attachments to their abusers as a result of control dynamics and power imbalances and explaining the resulting complexities, such as victims having romantic relationships with traffickers and recruiting other victims).

[7]      *See, e.g.*, Cook, *supra* note 5, at 168–69 ("Jurors, judges, and the public more readily recognize force and fraud where the victim is subjected to sensationalized forms of violence. Much less obvious and detectible as 'common sense' are the multitudinous forms of vulnerability, psychological manipulations, 'head games,' and grooming processes that sex traffickers use to control their victims. As in battered-women cases, for example, a jury may be reluctant to believe that a victim was unable to escape where she was physically mobile, in public without physical surveillance, or in contact with others."); Association of Trial Lawyers of America, *Representing the Victim of Sexual Assault and Abuse: Special Considerations and Issues*, Ann.2006 ATLA-CLE 1889 (2006) ("Suspicion, personal responsibility, and blaming the plaintiff are the most deadly of the biases, and the issues that arise in sexual assault and abuse cases seem to trigger these biases in a particularly potent way, especially when jurors identify with the plaintiff. Adult plaintiffs are

abused were "prostitutes," rather than victims, for years.[8]    Whether Class Representative ultimately would prove liability was far from assured.  And even if Class Representative's claims survived Defendants' motion for summary judgment and were successful at trial, these arguments undoubtedly would have been raised on appeal.

As importantly, the range of potential damages—assuming Class Representative succeeded in establishing liability at trial—was such that the Class faced substantial risk that a trial victory would have led to a recovery of a lesser amount than the Settlement.  As noted above, the Epstein Victims' Compensation Program on average awarded less than $1 million per applicant, meaning there was substantial risk that a jury would have awarded substantially less to survivors against a financial institution that allegedly benefited from the trafficking but was not the direct trafficker.  Moreover, any jury award would be reduced by the amount that the plaintiff had already received.

Further, class certification was not certain, and if it were granted, maintaining class certification through trial carries risk.  *Christine Asia Co., Ltd. v. Yun Ma*, 2019 WL 5257534, at

---

subject to intense bias for their perceived lack of personal responsibility—they should have said 'no' or should have taken more steps to protect their personal safety—as well as suspicion and 'blame the plaintiff' biases."); Kimberly D. Bailey, *Sex in A Masculinities World: Gender, Undesired Sex, and Rape*, 21 J. Gender Race & Just. 281, 291 (2018) ("Even with respect to those jurisdictions that no longer formally require force, courts and jurors still intuitively look for either physical resistance or some type of force on the part of the perpetrator as evidence of a lack of consent."); I. Bennett Capers, *Real Women, Real Rape*, 60 UCLA L. Rev. 826, 863–64 (2013) ("Summoning preexisting rape scripts, jurors are less likely to find that a rape occurred when the accuser's behavior does not comport with their understanding of what they believe rape victims do. For example, notwithstanding the relaxation and even elimination of the resistance requirement in many states, jurors continue to be skeptical in cases in which the accuser did not resist to their satisfaction. . . . Most importantly, preexisting scripts about what rape victims look like may conflict with rape shield messages and thus result in factfinders applying a different default assumption in cases involving victims who do not fit the script.").

[8]    *See* Jane Musgrave, *Prosecutor to Jeffrey Epstein victims: I'm sorry deal labeled you as prostitutes*, Palm Beach Post (Dec. 3, 2020), https://www.palmbeachpost.com/story/news/2020/12/03/prosecutor-jeffrey-epsteins-victims-im-sorry-deal-labeled-you-prostitutes/3812499001/.

*13 (S.D.N.Y. Oct. 16, 2019) (the risk of maintaining a class action through trial weighed in favor of final approval because "a class certification order may be altered or amended at any time before a decision on the merits").  With those risks in mind, securing a guaranteed payout for the Class weighs heavily in favor of awarding Class Counsel its fee request.

    ***The Contingent Nature of the Fee.***  The fee award must also account for the risk that Class Counsel could walk away from this case with nothing.  *See Flag Telecom*, 2010 WL 4537550, at *27 ("Courts in the Second Circuit have recognized that the risk associated with a case undertaken on a contingent fee basis is an important factor in determining an appropriate fee award."); *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 985 F. Supp. 410, 417 (S.D.N.Y. 1997) ("Numerous courts have recognized that the attorney's contingent fee risk is an important factor in determining the fee award.").  Class Counsel undertook this litigation on a wholly contingent basis, investing millions of dollars in time and resources to develop the facts and legal theories, complete fact discovery and undertake expert discovery, and oppose critical motions, all with no guarantee of compensation or even recovery of expenses.  Class Counsel has not yet been compensated for any time or expenses since they began to represent the Class and would have received no compensation or payment of its expenses had this case not been resolved successfully.  In undertaking that responsibility, Class Counsel was obligated to ensure that sufficient attorney and paraprofessional resources were dedicated to prosecuting the litigation and had to advance its own funds to pay nearly $1 million in out-of-pocket expenses.   BSF Decl. ¶¶ 7–8; EHL Decl. ¶¶  8–9.  Under such circumstances, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis.

    Class Counsel's assumption of the contingent-fee risk strongly supports the reasonableness of a fee request.   As the Second Circuit has recently explained, a "district court [may] reasonably

conclude[] that the significant litigation risk present in this case meant that class counsel had taken on a venture with a high risk of failure, and that the risk should be compensated." *Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*, 62 F.4th 704, 727 (2d Cir. 2023); *see Marsh*, 265 F.R.D. at 148 ("There was significant risk of non-payment in this case, and Plaintiffs' Counsel should be rewarded for having borne and successfully overcome that risk.").

### 5.   The Magnitude and Complexity of the Litigation

The complexity of the litigation is another factor examined by courts evaluating the reasonableness of attorneys' fees requested by class counsel. *See Christine Asia Co.*, 2019 WL 5257534, at *18–19. Class Representative's Amended Complaint included 12 statutory and tort claims against Defendants. Defendants moved to dismiss all 12 claims in a 35-page motion to dismiss and raised complex legal arguments requiring substantial research and collaboration in order to effectively and successfully respond. ECF No. 44. Factually, the case involved litigating Epstein's complex decades-long sex-trafficking operation; difficult issues around sexual abuse, coercion and control, and trauma bonding, requiring expert consultation and testimony; and issues relating to banking, anti-money laundering compliance, and Bank Secrecy Act compliance. All legal issues and factual allegations were hotly contested. Litigating such a case prior to and at trial on the many complex, contested issues inherent in this type of litigation requires substantial skill, resources, and experience, all while facing an uncertain outcome and with millions of dollars in damages at stake. Ultimately, because the Litigation revolved around "difficult, complex, hotly disputed, and expert-intensive issues," this factor favors awarding a 30% fee. *Aeropostale*, 2014 WL 1883494, at *16.

The Litigation involved significant briefing, motion practice, fact discovery, and expert discovery between Class Counsel and Defendants' Counsel, requiring sophisticated law firms with significant experience both litigating class action lawsuits and negotiating settlements to deploy

significant resources in order to litigate effectively on behalf of their clients.  Additionally, the Litigation required expertise not only in sex-trafficking and tort law, but also in banking and finance, expanding the areas covered beyond the already complex substance of the typical class action context.  Due to these overlapping areas of expertise required, discovery and motions practice were particularly complex and hard-fought—and would continue to be hard fought were litigation to continue.  Given the complexity and high stakes of the Litigation and the significant public interest it attracted, and the resources required to litigate the matter, Class Counsel's ability to secure a favorable outcome counsels in favor of Class Counsel's proposed fee award.

### 6.  Public Policy Considerations

Public policy considerations support awarding the requested fee.  "Counsel's fees should reflect the important public policy goal of providing lawyers with sufficient incentive to bring common fund cases, like this one, that serve the public interest.  A fee that is too low would create poor incentives to bring a class action case such as this." *Bekker v. Neuberger Berman Grp. 401(k) Plan Inv. Comm.*, 504 F. Supp. 3d 265, 270–71 (S.D.N.Y. 2020).  The representation of vulnerable sex-trafficking survivors is the type of case worthy of judicial encouragement, especially due to the difficulties associated with bringing such actions individually given the sensitive nature of the subject matter and their inherent risks.

Additionally, the litigation and successful settlement of this case will have broader public policy implications.  The case has the potential to reshape how financial institutions oversee the banking activity of clients with criminal histories and monitor transaction activity for indicia of sex trafficking and other criminal activity.

### C.  The Class's Reaction to the Fee Request to Date Supports the Requested Fee.

The Claim Administrator included in her Notice to potential Class Members that Class Counsel intended to apply to the Court for an award of attorneys' fees in an amount not to exceed

30% of the Settlement Amount, plus expenses not to exceed $1,500,000.  *See, e.g.*, ECF No 98-1 at 9.  The time to object to the fee request expires on September 29, 2023.  *See id.* ¶ 12.  To date, no objections to the fee and expense amounts set forth in the Notice have been filed, and no objections to any other aspect of the Settlement have been filed.  *Id.*  Such a "low level of objection is a 'rare phenomenon.'" *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 305 (3d Cir. 2005) quoting *In re Rite Aid Corp. Sec. Litig.*, 269 F. Supp. 2d 603, 610 (E.D. Pa. 2003)).  Further, no Class Member opted out of the Settlement by the July 28, 2023 deadline, ECF No 98-1 ¶ 11, and many Class Members have communicated their appreciation for the settlement to Class Counsel.  *See* Final Approval Mem. at 13–14.  The fact that zero objections have been filed to date and no Class Member has opted out supports the fairness of the fee request.

### D.  The Fee Request Is Reasonable Based on a Lodestar Cross-Check.

The Court has discretion to use the fee applicant's lodestar as a cross-check on reasonableness.  *Goldberger*, 209 F.3d at 50.  "It bears emphasis that the lodestar computation here is a cross-check, calculated with less precision than would be required if lodestar were the primary methodology." *In re AOL Time Warner*, *Inc. Sec. & ERISA Litig.*, 2006 WL 3057232, at *28 (S.D.N.Y. Oct. 25, 2006).  As *Goldberger* explained, when used as a "mere cross-check, the hours documented by counsel need not be exhaustively scrutinized by the district court." *Goldberger*, 209 F.3d at 50.  Class Counsel's fee request is appropriate under the lodestar metric.

The lodestar analysis has two parts.  First is determining the lodestar, which is calculated by "multipl[ying] the number of hours each attorney spent on the case by each attorney's reasonable hourly rate." *Aeropostale*, 2014 WL 1883494, at *13.  Here, Class Counsel's combined

lodestar, plus Professor Cassell's lodestar, totals $10,123,682.[9]  BSF Decl. ¶¶ 5–6; EHL Decl. ¶¶ 5–7.  "[S]econd, the court adjusts that lodestar figure (by applying a multiplier) to reflect such factors as the risk and contingent nature of the litigation, the result obtained, and the quality of the attorney's work."  *Aeropostale*, 2014 WL 1883494, at *13.  Based upon the fee request of 30% of the Settlement Amount, BSF, EHL, and Professor Cassell's combined lodestar multiplier is approximately 2.2.

In this contingency fee case, Class Counsel bore substantial risk that it would be paid nothing for its work on behalf of the Class.  Fees in excess of the lodestar are routinely awarded to account for this contingency-fee risk and other factors.  *See, e.g.*, *Flag Telecom*, 2010 WL 4537550, at *26 ("[A] positive multiplier is typically applied to the lodestar in recognition of the risk of the litigation, the complexity of the issues, the contingent nature of the engagement, the skill of the attorneys, and other factors." (quoting *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 2009 WL 5178546, at *20 (S.D.N.Y. Dec. 23, 2009))).  Put simply, and as the Second Circuit has recently explained, "an unenhanced lodestar fee does not account for the contingent risk that a lawyer may assume in taking on a case."  *Fresno Cnty. Employees' Retirement Ass'n*, 925 F.3d at 68.

---

[9]      In calculating their lodestars, BSF and EHL used current, rather than historical, billing rates.  The Supreme Court and courts in this Circuit have approved that approach, which compensates counsel for rising inflation (which is more salient now than at any time in the past 20 years) and the time-value of money.  *See, e.g.*, *Missouri v. Jenkins*, 491 U.S. 274, 283-84 (1989); *New York State Ass'n for Retarded Child., Inc. v. Carey*, 711 F.2d 1136, 1153 (2d Cir. 1983) (explaining that if, as here, "the [legal] services were rendered over two or three years, relevant figures for the current year will normally still be appropriate"); *In re KeySpan Corp. Sec. Litig.*, 2005 WL 3093399, at *15 n.8 (E.D.N.Y. Sept. 30, 2005) ("Given that services for this litigation were rendered over three years, this Court finds that use of current rates may be appropriate for purposes of the [lodestar] cross-check."); *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465, 489 n.25 (S.D.N.Y. 1998).

"Courts routinely award lodestar multipliers between two and six." *Sewell v. Bovis Lend Lease, Inc.*, 2012 WL 1320124, at *13 (S.D.N.Y. Apr. 16, 2012); *see also In re GSE Bonds Antitrust Litig.*, 2020 WL 3250593, at *5 (S.D.N.Y. June 16, 2020) (Rakoff, J.) ("[A] 4.09 multiplier is within the range of what has considered reasonable by courts."); *Wal-Mart*, 396 F.3d at 123 (3.5 multiplier); *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 354 (S.D.N.Y. 2005) (4.0 multiplier); *In re EVCI Career Colleges Holding Corp.*, 2007 WL 2230177, at *17 ("Lodestar multipliers of nearly 5 have been deemed 'common' by courts in this District."); *Maley v. Del Glob. Techs. Corp.*, 186 F. Supp. 2d 358, 369 (S.D.N.Y. 2002) (4.65 multiplier); *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. at 489 (lodestar multipliers between 3 and 4.5 are common); *Bekker v. Neuberger Berman Grp. 401(k) Plan Inv. Comm.*, 504 F. Supp. 3d 265, 271 (S.D.N.Y. 2020) (5.85 multiplier); *In re Colgate-Palmolive Co. ERISA Litig.*, 36 F. Supp. 3d 344, 353 (S.D.N.Y. 2014) (5.0 multiplier); Alba Conte and Herbert B. Newberg, *Newberg on Class Actions* § 14:6 (lodestar multipliers up to 4 "frequently are awarded in common fund cases when the lodestar method is applied"). Accordingly, a lodestar multiplier of 2.2 is below the range of reasonable multipliers in successful class actions.

As noted, the lodestar multiplier analysis is used as a cross-check on reasonableness. Here, while shouldering the ever-present risk of recovering nothing, Class Counsel litigated this case on a contingency basis, investing over 11,000 hours for the benefit of the Class. The requested fee is reasonable, both calculated as a percentage of the fund and cross-checked by using the lodestar method.

IV.   **COUNSEL'S EXPENSES ARE REASONABLE AND WERE NECESSARY TO THE PROSECUTION OF THIS LITIGATION.**

Class Counsel also requests an award of $1,123,965.69 in expenses incurred in prosecuting the Litigation.  *See* BSF Decl. ¶ 7; EHL Decl. ¶ 8.[10]  Counsel is entitled to the reimbursement of expenses reasonably incurred on behalf of the Class in litigating the case.  *See, e.g.*, *Flag Telecom*, 2010 WL 4537550, at *30 ("It is well accepted that counsel who create a common fund are entitled to the reimbursement of expenses that they advanced to a class.").

Class Counsel's expenses include filing fees, the costs of hiring experts and consultants, travel, document management, mediating the Class's claims, computer research, and claims administration costs incurred post-Settlement.  A breakdown by category of the expenses incurred is set forth in the accompanying BSF and EHL declarations.  *See* BSF Decl. ¶ 8; EHL Decl. ¶ 9.  These expenses were critical to counsel's success, and other courts have found that similar expenses were compensable.  *See In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 468 (S.D.N.Y. 2004) ("The expenses incurred – which include investigative and expert witnesses, filing fees, service of process, travel, legal research and document production and review – are the type for which 'the paying, arms' length market' reimburses attorneys.  For this reason, they are properly chargeable to the [s]ettlement fund.").  No objections to the expense amount set forth in the Notice have been filed.  ECF No. 98-1 ¶ 12.  Accordingly, Class Counsel respectfully requests payment for these expenses, plus interest earned on such amount at the same rate as that earned by the Settlement Fund.

V.   **CONCLUSION**

Class Counsel's efforts have achieved an outstanding result for the Class.  Based on the

---

[10]   As set forth in the EHL Declaration, $164,250 will be used to reimburse Class Counsel for Claims Administration expenses because the QSF will not be funded until after the Court grants final approval of the settlement.  EHL Decl. ¶ 10; ECF No. 90-1 § 1.25.

foregoing, and the entire record herein, Class Counsel respectfully requests that the Court award attorney's fees of 30% of the Settlement Amount, plus expenses in the amount of $1,123,965.69.

Dated:  September 15, 2023

Respectfully submitted,

 /s/ David Boies
David Boies
Andrew Villacastin
Sabina Mariella
Alexander Law
Boies Schiller Flexner LLP
55 Hudson Yards
New York, New York
Telephone: (212) 446-2300
Fax: (212) 446-2350
Email: dboies@bsfllp.com
Email: avillacastin@bsfllp.com
Email: smariella@bsfllp.com
Email: alaw@bsfllp.com

Sigrid McCawley (*pro hac vice*)
Daniel Crispino (*pro hac vice*)
Boies Schiller Flexner LLP
401 E. Las Olas Blvd. Suite 1200
Fort Lauderdale, FL 33316
Telephone: (954) 356-0011
Fax: (954) 356-0022
Email: smccawley@bsfllp.com
Email: dcrispino@bsfllp.com

Bradley J. Edwards
Edwards Henderson Lehrman PLLC
425 N. Andrews Ave., Suite 2
Fort Lauderdale, FL 33301
Telephone: (954) 524-2820
Fax: (954) 524-2822
Email: brad@cvlf.com

Brittany N. Henderson
Edwards Henderson Lehrman PLLC
1501 Broadway
Floor 12
New York, NY

Telephone: (954)-524-2820
Fax: (954) 524-2820
Email: Brittany@cvlf.com

Paul G. Cassell (*pro hac vice*)
S.J. Quinney College of Law at the
University of Utah
383 S. University St.
Salt Lake City, UT 84112
Telephone: 801-585-5202
Fax: 801-585-6833
Email: cassellp@law.utah.edu

(institutional address for identification
purposes, not to imply institutional
endorsement)

*Counsel for Jane Doe 1*